**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| **AMBER GASCHO, et al.,** | ) | |
| | ) | |
| **Plaintiffs** | ) | |
| | ) | |
| **v.** | ) | **CASE NO. 2:11-CV-436** |
| | ) | **JUDGE SMITH** |
| **GLOBAL FITNESS HOLDINGS, LLC,** | ) | **Magistrate Judge King** |
| | ) | |
| **Defendant.** | ) | |

**OBJECTION TO PROPOSED
CLASS ACTION SETTLEMENT**

Robert J. Zik and April N. Zik (collectively the "Ziks") and James Michael Hearon ("Hearon"), on behalf of themselves and a class of similarly situated persons (collectively the "Zik Class" or "Objectors"), by counsel, submit these objections to approval of the proposed class action settlement in this case between Plaintiffs and Global Fitness Holdings, LLC d/b/a Urban Active ("Urban Active").

## TABLE OF CONTENTS AND AUTHORITIES

I.     Summary .................................................................................................... **2**

II.    Background ................................................................................................ **4**

     *Pilgrim v. Universal Health Card, LLC*
     660 F.3d 943 (6th Cir. 2011) ................................................................ 7

III.   Legal Standard, Plaintiffs' Burden, and This Court's Duties ............................ **9**

     Fed. R. Civ. P. 23 ................................................................................ 9,10

     *Amchem Products, Inc. v. Windsor,*
     521 U.S. 591, 117 S.Ct. 2231 (1997) ....................................................... 10

     *Reynolds v. Beneficial Nat.'l Bank,*
     288 F.3d 277 (7th Cir. 2002) ................................................................ 10

     *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod.'s Liab. Lit.,*
     55 F.3d 768 (3d Cir. 1995). ................................................................ 10,11

     2 NEWBERG & CONTE § 11.28, at 11-59 ............................................... 11

     *UAW v. Gen. Motors Corp.,*
     497 F.3d 615, 631 (6th Cir. 2007) ......................................................... 11

IV.    Argument .................................................................................................. **11**

     A.    The Class and release are too broad and create unavoidable conflicts
         of interest among class members.  Likewise, Plaintiffs and their counsel
         have failed to adequately protect the interests of the disparate interests
         of the Class. .............................................................................. 11

         1.    Plaintiffs' claims are too disparate, even among themselves, to be
             settled on equal terms ......................................................... 11

             *Amchem Products, Inc. v. Windsor,*
             521 U.S. 591, 117 S.Ct. 2231 (1997) ............................ 11,12,13,16

             *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,*
             396 F.3d 96, 107 (2nd Cir. 2005) ...................................... 12

             *Reynolds v. Beneficial Nat.'l Bank,*
             288 F.3d 277 (7th Cir. 2002). ........................................... 13

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod.'s Liab. Lit.,*
55 F.3d 768, 787, 788 (3d Cir. 1995) ............................................................ 13

2. Significant differences in state law compound the problem ..................... 19

*Amchem Products, Inc. v. Windsor,*
521 U.S. 591, 117 S.Ct. 2231 (1997) ............................................................ 19

KRS § 367.192 ............................................................................................. 19

KRS § 367.930 ............................................................................................. 19

T.C.A. § 47-18-305 ...................................................................................... 19

*Pilgrim v. Universal Health Card, LLC,*
660 F.3d 943 (6th Cir. 2011) ...................................................................... 20

KRS § 367.170 ............................................................................................. 22

3. Plaintiffs failed to pursue, much less adequately protect, the *Zik*
Classes claims ............................................................................................ 22

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod.'s Liab. Lit.,*
55 F.3d 768 (3d Cir. 1995) .......................................................................... 22

B. The Settlement is otherwise unfair to the Class ............................................ 25

Fed. R. Civ. P. 23(e)(2) ............................................................................... 25

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod.'s Liab. Lit.,*
55 F.3d 768, 785 (3d Cir. 1995) .................................................................. 25

1. The Settlement is procedurally unfair ........................................................ 25

2 NEWBERG & CONTE § 11.28, at 11659 ................................................. 25

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod.'s Liab. Lit.,*
55 F.3d 768 (3d Cir. 1995) .......................................................................... 25,28

2. The Settlement is substantively unfair ........................................................ 29

*UAW v. Gen. Motors Corp.,*
497 F.3d 615, 631 (6th Cir. 2007) .............................................................. 29

a. Risk of collusion .................................................................................. 29

b. The complexity, expense, duration, and likelihood of success on the merits of the litigation ........................................................ 30

c. The opinions of Class counsel and Class representatives ................... 30

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod.'s Liab. Lit.,* 55 F.3d 768, 804 (3d Cir. 1995) ........................................... 31

d. The claims process will drastically and unnecessarily dilute the payout ........................................................................ 31

*Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide,* Exhibit 7, p. 6 ............................................. 33

e. The Notice is insufficient ........................................................ 33

*Manual for Complex Litigation, Fourth,* §21.312 (Federal Judicial Center 2007) ........................................... 34

f. The reaction of absent Class members and the public interest ........... 34

C. Plaintiffs' Motion for Attorneys Fees and the Zik Class's Motion for Fees ....... 34

*Reynolds v. Beneficial Nat. 'l Bank,* 288 F.3d 277 (7th Cir. 2002) ........................................... 35

D. Plaintiffs and Urban Active are forum shopping ............................... 36

28 U.S.C. § 1332(d)(3) ........................................................ 36

**V.    Conclusion** ............................................................. **38**

## I.    Summary

Undeterred from having its egregious and overly broad proposed settlement and release rejected by the Boone County Circuit Court in Kentucky after notice to 242,243 of its Kentucky members and a fairness hearing, Urban Active sought to do the same thing with Plaintiffs here.  It seeks an overly broad and global release from all 606,246 members who signed gym or personal training contracts with it over an approximate seven (7) year period in exchange for agreeing to pay members with widely divergent claims and damages the same bargain basement prices, provided claimants overcome the unnecessary hurdles in the claims process.  But fortunately for the class, the proposed settlement has many fundamental and fatal flaws.

Plaintiffs have failed to demonstrate that the sprawling settlement will be fair to the class, that their claims are common and typical of the class, and that common issues predominate over individual inquiries.  Likewise, Plaintiffs have not proven that they adequately represented the interests of the class, including the Zik Class, which is composed of over 200,000 members and which was on the eve of being certified as a class when Plaintiffs collusively sold Urban Active the overbroad release that it had been seeking for almost two years.

Plaintiffs' proposed settlement and positions here run directly contrary to the law and their positions and representations to the Boone County Circuit Court when objecting to the *Seeger* settlement:

(1) As Plaintiffs vigorously argued in *Seeger*, a class representative cannot release claims that do not share the *identical* factual predicates as his/her own claims.  Plaintiffs reverse course and now seek to release all claims "related" to their allegations, yet "specifically includ[ing]" all claims resulting from Urban Active's "sales, communications, contracting, billing, and/or

cancellations of any gym or personal training contracts." (Settlement Agreement, ¶ 2.23). Plaintiffs attempt to globally settle not only "non-identical" claims, but widely divergent claims (both factually and legally), for identical undervalued payouts.

(2) Plaintiffs argued that their claims (and class members' claims) were worth hundreds (if not thousands) of dollars each in *Seeger* and that they were very likely to obtain certification and summary judgment on the merits. But Plaintiffs attempt to settle such claims here for as low as a small percentage of $5.00 (depending on the claims' approval rate).

(3) Plaintiffs argued that their Kentucky Health Spa Act claims (available only to Kentucky class members) were their most valuable claims and that Kentucky claims and Ohio claims must remain separate for both certification and settlement. But Plaintiffs failed to obtain any separate or additional consideration for such claims here.

(4) Plaintiffs continually acknowledged and cannot deny that the Zik Class's narrow claims – based on conduct and damages *after* cancellations were processed and accepted by Urban Active – are very different from the claims pursued by Plaintiffs, which are based on conduct *prior* to Urban active approving cancellations. Yet Plaintiffs failed to even notify the Zik Class's counsel of settlement discussions apparently occurring over a five month period, much less include counsel in such discussions so that the Zik Class could be adequately represented.

(5) Plaintiffs continually acknowledged and cannot deny that the Zik Class's claims and counsel's work have been very valuable, but Plaintiffs failed to obtain any separate or additional consideration for the Zik Class or their counsel.

(6) After the proposed settlement was reached, Plaintiffs continue to take positions with this Court and Objectors' counsel that are directly contrary to their positions in *Seeger* in order to further frustrate the Zik Class's claims and further their own cause (not the cause of the class).

Finally, the claims approval process is very similar to the process in *Seeger* and will unnecessarily dilute approved claims to as low as 0.6% - 12% of the already undervalued compromised settlement. Urban Active possesses the information necessary to pay close to 100% of the claims directly without dramatically diluting the payout via a multistep claims process. Plaintiffs supported the objections to the *Seeger* settlement (and Judge Frolich's decision to reject the settlement) on this basis, yet ironically now seek to solely reap the benefits of that decision by promulgating a claims process very similar to the *Seeger* process.

