**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION (COLUMBUS)**

| | | |
|---|---|---|
| AMBER GASCHO, *et al.,* | : | |
| | : | |
| Plaintiffs, | : | Case No. 2:11-cv-436 |
| | : | |
| v. | : | Judge Smith |
| | : | |
| GLOBAL FITNESS HOLDINGS, LLC, | : | Magistrate Judge King |
| | : | |
| Defendants. | : | |

**<u>PLAINTIFFS' RESPONSE TO THE OBJECTION OF JOSHUA  BLACKMAN
AND THE OBJECTION OF ZIK/HEARON</u>**

s/ Thomas N. McCormick
William G. Porter (0017296)
wgporter@vorys.com
Thomas N. McCormick   (0075496)
tnmccormick@vorys.com
Kenneth J. Rubin (0077819)
kjrubin@vorys.com
VORYS, SATER, SEYMOUR AND
PEASE LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Telephone:  (614) 464-6400
Facsimile:  (614) 464-6350

James B. Lind (0083310)
jblind@vorys.com
VORYS, SATER, SEYMOUR AND
PEASE LLP
301 East Fourth Street, Suite 3500
Great American Tower
Cincinnati, OH 45202
Telephone: (513) 723-4000
Facsimile: (513) 852-7835

*Attorneys for Plaintiffs*

s/  Mark H. Troutman
Mark Landes   (0027227)
mlandes@isaacwiles.com
Gregory M. Travalio   (0000855)
gtravalio@isaacwiles.com
Mark H. Troutman   (0076390)
mtroutman@isaacwiles.com
ISAAC, WILES, BURKHOLDER &
TEETOR, LLP
Two Miranova Place, Suite 700
Columbus, Ohio 43215
(614) 221-2121
Facsimile:  (614) 365-9516

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

Page

Table of Authorities ......................................................................................... i

I. Preliminary Statement ........................................................................... 1

II. Facts..................................................................................................... 2

   A. Settlement Terms and Provisions. ................................................... 2

   B. The Notice and Claims Process........................................................ 3

   C. The Class Response......................................................................... 6

   D. The Seeger Settlement. ................................................................... 8

III. Argument .............................................................................................. 9

   A. Class Counsel pursued, adequately protected, and obtained significant value for the Gym Cancel Subclass.................................. 10

      1. The Zik/Hearon claims were also alleged in <u>Robins</u> and alleged and investigated in <u>Gascho</u>. .............................................. 11

         The same allegations about gym cancellation billings were made by Zik/Hearon, the plaintiffs in Robins v. Global Fitness Holdings, LLC, Case No. 1:11-cv-01373-DAP, and the Plaintiffs in this Lawsuit. Class Counsel thoroughly investigated the same claims alleged by Zik/Hearon and their potential value.............................................. 11

      2. Success of Zik/Hearon's Claims was unlikely. ............................ 13

         The Objectors claims were unlikely to succeed on the merits because the Northern District of Ohio rejected the identical claims saying that members were properly billed, per their contracts, for two more billing cycles and that Urban Active's Membership Contracts expressly permitted it to charge additional fees. *Robins v. Global Fitness Holdings, LLC,* 838 F. Supp.2d 631, 643-44 (N.D. Ohio 2012). .................. 13

      3. Even if successful individual damages were limited..................... 13

         Even if the Objectors claims were successful, the maximum recovery for the typical class member would be $36. Pursuant to this Settlement, Class Counsel has eliminated any and all risk of an adverse judgment and secured immediate payment of $44.54 to the average Gym Cancel Subclass Member. ..................................................... 13

   B. Class Counsel pursued, adequately protected, and obtained significant value for all other Class/Subclass Claims........................................ 14

         The Class' recovery pursuant to this Settlement is particularly notable given the significant risks of this litigation which include, the adverse decisions in *Robins,* 838 F. Supp.2d at 651; *Robins*'s decision to appeal to the Sixth Circuit; the absence of guiding case law relative

to the KHSA and PECA; Urban Active's strong equitable arguments; and the fact that Urban Active is no longer in business. ............................. 14

C.    The Release is narrowly tailored and appropriate. ............................................ 16

The Settlement Release fits squarely within the confines of the identical factual predicate doctrine. *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 107 (2d Cir. 2005); *Olden v. Gardner*, 294 F. App'x 210, 220 (6th Cir. 2008); In *Levell v. Monsanto Research Corp.*, 191 F.R.D. 543, 561 n.32 (S.D. Ohio 2000). ............................................... 16

D.    The Settlement is Procedurally Fair. ............................................................. 18

Class Counsel's discussions with Zik/Hearon's counsel broke down with no agreement. Because no agreement was reached, Class Counsel vigorously prosecuted its claims, filed its Motion for Class Certification, engaged in settlement negotiations, and reached a Settlement Agreement. This Court is the appropriate forum for administration of the Settlement because it has original jurisdiction, significant Ohio interests exist, the Court is familiar with the litigation, and court and settlement administration efficiency. ...................................... 18

E.    Class Representatives are representative, typical, and certification of the Settlement is appropriate. ........................................................................ 20

Certification of the Settlement is appropriate because the Class Representatives were subject to common policies and practices and typically suffered the same type of injury as the Class Members. The Class Representatives also posses sufficient unity so that absent members can fairly be bound by the decisions of the Class Representatives. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 619-620 (1997); *Manners v. American General Life Ins. Co.,* 1999 U.S. Dist. LEXIS 22880, at *47-48 (M.D. Tenn. Aug. 10, 1999); *Schwartz v. TXU Corp.*, 2005 U.S. Dist. LEXIS 27077, at *46-49, 54 (N.D. TX 2005). ............................................................................... 20

F.    The Class Notice was proper. ....................................................................... 24

The Notice Program, which included the Legal Notice, Postcard Notice, email notice, reminder email notice, general publication notice, and the numerous newspaper and television reports, was robust and exceeded the requirements of due process. ............................. 24

G.    The Claims Process was reasonable and necessary. ..................................... 26

1.    A Claims Made Process is common, and expected, including in gym settlement. ................................................................................................ 26

The simple claims process employed is common to consumer class action settlements and is particularly suited to class actions involving health clubs. *Lonardo v. Travelers Indemnity Co.,* 206 F. Supp. 2d 766, (S.D. Ohio 2010); *Kritzer v. Safeline Solutions, LLC*, 2012 U.S. Dist. LEXIS 74994 (May 30, 2012, S.D. Ohio); *Martina v. L.A. Fitness*

*Int'l, Inc.*, 2013 U.S. Dist. LEXIS 145285, at *27 (D. N.J. October 8, 2013); *Friedman v. 24 Hour Fitness USA, Inc.*, 2010 U.S. Dist. LEXIS 143816, at *9 (C. D. Cal. July 12, 2010). ..................................................... 26

2.  The Open Claims Process resulted in potential new Class Members and additional recoveries. ................................................................. 28

   The wide publicity and simple open claims process resulted in 3,900 claims by former club members who did not appear in Urban Active's records and the opportunity for thousands of Subclass Members to recover more money than what was represented in Urban Active's records. .................................................................................... 28

3.  Cases relied on by counsel are inapplicable to this Settlement.................. 28

   The authorities cited by the Objectors to support its position that courts reject claims made settlement are unpersuasive and distinguishable. *Burden v. Selectquote Ins. Servs.*, 2013 U.S. Dist. LEXIS 16977, at *17-18 (N.D. Cal. Mar. 18, 2013). ...................................... 28

H.  The class representatives' enhancement payments are reasonable and appropriate based upon their active participation in this case and the favorable settlement. ..................................................................... 29

   The Class Representatives came forward, willingly assisted counsel in prosecuting this action, and provided a valuable service to the Class.    Courts routinely provide enhancement payments to compensate class representatives for such services. *Lonardo v. Travelers Indemnity Co.,* 206 F. Supp. 2d 766, 787 (S.D. Ohio 2010); *In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 373-74 (N.D. Ohio 1990). ............................................................. 29

I.   Class Counsel's fee request is reasonable under both the lodestar and common fund approach as adopted by Courts in the Sixth Circuit. ............... 32

1.  The Lodestar Approach is best suited for this Settlement. .......................... 32

   The lodestar approach is particularly appropriate here because the Class' claims involved fee shifting statutes and the award of attorney fees does not diminish the fund available to the class............................... 32

2.  A Common Fund Cross-check establishes the reasonableness of Class Counsel's lodestar award. ........................................................ 35

   Courts routinely use a common-fund cross-check in cases in which a lodestar fee award has been requested and the common fund is calculated taking into consideration the total award available to the Class. *Van Horn v. Nationwide Property and Casualty Ins. Co.*, 436 Fed. Appx. 496, 501 (6th Cir. 2011); *Lonardo v. Travelers Indemnity Co.*, 206 F. Supp. 2d 766, 800-802 (S.D. Ohio 2010). ............................... 35

3.  Plaintiff's Fee Request is Reasonable in Proportion to Damage Actually Suffered by the Class. ............................................................. 36

iii

Pursuant to this Settlement, over 606,000 class members had the opportunity to complete a simple claim form providing nothing more than their name, address, and other contact information. The average claimant will be receiving a payment of $36.42, which is more than 140% of the cost of average monthly due paid by a member. For this significant reward, Class counsel has agreed to accept less than their current lodestar value. ............................................... 37

4.  Although not a necessary disclosure, Class Counsel's fee distribution is consistent each firm's lodestar totals .......................................................... 37

5.  Zik/Hearon argument is inconsistent with the CCAF regarding Class Counsel's fee awards, but neither is correct. .............................................. 38

The Objectors played no role in the prosecutions of this action, the negotiations of this Settlement, and the substantial relief being provided to the Class. Therefore, they are not entitled to any attorneys fee award. ................................................................................... 38

6.  The CCAF's "clear sailing" and "kicker aruments" are without merit. .......... 39

IV.  Conclusion .................................................................................................... 41

Certificate of Service ....................................................................................... 42

## TABLE OF AUTHORITIES

**Cases**

*Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997) ................................. 27, 28, 29

*Bittner v. Tri-County Toyota*, 58 Ohio St. 3d 143, 569 N.E.2d 464 (1991)..................... 42

*Blessing v. Sirius XM Radio Inc.*, 2011 U.S. Dist. LEXIS 94723 (S.D.N.Y. Aug. 24, 2011) ......................................................................................................... 19

*Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980) .................................................... 45, 46

*Browne v. Am. Honda Motor Co., Inc.*, 2010 WL 9499072, (C.D. Cal. July 29, 2010) ........................................................................................................................ 6

*Burden v. Selectquote Ins. Servs.*, 2013 U.S. Dist. LEXIS 16977 (N.D. Cal. Feb. 5, 2013) ....................................................................................................................... 36

*Churchill LLC v. Gen. Elec.*, 361 F.3d 566 (9th Cir. 2004) ......................................... 6, 8

*City of Livonia Employees' Retirement Sys. v. Wyeth*, 2013 WL 4399015 (Aug. 7, 2013) ........................................................................................................................... 7

*Cook v. Niedert*, 142 F.3d 1004 (7th Cir. 1998)............................................................ 38

*D'Amato v. Deutsche Bank*, 236 F.3d 78 (2d Cir. 2001)................................................. 6

*DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 314 (W.D. Tex. 2007) .............................. 34