The proposition that only 0.6% - 12% of the class receive a small fraction of their loss (including irrefutable loss in many cases, including the Zik Class's loss) is a travesty, and Urban Active should be required to send refund checks representing a fair value to 100% of the class.

Plaintiffs' flip flop can be explained by their securing $2.39M in attorneys fees and up to $5,000 each as incentive awards. Just like the previously rejected *Seeger* settlement, this settlement only benefits a few – Urban Active, Plaintiffs' counsel, and Plaintiffs – to the detriment of hundreds of thousands of Urban Active members and the Zik Class.

## II.     Background

This is one of four putative class actions currently pending against Urban Active at the trial court level. The other three are:

- *Zik, et al. v. Global Fitness Holdings, LLC*, Case No. 11-CI-790 (Jefferson County, Kentucky Circuit Court, Div. 9 [Judge Judith McDonald-Burkman]);

- *Tartaglia, et al. v. Global Fitness Holdings, LLC*, Case No. 11-CI-1121 (Boone County, Kentucky Circuit Court, Div. I [Judge Anthony Frolich]); and

- *Seeger v. Global Fitness Holding, LLC*, Case No. 09-CI-3094 (Boone County, Kentucky Circuit Court, Div. I [Judge Anthony Frolich])("*Seeger*").

4

This case is the only one of the four cases not currently pending in Kentucky state courts. Urban Active originated, is domiciled, has always had its corporate headquarters, and has always promulgated its corporate policies, in Kentucky. More than one-third of its members were residents of Kentucky.

Objectors brought their suit on February 2, 2011 in Jefferson Circuit Court in Louisville, Kentucky, which was prior to Plaintiffs bringing any of their claims in this Court or Boone Circuit Court, Kentucky. (See Docket Sheet, attached as **Exhibit 1**; Zik Second Amended Complaint, attached as **Exhibit 2**). Objectors sought certification of a simply-defined, contractually-based class of the hundreds of thousands of members who cancelled their month-to-month memberships with Urban Active from February 2, 1996 through the present, and after such cancellation, were charged: (a) membership dues for the month that started subsequent to 30 days after they provided notice of cancellation of their membership to Urban Active; and/or (b) a $10.00 (or greater) administrative cancellation fee (the "Zik Class") (hereafter "the Zik class"). (Id.; Declaration of Joshua T. Rose, attached as **Exhibit 3**, ¶ 3.)

Objectors were farther along in the class certification process than plaintiffs in any other case, and in fact were advised of the proposed settlement in this case on the eve of their own class certification hearing. (Id., ¶ 4). The core of the Zik Class' case is that their contracts with Urban Active did not permit it to charge members an additional month's dues upon cancellation (i.e. for the month beginning after 30 days of notice of cancellation) and/or a $10.00 administrative cancellation fee. (Id.). As fully discussed below, Objectors' claims are very likely to be certified and succeed on the merits, because the Zik Class' contracts do not allow the challenged charges, and because class membership (and the liquidated sums owed to each member) can be determined from Urban Active's records. (Id.).

The other two lawsuits, including a suit filed by counsel for Plaintiffs in this case, are pending before the Honorable Judge Anthony Frolich, in Boone County Circuit Court in northern Kentucky.  In the summer of 2012, Urban Active and plaintiffs in *Seeger* persuaded the Boone Circuit Court to preliminarily approve a settlement without Objectors' knowledge or participation. (Id.).  Plaintiffs joined the Zik Class in vigorously opposing that settlement for approximately six (6) months.  (Id.).  After notice to the class of 242,243 Kentucky members was sent, claims were processed, discovery regarding the fairness was conducted, and a fairness hearing was held, Judge Frolich unceremoniously rejected the settlement for numerous reasons that are also applicable here, including:

(1) the proposed settlement and release being overly broad, as including claims that did not share the identical factual predicates as plaintiffs' claims; and

(2) the class participation in the settlement being "dismal" due to a claims process that was "too cumbersome" and resulting in a very low claims approval rate.

(Seeger Order Rejecting Settlement, attached as **Exhibit 4**).

Judge Frolich concluded that:

[T]he beneficiaries of this settlement agreement is the defendant who receives a global release and Class Counsel who seeks a fee in the range of $250,00 to $300,000, as well as the representatives of the Class who are to receive $1,000 a piece…  These benefits are disproportionate to the benefits to be received by the class.  The settlement is unfair in that too large a group of people are bound to an agreement for which little benefit is given.

(Id.**;** See also the Settlement Administrator's Report, filed under seal as Exhibit E-3 to the Zik Class's Motion to Intervene).

Zik Class's case (and Plaintiffs' Kentucky cases) were stayed pending approval of the *Seeger* settlement for approximately seven (7) months – from July 2012 through January 2013. (Rose Declaration, ¶ 6).  During that time, Plaintiffs' counsel and Zik Class' counsel worked closely together and vigorously to defeat the unfair *Seeger* settlement, including jointly drafting

briefs, engaging in many strategy conferences, and participating in numerous hearings before the

Judge. (Id.). Plaintiffs' lead counsel continually recognized the vast differences between the Zik

Class's claims and Plaintiffs' claims and that Plaintiffs were not pursuing the Zik Class's claims.

(Id.). He also continually represented the significant differences between Plaintiffs' Kentucky and

Ohio consumer protection claims, and that the Kentucky Health Spa Act claims were the most

valuable claims. (Id.). Plaintiffs' lead counsel wrote:

> [W]e believe that the Ohio and Kentucky claims must remain separate for both class
> certification and settlement purposes.
>
> [*citing*] *Pilgrim v. Universal Health Card, LLC,* 660 F.3d 943 (6th Cir. 2011)[differences
> in state consumer protection laws precluded certification]
>
> []
>
> Given the requirements of the Kentucky Health Spa Act and the penalties that result from
> a violation, we stand a much better chance of recovering significant dollars and reaching
> LA Fitness in Kentucky.

(Mr. McCormick's Feb. 27 Email, attached as Exhibit 3-A).

> Last, I want to emphasize that I strongly believe the class will benefit from both of our
> firms working together and avoiding what happened in the Seeger case. As we discussed
> in Cincinnati, the amount of money that can be recovered from Global Fitness is enough
> to fully compensate the class and both firms for the work put in. We look forward to talking
> with you soon. Thanks

(Id.; Jan. 23 Email in Email String from Dec. 31, 2012 – March 4, 2013, attached as Exhibit **3-B**).

Likewise, Kentucky Plaintiffs vigorously objected to the *Seeger* settlement and devoted

much of their objection to *Seeger* counsel's failure to assert and recognize the purported great

value of their KHSA claims. (Objections of Kentucky Plaintiffs, filed under seal as Exhibit E to

Zik Class' Motion to Intervene on September 25, 2013). Plaintiffs expressed:

> [T]he cash value [being reimbursement of one month's dues per member under the Seeger
> settlement] **pales in comparison** to the statutory right of all members to void the contract
> *ab initio* and receive disgorgement as discussed in Objections 5, 6, and 7 below.

7

(Id., p. 8)(emphasis added).

> Pursuant to the Kentucky Health Spa Act, damages would likely include all Global Fitness contracts [for Kentucky members] being declared null and void. This realization likely motivated Defendants to quickly seek a settlement with the Seeger Plaintiffs [] in hopes that Global Fitness could avoid the far greater damages that would be awarded to the Tartaglia Plaintiffs and the classes they represent.

(Tartaglia's Motion to Intervene and Motion for Discovery into Fairness of Proposed [*Seeger*] Settlement, pp. 6, 7, attached as **Exhibit 5**).

Plaintiffs likewise led with and devoted much of their objections in *Seeger* to that arguing class representatives can only release claims and conduct "aris[ing] out of the **identical factual predicate** as the settled conduct," and that *Seeger's* release of claims that were not identical to the *Seeger* plaintiffs' claims was fatal to the settlement. (Objections of Tartaglia to Seeger Settlement, pp. 1-7).

The issue of certification in the Zik Class's case was fully and extensively briefed, and a hearing was scheduled on the motion for Monday, September 16, 2013, at 8:45 a.m. (Rose Declaration, ¶ 9). But on Friday, September 13, Zik Class's counsel were informed for the first time that Plaintiffs and Urban Active had reached a settlement agreement with Urban Active that also consolidated the *Tartaglia* action pending before Judge Frolich in this Court. (Id.). The Zik Class was advised that this settlement was negotiated over many months during which time the Zik Class's counsel were never informed or consulted in any fashion. (Id.).