*Dewey v. Volkswagen of Am.*, 728 F.Supp. 2d 546, 575 (D. N.J. 2010) ......................... 7

*Ferrari v. Howard*, 2002 Ohio 3539 (8th Dist.).............................................................. 42

*Friedman v. 24 Hour Fitness USA, Inc.*, 2010 U.S. Dist. LEXIS 143816 (C. D. Cal. July 12, 2010)..................................................................................................... 35

*Garner v. State Farm Mut. Auto: Ins. Co.*, 2010 WL 1687832 (N.D, Cal. 2010) ............ 8

*Gooch v. Life Investors Ins. Co. of Am.*, 672 F.23d 402 (6th Cir. 2012) ........................ 51

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir.1998) .................................... 8

*In re Apple Iphone 4 Prods. Liab. Litig.*, 2012 U.S. Dist. LEXIS 113876 ...................... 33

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, 2010 U.S. Dist. LEXIS 87409 (W.D. Ky. Aug. 20, 2010)...................................................................... 22

*In re Dry Max Pampers Litig.*, 724 F.3d 713................................................. 39, 46, 47, 51

*In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366 (N.D. Ohio 1990) .......................................................................................................................... 37

*In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 801 (3d Cir. Pa. 1995) ................................................................................................................... 28

*In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 359, 376 (N.D. Ohio 2001) ......... 30

*In re Law Office of Jonathan E. Fortman, LLC*, 2013 WL 414476 (E.D. Mo. Feb. 1, 2013) ....................................................................................................................... 7

*In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454 (9th Cir. 2000) ..................................... 38

*In re Prudential Ins. Co. of Am. Sales Prac. Litig.*, 261 F. 3d 355, 366-67 (3rd Cir. 2001) ........................................................................................................................... 20

*In re Southwest Airlines Voucher Litig.*, 2013 WL 4510197 (N.D. Ill. Aug. 26, 2013) ........................................................................................................................... 38

*In re Synthroid Mktg. Litig.*, 264 F.3d 712 (7th Cir. 2001)............................................. 38

*In re Worldcom, Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 23079 (S.D.N.Y. Oct. 11, 2005)................................................................................................................... 20, 22

*In re: Educ. Testing Serv. Praxis Principles of Learning and Teaching Grades* 7-12, 2006 U.S. Dist. LEXIS 83479, 2006 WL 3332829 (E.D. La. Nov. 15, 2006).. 32, 34

*Jones v. Dominion Res. Servs., Inc.*, 601 F.Supp.2d 756 (S.D. W.Va. 2009) .............. 38
*Kritzer v. Safeline Solutions, LLC*, 2012 U.S. Dist. LEXIS 74994 (May 30, 2012, S.D. Ohio) ................................................................................................. 33, 44, 50
*Levell v. Monsanto Research Corp.* ........................................................................... 21
*Little-King v. Hayt Hayt & Landau*, 2013 U.S. Dist. LEXIS 129587 (D.N.J. Sept. 10, 2013) ............................................................................................................. 22
*Lonardo v. Travelers Indem. Co.*, 706 F.Supp. 2d 766, 785 (N.D. Ohio 2010)....... passim
*Luft v. Perry County Lumber & Supply Co.*, 2003 Ohio 2305 (10th Dist.)..................... 42
*Mangone v. First USA Bank*, 206 F.R.D. 222 (S.D. Il. 2001) .......................................... 8
*Manners v. American General Life Ins. Co.,* 1999 U.S. Dist. LEXIS 22880 (M.D. Tenn. Aug. 10, 1999) .............................................................................. 28, 29
*Martina v. L.A. Fitness Int'l, Inc.*, 2013 U.S. Dist. LEXIS 145285 (D. N.J. October 8, 2013) ......................................................................................................... 35
*Masters v. Wilhelmina Modeling Agency, Inc.*, 473 F.3d 423 (2d Cir. 2007) ................ 38
*Milliron v. T-Mobile*, 2009 U.S. Dist. LEXIS 101201 (D. N.J. Sept. 10, 2009).............. 33
*Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 349 (6th Cir. 2009) ................................... 20
*Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 18 n.7 (2d Cir. 1981) ........................................................................................................... 20
*Olden v. Gardner*, 294 F. App'x 210, 220 (6th Cir. 2008) ........................................ 19, 20
*Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542 (2010) ................................................ 42
*Physicians of Winter Haven LLC v. Steris Corp.*, 2012 U.S. Dist. LEXIS 15581 (N.D. Ohio) ............................................................................................... 46
*Radcliffe v. Experian Info. Solutions, Inc.*, 715 F.3d 1157 (9th Cir. 2013) ................... 39
*Reynolds v. Beneficial Nat'l Bank*, 288 F. 3d 277, 282 (7th Cir. 2002).......................... 28
*Robins v. Global Fitness Holdings, LLC*, 838 F. Supp.2d 631 (N.D. Ohio 2012)....passim
*Schulte v. Fifth Third Bank*, 805 F.Supp.2d 560, (N.D. Ill. 2011).................................. 32
*Schwartz v. TXU Corp.*, 2005 U.S. Dist. LEXIS 27077 (N.D. TX 2005)........................ 29
*Smith v. Levine Leichtman Capital* ............................................................................... 36
*Spark v. MBNA Corp.*, 48 F. App'x 385, 390 (3d Cir. 2002) ......................................... 34
*Stoetzner v. U.S. Steel Corp.*, 897 F,2d 115 (3d Cir. 1990) .......................................... 6
*Taft v. Ackermans*, 2007 U.S. Dist. LEXIS 9144 (S.D.N.Y. Jan. 31, 2007) .................. 22
*TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982)............. 20
*Van Horn v. Nationwide Prop. & Cas. Ins. Co.,* 2010 U.S. Dist. LEXIS 42357 (S.D. Ohio).................................................................................... 41, 44, 45
*Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, 436 Fed. Appx. 496 (6th Cir. 2011) ........................................................................................................... 45
*Vassalle v. Midland Funding LLC*, 708 F.3d 747, 755-56 (6th Cir. 2013)..................... 40
*Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 107 (2d Cir. 2005) ................. 19
Wess v. Storey, 2011 U.S. Disc. LEXIS 41050 *12 (S.D. Ohio Apr. 14, 2011).............. 38
*Wren v. RGIS Inventory Specialists*, 2011 WL 1230826 (N.D. Cal. Apr. 1, 2011).......... 6

**Statutes**

28 U.S.C. § 1332(d)(2) .................................................................................................. 20
28 U.S.C. § 1332(d)(3) .................................................................................................. 20
KRS 367.900 ................................................................................................................. 33
KRS 367.912(1) ............................................................................................................. 14
KRS 367.930(2) ............................................................................................................. 33

O.R.C. 1345.01 ............................................................................................................ 33

O.R.C. 1345.09(F)(2) ................................................................................................. 33

O.R.C. 1345.44(C) ...................................................................................................... 14

### PLAINTIFFS' RESPONSE TO THE OBJECTION OF JOSHUA BLACKMAN AND THE OBJECTION OF ZIK/HEARON

Plaintiffs Amber Gascho, Ashley Buckemeyer, Michael Hogan, Edward Lundberg, Terry Troutman, Anthony Meyer, Rita Rose, Julia Snyder, Albert Tartaglia, Michael Bell, Matt Volkerding, and Patrick Cary, on behalf of all members of the Class and Subclasses, hereby respond to the Objections of Zik and Hearon filed on December 23, 2013, (Docket No. 118) ("Zik/Hearon Objection") and Joshua Blackman filed on December 27, 2013, (Docket No. 122) ("CCAF Objection").

## I.    PRELIMINARY STATEMENT

Pursuant to this Settlement Agreement, Defendant Global Fitness Holdings, LLC d/b/a Urban Active Fitness ("Urban Active") pledged over $17,000,000 in cash refunds to more than 606,000 former members. To receive an award, Class Members needed only to complete a claim form providing basic contact information and, if applicable, check box(es) indicating Subclass membership. No further proof or documentation was needed. Approximately 55,600 Claim Forms were filed of which 49,457 were deemed valid and approximately 3,965 are pending further review. Most importantly, the average payment for each Approved Claimant is $36.41 – a significant amount because the average monthly payment for an Urban Active gym membership was $26.00.

Despite these results, a professional objector, the CCAF, whose client has paid Urban Active nothing – and thus has <u>no</u> <u>damages</u> – seeks to overturn this Settlement because Class Counsel "settled" his claims for a mere $25.00 payment. The Zik/Hearon Objection is equally frivolous when one considers the ruling in *Robins v. Global Fitness Holdings, LLC*, 838 F. Supp.2d 631, 654 (N.D. Ohio 2012), dismissing claims identical to Zik/Hearon's. In addition, even assuming Zik/Hearon could succeed

on its claims which partially overlap with the claims of the Gym Cancel Subclass, the average class member of a proposed "Zik/Hearon Class" would only recover $36.00 ($26 monthly fee plus $10 cancellation fee). Here, the average Allowed Claimant will recover $36.41, and the average Gym Cancel Subclass Member will recover $44.54.

Not only is this Settlement fair, reasonable, and adequate, but this Settlement is in the best interest of the Class/Subclasses because it provides immediate payment from a defunct company, eliminates any risk of an adverse judgment, and provides a significant cash award equaling or exceeding what could be achieved at trial.

## II.   FACTS

### A.   *Settlement Terms and Provisions.*

The Settlement, as preliminarily approved by this Court, creates a single Class and three Subclasses whose members may receive the following awards:

- The "Class" includes all individuals who signed a gym membership or personal training contract on or between January 1, 2006, to October 26, 2012. Any Class Member that filed a valid Claim Form will receive $5 in addition to any other Claim Award.

- The "FIF Subclass" includes all Class Members who paid a $15 Facility Improvement Fee ("FIF"), Club Administrative Fee ("CAF"), or any other biannual $15 fee between April 1, 2009, to October 26, 2012. Any FIF Subclass Member that filed a valid Claim Form will receive $20 in addition to any other Claim Award.

- The "Gym Cancel Subclass" includes all Class Members who cancelled their gym membership contract on or between January 1, 2006, to October 26, 2012. Any Gym Cancel Subclass Member that filed a valid Claim Form will receive $20 in addition to any other Claim Award.

- The "Personal Training Cancel Subclass" includes all Class Members who cancelled a personal training contract on or between January 1, 2006, to October 26, 2012. Any Personal Training Cancel Subclass member who becomes an Allowed Claimant will receive $30 in addition to any other Claim Award.

2

Thus, all Class/Subclass Members who file a claim will receive a cash payment of $5, $25, $35, $45, $55, or $75 for alleged conduct causing actual damages of between $0 and $100 to virtually all Class Members. Class/Subclass inclusion is based solely on simply defined, common, and objective criteria:

- For the Class, the existence of a membership contract;
- For the Gym Cancellation Subclass, the cancellation of that contract;
- For the FIF Subclass, the payment of a FIF; and
- For the Personal Training Cancel Subclass, the existence of and cancellation of a personal training contract.

These payments are in settlement of this lawsuit's claims and allegations which include misrepresentations and violations of states' consumer sales practices acts, breach of contract, and unjust enrichment. The Release is narrowly tailored to only release claims that were "raised or which could have been raised in the Action, and which arose during the Class Period and arise out of or are related to the factual allegations or are based on the same factual predicates as alleged in the Action's Third Amended Complaint." *See* Settlement Agreement § 2.23 (*emphasis in original*).