Despite Plaintiffs contrary prior positions and representations, they now seek to settle all claims of all 606,246 members of Urban Active who signed gym and/or personal training contracts between January 1, 2006 through October 26, 2012 (the date Urban Active transferred ownership of the fitness centers and member contracts to non-party LA Fitness). (Settlement Agreement, ¶¶ 2.10, 6.11, 2.23, 2.24).

The release includes all claims that are "**related** to the factual allegations" alleged in the Third Party Complaint" yet "specifically include[ing] any and all claims" resulting from Defendant's sales, communications, contracting, billing, and/or cancellations of any gym or personal training contracts." (Id, ¶ 2.23)(emphasis added).  The release also specifically includes LA Fitness as a released party, because many (if not most) of its members of gyms purchased from Urban Active signed Urban Active membership contracts that were assigned to LA Fitness with the purchase.  (Id., ¶ 2.24).

### III.    Legal Standard, Plaintiffs' Burden, and This Court's Duties

Given that settlement occurred prior to class certification, Plaintiffs have a heightened burden of proving that: (1) the proposed class (and subclasses) should be certified under Fed. R. Civ. P. 23; and (2) the settlement is fair, reasonable, and adequate.  *See* Fed. R. Civ. P. 23(e); *See Amchem Products, Inc. v. Windsor,* 521 U.S. 591, 620 (1997).  Fed. R. Civ. P. 23(e) expressly provides that only claims of a "certified class" may be settled.

First, the Court must determine that the proposed class (and subclasses) should be certified under Fed. R. Civ. P. 23, including Plaintiffs proving that: (1) Plaintiffs' claims are common and typical of each other's claims and those of the class; (2) the representatives and class counsel have fairly and adequately protected the interests of the class and all subclasses and distinct groups within the class; (3) common questions of law and fact predominate over individual inquiries; and (4) class resolution is superior to other methods of adjudication.  *Id.*

The United States Supreme Court makes clear the vital importance that Courts more closely scrutinize the requirements of Rule 23 (such as commonality, typicality, and adequacy of

representation) in the settlement context than in the adversarial certification context.  *Amchem*

*Products, Inc.,* 521 U.S. at 620.  Our highest Court explained:

> [T]hose [specifications of the Rule] designed to protect absentees by blocking unwarranted
> or overbroad class definitions [] demand undiluted, even heightened, attention in the
> settlement context. Such attention is of vital importance, for a court asked to certify a
> settlement class will lack the opportunity, present when a case is litigated, to adjust the
> class, informed by the proceedings as they unfold.

*Id.*

Likewise, given the potential that representatives or class counsel may favor themselves

over the class, the law "requires district judges to exercise the highest degree of vigilance in

scrutinizing proposed settlements of class actions." *Reynolds v. Beneficial Nat.'l Bank,* 288 F.3d

277, 279 (7th Cir. 2002).  "Pre-certification negotiations also hamper a court's ability to review the

true value of the settlement or the legal services after the fact   [and] **unauthorized negotiations**

also result in denying other plaintiffs' counsel information that is necessary for them to make an

effective evaluation of the fairness of any settlement that results." *In re Gen. Motors Corp. Pick-*

*Up Truck Fuel Tank Prod.'s Liab. Lit.,* 55 F.3d 768, 788 (3d Cir. 1995)(emphasis added).

Next, the Court must review the terms of a proposed settlement to ensure that it is "fair,

reasonable, and adequate." Fed. R. Civ. P. 23(e)(2).  "Under Rule 23(e) the district court acts as a

fiduciary who must serve as a guardian of the rights of absent class members.... [T]he court cannot

accept a settlement that the proponents have not shown to be fair, reasonable and adequate." *In re*

*Gen. Motors Corp.,* 55 F.3d at 785.

The fairness analysis is usually divided into two steps.  First, the Court must analyze the

process by which the settlement was reached in order to determine whether the nature of the

settlement proceedings give rise to concerns about the settlement's *procedural* fairness. *Id.* at 796.

A presumption of fairness may arise where a class settlement [is] reached in arms-length

negotiations between experienced, capable counsel after meaningful discovery. *Id.*

"But these inferences depend on the implicit assumption that the lawyers actually

negotiating really were doing so on behalf of the *entire* class, *see* 2 NEWBERG & CONTE §

11.28, at 11-59, assumptions which are clearly unjustified in a context where the potential for

intra-class conflict further imperils the class's representation. Far too much turns on the adequacy

of representation to accept it on blind faith." *Id.* at 797. Likewise, where the court has not yet

certified a class or named its representative or counsel when the settlement is negotiated, the

assumption of fairness in negotiating should be questioned. *Id.* at 787, 788.

Finally, the Court must consider the *substantive* fairness of the settlement, including the

following factors:

> (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of
> the litigation; (3) the amount of discovery engaged in by the parties; (4) the
> likelihood of success on the merits; (5) the opinions of class counsel and class
> representatives; (6) the reaction of absent class members; and (7) the public interest.

*UAW v. Gen. Motors Corp.,* 497 F.3d 615, 631 (6th Cir. 2007).


**IV.      Argument**

**A.      The Class and release are too broad and create unavoidable conflicts of
interest among class members.  Likewise, Plaintiffs and their counsel have
failed to adequately protect the interests of the disparate interests of the Class.**

**1.   Plaintiffs' claims are too disparate, even among themselves, to be settled
on equal terms**

In order to adequately protect the interests of the class, "a class representative must be part

of the class and possess the same interest and suffer the same injury as the class members."

*Amchem Products, Inc.,* 521 U.S. at 624.  Common and typical questions of fact and law must

predominate over individual inquiries in order to ensure that absent class members' interests are protected.  *Id.* at 623-624.

Likewise, as Plaintiffs cannot deny, class representatives can only release claims and conduct "aris[ing] out of the **identical factual predicate** as the settled conduct." (See Objections of Tartaglia to Seeger Settlement, pp. 1-7, Exhibit E to Motion to Intervene); *citing Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,* 396 F.3d 96, 107 (2nd Cir. 2005)(emphasis in original)(additional citations omitted).  Plaintiffs' first line of defense in *Seeger* was that the settlement must be rejected because the release covered claims "not identical" to those brought in *Seeger. Id.* at 2-7.

In *Amchem*, *supra*, the Supreme Court emphasized the variances in damages, causation, and claims among persons exposed to asbestos when affirming the Third Circuit's reversal of the District Court's approval of class settlement.  *Id.* at 624.  The Court also noted that "differences in state law [] compound the disparities." *Id.*

Our Supreme Court explained that settling class representatives cannot adequately represent class members who have different damages and/or claims by globally representing the entire class:

> The settling parties, in sum, achieved a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected. Although the named parties alleged a range of complaints, each served generally as representative for the whole, not for a separate constituency.
>
> []
>
> "[W]here differences among members of a class are such that subclasses must be established, we know of no authority that permits a court to approve a settlement without creating subclasses on the basis of consents by members of a unitary class, some of whom happen to be members of the distinct subgroups. The class representatives may well have thought that the Settlement serves the aggregate interests of the entire class. But the adversity among subgroups requires that the members of each subgroup cannot be bound to a settlement except by consents given by those who understand that their role is to represent solely the members of their respective subgroups."

*Id.* at 627, 609 (groups of class members being exposed to different products, in different ways, over different time periods, and resulting in different injuries and damages required rejection of settlement).

The Court in *Reynolds, supra,* highlighted the conflict of interest between class members who only took out one or two defective loans and those who took out two or more loans when the compromised relief did not increase for members who took out two or more loans. 288 F.3d at 282. Also, in *Reynolds*, two other potential subclasses of plaintiffs were "swept up" in the settlement without Plaintiffs adequately pursuing or achieving additional recovery for those claims, which further required rejection of the overbroad settlement. *Id.* at 285, 286.

Likewise, the Court in *In re Gen. Motors Corp., supra,* held that the disparate value of the recoveries to members of the same class precluded adequacy of representation, and "[a]t the very least, the class should have been divided into sub-classes" to reflect the distinct values to the differing member groups. 55 F.3d at 801.

Here, Plaintiffs and Urban Active attempt to do what was forbidden by *Amchem* and what Plaintiffs found so egregious in *Seeger* – sweepingly settle a wide range of disparate claims of all 606,246 former Urban Active members (including current LA Fitness members) via class representatives who jointly seek to represent the entire class.

Plaintiffs improperly attempt to release all claims that are "related to the factual allegations" alleged in the Third Party Complaint", yet "specifically includ[ing] any and all claims" resulting from Defendant's sales, communications, contracting, billing, and/or cancellations of any gym or personal training contracts." (Settlement Agreement, p. 6, Sec. 2.23)(emphasis added). Plaintiffs cannot deny that they can only release claims based on "identical" – not "related" – factual predicates, especially when the release "specifically includes

13

any and all claimsí resulting from Defendantøs sales, communications, contracting, billing, and/or cancellations of any gym or personal training contracts.ö (Id.).