### B. *The Notice and Claims Process.*

This Court approved a notice program involving a Notice Postcard, an email notice, a reminder email notice, general publication, and establishment of an internet site. Approximately 601,000 potential claimants were provided direct Notice. Counsel also issued a press release and placed it on the PR Newswire. As a result of this extensive notice program, newspapers and television stations in Columbus, Cincinnati, Cleveland, Lexington, Louisville, and Harrisburg reported on the settlement and included instructions on how to file a Claim. *See* Exhibit 1. Numerous independent websites and other social media outlets also reported the Settlement and provided

instructions on how to file a claim.  *See* Exhibit 2.

To perfect a claim, a Class Member needed only to complete a Claim Form containing basic identifying information and submit it online or via U.S. Mail.  No documentation or other proof of their claim was required.  Moreover, the claims process was open to any individual, even those not receiving direct Notice.

This open claims process was necessary because Urban Active's data (produced in discovery and provided to the Claims Administrator) was unreliable in identifying the current name and current address of all Class Members and the Settlement amount each was entitled.  This unreliability stemmed from the fact that Class Members moved, changed emails, changed names, and were otherwise not reachable via the information provided when they signed their contracts, which was anytime between January 1, 2006, to October 26, 2012.  Because the Postcard Notice was not mailed until October 30, 2013, the contact information in Urban Active's records was 1 to 8 years old.  Compounding the passage of time is the fact that Urban Active used 4 different electronic record management systems since 2006.  The use of these various systems, and the transfer of information between them meant that Urban Active's data contained inaccuracies, therefore necessitating an open claims process.

On October 30, 2013, Postcard Notices were mailed to the 601,494 Class Members for whom valid mailing addresses existed.  *See* Affidavit of Jeffery D. Dahl, President of Dahl Administration, January 21, 2014, attached hereto as Exhibit 3, at ¶12.  More than 146,000 Notice Postcards were initially returned to the Settlement Administrator as undeliverable.  *Id.* at ¶14.

In response to the Notice program, Dahl received 55,597 claim forms, of which

4

49,457 were deemed timely filed and valid, 3,965 are pending further review, 2,161 were invalid duplicates, and 14 were untimely. *Id.* at ¶33. Of the total, 4,130 were filed without a Claimant ID number (*Id.* at ¶43), indicating that the Claimant learned of the Settlement through news reports or other general publications, and not through the Postcard Notice or email notice. Moreover, 3,900 of the timely filed Claims did not match any information contained in Urban Active records. *Id.* at ¶33. Thus, the Settlement Administrator is reviewing those potential Claims to determine the Claimants are indeed Class Members that do not appear within Urban Active's records. *Id.* at ¶32.

As of today, 49,457 of the 55,418 claims have been deemed valid. *Id.* at ¶33. The total payout to these 49,457 Allowed Claimants will be between $1,542,505 and $2,003,416. *Id.* at ¶38. The Settlement Administrator is currently resolving this variance pursuant to its duties in paragraph 10.4 of the Settlement Agreement. *Id.* The variance exists because Claim Forms submitted by approximately 20,459 Allowed Claimants, indicated membership in additional subclass(es) not matching Urban Active's records. *Id.* The Settlement Administrator thus requested additional information from Defendant and is following up with those Allowed Claimants. *Id.*

As of today, the average confirmed cash payment to each Allowed Claimant is **$36.41**. *Id.* at ¶36. Objectors Zik/Hearon take particular issue with the award to each Gym Cancel Subclass Member; however, as of today, the average cash payment to Gym Cancel Subclass Members is **$44.54**. *Id.* During the Class Period, the average membership sold by Urban Active cost approximately **$26.00** per month,[1] meaning the

---

[1]     A review of the databases provided in discovery by Urban Active for Kentucky Members indicated an average monthly fee of $25.51. A review of the database produced by Urban Active's third party vendor Motionsoft for members in Ohio, Kentucky, Georgia, Tennessee, North Carolina, and Pennsylvania indicated an average monthly fee of $26.76. For simplicity purposes, these calculations

typical Class Member will be refunded **140%** of one month's dues and the typical Gym Cancel Subclass member will be refunded over **170%** of one-month's dues.

### C. *The Class Response.*

Only two Objections were filed out of a 606,000 member class, demonstrating unusually broad support for the settlement.[2] Neither of these objections were filed by Class Members who truly believe the compensation is inadequate. Rather, one is by an ideological professional objector and the other alleges that this Settlement – specifically the Gym Cancel Subclass – compromises pending class action claims.

Objector Joshua Blackman is represented by the "Center for Class Acton Fairness" ("CCAF"). Mr. Blackman filed a Claim Form seeking $25 as a member of the Class and Gym Cancel Subclass. As noted in Defendant's Motion to Strike, Docket No. 125, Mr. Blackman joined Urban Active on August 16, 2011, and rescinded his contract during the 3-day cancellation period. He was fully refunded everything paid. Thus, Mr. Blackman has paid Urban Active nothing, has made a claim for $25, and is simultaneously arguing that the Settlement Agreement is unfair to the Class.

While the CCAF preemptively tries to establish that it is not a "professional objector[]," the above facts and its track record prove otherwise. The Northern District of Ohio recently commented that the CCAF is a serial objector "long on ideology and short on law." *Lonardo v. Travelers Indem. Co.*, 706 F.Supp. 2d 766, 785 (N.D. Ohio

---

have been rounded to $26.00 per month. *See* Affidavit of Thomas McCormick, January 21, 2014, attached as Exhibit 4, ¶¶ 5-6.

[2]     *See Browne v. Am. Honda Motor Co., Inc.*, 2010 WL 9499072, at * 18 (C.D. Cal. July 29, 2010) (finding that low percentage of objections favors settlement approval); *Churchill LLC v. Gen. Elec.*, 361 F.3d 566, 577 (9th Cir. 2004) (affirming final approval with 45 objections out of 90,000 notices); *Wren v. RGIS Inventory Specialists*, 2011 WL 1230826, at *10 (N.D. Cal. Apr. 1, 2011) (finding 0.02% objection rate "strongly supports approval of the settlement"); *see also, e.g., Stoetzner v. U.S. Steel Corp.*, 897 F,2d 115, 118-19 (3d Cir. 1990)*; D'Amato v. Deutsche Bank*, 236 F.3d 78 86-87 (2d Cir. 2001).

2010). Another court referred to the CCAF and its founder, Ted Frank, as a "professional objector" of which "federal courts are increasingly weary." *See Dewey v. Volkswagen of Am.*, 728 F.Supp. 2d 546, 575 (D. N.J. 2010). Yet another Court observed that a CCAF objection was not grounded in the facts of that particular case, but rather in the CCAF's objection to class actions in general. *See City of Livonia Employees' Retirement Sys. v. Wyeth*, 2013 WL 4399015, at *5 (Aug. 7, 2013). When considering the content of the CCAF's Objections, this Court should "consider the background and intent of objectors and their counsel, particularly when indicative of a motive other than putting the interest of the class members first." *In re Law Office of Jonathan E. Fortman, LLC*, 2013 WL 414476, at *5 (E.D. Mo. Feb. 1, 2013).

Here, as in other cases, the CCAF used its blog to solicit objectors. *See, e.g.,* http://centerforclassactionfairness.blogspot.com/2013/11/urban-active-fitness-class-action.html. The CCAF's November 20, 2013, blog post said: "[o]ne hopes that a class member who received a[n Urban Active] postcard investigates the unfairness of the settlement and retains qualified counsel to object." Indeed, the CCAF has objected to over 27 class settlements since 2009, making similar arguments to those made here.

Objectors Robert and April Zik and James Hearon are Class Members and Gym Cancel Subclass members eligible to recover $25 pursuant to Urban Active's records. These individuals did not file Claim Forms; therefore they have no stake in the proceeds of the Settlement should it be finally approved. As evidenced by the Request for Fees, the motivation in objecting is not to secure additional value or compensation to the class, but rather to secure payment of over $640,000 in attorney's fees.

Despite these two objections, the Class's response to this Settlement has been

overwhelmingly positive as only 90 Class Members opted-out.  Such a low opt-out rate (0.014%) shows that overall the Class considers the Settlement to be fair.[3]

### D. *The Seeger Settlement.*

Zik/Hearon devotes significant space to comparing this Settlement to "the *Seeger* Settlement."  The *Seeger* Settlement provided coupons for 30 day memberships.  The *Seeger* Court determined that these coupons were worthless because (i) most class members had cancelled their membership with Urban Active and had no desire to go back, and (ii) 30-day trial memberships are a common marketing tool used by health clubs to generate business.  In exchange, Urban Active received a broad general release absolving Urban Active of *any* wrongdoing, at *any* time, for *any* reason.  As set forth in the chart below, the *Seeger* Settlement does not compare to this Settlement:

---

[3]     *See Garner v. State Farm Mut. Auto: Ins. Co.*, 2010 WL 1687832, at * 15 (N.D, Cal. 2010) (0.4%.opt-out rate "is a further indication of the fairness of the Settlement"); *see also, e.g., Mangone v. First USA Bank*, 206 F.R.D. 222, 227 (S.D. Il. 2001); *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1027 (9th Cir.1998); *Churchill L.L.C. v. Gen. Elec.,* 361 F.3d 566, 577 (9th Cir. 2004).

|  |  | *Seeger* |  | *Gascho* |
|---|---|---|---|---|
| **Notice** |  | Email *or* Postcard |  | Email *and* Postcard |
| **Class Member Benefit** |  | 30 Day Coupon |  | Cash Refund (between $5-$75, with an average of $36.41). |
| **Release** |  | General Release: Unlimited in time or scope.[4] |  | Specific Release: Limited to class period and alleged claims.[5] |
| **Minimum payment** |  | $0.00 |  | $1,300,000.00[6] |
| **Approved Claims** |  | 1,444[7] |  | Between 49,457 and 53,422 |
| **Claim Rate** |  | 0.6%[8] |  | 9.2%[9] |
| **Payment to the Class** |  | $0.00 |  | Between $1,542,505 and $2,003,416 |

Zik/Hearon ignores these facts and attempts to persuade this Court with inaccurate statements, unsupported attacks, and unconvincing arguments.  As discussed below, this Settlement is in the best interest of the Class because it provides substantial recovery to all Urban Active Members without any risk of an adverse judgment.

## III.    ARGUMENT

Many of the Objectors' statements are simply false.  Each Objection should be overruled. Rather than responding to each misstatement and unduly lengthen this (already lengthy) Response, Class Counsel will focus on and directly respond to the

---

[4]      See Exhibit 5, Order denying Final Approval saying, "the release sought by the defendant is overly broad.  The release is unlimited in time or nature of claims.  The release includes claims that do not share the identical factual predicate as Plaintiff's claims."

[5]      *See* Section III(C) herein.

[6]      Settlement Agreement § 7.1

[7]      *See* Exhibit 5 at 3.

[8]      *Id.*

[9]      *See* Exhibit 3 at ¶46.

arguments and inaccuracies relevant to the Final Approval decision.[10]

### A. Class Counsel pursued, adequately protected, and obtained significant value for the Gym Cancel Subclass.

The Zik/Hearon Objections are primarily concerned with the Settlement of the Gym Cancel Subclass' claims. The Settlement allows all Gym Cancel Subclass Members to collect at least $20 for breach of contract, unjust enrichment, and consumer sales practice act claims associated with the member's cancellation of their gym membership contracts pursuant to Defendant's policies of charging cancellation fees, refusing to accept, process, and honor cancellations, and continuing to charge members monthly fees after cancellations.