The overbroad release language is fatal in and of itself, but there are many other serious defects with the release and inadequate global representation. Although cumbersome, close scrutiny of Plaintiffsø claims is not only warranted, but necessary for approval of the settlement. Below is a summary of the factual predicates for Plaintiffsø claims.

(1) <u>Amber Gascho</u> alleges Urban Active misrepresented to her that she could cancel her long term personal training contract at any time with a $10.00 cancellation fee, despite her written contract containing a $250.00 cancellation fee, which she discovered when she tried to cancel a few weeks after she signed the contract. (Plaintiffsø Third Amended Complaint, õTACö, ¶¶ 24-32). Ms. Gaschoøs claims are unclear, including Plaintiffs failing to present the number of months and amounts wrongfully charged. (Id.).

(2) <u>Ashley Buckenmeyer</u> alleges that Urban Active failed to properly advise her of her right to cancel her personal training contract and that she verbally cancelled the contract within four hours of signing it. (Id., ¶¶ 33-43). Although not specified in her TAC, her prior complaint alleges she was wrongfully charged dues for approximately five (5) months after cancellation, yet her monthly rate was not disclosed. (Plaintiffsø Second Amended Complaint, ¶¶ 36, 43).

(3) <u>Michael Hogan</u> alleges he was charged membership dues through February 2011, despite cancelling in October 2010, and overcharged in excess of $100.00 due to Urban Active allegedly not receiving his written notice of cancellation sent to the corporate office. (TAC, ¶¶ 47-49). Urban Activeøs membership contracts typically provide a 30 day notice of cancellation.

(4) <u>Edward Lundberg</u> alleges he continues to be double billed $42.69 per month for many months (if not years) as a result of transferring his membership between gym locations. (Id., ¶¶ 50-57).

(5) <u>Terry Troutman</u> claims that Urban Active improperly charged him $60.00 (three charges of $20) for no apparent or authorized reason, and that *only after he filed his lawsuit*, Urban Active attempted to remedy the improper deductions via credit for future services instead of direct monetary refund. (TAC, ¶¶ 58-65)(emphasis added).

(6) <u>Anthony Meyer</u> alleges he was improperly charged dues of $32.16 per month for four months post cancellation due to leaving for U.S. Navy boot camp, despite submitting a written cancellation form at the gym. (Id., ¶¶ 66-75). Urban Active contracts typically allow members to cancel immediately due to member relocation more than 25 miles from previous residence and 5 miles from any Urban Active gym. (Exhibits to Zik Complaint).

14

(7) <u>Rita Rose</u> alleges that she signed a month-to-month contract, but that Urban Active forged her signature on a 12 month contract and improperly charged her dues of $21.34 for three (3) months (apparently due to not recognizing her cancellation) and a $10.00 fee. (TAC, ¶¶ 76-90).

(8) <u>Julia Cay f/k/a Julia Snyder</u> alleges she was improperly charged a $250.00 "buy-out" of her personal training contract, plus her $200.00 pre-paid last month's dues without receiving services for the last month, in contrast to representations of Urban Active. (Id., ¶¶ 91-103).

(9) <u>Albert Tartaglia</u> alleges Urban Active sold him gym ($29.00 per month) and personal training memberships ($90.00 per month) without disclosing the list of all available plans registered with the Kentucky Attorney General and that were more expensive than registered plans, both in violation of Kentucky's Health Spa Act. (Id., ¶¶ 104-113). He also alleges that Urban Active refused to accept his cancellation and continued to wrongfully charge him dues for five months. (Id., ¶¶ 114-116). He claims damages in excess of $400.00. (Id., ¶ 117).

(10) <u>Michael Bell</u> alleges Urban Active sold him a gym membership ($29.00 per month) without disclosing the list of all available plans registered with the Kentucky Attorney General and that were more expensive than registered plans, both in violation of Kentucky's Health Spa Act. (Id., ¶¶ 118-120). Bell also alleges that he was not permitted to cancel his contract in person in violation of his contract, that he was charged at least two $15.00 Facility Improvement fees that were not disclosed, that he was charged multiple improper charges of $20.00, and an improper $10.00 cancellation fee. He claims compensatory damages in excess of $100.00. (Id., ¶¶ 121-125).

(11) <u>Matt Volkerding</u> alleges Urban Active sold him a gym membership ($29.99 per month) without disclosing the list of all available plans registered with the Kentucky Attorney General in violation of Kentucky's Health Spa Act, but apparently not for a rate greater than registered plans. (Id., ¶¶ 126-128). Volkerding also alleges that he was not permitted to cancel his contract in person in violation of his contract, that he was charged "numerous" $15.00 Facility Improvement fees *that was not mentioned in his contract* and an improper $10.00 cancellation fee. (emphasis added). He claims compensatory damages in excess of $100.00. (Id., ¶¶ 129-132).

(12) <u>Patrick Cary</u> alleges Urban Active sold him a gym membership ($39.99 per month) without disclosing the list of all available plans registered with the Kentucky Attorney General and that were more expensive than registered plans, both in violation of Kentucky's Health Spa Act. (Id., ¶¶ 133-136). Then years later, he was sold another gym membership for $29.95 without disclosing the list of all registered plans. (Id., ¶¶ 140-141). Cary also alleges that he was charged at least **eight (8) $15.00 Facility Improvement fees** that were not legally disclosed. (Id., ¶¶ 134, 138). (emphasis added).

15

Also attached as **Exhibit 6** is a summary of the claims of the sixteen (16) plaintiffs in *Seeger* (and accompanying copy of the Amended Complaint in *Seeger*), which further shows the disparities of claims among class members, including plaintiffs in *Seeger* being allegedly overcharged hundreds of dollars for a wide range of illegal conduct, including forgery and harassment.[1]

Settling class representatives cannot adequately represent class members with disparate damages and/or claims. *Amchem Products, Inc.,* 521 U.S. at 627. At the very least, the members must be broken into subclasses based on their differences, and each subclass must have a representative separately protecting his/her subclass's best interest in the settlement. *Id.* Here, Plaintiffs did not even attempt to separate proposed class representatives among the four proposed subclasses, much less adequately protect the interests of widely divergent groups within the subclasses.

For example, Julia Cay f/k/a Julia Snyder alleges she was improperly charged a $250.00 "buy-out" of her personal training contract, plus her $200.00 pre-paid last month's dues without receiving services for the last month, in contrast to representations of Urban Active, and that other class members are similarly situated. (TAC, ¶¶ 91-103). Ms. Cay and her counsel apparently believe that $35.00 ($30 for Personal Training Cancel Subclass and $5.00 for Class inclusion) is just compensation for all of the following persons while Mrs. Cay receives $3,500 and her lawyers receive $2.39M: (1) those similarly situated as Ms. Cay (with $450.00 compensatory damages); (2) those similarly situated as Ms. Gascho and/or Ms. Buckenmeyer (whose claims vary and damages are not disclosed); (3) Personal Training Cancel Subclass members who have no viable

---

[1] The Zik Class's claims and the infirmity of Plaintiffs and Urban Active diluting the payout of the class's claims by requiring that claims forms be requested, completed, verified under oath, and approved are discussed separately in sections below.

claims or damages; and (4) Personal Training Cancel Subclass members who have varying membership rates, varying numbers of months improperly charged dues, and various other complaints and potential claims under various state laws.

The Facility Improvement Fee ("FIF") Subclass members who overcome the hurdles for claims approval will each receive $20.00 despite some members paying bi-annual $15.00 FIFs for years (and others paying only one $15.00 fee), and despite some members' written contracts including the fee and some members' written contracts not including the fee. Plaintiff Cary alleges that he was charged at least eight $15.00 FIFs (apparently with the FIF included in his contract but not disclosed when he signed up), and Plaintiff Volkerding alleges he was charged numerous $15.00 FIFs despite the FIF not being in his written contract. Reimbursements of FIFs to members, at the very least, must be based on the number of $15.00 charges and distinguish between members with FIFs in their contracts (and those without) – not a blanket number of $20.00 for all members.

Plaintiff Lundberg alleges he (and members similarly situated) "continue" to be double billed $42.69 per month for many months (if not years) as a result of transferring his membership between two gym locations. Mr. Lundberg's claims (as with many of the Plaintiffs) are based on completely different factual predicates than the other Plaintiffs, and yet he is lumped in with all other Plaintiffs as representing all class members, as opposed to representing a distinct subclass. Class members remotely similar to Mr. Lundberg (i.e. members who transferred between gyms yet continue to be double billed) will have claims that vary greatly in both liability regarding conduct surrounding the transfer and damages based on different monthly rates and varying numbers of months of improper charges. One class member in the non-existent yet required "Lundberg transfer subclass" may have been wrongfully charged for 12 months at a rate of $49.99, yet other members would have been wrongfully charged for one month at a rate of $14.95 (and

various other rates, numbers of months charged, and conduct surrounding the transfers).[2] However, each member like Lundberg will receive between $5.00 and $25.00, provided they jump over the necessary hurdles and depending on whether they understand a "transfer" of membership to mean a "cancellation" of membership.