The Zik/Hearon claims focus on just two of the cancellation policies at issue in this Litigation: charging of one extra months' dues after cancellation and a $10 cancellation fee. Zik/Hearon argue that they are the only plaintiffs to allege the "simply defined" and "contractual" claims related to these billing practices.[11] Zik/Hearon also repeatedly allege that these claims are "very likely to be certified and succeed on the merits." *Id.* at 5, 24. Last, Zik/Hearon allege that each Class Member is owed up to $60 for these claims. *Id.* at 22. As discussed below, each of these allegations is categorically false.

---

[10] Pursuant to this Court's Preliminary Approval Order and the Settlement Agreement, §13.2, the Joint Proposed Final Order, Joint Proposed Final Judgment, and the associated Joint Motion Documents will be filed on February 4, 2014. These documents will further address this Court's obligations under Fed. R. Civ. P. 23(e) and any other legal requirements necessary for Final Approval

[11] *See* Zik/Hearon Objection pp. 5, 22, 23 (saying that Zik/Hearon seeks certification of "simply-defined, contractually-based claims," and "the core of the Zik's Class's claims is that their contracts with Urban Active did not permit it to charge members an additional months dues upon cancellation and/or a $10 administrative cancellation fee," and that "the heart of [the] Zik Class's claims are that Urban Active irrefutably failed to follow its own membership contracts" in charging an additional months' dues and charging a $10 cancellation fee.)

1.    ***The Zik/Hearon claims were also alleged in <u>Robins</u> and alleged and investigated in <u>Gascho</u>.***

Two other class actions containing the same allegations about gym cancellation billing were filed around the same time as Zik/Hearon.  One is *Robins v. Global Fitness Holdings, LLC*, Case No. 1:11-cv-01373-DAP (N.D. Ohio), which was dismissed pursuant to Rule 12(b)(6), 838 F.Supp.2d 631 (2012).  The other is this Litigation.

In *Robins*, plaintiffs alleged that:

[Urban Active] drafted form contracts containing egregious, confusing and misleading cancellation provisions that guarantee members will be charged for one or more months beyond the date they cancel their memberships.  ***

In mid-November 2010, [two named plaintiffs] informed Global of their intent to cancel, and Global confirmed [the] cancellation in writing on November 22, 2010. Still, Global billed them not only for the remainder of November, but for the entire month of December, and for the entire month of January" – although January's payment was eventually reversed by the bank.

*Id.* at 637, 638.  These claims are identical to Zik/Hearon's allegations – Urban Active improperly charged an additional month after the 30 day cancellation period.

In this Litigation, Plaintiffs alleged a class of Ohio Members who cancelled their contracts, "and for whom Urban Active continued to charge their credit, bank, or debit accounts."  *See* Second Amended Complaint, Docket No. 31, August 5, 2011, at ¶7 The Complaint further alleged that Urban Active had a "common policy and practice of intentionally avoiding, refusing to accept, and refusing to properly process notices of cancellation…"; that "Defendant engages in a common policy and practice of avoiding cancellation, making cancellations as difficult as possible, and failing to honor cancellations; and, that Urban Active breached is contracts by "making unauthorized

charges to members … accounts, refusing to honor contract cancellations, and failing to comply with terms and conditions regarding contract cancellation." *Id*. at ¶¶ 10, 20, and 163. Almost identical allegations were made in the *Tartaglia* litigation.[12] *See* First Amended Complaint, July 11, 2011, ¶¶ 7, 9, 57, 68, attached as Exhibit 6. A number of Class Representatives made specific allegations related to the $10 fee and additional monthly fees after cancellation with one specifically claiming that he was not allowed to submit his cancellation form at the front desk, and, just like the plaintiffs in *Robins* and *Zik/Hearon,* that he was charged an additional months' dues after his cancellation was sent by certified mail. *Id*. at ¶43. He described his claims by saying:

> [I] sent the form to Urban Active via certified mail on or about February 1, 2011. Despite complying with these extra-contractual cancellation procedures, I continued to incur charges through April, 2011. In addition, I was charged a $10 cancellation fee which was never disclosed.

Exhibit 7.

During discovery, Class Counsel reviewed hundreds of thousands of internal emails and other documents. Pursuant to these extraordinary efforts, which no other plaintiffs' group engaged in, Class Counsel learned that Urban Active referred to its practice of charging one additional months' dues after the 30 day cancellation period as the "two billing cycle cancellation policy." *See e.g.* Exhibit 8. From this, and other internal documents, Class Counsel learned, among other things, that the "two billing cycle cancellation policy" language was added to the standard form contract in approximately March, 2008, and that enforcement of the policy began on July 9, 2009. *Id*. Urban Active claims that it ceased enforcement of its two billing cycle cancellation

---

[12] The *Tartaglia* matter is parallel litigation filed in Kentucky State Court by the Vorys firm alleging violations of Kentucky law. Upon reaching a global settlement, the *Tartaglia* Plaintiffs and causes of action were incorporated into the Third Amended Complaint filed here. The *Tartaglia* matter has been stayed pending the final resolution of this Settlement, and will be dismissed upon final approval.

policy in June, 2010. While some evidence exists to support this statement, other evidence indicates that Urban Active was inconsistent in eliminating the policy.

Regarding the $10 cancellation fee, Class Counsel learned that the $10 cancellation fee provision (paragraph 45) was added to Urban Active's standard form contract in late 2007, and that its enforcement began on July 9, 2009. *See* Exhibit 9.

### 2. Success of Zik/Hearon's Claims was unlikely.

Zik/Hearon's statement that its claims were "very likely to be certified and succeed on the merits" is directly contradicted by established case law. As noted above, *Robins'* identical claims were dismissed because the plaintiffs, "were properly billed, per their contracts, for two more billing cycles (i.e., December 2010 and January 2011)" and that "the Membership Contracts expressly permitted [Urban Active] to charge these fees to their accounts." *See Robins,* 838 F. Supp.2d at 643-44. Thus, at best, success for Zik/Hearon is uncertain.

Similarly, success on Zik/Hearon's contract claim related to the $10 cancellation fee is also uncertain because, as noted above, beginning in 2008 all of Urban Active contracts provided for the charging of a $10 cancellation fee and Urban Active's documents prove that defendant did not start charging this fee until July, 2009. Zik/Hearon are unlikely to succeed on the merits of those claims.

### 3. Even if successful individual damages were limited.

Zik/Hearon also overstate the value of their claims. Zik/Hearon argue that each member is owed as much as $60 for being overcharged by one month and the $10 cancellation fee. This number is inflated because the typical Class Member only paid $26 in monthly dues. Exhibit 4, ¶¶5-6.

In other words, even if both of Zik/Hearon's claims were entirely successful, the

13

maximum recovery for the typical class member would be $36 ($26 + $10). Here, Class Counsel has (i) eliminated any and all risk of an adverse judgment, and (ii) secured an immediate payment of *no less* than $25 to every member of the Gym Cancel Subclass. In fact, the average award to be received by a member of the Gym Cancel Subclass is $**44.54** – $18 more than Zik/Hearon's maximum damages. *See* Exhibit 3 at ¶36.

### B. *Class Counsel pursued, adequately protected, and obtained significant value for all other Class/Subclass Claims.*

Zik/Hearon also object claiming that Kentucky Class Members have not received sufficient value for the release of their Kentucky Health Spa Act (KHSA) claims. This argument displays a fundamental misunderstanding of the pending claims, the overall structure of the Settlement, and the inherent risks associated with any litigation.

One potential remedy available under the KHSA is the voiding of the contract. *See* KRS 367.912(1). Likewise, rescission of the contract is a possible remedy under the Ohio's Prepaid Entertainment Contract Act ("PECA"). *See* ORC 1345.44(C). Thus, while the laws may be different, and the facts necessary to succeed on the claims may be different, the potential remedies available are similar.

In negotiating this Settlement, Class Counsel was keenly aware of the potential value of all of the Class' claims, but also the risks to the Class associated with continued litigation. Here, that risk was heightened by a number of factors.

First, as discussed above, the ruling in *Robins* hampered the Class' claims. In *Robins,* not only were plaintiffs' contract claims dismissed, but the Kentucky Subclasses' KHSA claims and the Ohio Class's CSPA and PECA claims were also dismissed. In dismissing the Kentucky Subclass claims, the Court specifically ruled that Urban Active's contracts complied with the KHSA saying:

14

> A review of these Plaintiffs' contracts shows that they comply with the statutory provisions and contain, verbatim, the quoted statutory language…. Because these Plaintiffs have not alleged facts showing that these contracts violate the Kentucky statute, Count Seven must be dismissed with prejudice.

*See Robins,* 838 F. Supp.2d at 651. In dismissing the Ohio CSPA and PECA claims,

the Court said, among other things:

> More importantly, Plaintiffs have failed to allege individual claims against Global under the Acts because Global's conduct in charging post-cancellation and other fees was consistent with the executed contracts, and any oral representations to the contrary were precluded by the integration clauses in those contracts. Furthermore, the contracts contained, nearly verbatim, the statutory language for three-day cancellations and cancellations due to death, disability and relocation – the only cancellation provisions required under the OPECA. Accordingly, Counts Four and Five are dismissed with prejudice.

*Id.* at 649.

Second, the Class' claims were further threatened by *Robins*' appeal to the Sixth

Circuit. *Robins et al v. Global Fitness Holdings, LLC*, Case No: 12-3231 (6th Cir.). At

the time of the Settlement, *Robins*'s appeal was being briefed. Had the Sixth Circuit

affirmed the Northern District's decision, the Class would have had to distinguish its

claims from the Sixth Circuit's affirmation.

Third, the KHSA and PECA have rarely been litigated with few judicial decisions

on point. Indeed, there is no Kentucky or Ohio case law interpreting the KHSA and

PECA and identifying when rescission is appropriate. Likewise, no cases describe an

appropriate method to calculate damages. This absence of guiding law was further

complicated by the fact that Urban Active possessed strong equitable arguments (i.e.

members were provided substantial benefits pursuant to their contracts), which would

have weighed against monetary recovery in excess of what is already being provided

pursuant to this Settlement. This again reinforces the significant value being provided pursuant to this Settlement, all while eliminating any risk of an adverse judgment.

Last, Urban Active is no longer in business and has no income stream, which weighs against continuing a protracted and expensive litigation. In sum, Class Counsel negotiated to maximize the value of the Class' claims while still securing a substantial and guaranteed recovery for the Class/Subclasses.

## C.    *The Release is narrowly tailored and appropriate.*

The Release here releases no more than conduct "aris[ing] out of the identical factual predicate as the settled conduct." *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.*, 396 F.3d 96, 107 (2d Cir. 2005); *see also Olden v. Gardner*, 294 F. App'x 210, 220 (6th Cir. 2008) (approving class-wide release because it only released claims arising from the "identical factual predicate"). Pursuant to the identical factual predicate doctrine, Class plaintiffs may release claims not asserted in the litigation as long as they arise from the same factual allegations. *See Blessing v. Sirius XM Radio Inc.*, 2011 U.S. Dist. LEXIS 94723, at *15 (S.D.N.Y. Aug. 24, 2011); *In re Prudential Ins. Co. of Am. Sales Prac. Litg.*, 261 F. 3d 355, 366-67 (3rd Cir. 2001).