Plaintiff Meyer claims he was charged 4 extra months dues of $32.16 per month (total of $128.64) due to leaving for U.S. Navy boot camp, despite submitting a written cancellation form at the gym. Those similarly situated to him (i.e. Urban Active's failure to process immediate cancellations due to geographic move) will only receive $25.00, and their claims will vary widely in number of months charged, meeting the geographic requirements, and monthly rate.

Also, Plaintiffs and class members who claim that Urban Active refused to allow them to cancel their memberships in person in the gym in violation of their contracts (and instead required them to send cancellation via certified mail to the corporate office) will have varying membership rates, varying number of months of overcharges, and varying cancellation conduct.[3]

Without even considering other disparities discussed below, Plaintiffs' claims vary widely amongst themselves and the proposed Class, including time periods overcharged, monthly rates,

---

[2] Based on a review of Urban Active's databases, the vast majority of Urban Active's gym membership rates fall between $14.95 and $49.99 per month but vary greatly within that range. (Rose Declaration, ¶ 10).

[3] Also, Plaintiffs allege that Urban Active instituted an egregious company-wide policy on October 1, 2010 to remove all cancellation forms from club locations and to refuse to accept in-club cancellations after that date in violation of member contracts, yet the Settlement does not distinguish between members cancelling before and after October 1, 2010. (Tartaglia Objection to *Seeger* Settlement, pp. 17-19). Plaintiffs even acknowledge that their "claims are based on hundreds and (sic) thousands of individual consumer transactions which involved individual Class Members and thousands of different employees of Defendant" – not the cohesive claims of the *Zik* Cancellation Class that are based on Urban Active violating their own contracts in a uniform and largely irrefutable fashion. (Motion for Preliminary Approval, p. 12).

types of overcharges, reasons for overcharges, contract terms, and conduct involved.  The Plaintiffs simply did not adequately and separately represent the interests of persons similarly situated as themselves, and Plaintiffs' counsel did not do so either.  They improperly all seek to jointly represent the entire Class and settle a wide range of disparate claims within subclasses (including claims worth hundreds of dollars and claims worth nothing) for the same subclass prices, which will be $5.00 for many members.

### 2.   Significant differences in state law compound the problem

As the U.S. Supreme Court recognized in *Amchem*, *supra*, "differences in state law [] compound the disparities" among class members.  521 U.S. at 624.  In *Amchem*, state law varied on important issues such as whether or not a plaintiff could recover damages for various types of claims.  *Id.* at 609, 610.[4]

The Kentucky Plaintiffs (Tartaglia, Bell, Volkerding, and Cary) primarily allege claims under the Kentucky Health Spa Act ("KHSA") and Kentucky Consumer Protection Act ("KCPA") that are unavailable to Plaintiffs in Ohio and class members in other states.  First, Kentucky Plaintiffs seek rescission of the illegal contracts and all money paid under the contracts under the KHSA, which provides that all contracts in violation of the Act are "void and unenforceable as contrary to public policy," in addition to actual damages and potential punitive damages.  KRS § 367.192; KRS § 367.930.

---

[4] The disparities in the laws of Kentucky and Ohio regarding Plaintiffs' statutory consumer protection and health spa claims are significant, without even delving into every difference in the consumer protection laws of the numerous other states (namely Tennessee, North Carolina, Pennsylvania, Georgia, and Nebraska) whose consumers are releasing statutory claims under the laws of those states.  For example, Tennessee law expressly precludes health clubs from charging any fees other than the monthly membership fee, including any cancellation fee or any FIF fee. T.C.A. § 47-18-305.

Plaintiffs' counsel repeatedly represented to the Boone Circuit Court and the Zik Class the enormous value of his Kentucky clients' KHSA claims, given his belief that violations void the contracts (including current contracts with the new owner of the gyms, LA Fitness) and provide disgorgement of all damages resulting from the violations, including any difference in price and/or other terms between the plans sold and the plans registered with the Kentucky Attorney General. (Rose Declaration, ¶ 11).

Plaintiffs' lead counsel, Mr. McCormick, clearly recognized this disparity when he wrote:

[W]e believe that the Ohio and Kentucky claims must remain separate for both class certification and settlement purposes.

[*citing*] *Pilgrim v. Universal Health Card, LLC,* 660 F.3d 943 (6th Cir. 2011)[differences in state consumer protection laws precluded certification]

[]

Given the requirements of the Kentucky Health Spa Act and the penalties that result from a violation, we stand a much better chance of recovering significant dollars and reaching LA Fitness in Kentucky.

(Id., Mr. McCormick's Feb. 27 Email).

Likewise, Kentucky Plaintiffs vigorously objected to the *Seeger* settlement and devoted much of their objection to *Seeger* counsel's failure to assert and recognize the purported great value of their KHSA claims. (Objections of Tartaglia to *Seeger* Settlement). Plaintiffs expressed:

[T]he cash value [being reimbursement of one month's dues per member under the Seeger settlement] **pales in comparison** to the statutory right of all members to void the contract *ab initio* and receive disgorgement as discussed in Objections 5, 6, and 7 below.

(Id., p. 8)(emphasis added).

Pursuant to the Kentucky Health Spa Act, damages would likely include all Global Fitness contracts [for Kentucky members] being declared null and void. This realization likely motivated Defendants to quickly seek a settlement with the Seeger Plaintiffs [] in hopes that Global Fitness could avoid the far greater damages that would be awarded to the Tartaglia Plaintiffs and the classes they represent.

(Tartaglia's Motion to Intervene and Motion for Discovery into Fairness of Proposed [*Seeger*] Settlement, pp. 6, 7).

Plaintiffs also represented to the Boone Circuit Court that his Kentucky clients' claims were worth "hundreds" if not "thousands" of "dollars" per person. (Video of August 12, 2012 Hearing at 2:08 p.m. and 2:34 p.m.) Plaintiffs likewise continually focused on the enormous value of his clients' KHSA claims when negotiating with Zik Class's counsel and even characterized Tartaglia's KHSA claims as "his only claims." (Rose Declaration, ¶ 11, Nov. 28 Email, attached thereto as Exhibit 3-C).

Despite this enormous alleged value, the Settlement fails to provide **any** additional or separate compensation to Kentucky class members for their KHSA claims that are not available to class members in other states. The KHSA claims would purportedly entitle Kentucky Plaintiffs (and those similarly situated) to rescission of their current, illegal LA Fitness contracts and disgorgement of all damages, which could be many years of heightened monthly membership dues and other charges not disclosed in membership plans registered with the Attorney General.

Further, the Settlement fails to provide any compensation to Kentucky class members for KCPA claims that are outside of and in addition to the limited claims available to Ohio class members under the Ohio Consumer Sales Practices Act ("OCSPA") and Ohio Prepaid Entertainment Contract Act ("OPECA"). As this Court ruled on March 28, 2012, Plaintiffs' OCSPA and OPECA claims are limited to Urban Active's alleged failure to inform members of a right to cancel, failure to provide the required notice of cancellation, and/or failure to honor a valid notice of cancellation. (p. 28). In addition to KHSA claims, Kentucky class members have the ability to assert KCPA violations for **any** "[u]nfair, false, misleading, or deceptive act or practice," and have asserted many claims based on factual predicates falling outside the limited factual

21

predicates actionable under OCSPA and OPECA. KRS § 367.170; *Seeger* claims, Exhibit 6 hereto; Zik Complaint; Plaintiffs' TAC.

Interestingly, a large percentage of the Vorys' firm's work and large fees were devoted to ESI discovery to be used for the purpose of proving the KHSA claims – claims for which no additional consideration was negotiated. (McCormick Nov. 12 Email, Exhibit 3-D to Rose Declaration).

The Kentucky Plaintiffs did not even seek separate designation as representatives of Kentucky subclasses, much less obtain additional compensation for their unique claims of purported enormous value. This begs the question – if Kentucky class members did not reap the benefits of immensely valuable KHSA claims, who did?

### 3. Plaintiffs failed to pursue, much less adequately protect, the Zik Class's Claims

"[S]ettlement classes, depending on how they are used, evade the processes intended to protect the rights of absentees." *In re Gen. Motors Corp.,* 55 F.3d at 788. The class representatives' interests and claims must be "aligned with the absentees." *Id.* at 800.

The Zik Class' claims are very likely to succeed on the merits, cover hundreds of thousands of cancelling members, and will be severely impaired by the proposed settlement in this case.