The same or identical predicate refers to any claim that "'depend[s] on the very same set of facts'" as the underlying class action complaint. *In re Worldcom, Inc. Sec. Litig.*, 2005 U.S. Dist. LEXIS 23079, at *3 (S.D.N.Y. Oct. 11, 2005) (quoting *Nat'l Super Spuds, Inc. v. N.Y. Mercantile Exch.*, 660 F.2d 9, 18 n.7 (2d Cir. 1981)); *see also Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 349 (6th Cir. 2009) ("The question is . . . whether the released claims share a factual predicate with the claims pled in the complaint.") (quotations and citation omitted). Because the focus is on the facts giving

16

rise to the complaint rather than the legal theories pled therein, released claims can include not only those "that were, or could have been pleaded," but also "those that were unknown or had not accrued at the time of settlement." *Olden*, 294 F. App'x , at 219-20; *see also TBK Partners, Ltd. v. Western Union Corp.*, 675 F.2d 456, 460 (2d Cir. 1982) (providing that a claim can be released "even though the claim was not presented and might not have been presentable in the class action").

Here, the Settlement Release fits squarely within these requirements. It releases only those claims that share a factual predicate with those pled in the Complaint. Specifically, the released claims are limited to those that:

> were raised or which could have been raised in the Action, and which arose during the Class Period and arise out of or are related to the factual allegations or are based on the same factual predicates as alleged in the Action's Third Amended Complaint. This specifically includes any and all claims for breach of contract, unjust enrichment, misrepresentation, and/or violations of consumer protection acts, health spa acts, or prepaid entertainment contract statues resulting from Defendant's sales, communications, contracting, billing, and/or cancellations of any gym or personal training contracts.

*See* Settlement Agreement § 2.23 (emphasis in original).

In fact, courts routinely approve settlements involving similar settlement releases. In *Levell v. Monsanto Research Corp.*, this Court rejected objections and approved a settlement that released any and all claims "which the [class members] may possess under the Price Anderson Act, the Common Law, or any other federal or state law, regulation, or rule of any kind and **which relate in any way** [to the defendants'] acts, omissions, disclosures, non-disclosures, or conduct concerning [the] operation of the Mound facility . . . ." 191 F.R.D. 543, 561 n.32 (S.D. Ohio 2000) (emphasis added). The Southern District of New York recently approved a similar settlement, which

released any and all claims "arising out of, based upon, *or related in any way to*: (a) the purchase, acquisition, sale, disposition, retention, or ownership of [certain] securities . . . and the allegations that were made or could have been made in the Litigation," as well as "(b) the purchase or other acquisition of, the retention of, [the ownership of,] the sale or other disposition of, or any other transaction involving [certain] securities by any of the Released Persons during the Settlement Class Period; or (c) the settlement or resolution of the Litigation." *Taft v. Ackermans*, 2007 U.S. Dist. LEXIS 9144, at *24-26 (S.D.N.Y. Jan. 31, 2007) (emphasis added).

This Court should likewise reject Zik/Hearon's argument that the second sentence of the provision describing the released claims could be construed as being independent from, and thus not limited by, the preceding sentence. "[T]he release in the . . . Settlement must be read in the context of the entire document and not parsed out." *Little-King v. Hayt Hayt & Landau*, 2013 U.S. Dist. LEXIS 129587, at *47 (D.N.J. Sept. 10, 2013). The subordinate sentence of the provision describing the released claims is just that -- subordinate. To be released, a claim must either be pled in or "based on the same factual predicate" as the complaint. Settlement Agreement § 2.23. "Obviously, a failure to understand the settlement agreement is not a valid objection." *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, 2010 U.S. Dist. LEXIS 87409, at *29 (W.D. Ky. Aug. 20, 2010). "It is, after all, a given that the Release will only be applied insofar as its application conforms to law." *In re WorldCom, Inc. Secs. Litig.*, 388 F. Supp. 2d 319, 342 n.36 (S.D.N.Y. 2005).

### D. *The Settlement is Procedurally Fair.*

Objectors Zik/Hearon argue that the Settlement is procedurally unfair because

settlement discussions occurred without their involvement. No legal basis exists to support this Objection and Zik/Hearon cite none. Therefore, it should be rejected.

After the *Seeger* Settlement was defeated, Class Counsel and Zik/Hearon discussed consolidating actions and/or pooling resources to jointly prosecute these actions against Urban Active. These discussion broke down. Because no agreement was reached, Class Counsel separately prosecuted their claims: continuing discovery, taking numerous depositions, and moving for class certification on June 14, 2013. Shortly thereafter, the parties began meaningful settlement negotiations, reaching agreement on September 12, 2013.

Regarding Class Counsel's negotiations with Zik/Hearon, as evidenced in Class Counsel's email of January 23, 2013, (attached as Exhibit 10) Zik/Hearon refused to accept compensation based on a legally supportable position, i.e. (1) the time, effort, and costs, committed to the litigation (i.e. a lodestar analysis); or (2) an already overly generous percentage of the Kentucky Class' recovery as compensation for their "simply defined contractually based claims" that already overlapped with Gascho's claims (i.e. the common fund approach). Simply stated, Zik/Hearon refused to accept a fee sharing agreement that could be justified in any Court. Notably, as they continue to do in their Objections, Zik/Hearon refused to acknowledge *Robins*, which dismissed the same contract claims. Instead, they insisted that they be handsomely compensated for a purported "nationwide" class of all members from 1996 to 2012, despite *Robins'* ruling that Urban Active's form contracts bar such claims. While Class Counsel made numerous efforts to bridge the gap, it ultimately became clear that Zik/Hearon would not accept fees proportional to time, effort and value; and its demands were not based in

reality.

Objectors Zik/Hearon further argue that by seeking Final Approval in this Court, the parties have forum-shopped. *See* Zik/Hearon Objection at 36. This accusation is erroneous. During the Class Period, Urban Active had 19 gyms in Ohio compared to only 10 in Kentucky,[13] Urban Active had almost twice as many members in Ohio than Kentucky (315,611 vs. 179,635 members), and despite doing business in seven states, more than 52% of all members belonged to Ohio gyms (315,611 of approximately 606,000 members). Ohio's interest in this litigation is obvious.

Nevertheless, Zik/Hearon wrongfully claim that pursuant to 28 U.S.C. § 1332(d)(3), this Court should decline jurisdiction because more than 1/3 of the Class Members and Defendant reside in Kentucky. This argument fails on the numbers alone. Less than 30% of the Class (179,635 of 606,000 members) belonged to Kentucky gyms. Therefore, under 28 U.S.C. § 1332(d)(2) this court has original jurisdiction of this action and may not decline jurisdiction under subsection 1332(d)(3). Regardless, even assuming this Court had discretion under subsection 1332(d)(3), the significant Ohio interest described above, this Court's familiarity with the litigation, court and settlement administration efficiency, and the multi-state nature of this Settlement all weigh heavily in favor of this Federal Court retaining jurisdiction as opposed to Kentucky State Court.

### E. *Class Representatives are representative, typical, and certification of the Settlement is appropriate.*

Inclusion in the Class, or any Subclass, of this Settlement is based upon easily defined, objective, and common criteria.

- Every Class member had a membership contract, and therefore, was subject to the practices and policies alleged in the Third Amended

---

[13]     *See* Exhibit 11.

Complaint. The Class Representatives are representative of the Class.

- Every Gym Cancel Subclass member cancelled their membership agreement, and, as alleged in the Third Amended Complaint, was subject to the Urban Active's practices and policies which included charging additional fees and refusing to honor, accept, and process gym membership cancellations in accordance with its contracts and applicable law. All Class Representatives except Snyder and Cary are representative of this Subclass.

- Every FIF Subclass Member paid Urban Active a $15 Facility Improvement Fee, and therefore, as alleged in the Third Amended Complaint was subject to Urban Active's practice and policy of failing to properly disclose these fees. All of the Class Representatives are representative of this Subclass.

- Every Personal Training Cancel Subclass Member cancelled a personal training contact. Every member of this Subclass was, as alleged in the Third Amended Complaint, subject to Urban Active's practices and policies which included charging additional fees and refusing to honor, accept, and process personal training cancellations in accordance with its contracts and applicable law. Class Representatives Gascho, Tartaglia, Buckenmeyer, Lundberg, Troutman, and Snyder are representative of this Subclass.

Despite Class Representatives being subject to these common policies and practices and typically suffering from the same type of injury, Zik/Hearon argue that the Class Representatives and the Class' claims are too disparate for settlement purposes. Zik/Hearon's argument is legally and factually incorrect.

<u>Legally</u>, Zik/Hearon completely misconstrues the seminal holding in *Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997). In *Amchem*, the Supreme Court affirmed the Third's Circuit's decision to reject a class action settlement related to asbestos claims. In affirming, however, the Supreme Court criticized the Third Circuit's refusal to consider the fact of settlement as part of the Rule 23 analysis. The Supreme Court said, "***settlement is relevant to a class certification***" and "confronted with a request for settlement-only class certification, a district court ***need not*** inquire whether

21

the case, if tried, would present intractable management problems … **for the proposal is that there be no trial.**" *Id.* at 619-20. The Supreme Court went on to say that the "dominant concern" is whether a proposed class has "sufficient unity so that absent members can fairly be bound by decisions of class representatives" and that the Third Circuit should have acknowledged that "**settlement is a factor in the calculus**." *Id.* at 22. (Emphasis added).

Turning to the facts of *Amchem*, the Supreme Court said that regardless of the Third Circuit's incorrect application of the law, "No settlement class called to our attention is as sprawling as this one" and specifically noted that a global class of asbestos claimants could not satisfy Rule 23 because of "individuals' varying medical expenses, smoking histories, and family situations." *Id.* at 624-25. Importantly, the Supreme Court commented that, "predominance is a test readily met in certain cases alleging **consumer** or securities fraud or violations of the anti-trust laws." *Id.* (Emphasis added.) Thus, this Litigation, as a consumer action, fits squarely within the Supreme Court's instruction that "predominance is a test readily met."

The other cases cited by Zik/Hearon also support approval of this Settlement. *See Reynolds v. Beneficial Nat'l Bank*, 288 F. 3d 277, 282 (7th Cir. 2002) (rejecting settlement for a number of reasons, none of which deal with any conflict of interest between class members; in discussing the alleged conflict of interest, the court specifically said, "we are not disposed to regard this particular defect in the settlement as fatal."); *In re GMC Pick-Up Truck Fuel Tank Prods. Liab. Litig.,* 55 F.3d 768, 801 (3d Cir. Pa. 1995) (pre-*Amchem* decision holding that "at the very least, the class should have been divided into sub-classes so that a court examining the settlement could

22

consider settlement impacts that would be uniform at least within the sub-classes.").

Following *Amchem,* numerous class actions involving allegations of consumer fraud and misconduct similar to those in this case have been approved. For example, the court in *Manners v. American General Life Ins. Co.,* 1999 U.S. Dist. LEXIS 22880, at *47-48 (M.D. Tenn. Aug. 10, 1999), found commonality and predominance because:

> [P]laintiffs allege over 30 factual and legal issues common to the Class. These allegations relate to whether AGL uniformly failed to disclose material information relating to policy dividends, interest credits and values, whether AGL developed a common scheme for fraudulently inducing Class Members to purchase insurance, and whether AGL implemented any such scheme by training agents to use uniformly deceptive sales techniques and by providing agents with uniformly deceptive sales materials and policy illustrations to be used with prospective purchasers. Resolution of these issues will clearly so advance the litigation that they may fairly be said to predominate.