Robert and April Ziks' membership agreements with Urban Active ("Zik Contract") read:

… This **month-to-month membership may then be cancelled with a 30 day written notice** to Seller by certified mail, return receipt requested, or on the cancellation form provided at the Club location **with said cancellation to become effective on the 1st of the next month following the expiration of this 30-day written notice** with no proration, provided your account is not delinquent. Said written notice must be received by the Club at least 30 days prior to the first day of the month which Member desires to cancel said membership…

(See Zik Complaint, ¶¶ 5, 6, Exhibits A and B thereto; Urban Active's Answer thereto, ¶¶ 5, 6, attached as **Exhibit 7**)(emphasis added). It is undisputed that the Ziks cancelled their memberships on December 29, 2009. (Id. ¶¶ 7). It is also undisputed that the Ziks were charged membership dues of $49.99 each for January **and February** 2010 via direct withdrawal from their bank account. (Id., ¶¶ 8).

The Zik Contract is clear that they were not supposed to be charged any dues for February 2010. Thus, the Ziks (and those similarly situated) should not have been charged for any month beginning more than 30 days after notice of cancellation, and the Zik Class should be fully refunded one month's membership dues – $49.99 each in the case of the Ziks, plus interest. The heart of Zik Class' claims are that Urban Active irrefutably failed to follow its own membership contracts – not the varying and individualized inquiries that temper Plaintiffs.[5]

The Ziks were also each charged a $10.00 cancellation fee by Urban Active via direct withdrawal from their bank account. (Complaint, ¶ 11). Robert Zik's Contract expressly does not provide for the $10.00 cancellation fee, yet he was charged the fee anyway. (Id.; Reverse side of Zik Contract attached as Exhibit 3-E to Rose Declaration). The Zik Class is unaware of any other plaintiffs who are seeking the $10.00 cancellation fee based on the fee not expressly being included in their contract, and Plaintiffs do not allege that their contracts excluded the $10.00 fee.

---

[5] The Hearon contract is vague regarding Urban Active's right to charge the extra month's dues, but the Hearon contract repeatedly and conspicuously calls the membership "month-to-month", and all ambiguities will be resolved against Urban Active. Urban Active began using the Hearon contract form around March 2008, and virtually all Urban Active contracts before that time used the Zik cancellation language and after that time used the Hearon cancellation language. (Parker Allen Dep., pp. 34-35, filed under seal as Exhibit E-6 in support of Zik Class' Motion to Intervene). Urban Active inexplicably moved to dismiss all of Plaintiffs' claims and argued that the express terms of the membership agreements preclude Plaintiffs' claims, among various other reasons. However, the Court denied the motion to dismiss on all counts after extensive briefing.

Urban Active admitted in deposition that it charged **all** gym members the extra month's dues upon cancellation (i.e. the dues sought by the Zik Class) from at least June 2009 through June 2010, but a review of the databases produced by Urban Active after deposition showed that Urban Active charged members for the extra month's due outside of that time period.   (Devary Depo., pp. 20, 21, filed under seal as Exhibit E-7 to Zik Class' Motion to Intervene; Rose Declaration, ¶ 15).   According to Urban Active's records, over 100,000 gym members cancelled their memberships **in that one year time frame alone**, with a vast majority of cancellations being month-to-month memberships.  (Id.; See MS and PM Spreadsheets filed with the Court under seal as Exhibit E-8 to Zik Class Motion to Intervene).[6]

The Zik Class is owed as much as $60.00, plus interest, solely for its narrow claims based on overcharges after Urban Active processed and accepted cancellations.  The Zik Class's claims would not include Plaintiffs' wide array of pre-cancellation claims, including claims based on Urban Active failing to allow, process, or recognize a cancellation.  Presumably Plaintiffs valued their pre-cancellations claims at $20.00 each – i.e. the amount to be paid to the Gym Cancel Subclass.

No Plaintiff even pursued, much less adequately protected or secured any separate or additional recovery for the Zik Class' narrow, largely irrefutable, and valuable claims, which are ideally suited for class relief.

---

[6] No Plaintiff cancelled his/her membership prior to July 2010 (the time period when Urban Active admittedly charged the extra month's dues upon cancellation), except for Mr. Meyer whose claim is widely divergent from Zik Class' claims.

**B.  The Settlement is otherwise unfair to the Class**

Even if Plaintiffs prove after close and heightened scrutiny by the Court that all requirements for certification are met (which they have not and cannot do), the Court must also act as a fiduciary and guardian of the interests of absentee class members to ensure that the Settlement is otherwise õfair, reasonable, and adequateö from a procedural and substantive standpoint.  Fed. R. Civ. P. 23(e)(2);  *In re Gen. Motors Corp.,* 55 F.3d at 785.

Plaintiffs fail on both counts.

**1.  The Settlement is procedurally unfair**

The general presumption of procedural fairness õdepend[s] on the implicit assumption that the lawyers actually negotiating really were doing so on behalf of the *entire* class, *see* 2 NEWBERG & CONTE § 11.28, at 11ó59, assumptions which are clearly unjustified in a context where the potential for intra-class conflict further imperils the class's representation. *In re Gen. Motors Corp.,* 55 F.3d at 797.  Likewise, where the court has not yet certified a class or named its representative or counsel when the settlement is negotiated, the assumption of fairness in negotiating should be questioned.  *Id.* at 787, 788.  õFar too much turns on the adequacy of representation to accept it on blind faith.ö *Id.* at 797.

The complete exclusion of Zik Class from the settlement process casts considerable doubt about the procedural fairness of the settlement and the adequacy of representation, particularly given the extensive history between and representations of Plaintiffsø counsel to Zik Classø counsel.

Zik Classø case (and Plaintiffsø Kentucky cases) were stayed pending approval of the *Seeger* settlement for approximately seven (7) months ó from July 2012 through January 2013. During that time, Plaintiffsø counsel and Zik Classø counsel worked closely together and

vigorously to defeat the unfair *Seeger* settlement, including jointly drafting briefs, engaging in many strategy conferences, and participating in numerous hearings before the Judge.[7]  In fact, Zik Class' counsel led oral arguments and witness examinations at the hearings, including the fairness hearing on December 21, 2012.  (Id.).

The result of the Zik Class' and Plaintiffs' hard work was that the unfair *Seeger* settlement was rejected.  If the *Seeger* settlement were not rejected, all claims of Kentucky class members in this case would have been released (and any recovery here eliminated) in exchange for 0.6% the *Seeger* class' claims (242,243 Kentucky members of Urban Active) being approved.  (*Seeger* Order, p. 3).

Plaintiffs' counsel and Zik Class' counsel also discussed their respective clients' claims being based on different factual predicates and theories, potentially joining forces, and fair way to divide any recovery if forces were joined based on the disparity between and viability of Plaintiffs' and the Zik Class' respective claims.  (Rose Affidavit, ¶ 8, Email String between McCormick and Rose, Dec. 31 – March 4, 2013, Ex. 3-B).

Ultimately the Zik Class and Plaintiffs were not able to reach an agreement on combining their respective claims, based in large part on Zik Class' significant concern with the disparity among Plaintiffs' claims for certification purposes and Plaintiffs' enormous legal bills that would inevitably reduce the class' recovery (i.e. the amount Urban Active would or could pay).  (Id.).  Recognizing the significant value in Zik Class' claims and its counsel's work, Plaintiffs' counsel's last offer was that the Zik Class' counsel receive 40% of any recovery from the first

---

[7] Zik Class prepared and filed many motions and briefs in *Seeger,* including objections to settlement, motion to intervene, motions to compel discovery, motion to summarily reject settlement, and post-hearing briefs on fairness of the settlement.  (Rose Declaration, ¶ 6).

$6M recovered on behalf of any Kentucky class.  (McCormick Feb. 27 Email).  Also, Plaintiffs'

lead counsel expressed:

> [W]e believe this [Plaintiffs' offer] properly balances the respective value we each bring
> to the table vis-à-vis our respective causes of action.

(Id.; Feb. 12 Email in string)

> While both your claims and our claims have positives and negatives, we believe ours are
> more likely to be certified and more likely to succeed on the merits.

> []

> Last, I want to emphasize that I strongly believe the class will benefit from both of our
> firms working together and avoiding what happened in the Seeger case.  As we discussed in
> Cincinnati, the amount of money that can be recovered from Global Fitness is enough to fully
> compensate the class and both firms for the work put in.  We look forward to talking with you
> soon.  Thanks

(Id.; Jan. 23 Email in string)

Unfortunately and despite Plaintiffs' "strong belief" that they must work with the Zik Class

to obtain the best recovery for the class, Plaintiffs' counsel never informed the Zik Class of any

settlement discussions with Urban Active until Friday, September 13, 2013, on the eve of the Zik

Class's certification hearing set for the following Monday, September 16, 2013.  Apparently,

Plaintiffs had been secretly negotiating and colluding with Urban Active to settle all claims

(including Zik Class' claims) for five (5) months, including mediating on July 8, 2013.  (Motion

for Preliminary Approval, pp. 7, 14).