*Id.* That court also rejected any argument that differences in state laws prevented certification because (i) the Third Circuit had expressly rejected that argument, and (ii) because, "to the extent any variations in state law would suggest that the case might not be readily manageable as a class action, that is an issue that the Supreme Court has specifically stated a court need not consider in determining whether a class should be certified for settlement purposes." *Id.* at 49-50 (citing *Amchem*, 521 U.S. at 620).

Likewise, the Court in *Schwartz v. TXU Corp.*, 2005 U.S. Dist. LEXIS 27077, at *46-49, 54 (N.D. TX 2005), certified a settlement class finding that commonality, typicality, and predominance were all satisfied because the claims of all class members rested on the same false and misleading statements, the alleged misconduct affected the members of the class in the same manner, and the alleged misrepresentations *involved a series* of statements that were uniformly distributed. *Id.* (emphasis added).

Here, like in *Manners* and *Schwartz*, the Class has alleged a course of conduct

that was uniformly applied to the Class. In addition, the Subclasses allege a course of conduct that was applied uniformly to each Subclass and resulted in the charging of unlawful and undisclosed fees and dues. Zik/Hearon's objections completely ignore – like they ignore *Robins* – the fact that three distinct subclasses have been created relating directly and objectively to the conduct of Urban Active which caused Class/Subclass members damage. As noted in *In re Inter-Op Hip Prosthesis Liab. Litig.*, 204 F.R.D. 359, 376 (N.D. Ohio 2001):

> Differences in state law . . . do not destroy class cohesion because the settlement agreement provides for distribution of benefits based on the *objective criteria* described therein. Similarly, individual issues relating to causation, injury, and damage also disappear because the settlement's objective criteria provide for an objective compensation scheme. The Court does not mean to state that the benefits of the settlement itself provide a common issue which satisfies the predominance requirement; rather, this Court finds that the common issues that preexisted the proposed settlement -- involving a common product, defendant, and course of conduct -- when considered in light of the proposed settlement, predominate over any individual issues between class members.

*Id.* As such, the Class Representative and Class/Subclass Members share common interests because the factual, legal, and remedial theories raised by the Representative Plaintiffs are shared with the Class/Subclass Members.

### F. *The Class Notice was proper.*

In the Preliminary Approval Order, this Court approved the "Claim Form, Legal Notice ('Notice'), and Notice Postcard." Preliminary Approval Order ¶3. Despite this approval, Zik/Hearon accuses Class Counsel of "disingenuously claim[ing]" that Notice meets the requirements of Rule 23. Zik/Hearon Objections at 33.

To support this argument, Zik/Hearon first argues that the Legal Notice, rather than the Notice Postcard, should have been mailed to all Class Members. No legal support is provided for this argument because none exists. *See* Newberg on Class

Actions § 8:28 (5th ed.) ("Even though the quantity of information conveyed on a postcard is less than that included in a several-page notice, numerous courts have held that postcard notice is 'more than sufficient.' Notice sent by postcards is particularly useful when used in conjunction with other forms of notice, including publication and email.  These short-form postcards may also include information telling class members how to receive long-form notice if they want more information…").

Next, Zik/Hearon acknowledges that whatever gets mailed to the Class Members "must interest them to the extent they access the more detailed description of the settlement terms on the website."  Zik/Hearon Objections at 33.  Zik/Hearon then quotes from the Federal Judicial Center saying, in part, "[wi]th junk mail on the rise … legal notices must stand out…. Notices can be discarded unopened…. [and], a good notice starts with envelope design."  *Id.*

Here, the Postcard Notices do not have envelopes, do not have to be opened, and thus there is no need for better "envelope design."   In fact, the Settlement Administrator and Newberg on Class Actions agree that Postcard Notice combined with a website is particularly effective at producing high claim rates.  *See* Exhibit 3 at ¶40.

Here, the Postcard Notice prominently lists both Global Fitness Holdings LLC and Urban Active, it grabs the reader's attention by saying they are entitled to "money," and then it highlights the Settlement website so the reader can gather more detailed information.  Simply put, the Legal Notice, Postcard Notice, email notice, reminder email notice, general publication notice, and the numerous newspaper and television reports combined to provide the Class with all of the information needed to learn about the settlement and make an informed decision regarding participation in the Settlement.

The Notice program was robust and exceeded the minimum requirements of due process. *Id.* at ¶¶40,45.

### G. *The Claims Process was reasonable and necessary.*

The Objectors advocate for a direct payment system that would have sent more than 140,000 checks to undeliverable addresses, and countless others to addresses in which class members no longer resided. *Id.* at ¶14. This boilerplate objection, which is often raised by professional objectors, especially CCAF, has been widely rejected despite CCAF's claims to the contrary. Indeed, courts recognize that "a direct-distribution of settlement benefits…is not a panacea." *Schulte v. Fifth Third Bank*, 805 F.Supp.2d 560, 594 (N.D. Ill. 2011) (citing *In re: Educ. Testing Serv. Praxis Principles of Learning and Teaching Grades* 7-12, 2006 U.S. Dist. LEXIS 83479, 2006 WL 3332829, at *2 (E.D. La. Nov. 15, 2006)

### 1. A Claims Made Process is common and expected, including in gym settlements.

The simple claims process employed in this case is common to consumer class action settlements. *See, e.g., Lonardo*, 706 F. Supp at 766 (granting final approval to settlement in which claimants who properly submit a claim form receive $18); *Kritzer v. Safeline Solutions, LLC*, 2012 U.S. Dist. LEXIS 74994, **32 (May 30, 2012, S.D. Ohio) (granting final approval to settlement in which claimants were required to submit a claim form); *In re Apple Iphone 4 Prods. Liab. Litig.*, 2012 U.S. Dist. LEXIS 113876, at *11 (rejecting argument that claims process was overly burdensome where perspective class members needed to "provide only their name, address and iPhone serial number and to check a box"); *Milliron v. T-Mobile*, 2009 U.S. Dist. LEXIS 101201, at *19 (D. N.J. Sept. 10, 2009) ("Courts have frequently upheld claims forms such as the one utilized in

this case, and the Court finds it perfectly appropriate to require Class members to submit certain information proving that they are entitled to collect the relief awarded in this case."); *DeHoyos v. Allstate Corp.*, 240 F.R.D. 269, 314 (W.D. Tex. 2007). *See also Spark v. MBNA Corp.*, 48 F. App'x 385, 390 (3d Cir. 2002 ) (declining invitation to fashion across-the-board rule requiring that all settlements provide only for an automatic credit or disbursement and stating that "a claims process … is not inherently inconsistent with a fair and reasonable settlement, as this case demonstrates.");

The claims process employed here is particularly suited to disputes involving fitness clubs because the Class includes persons who provided their names and addresses up to 8 years ago, and includes a large number of younger health club members who tend to move, on average, more frequently than other age groups. Moreover, Defendant used four different databases during the Class Period to collect and store member information resulting in lost information related to older members. Indeed, nearly 25% of the Notice Postcards were returned as undeliverable. This figure does not include notices where the post office was able to make delivery, but the intended recipient no longer resided at that address. Courts have found this problem to be reason alone to reject the direct-payment approach CCAF demands. *See In re: Educ. Testing Serv. Praxis Principles of Learning and Teaching Grades 7-12*, 2006 WL 3332829, at *2 (overruling objection because claims process prevents checks from being mailed to unverified and old addresses and thereby reduces fraudulently cashed checks).

Tellingly, courts around the country have approved claims processes like this one involving fitness clubs. *See, e.g., Martina v. L.A. Fitness Int'l, Inc.*, 2013 U.S. Dist.

LEXIS 145285, at *27 (D. N.J. October 8, 2013); *Friedman v. 24 Hour Fitness USA, Inc.*, 2010 U.S. Dist. LEXIS 143816, at *9 (C. D. Cal. July 12, 2010).

### 2. The Open Claims Process resulted in potential new Class Members and additional recoveries.

Objectors' request for a direct-distribution settlement may have foreclosed the identification of potential Class Members. Here, the wide publicity and simple open claims process resulted in 3,900 claims by former club members who did not appear in Urban Active's records. Exhibit 3 ¶¶32-33. Moreover, as noted on pages 5-6 herein, the open claims process also resulted in an opportunity for thousands of Subclass Members to recover more money than what was represented in Urban Active's records.

### 3. Cases relied on by Objetors are inapplicable to this Settlement.

The CCAF cites to a number of cases for the proposition that "more and more frequently" courts are rejecting "superfluous" claims processes. CCAF Objection at 17. To the extent that claims-made distributions have been rejected, they have been rejected on unique facts and represent the rare exception not the rule. The authorities cited by CCAF in support of its position are weak, at best.

For example, in *Burden v. Selectquote Ins. Servs.*, 2013 U.S. Dist. LEXIS 16977 (N.D. Cal. Feb. 5, 2013), the Court did not reject a claims-made process, but instead ordered supplemental briefing on the issue. CCAF neglects to inform this Court of the subsequent decision – rendered less than six weeks later – ***approving the claims process.*** *See* 2013 U.S. Dist. LEXIS 16977, at *17-18 (N.D. Cal. Mar. 18, 2013). Similarly, the court in *Smith v. Levine Leichtman Capital,* found the entire settlement problematic and questioned only one aspect of the proposed claims process. 2012 U.S.

28

Dist. LEXIS 163672, at *8 (N.D. Cal 2012). Likewise, the advisory notice authored by Judge Alsup which CCAF claims to be "well-respected" has not been cited by a single court in the country.

> **H.** **The class representatives' enhancement payments are reasonable and appropriate based upon their active participation in this case and the favorable settlement.**

The Class Representatives have adequately represented the Class. Courts routinely review and permit incentive awards (used interchangeably with "enhancement payments") to class representatives.[14] *See, e.g.*, *Lonardo*, 706 F.Supp. 2d at 787 (approving $5,000 incentive award for those who have extensively involved themselves in litigation more than a typical class member); *In re Dun & Bradstreet Credit Servs. Customer Litig.*, 130 F.R.D. 366, 373-74 (N.D. Ohio 1990) (finding that "[n]umerous courts have not hesitated to grant incentive awards to representative plaintiffs who have been able to effect substantial relief for classes they represent" and approving incentive awards ranging from $35,000-$55,000,); *Wess v. Storey*, 2011 U.S. Disc. LEXIS 41050 *12 (S.D. Ohio Apr. 14, 2011) (approving incentive award "in a very modest amount of $3,000 each").[15] Given the prevalence of service payments and the frequency of their approval, this Court should approve the modest Enhancement Payments.

The Class Representatives came forward and willingly assisted counsel in prosecuting this action. As set forth in Plaintiffs' Motion for Enhancement Payments,

---

[14]    Although the Sixth Circuit has "never explicitly passed judgment on the appropriateness of incentive awards," it has recognized "there may be circumstances where incentive awards are appropriate." *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 756 (6th Cir. 2013) (citation omitted). That said, nearly every class action settlement across the nation contains incentive awards.