As a result of Plaintiffs' collusion with Urban Active to the exclusion of the Zik Class,

"what happened in the Seeger case" was not avoided – it happened again.  Step number one in

adequately protecting the Zik Class's claims would have been to invite their attorneys to the

negotiations so that such claims could be represented and protected.  Plaintiffs were not pursuing

such claims, yet they are attempting to settle them without additional compensation from Urban

Active, despite Plaintiffs' lead counsel's valuation of such claims being at least 40% of the overall recovery for Kentucky members.  Judge Frolich was likewise concerned with Plaintiffs and Objectors not being included in the *Seeger* negotiations.  (Video of August 16, 2012 Hearing in *Seeger* at 2:19 p.m., manually filed as **Exhibit 8**).

Plaintiffs' counsel also breached their fiduciary duties to the Zik Class by settling their claims without including their counsel in the settlement discussions and by continuing to frustrate the Zik Class's interests by disingenuously objecting to their intervention in this case and by refusing to provide their counsel the information requested regarding the settlement.  "Beyond their ethical obligations to their clients, class attorneys, purporting to represent a class, also owe the entire class a fiduciary duty once the class complaint is filed."  *In re Gen. Motors Corp.,* 55 F.3d at 801.

Plaintiffs objected to the Zik Class's Motion to Intervene in this case, despite Plaintiffs moving to intervene in *Seeger* for the very same purpose – to challenge the *Seeger* settlement and seek discovery related thereto.  (See Tartaglia's Motion to Intervene in *Seeger*).  Plaintiffs even argued that their motion to intervene was timely, because no intervention was necessary until the *Seeger* plaintiffs attempted to release Plaintiffs' claims.  (Id., p. 13; See Seeger Hearing at 2:06 p.m.).  Plaintiffs likewise argued in *Seeger* that "Courts routinely allow discovery into whether or not a class settlement is fair," and that discovery is particularly appropriate when settlement is reached before certification or where there are competing interests among the class.  (Id., pp. 17-21).  Yet Plaintiffs have taken the opposite positions here in order to serve their interests, and in derogation of their duties to the Class and the Courts.

Next, Plaintiffs refuse to provide the Zik Class requested information relevant to the Settlement, despite Plaintiffs obtaining the same information in *Seeger*. (Rose Declaration, ¶ 16, Requests and Correspondence thereon, Exhibit 3-F).

The proposition that Plaintiffs have adequately protected the interests of the Class and the Zik Class is absurd.

### 2. The Settlement is substantively unfair

Finally, the Court must consider the *substantive* fairness of the settlement, including, but not limited to, the following factors:

> (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest.

*UAW v. Gen. Motors Corp.,* 497 F.3d 615, 631 (6th Cir. 2007).

### a. Risk of Collusion

A great risk of collusion exists as a result of: (1) the patently overbroad release sought by Plaintiffs; (2) the Zik Class being excluded from all settlement discussions, despite an extensive history and contrary to prior representations; (3) Plaintiffs frustrating the Zik Class's and the Class's interests by objecting to intervention and discovery, contrary to prior positions; (4) Plaintiffs'attorneys receiving $2.39M in fees while the Class may very well receive less than that; (5) Plaintiffs not separately representing and protecting the interests of distinct groups within subclasses; and (6) Dilution of the payout via the unnecessary claims process, as discussed below.

**b.   The complexity, expense, duration, and likelihood of success on the merits of the litigation**

As Plaintiffs' acknowledge, a very important factor to be considered in reviewing a class settlement is the likelihood of success on the merits.  (Plaintiffs' Motion for Preliminary Approval, p. 11)(additional citations omitted).  In their motion, Plaintiffs claim a "tempered" confidence that their claims will succeed on the merits, including uncertainty surrounding their KHSA claims and certification of individualized claims.  (Id., p. 12).  However, when opposing the *Seeger* settlement, Plaintiffs claimed a "high likelihood of class certification and success on the merits" and even boasted a likelihood of obtaining summary judgment.  (Objection of Tartaglia in *Seeger*, p. 14, 15; Seeger Hearing at 2:10, 11 p.m.).

Next, Plaintiffs claim that the recovery is "significant, especially when compared to the risk of continued litigation and the relatively small amount of actual damages suffered by each Class/Subclass Member."  (Motion for Preliminary Approval, p. 13).  However, as discussed above, Plaintiffs continually represented the enormous value of their claims (particularly their KHSA claims) and that their claims were worth hundreds (if not thousands) of dollars each.  (Hearing Video at 2:08, 2:34).  Plaintiffs now flip-flop and sell out all claims of every nature for pennies on the dollar.

**c.   The opinions of Class counsel and class representatives**

Plaintiffs have not presented any opinions or testimony of Class representatives.  The named class representatives in this case will recover between $1,000 and $5,000, which is 200-1,000 times the minimal class payment of $5.00.  (Settlement Agreement, ¶¶ 8.1-8.2).  The Court cannot assume that the class representatives' support of the proposed settlement has anything to do with its merits beyond their own recovery, particularly given the global joint representation and recoveries despite the disparity among Plaintiffs' claims.

Likewise, the opinions of class counsel should be given little weight when considering the grave flaws with the Settlement, which was achieved in order to provide Urban Active (and LA Fitness) with the overbroad release it was seeking and in order to secure $2.39M in attorneys' fees. Courts have explained:

> In considering the adequacy of representation, we are loath to place such dispositive weight on the parties' self-serving remarks. And even if counsel did not discuss fees until after they reached a settlement agreement, the statement would not allay our concern since the *Task Force* recommended that fee negotiations be postponed until the settlement was judicially approved, not merely until the date the parties allege to have reached an agreement.

*In re Gen. Motors Corp.,* 55 F.3d at 804.

### d. The claims process will drastically and unnecessarily dilute the payout

The Settlement provides that there are more than 600,000 potential claimants who are entitled to receive between $5 and $75 each if they jump through the necessary hoops. Plaintiffs represent that Urban Active's potential exposure in Class/Subclass payments exceeds $19 million.

However, the Settlement Agreement provides that Urban Active will pay *at least* $1.3M to settle class claims – an *express* acknowledgement that class members may file too few claims to amount to even 7% of Urban Active's potential exposure. (¶ 7.1). Looked at another way, this is a proposed settlement in which Urban Active may succeed in retaining up to *93%* of its ill-gotten gains, without even considering that much of the Class's claims are undervalued and not separately or adequately represented.

The proposed settlement in *Seeger* is instructive, and this case retains similar fundamental problems as those in *Seeger*. In that case, postcard notice was mailed to the 242,243 potential Kentucky class members, but only 2,720 bothered to respond, a response rate of little more than 1%. (Seeger Order Rejecting Settlement, p. 3). Half of those claims were disallowed, resulting in proposed payment of only 0.6% of potential class claims. As in *Seeger*, Class members were not

mailed checks or even a proof of claim form with their notice to facilitate their claim.  Instead, class members are directed to call or write the Settlement Administrator or access the settlement website in order to obtain such a form. Claimants are required to sign the form "under penalty of perjury," a ridiculous requirement for members when the validity of their claims and their liquidated damages can be determined from Urban Active's own records.  Finally, claims must be approved by the Settlement Administrator, an uncertain process that will likely frustrate claims where the only guaranteed recovery – $5.00 according to the notice – is hardly worth the trouble. At the fairness hearing in *Seeger*, the Settlement Administrator (perhaps the same one used here) testified that he would anticipate a response rate of just 10-12% under the best of circumstances.

It is important to note that members of the Class (including the Zik Class) would only receive $5.00 - $75.00, provided they jumped through all the hoops required to receive their money, including: (1) receiving the postcard notice; (2) recognizing they have a claim; (3) taking the time (if a desire is there) to contact the settlement administrator to receive a claim form for perhaps only a $5.00 recovery; (4) filling out the claim form and signing it under penalty of perjury; (5) submitting the claim form to the Settlement Administrator; and (6) being approved in the Settlement Administrator's discretion.

Further, the claims process is wholly unnecessary, because the information sought to be verified in the Claims Form can be easily determined from Urban Active's records.  For example, every person who receives a notice is a member entitled to the $5.00 award – no cumbersome claims process need be undertaken.  Likewise, Urban Active has produced databases and spreadsheets showing all cancelling members.  (Rose Declaration, ¶ 17).

Assuming members even receive and read the notice, why should members have to take the time to obtain a claims form and complete it under penalties of perjury when Urban Active has

all the information necessary to determine who are members of the class and send them their money?  The Answer is simple, as proven by the *Seeger* settlement – so that the payout is drastically diluted.

The Federal Judicial Center warns that "[i]n too many cases, the parties may negotiate a claims process which serves as a choke on the total amount paid to class members.  **When the defendant already holds information that would allow at least some claims to be paid automatically, those claims should be paid directly without requiring claim forms**." *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide,* Exhibit 7, p. 6 (emphasis added).