[15]    *See also, e.g., Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998); *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 463 (9th Cir. 2000); *In re Southwest Airlines Voucher Litig.*, 2013 WL 4510197, at *11 (N.D. Ill. Aug. 26, 2013); *Masters v. Wilhelmina Modeling Agency, Inc.*, 473 F.3d 423, 430 (2d Cir. 2007); *Jones v. Dominion Res. Servs., Inc.*, 601 F.Supp.2d 756, 768 (S.D. W.Va. 2009).

29

the Class Representatives performed a range of tasks necessary to prosecute their claims and protect the Class' interests. Many Class Representatives suffered only $50 of damages or less, yet they willingly agreed to serve as class representatives with no assurance that they would receive anything. *See In re Synthroid Mktg. Litig.*, 264 F.3d 712, 722 (7th Cir. 2001) ("[i]ncentive awards are justified when necessary to induce individuals to become named representatives"). Given the class representatives' efforts in bringing this case to counsel and assisting counsel, the agreed upon Class Representative Enhancement Payments are within, and frankly below, typical awards.

Nevertheless, the CCAF objects saying that the Enhancement Payments render the settlement unfair. This Objection ignores the relevant inquiry – whether the class representatives performed services benefiting the Class and fulfilled their fiduciary obligations to the Class. Instead, it constitutes CCAF's ideological position, which relies almost entirely on two settlements which are not comparable to the Settlement here.

The CCAF first compares this Settlement to *In re Pampers Dry Max Litig.*, which provided an incentive award payment of $1,000 per affected child. 724 F.3d at 716. Class members, however, only received injunctive relief.[16] *Id.* This disparity put the class representatives in a situation in which they would be entitled to a different form of relief, and an infinitely more valuable award than nearly every class member.

The CCAF also relies on *Radcliffe v. Experian Info. Solutions, Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013), which provided $5,000 incentive awards expressly conditioned on the class representatives' support for the settlement. *Id.* at 1164. The court said, "we are not confronted with run-of-the-mill incentive awards, but rather a

---

[16] Class Members were only eligible for a refund of one box of diapers if they saved UPCs and receipts from diaper purchases.

settlement provision that weighs on the class representatives' independent judgment on whether to support the settlement by calling for the denial of incentive awards if they do not support it." *Id.* at 1167.  One expert opined that he reviewed hundreds of class action settlements without ever seeing a term expressly requiring class representatives to support the settlement to obtain their incentive award.  *Id.*

Last, the CCAF references the Sixth Circuit's decision in *Vassalle*, but again that case is distinguishable because the *Vassalle* named plaintiffs received a different type of benefit – exoneration of their debts – than class members who retained their debt and received less than $20.  *See Vassalle v. Midland Funding LLC*, 708 F.3d 747, 755-56 (6th Cir. 2013).

Here, no preferential treatment exists and the incentive award is not "perfunctory."[17]  As of today, the average award per claimant is $36.41, with the average Gym Cancel Subclass Member receiving $44.54.  *Importantly, the CCAF never argues that the compensation arrangement to Class/Subclass members is inadequate*. This is fatal to many of the CCAF's arguments, including this one.

Moreover, the Settlement Agreement does not condition Enhancement Payments on the Class Representatives' support for the Settlement.   In fact, Class Representatives must submit a claim form to receive relief just like any other Class Member. *See* Settlement Agreement ¶ 8.1.  The Enhancement Payment is provided only for their "service and assistance to the class" and notably, the Settlement

---

[17]     The online Oxford Dictionary defines "perfunctory" as meaning "(of an action or gesture) carried out with minimum effort or reflection." *See* www.oxforddictionaries.com.  The CCAF provides no evidence to support a claim that the Settlement was not carefully considered and fervently negotiated by Class Counsel.  Moreover, the term "perfunctory" cannot be examined in a vacuum without considering the individual claims and circumstances of the case.  The CCAF, however, ignores all circumstances of this case (perhaps because its client suffered zero damages), and instead seems to argue that *all* negotiated settlements, which necessarily involve some compromise, are perfunctory.

Agreement even varies the amount of the Enhancement Payment based upon the "varied burdens and obligations" each Class Representative faced.[18]  *Id.* at ¶¶ 8.1 - 8.2. No Class Representatives was promised any payment at the onset of the case nor was any promised service payments only if they agreed to the Settlement.

The CCAF's entire Objection relies on the errant assumption that the Settlement is somehow unfair.  However, once this Court determines that the Settlement is fair, it implicitly acknowledges that the Class Representatives aptly fulfilled their role, and a strong presumption should exist that the Class Representatives' incentive awards are proper.  As such, this Court should overrule the CCAF's Objection.

      **I.**     *Class Counsel's fee request is reasonable under both the lodestar and common fund approach as adopted by Courts in the Sixth Circuit.*

Courts in this Circuit have wide discretion as to whether to employ a lodestar or common benefit approach to counsel fees, and frequently one method of analysis is employed as a cross-check on the other.  *See Van Horn*, 2012 U.S. Dist. Lexis 42357, at **8.  Here, a lodestar approach with a common benefit cross-check is employed.

      **1.**     **The Lodestar Approach is best suited for this Settlement.**

The lodestar approach is particularly appropriate here for at least two reasons.

<u>First</u>, a significant number of Plaintiffs' claims involve fee shifting statutes.  *See Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 550-51 (2010) (adopting lodestar analysis in most situations where fee shifting is the appropriate remedy).  Plaintiffs' core

---

[18]     In a similar way, the *Staton* case referenced by the CCAF in footnote 10 fares no better when analyzed in conjunction with the actual terms of this settlement.  *Staton v. Boeing Co.*, 327 F.3d 938, 976-77 (9th Cir. 2003).  The Ninth Circuit was evaluating incentive awards of up to $50,000 and that averaged $30,000 per class representative.  *Id.*  Even non-named class members were to receive such payments, which the Court observed was not fair.  *Id.*  Thus, that court acknowledged that the incentive awards need to be evaluated individually to ensure their fairness.  *Id.* at 977.

claims in Kentucky and Ohio were based upon the Kentucky Health Spa Act (KRS 367.900 *et seq.*) and the Ohio Consumer Sales Practices Act (O.R.C. 1345.01 *et seq.*), which contain fee shifting provisions. *See* KRS 367.930(2) and O.R.C. 1345.09(F)(2).

Ohio courts routinely grant lodestar awards or "reasonable attorneys fees" that exceed the relief obtained. *See Luft v. Perry County Lumber & Supply Co.*, 2003 Ohio 2305 (10th Dist.) (recovery of $86,115 in attorney fees on recovery of $8,000); *Ferrari v. Howard*, 2002 Ohio 3539 (8th Dist.) (reversing trial court decision that only allowed attorney fee recovery of $600 on an amount in controversy of $670). In *Bittner v. Tri-County Toyota*, 58 Ohio St. 3d 143, 569 N.E.2d 464 (1991), the Ohio Supreme Court made it clear that the determination of attorney fees under the Ohio Consumer Sales Practices Act should not be a function of the amount recovered on behalf of the plaintiff in order to avoid frustrating the public policy favoring private enforcement of Ohio's consumer protection laws. The over-arching policy behind these decisions require courts to award a fee that is both reasonable and sufficient to incentivize lawyers to take these important cases at their own risk. As such, it is critical that attorneys are reasonably compensated for bringing actions on behalf of consumers.

Second, the lodestar approach is particularly appropriate in cases where the award of attorney fees does not diminish the fund available to the class. *See Lonardo*, 706 F. Supp. 2d at 789 (adopting a lodestar approach because the provision for attorneys' fees was independent of the benefit to the class).

The CCAF entirely rejects the lodestar analysis arguing that an attorney fee can never be independent of the common fund. This argument fails because the class's

33

recovery here was negotiated before, and independently of, attorneys fees,[19] and because the CCAF's position is contrary to the law of this Circuit.

The lodestar approach is firmly established as an appropriate methodology to award fees in the Sixth Circuit. *See Van Horn* at *9; *Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway,* 46 F.3d 1392, 1401 (6th Cir. 1995). Moreover, the District Court in *Lonardo* rejected these same arguments also made by CCAF. In adopting a lodestar approach, with a common benefit cross-check, that court reminded the CCAF that relying purely on a common benefit analysis would often significantly undervalue class counsel's service to the class and the public, and that courts may choose to use lodestars, cross-checked by the common benefit, to reach an accurate and well-reasoned result. *Lonardo*, 706 F.Supp. 2d at 789-92. The *Lonardo* court also reminded the CCAF that it had expressly admitted "that there is a strong presumption that an unenhanced lodestar figure is a reasonable fee." *Id.* at 816.

In summary, the Objections ignore entirely the reasonableness of applying a lodestar to Class Counsel's fee request. The Objectors' failure is likely borne of ideology rather than reality given Class Counsel will receive less than their total lodestar value. Moreover, Class Counsel accepted this representation on a contingent basis, expended an immense of amount of time, and secured an exceptional benefit for the class. *See Kritzer v. Safeline Solutions, LLC*, 2012 U.S. Dist. LEXIS 74994, at *30 (May 30, 2012, S.D. Ohio) (noting that some courts consider the risk of non-recovery the most important factor in fee determination.)

---

[19]     See Declarations of Thomas N. McCormick and Mark Troutman (Class Counsel), and Richard Gurbst (Defense Counsel) attached as Exhibits 12-13.

### 2.  A Common Fund Cross-check establishes the reasonableness of Class Counsel's lodestar award.

Courts routinely use a common-fund cross-check in cases in which a lodestar fee award has been requested.  *See, e.g.*, *Van Horn*, 2010 U.S. Dist. LEXIS 42357, at *21-25; *Lonardo v. Travelers Indemnity Co.*, 206 F. Supp. 2d 766, 796 (S.D. Ohio 2010).  As established in Class Counsel's Motion for Fees (Docket No. 114 at 14-15), the requested fee is reasonable because it is at the low end of percentages of common funds awarded by Ohio courts.

Recognizing this, the CCAF urges this Court to adopt a valuation method contrary to the law in the Sixth Circuit.  A recent Sixth Circuit decision reviewed these same arguments (also presented by the CCAF), and soundly rejected them.  *See Van Horn*, 2010 U.S. Dist. LEXIS 42357 (S.D. Ohio), *aff'd* 436 F. App'x (6th Cir. 2011).

Moreover, recent district court cases from within this circuit have likewise rejected the CCAF's arguments.  In *Lonardo*, the Court carefully considered an identical CCAF Objection.  706 F.Supp. 2d at 800-02.  After extensive analysis and thorough consideration, the court explicitly rejected the CCAF's position and instead used the mid-point between the actual funds available to the class and the amount paid out (or likely to be paid out) to the class.  *Id.* at 802.  In rejecting the CCAF's argument, the Court noted this was precisely the argument that had already been rejected by the Second, Ninth, and Eleventh Circuits.  (Citations omitted).  Moreover, that Court said that the CCAF's position conflicted with the principle articulated in *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980), which held that "the Available Benefit *is* a benefit, and as a corollary to that principle, that an important aspect of the Court's responsibility in evaluating the Settlement Agreement is to ensure that class counsel is fairly

compensated for the work done and the result achieved."

Following *Boeing* and *Lonardo*, the court in *Physicians of Winter Haven LLC v. Steris Corp.*, 2012 U.S. Dist. LEXIS 15581 (N.D. Ohio), awarded an attorney fee based upon class counsel's estimate of the total class benefits of approximately $20 million.