### e.  The Notice is insufficient.

Even if notice and claims forms were otherwise proper to compensate the *Zik* Class and other class members (which it is not), the notice has other deficiencies that increase dilution of paid claims.  Plaintiffs disingenuously claim that "the Notice, attached as Exhibit 6 to the Settlement Agreement meets all the requirements of Rule 23." (Motion for Preliminary Approval, p. 22).  But the "notice" to which Plaintiffs refer is what will appear on the settlement website.  The *actual* notice the class will receive – and which must interest them to the extent they access the more detailed description of the settlement terms on the website – is a mailed postcard, just like in *Seeger*.  That mailed postcard notice simply fails – by intention – to meet any of the standards for notice intended to "grab" the attention of class members.  The Federal Judicial Center says:

> With "junk mail" on the rise, … , legal notices must stand out with design features long known to communications pros. … . Notices can be discarded unopened by class members who think the notices are junk mail.  *A good notice starts with the envelope design*, … . It is important to capture attention with a prominent headline (like a newspaper article does).  This signals who should read the notice and why it

is important.  The overall layout of the notice will dictate whether busy class members will take time to read the notice and learn of their rights.

*Id*., p. 5 (emphasis added).

The notice here should be held to an even higher standard due to the dismal results in Seeger.  Instead, it tracked the *Seeger* notice.  It is the size of a postcard, which can easily be lost or confused with other junk mail and discarded, and leads with õGlobal Fitnessö, not õUrban Activeö (the name with which consumers are familiar).  Its print is small and difficult to read.  The statement in the notice that claimants may receive as little as $5.00 is likely to depress claims even further.

The amount of attorneyøs fees ($2.39M) is not disclosed in the postcard notice to the class, in derogation of recommended federal practice in class action settlements.  *Settlement Agreement*, Exhibit 7; *Manual for Complex Litigation, Fourth,* §21.312 (Federal Judicial Center 2007).  Such a large monetary amount would raise the attention of class members ó as opposed to leading with the minimal payout of $5.00.

### f.   The reaction of absent Class members and the public interest

The reaction of the Zik Class is self-evident, and the reaction of the other absentees will be seen after all objections and claims are filed, the Settlement Administratorøs Report is filed, and the fairness hearing is held.

For all the reasons set forth herein, the public interest will be best served by rejecting the Settlement.

### C.  Plaintiffs' Motion for Attorneys Fees and the Zik Class's Motion for Fees

The Zik Class cannot fully respond to Plaintiffsø motion for attorney fees because the Settlement Administratorøs report has not yet been produced.  The report will show the claims

approval rates, which will bear upon the "common benefit" approach to calculating attorney fees – i.e. basing fees on a percentage of the benefit conferred on the Class.  Also, Plaintiffs have not produced its invoices (including detailed time entries) that would be helpful to any lodestar analysis or any other documents requested by the Zik Class regarding the Settlement.  However, for the reasons set forth in this Objection, the fees are certainly excessive when compared with the value to the Class.

Further, if the Court ultimately approves the Settlement, Objectors request a reasonable incentive payment and that Objectors' counsel be awarded a reasonable attorney fee.  Attorneys who contribute to a class action recovery, including objectors' counsel, are entitled to a reasonable attorney fee.  *See Reynolds,* 288 F.3d at 288.

Plaintiffs cannot deny that the Zik Class has provided a significant benefit to the Class, including its efforts in cooperation with Plaintiffs' counsel over seven months in having the *Seeger* settlement rejected – approval of that settlement would have negated virtually all benefit to the Class and Plaintiffs' counsel.

The Zik Class was also farther in the certification process than plaintiffs in any other case and on the eve of their certification hearing when Plaintiffs and Urban Active finally reached a settlement over two months after their mediation.  The Jefferson County Circuit Court also denied Urban Active's motion to dismiss all of the Zik Class's claims on the merits after extensive briefing.  Further, Objectors were deposed, successfully had their case remanded back to state court after Urban Active's removal, took numerous depositions of Urban Active employees, and engaged in significant discovery over the almost three (3) years that their claims have been pending.  (Rose Affidavit, ¶ 18).  Surely the Zik Class's efforts pursing their claims for years and

to the eve of certification played a role in pushing Urban Active and Plaintiffs to settle, and the Zik Class continues to protect the class's interests.[8]

The Zik Class's alternative request for an incentive award and attorneys fees is made simply to protect their interests and investment in the event the settlement is ultimately approved, and should not, in any way, be construed as an approval of the settlement.  Objectors and their counsel would much rather see rejection of the settlement and ultimately a fair recovery for the class than any fees as part of the settlement.

### D.      Plaintiffs and Urban Active are forum shopping

Plaintiffs moved to amend their complaint on September 18, 2013 for purposes of settlement to add four Kentucky Plaintiffs who were previously seeking certification of class claims in Kentucky state court.  28 U.S.C. § 1332(d)(3) provides that the Court may decline to exercise jurisdiction where more than one third (but less than two thirds) of the class members and defendant are citizens of the state where the action was originally filed, when considering certain factors discussed below.  Also, Plaintiffs forum shopping further demonstrates that Plaintiffs are not protecting the interests of the Kentucky class members.

The lawsuits were originally filed in Kentucky state courts, Urban Active is a Kentucky citizen, and more than one third of the proposed class members are Kentucky citizens.  (See Urban Active Letters regarding club data between states, filed under seal as Exhibit E-12 to Zik Class'

---

[8] Plaintiffs' counsel valued Objectors' counsel's benefit to the class in the amount of *at least* 40% of the gross attorney fees for the first $6M in benefits achieved for Kentucky members.  Kentucky members represent approximately 40% of class members.  If Plaintiffs' counsel values its benefit to the class as being $2.39M, then Plaintiffs' counsel's fees relative to Kentucky members should equate to $956,000, which would equate to a $637,000 for Objectors' counsel value to the class even under Plaintiffs last valuation of Objectors' counsel value.

Motion to Intervene). Likewise, after Urban Active removed the Zik litigation to federal Court in the W.D. Kentucky, Urban Active agreed to remand the case to state court after discovery related to CAFA jurisdiction. (Rose Declaration, ¶ 18).

The circumstances discussed above weigh against this Court exercising jurisdiction, including: (1) the Zik litigation already being remanded to Kentucky state Court and being on the eve of certification when plaintiffs first brought their Kentucky complaints to this Court; (2) there being three putative class action lawsuits pending in Kentucky State Court, including a lawsuit filed by Plaintiffs and a lawsuit where Urban Active has already had a global settlement preliminarily approved – only to be rejected for lack of fairness to the class; (3) the core of much of Plaintiffs' claims being based on Urban Active failing to disclose information allegedly required by KHSA; (4) Kentucky having a distinct nexus with Urban Active and its conduct – all of Urban Active's corporate malfeasance derived from its corporate headquarters in Kentucky; and (5) Plaintiffs' counsel considering their KHSA claims to be their most valuable claims and expressing that "Kentucky and Ohio claims must remain separate for both class certification and settlement purposes." (McCormick Email, Feb. 27).

Plaintiffs' counsel and Urban Active are clearly forum shopping in order to distance themselves from the Zik Class and Judge Frolich (Boone Circuit Court), who has extensive experience with the cases brought by Kentucky members. Judge Frolich was disqualified by the very fact that he *has* been through this process before, and the Settlement in this case shares the same problems as the one he rejected in *Seeger*.

Plaintiffs' forum shopping should not be rewarded, and the Court should decline to exercise jurisdiction over the Settlement.

## V.    <u>Conclusion</u>

This is yet another proposed class action settlement, as was the one in *Seeger*, in which the beneficiaries of the settlement are Urban Active, class counsel, and the named class representatives ó not the class in general and certainly not the Zik Class.

The Zik Class respectfully requests that Plaintiffsø motion for approval of the Settlement be denied.

Respectfully submitted,

*Counsel for Objectors, Robert Zik, April Zik, and James Hearon*

/s/ Joshua T. Rose
Joshua T. Rose
Hummel, Coan, Miller, Sage & Rose, LLC
239 South Fifth Street, Suite 1700
Louisville, KY  40202-3268
502/585-3084
jrose@hcmsrlaw.com
*Pro Hac Vice Co-Counsel for Objectors*

/s/ Gregory Belzley
Gregory A. Belzley
P.O. Box 278
Prospect, KY  40059
502/292-2452
gbelzley@aol.com
*Pro Hac Vice Co-Counsel for Objectors*

/s/ Ronna Lucas
Ronna Lucas
Ohio Registration No. 0063304
John E. Stillpass, Attorneys at Law
4901 Hunt Road, Suite 103
Cincinnati, Ohio 45242
Ph. 513.936.0800
Fax 513.794.8800
rlucas@stillpass.com
*Co-Counsel for Objectors*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed with the Court and served on all participants in the Court's ECF system in this case on this 23rd day of December, 2013.


/s/ Joshua Rose