The CCAF does not cite a single case from the Sixth Circuit to support its position that the percentage should be calculated on the basis of the amount paid out to the class rather than the total amount available to the class, and indeed, none exist.[20] In an earlier portion of the Objection (p. 17), the CCAF cites to a few cases from other jurisdictions to support its claim that the amount claimed should constitute the appropriate valuation of the common fund, however, all of these cases are easily and readily distinguishable from the present case. Moreover, in none of these cases did a court state that the reasonableness of attorney fees was to be determined only on the basis of the amount actually paid out.[21]

### 3. Plaintiff's Fee Request is Reasonable in Proportion to Damage Actually Suffered by the Class.

Pursuant to this Settlement, over 606,000 class members had the opportunity to complete a simple claim form providing nothing more than their name, address, and other contact information. The average claimant will be receiving a payment of $36.42,

---

[20]     In the course of its argument on this issue, CCAF does cite to *In re Dry Max Pampers Litigation*, however, that case stands only for the unobjectionable proposition that settlement values cannot be premised on a fictive world. This Settlement is hardly "fictive." The total amount of money available to the Class can be established with near certainty through a simple mathematical calculation of total number of Class/Subclass members multiplied by the award to each.

[21]     The CCAF also argue that *Boeing* was superseded by the 2003 Amendments to Federal Rule of Civil Procedure 23 and the Class Action Fairness Act in 2005. However, the CCAF provides no explanation, and, aside from citation to a single law review article, provides no authority whatsoever for this proposition. The CCAF also cites to the Federal Judicial Center *Manual for Complex Litigation,* § 21.71 (4th ed. 2004), but again never explains how this authority supersedes the established law of this Circuit as noted above.

which is more than 140% of the cost of average monthly due paid by a member. For this significant reward, Class counsel has agreed to accept less than their current lodestar value. Pursuant to this Settlement, over 606,000 class members had the opportunity to complete a simple claim form providing nothing more than their name, address, and other contact information. For this simple task, Class Members were eligible to receive between $5 and $75. The average claimant will be receiving a payment of $36.42, which is more than 140% of the cost of average monthly due paid by a member.

Thus, unlike the cases cited by the Objectors, this is not a case in which the attorneys get a windfall and the class gets only coupons of little value. *See, e.g.*, *In re Dry Max Pampers Litig.*, 724 F.3d 713. Nor is it a case where the cash recovery by the class represents only a tiny portion of the actual damages suffered by the class members. This is a case in which counsel took a significant risk, obtained an excellent result, and deserves the fee that it has requested.

It is ironic that the CCAF claims that the class has "settled" for something less than adequate compensation while the attorneys have prospered. The CCAF's client, Blackman joined an Urban Active gym after the filing of this lawsuit, cancelled his membership during the three-day cancellation period, and received a full refund. Blackman has paid absolutely nothing to Urban Active, seeks to recover $25, yet argues that Class Counsel has "settled" his claims for less than full value.

### 4. Although not a necessary disclosure, Class Counsel's fee distribution is consistent each firm's lodestar totals.

While such disclosure is not necessary for Final Approval, and it provides absolutely no useful information to the Class, Class Counsel will split this Court's Award

of attorney fees and costs consistent with, and pursuant to, each firm's lodestar value. Specifically, after costs are reimbursed, the Vorys Firm will recover 72% of the remainder and the Isaac Wiles firm will recover 28% of the remainder. Because Class Counsel's Fee Request is less than Class Counsel's current combined lodestar value, these percentages were calculated to appropriately divide the award. Class Counsel's fee request is consistent with applicable case law, and the expectation that class counsel's fees should be based on time and effort expended, and the value provided.

### 5.    Zik/Hearon argument is inconsistent with the CCAF regarding Class Counsel's fee awards, but neither is correct.

As discussed above, the CCAF argues that the agreed upon attorney fee award is too much. At first, Zik/Hearon appears to support the CCAF by including in its Objection one unsupported sentence suggesting that the fees are excessive when compared to the value to the class. Zik/Hearon Objection at 35. Then, Zik/Hearon take an immediate 180 degree turn and argue that if the Settlement is Finally Approved Zik/Hearon's counsel should be paid $640,000. *See* Zik/Hearon Objection, n. 8. This outlandish demand is contrary to the law, unsupported, and is mathematically flawed.

In their argument, Zik/Hearon presumes that an unsuccessful negotiation with the Vorys firm for a co-counsel arrangement magically entitles them to a significant award despite the fact that negotiation ended approximately nine months before this Settlement was consummated. Zik/Hearon then proffers that 40% of the class members are from Kentucky (which is incorrect) and arrive at a $956,000 fee award attributable to the relief obtained for the Kentucky class members. Zik/Hearon then claim they are entitled to attorneys' fees of $637,000, *which is approximately 67% of the total fee they attribute to Kentucky*! Were the math correct, their erroneous and

unsupported claim would be $382,400.[22]

Zik/Hearon played absolutely no role in the prosecution of this action, the negotiations of this Settlement, and the substantial relief being provided to the Class. In fact, Zik/Hearon's counsel spends more than 35 pages of its Objections mischaracterizing the Settlement in an attempt to advance its own interests – not the Class. This Court should recognize the objection for what it is -- an attempt by counsel for Zik/Hearon to appropriate with no basis or justification the reasonable fees that have been requested by Class Counsel.

> **6.    The CCAF's "clear sailing" and "kicker" arguments are without merit.**

The CCAF suggests at pages 18-21 of its Objection that the "clear sailing" and "kicker" provisions are somehow evidence of collusion between the Plaintiffs and Defendant. Again, the CCAF ignores the Sixth Circuit law and the undisputed facts.

The CCAF's entire argument on these points (in fact, its entire Objection) is based on erroneous factual assumptions:  (1)  that Counsel's fees were not negotiated after class relief had been fully determined and (2) the negotiations concerning fees somehow affected the relief available to the class. The CCAF, however, provides no evidence to support this claim. No evidence exists because the CCAF's allegations are categorically false. *See* Exhibit 12 (McCormick Declaration at ¶¶ 8-10 and Troutman Declaration at ¶¶ 12-14) and Exhibit 13 (Gurbst Declaration at ¶¶ 8-10 ). *See also* Class Counsel's Motion for Fees (Docket No. 114) at 12-13. To finalize the settlement and make relief available to the class on an expedited basis, Counsel agreed to accept

---

[22]    Zik/Hearon comment on what they believed were failures to provide information concerning Class Counsel's fees but provide none of their own. Even assuming that their argument makes sense, there is nothing upon which this Court could base any award of attorneys' fees or costs to Zik/Hearon.

a fee below its lodestar.  Once the CCAF's central thesis is abandoned, its argument collapses.

Agreement of counsel as to fees is normal, and such agreements have been upheld and enforced in numerous cases in this circuit.  *See, e.g., Kritzer v. Safeline Solutions, LLC*, 2012 U.S. Dist. LEXIS 74994 (May 30, 2012, S.D. Ohio) (negotiated fee in settlement agreement);  *Lonardo v. Travelers Indemnity Co.*, 706 F. Supp. 2d 766 (N.D. Ohio 2010) (agreement not to oppose fee request no greater than $4.6 million);[23]

As with the CCAF's other arguments, his "kicker" argument is again dependent on the unsupported premise that fees in this case were not negotiated independently of class relief.  The CCAF's argument also has no support in Sixth Circuit law, and the CCAF cites none.[24]  When the attorney fee has been independently negotiated,  courts in the Sixth Circuit, including the Court of Appeals in *Van Horn*, recognize that the attorney fees constitute an *additional benefit* to the class.  *Van Horn*, 436 Fed. Appx. at 501; Lonardo, 706 F. Supp. 2d at 803.

Moreover, given the independence of the class relief and the fee agreement in this case, it is only reasonable and fair that if the Court finds the fee request to be unreasonable that the remainder should revert to the Defendant.  As the Court in

---

[23]  As CCAF acknowledges, the single Sixth Circuit case he cites, *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.23d 402 (6th Cir. 2012), *approved* a settlement involving a clear sailing provision. In fact, the Court upheld the settlement agreement stating that "it seems likely the result of the already protracted history of litigation between the parties–a history that evidence adversity to such a degree that we have serious doubts that plaintiff's counsel subsequently engaged in collusion with a longstanding adversary." *Id.* at 426.  Here, the Court is well aware of the longstanding adversary relationship between the parties.

[24]  CCAF does cite *Pampers* for the obvious "economic reality" that a settling defendant is concerned with his total liability.  However, the court in *Pampers* had nothing to say about the effect, or lack thereof, of a "kicker clause" in a settlement agreement.  Moreover, as previously described, the facts of *Pampers* could not be more distinguishable from the facts of the present case.

*Lonardo* recognized − and CCAF ignores − this is not a common fund case.[25] The attorney fees do not come out of the class relief; they are in additional to, and − as has been previously argued − are considered by courts in the Sixth Circuit to be an additional benefit to be added to the class relief in determining the value of a settlement. If Class Counsel's fee request is for any reason unreasonable − which it clearly is not − any reversion to the Defendant will not affect the relief to the class.

## IV.    CONCLUSION

For the reasons set forth above, and for the reasons set forth in Plaintiffs' Joint Motion for Final Approval to be filed on February 4, 2014, this Court should reject the Objections of Zik/Hearon and Blackman, Finally Approve the Class Action Settlement, and award Class Representative Enhancement Payments and attorneys fees and costs as agreed in the Settlement Agreement.

---

[25]    The CCAF argues that the attorney fees should be considered part of a "constructive common fund." It provides no definition for this term, no authority for its use or application in the Sixth Circuit, and no justification for treating it as such.

Respectfully submitted,

s/ Thomas N. McCormick
William G. Porter (0017296)
wgporter@vorys.com
Thomas N. McCormick   (0075496)
tnmccormick@vorys.com
Kenneth J. Rubin (0077819)
kjrubin@vorys.com
VORYS, SATER, SEYMOUR AND
PEASE LLP
52 East Gay Street, P.O. Box 1008
Columbus, Ohio 43216-1008
Telephone:  (614) 464-6400
Facsimile:  (614) 464-6350

James B. Lind (0083310)
jblind@vorys.com
VORYS, SATER, SEYMOUR AND
PEASE LLP
301 East Fourth Street, Suite 3500
Great American Tower
Cincinnati, OH 45202
Telephone: (513) 723-4000
Facsimile: (513) 852-7835

*Attorneys for Plaintiffs*

s/  Mark H. Troutman
Mark Landes   (0027227)
mlandes@isaacwiles.com
Gregory M. Travalio   (0000855)
gtravalio@isaacwiles.com
Mark H. Troutman   (0076390)
mtroutman@isaacwiles.com
ISAAC, WILES, BURKHOLDER &
TEETOR, LLP
Two Miranova Place, Suite 700
Columbus, Ohio 43215
(614) 221-2121
Facsimile:  (614) 365-9516

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on January 23, 2014, a copy of the foregoing was filed electronically.  Notice of this filing will be sent to all parties by operation of the Court's electronic filing system.  The parties may access this filing through the Court's system.

/s/ Thomas N. McCormick
Thomas N. McCormick (0075496)
tnmccormick@vorys.com

1/23/2014 18500972