# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | | |
|---|---|---|
| AMBER GASCHO, et al., | ) | |
| | ) | |
|     **Plaintiffs** | ) | |
| | ) | |
| v. | ) | **CASE NO. 2:11-CV-436** |
| | ) | **JUDGE SMITH** |
| GLOBAL FITNESS HOLDINGS, LLC, | ) | **Magistrate Judge King** |
| | ) | |
|     **Defendant.** | ) | |

## REPLY IN SUPPORT OF OBJECTION
## TO PROPOSED CLASS ACTION SETTLEMENT

Robert J. Zik and April N. Zik (collectively the "Ziks") and James Michael Hearon ("Hearon"), on behalf of themselves and a class of similarly situated persons (collectively "Objectors" or the "Zik Class"), by counsel, reply to the responses of Plaintiffs and Global Fitness Holdings, LLC d/b/a Urban Active ("Urban Active" or "Defendant") to the Objection of the Zik Class.

*Counsel for Objectors, Robert Zik, April Zik, and James Hearon*

| | |
|---|---|
| /s/ Ronna Lucas | /s/ Joshua T. Rose |
| Ronna Lucas | Joshua T. Rose |
| Ohio Registration No. 0063304 | Hummel Coan Miller Sage & Rose LLC |
| John E. Stillpass, Attorneys at Law | 239 South Fifth Street, Suite 1700 |
| 4901 Hunt Road, Suite 103 | Louisville, KY 40202-3268 |
| Cincinnati, Ohio 45242 | 502/585-3084 |
| Ph. 513.936.0800 | jrose@hcmsrlaw.com |
| Fax 513.794.8800 | |
| rlucas@stillpass.com | |
| | /s/ Gregory Belzley |
| | Gregory A. Belzley |
| | P.O. Box 278 |
| | Prospect, KY 40059 |
| | 502/292-2452 |
| | gbelzley@aol.com |

**TABLE OF CONTENTS**

I.     **Summary of Argument** ................................................................... **1**

II.    **Plaintiffs do not even attempt to explain why the vast disparities among class members' claims preclude a global settlement.** .......................... **2**

    A.    The Zik Class' Claims ............................................................ 3

        *Robins v. Global Fitness Holdings, LLC,*
        838 F.Supp.2d 631 (N.D. Ohio 2012) ....................................... 4,5

        *De Leon v. Bank of America*, *N.A.,*
        2012 WL 2568142 (M.D. Fla.) ................................................. 6

        *Sacred Heart Health Sys., Inc. v. Humana Military Heath Care*
        *Servs., Inc.,* 601 F.3d 1159 (11ᵗʰ Cir. 2010) ............................ 6

    B.    KHSA Claims and Other Hollow Arguments of Plaintiffs
        regarding the Disparity among the Class' Claims .................................. 7

        *Gascho v. Global Fitness Holdings, LLC,*
        863 F.Supp.2d 677 (S.D. Ohio 2012) ...................................... 7

        *Robins v. Global Fitness Holdings, LLC,*
        838 F.Supp.2d 631 (N.D. Ohio 2012) ...................................... 8

        *Amchem Products, Inc. v. Windsor,*
        521 U.S. 591, 117 S.Ct. 2231 (1997) ....................................... 9,10

        *Manners v. American Gen. Life Ins. Co.,*
        1999 WL 33581944 (M.D. Tenn.) ............................................ 11

        *Swartz v. TXY Corp.,*
        2005 WL 3148350 (N.D. Tex.) ............................................... 11

        *In re Inter-Op Hip Prosthesis Liab. Litig.,*
        204 F.R.D. 359 (N.D. Ohio 2001) ........................................... 11

    C.    The Overbroad and Vague Release ........................................... 11

        *Levell v. Monsanto Research Corp*.,
        191 F.R.D. 543 (S.D. Ohio 2000) ........................................... 12

    *Taft v. Ackermans,*
    2007 U.S. Dist. LEXIS 9144 (S.D.N.Y. Jan. 31, 2007)................................ 14

    *Moulton v. U.S. Steel Corp.,*
    581 F.3d 344 (6th Cir. 2009) ......................................................... 14

    *Olden v. Gardner,*
    294 Fed. Appx. 210 (6th Cir. Mich. 2008)................................... 15

**III.**    **$19 million purported value vs. $2 million actual value. ..................**   **15**

    *UAW v. Gen. Motors Corp.,*
    497 F.3d 615 (6th Cir. 2007)...................................................... 16

    *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod.'s Liab. Lit.,*
    55 F.3d 768 (3d Cir. 1995)......................................................... 16

    *Bell Atlantic Corp. v. Bolger,*
    2 F.3d 1304 (3d Cir. 1993)........................................................ 16

    *De Leon v. Bank of America, N.A.,*
    2012 WL 2568142 (M.D. Fla.) ................................................... 16

    *McReynolds v. Richards-Cantave,*
    588 F.3d 790 (2d Cir. 2009)...................................................... 17

    A.    There was no need for mailed notice or the claims process,
           particularly as to the Zik cancellation class.............................. 17

           Federal Judicial Center, *Judges' Class Action Notice and Claims*
           *Process Checklist and Plain Language Guide* ........................... 17,18

           *Manners v. American Gen. Life Ins. Co.,*
           1999 WL 33581944 (M.D. Tenn.) .............................................. 18

           *De Leon v. Bank of America, N.A.,*
           2012 WL 2568142 (M.D. Fla.)................................................... 18

    B.    What was the purpose of mailed notice?.................................... 18

           *In re: Educational Testing Service Praxis Principles of Learning*
           *and Teaching, Grades 7-12*, MDL No. 1643, 2006 WL 3332829
           (E.D.La. Nov. 15, 2006)............................................................ 21

C.     What was the purpose of the Claim Form? ................................. 22

*Schulte v. Fifth Third Bank,*
805 F.Supp.2d 560 (N.D. Ill. 2011) ............................................. 23

D.     The parties have manipulated the claims process ......................... 24

1.     õClass membershipö is a õpendingö issue as to almost
4,000 claimants ................................................................. 24

2.     A õfinal awardö has yet to be determined for more than
40% of õvalidö claims ........................................................ 25

Leslie, *The Need to Study Coupon Settlements in Class
Action Litigation*, 18 GEO. J. LEGAL ETHICS at 1397 ................. 26

*Buchet v. ITT Consumer Fin. Corp.*,
845 F. Supp. 684, 695 (D. Minn. 1994) ........................................ 26

Brian Wolfman & Alan B. Morrison, *Representing the
Unrepresented in Class Actions Seeking Monetary Relief*,
71 N.Y.U. L. REV. 439, 474 (1996) ............................................. 26

*De Leon v. Bank of America, N.A.*,
2012 WL 2568142 (M.D. Fla.) .................................................... 27

*In re Gen. Motors Corp. Pick- Up Truck Fuel Tank Prod.
Liab. Lit.*, 55 F.3d at 785 .......................................................... 27-28

*Maywalt v. Parker & Parsley Petroleum Co.*,
67 F.3d 1072, 1078 (2d Cir. 1995) .............................................. 28

IV.    **Procedural Fairness and Attorney's Fees** .......................................... **28**

*In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod.'s Liab. Lit.*,
55 F.3d 768, 801 (3d Cir. 1995) .................................................. 28

*Manners v. American Gen. Life Ins. Co.*,
1999 WL 33581944 (M.D. Tenn.) ............................................... 31

V.     **Conclusion** ........................................................................... **31**

# I.    Summary of Argument

The parties attempt to globally settle all claims of every Urban Active member since January 1, 2006 at the rate of no more than an average of **$3.31 per member** (maximum of $2,003,415 divided by 605,735 class members). This is despite:

•    Urban Active admittedly possessing the information necessary to directly pay class members without requiring members to submit claims, and the Claims Administrator attesting that over 90% of class members actually received notice and thus would have received and deposited a check. The unnecessary claims process drastically diluted the "agreed upon" settlement benefit to the class from over $17 million to likely less than $2 million. The <u>only reason</u> for the unnecessary claims process was to save Urban Active $15 million, and Plaintiffs apparently have no problem with that, provided they receive up to $5,000 each and $2.39 million in attorney's fees.

•    No Plaintiff possessing the claims of the Ziks. Robert Zik (and the tens, if not hundreds, of thousands of members like him) irrefutably being owed a refund of one month's dues and a $10 cancellation fee, plus interest. Unlike Plaintiffs, whose post-cancellation claims to these amounts were arguably barred by their membership contracts (as the *Robins* Court ruled), Robert Zik is owed approximately $75 under the express terms of his membership contract, without even considering his Kentucky Consumer Protection Act claims. Plaintiffs cannot possibly settle and release claims they do not possess, much less adequately represent the Ziks (and those like them) on such claims.

•    Groups of class members with widely divergent claims (both factually and legally) not being segregated into appropriate subclasses or represented by distinct class representatives, contrary to U.S. Supreme Court precedent. Instead, 8.2% of class members (and

even those with no claims) will be paid the identical amounts. Defendants even admit that Plaintiffs' claims are not amenable to class certification, and thus such claims cannot appropriately be settled as a global class. (Response to Objections, pp. 10-14).

Plaintiffs do not even attempt to explain the disparities of their own claims with any detail or evidence, much less demonstrate that such disparities should not preclude settling such claims for the same prices. Plaintiffs also utterly fail to explain or reconcile why their positions with this Court are drastically different than the positions previously taken with the *Seeger* Court and Objectors, including Plaintiffs' previous positions that: (1) Kentucky claims and Ohio claims must remain separate for class certification and settlement; (2) their Kentucky claims were immensely valuable and should be litigated in Kentucky to maximize that value; and (3) Objectors' claims (and their attorney's work) were valuable, and that Plaintiffs and Objectors must work together to achieve maximum results (not collusively settle like Plaintiffs did).

It is clear that Plaintiffs will take whatever position is necessary to save their Settlement (including their $2.39 million attorney fee), regardless of the merits of the position or the affect on certain class members. The Court should not presume that the settlement is fair or that class certification is proper. As required by law, the Court should rigorously analyze all of the various claims brought here and in other lawsuits. After doing so, the Court should reject the settlement under its fiduciary duty to protect all class members.

## II.    Plaintiffs' claims are significantly disparate from themselves and the Ziks' claims.

Plaintiffs continue to fail to educate the Court on the factual and legal details of their own claims, misrepresent the Objectors' claims, and certainly do not demonstrate why settling such vastly disparate claims for the same prices satisfies is fair. Plaintiffs' omissions and misstatements are glaring, particularly given that the Objection went to great lengths to detail the

disparities and the injustice caused by globally settling such disparate claims for the same prices without appropriate subclasses. (Objection, pp. 11-24).

A.      **The Zik Class's Claims**

Plaintiffs and Urban Active misleadingly argue that the Ziks were unlikely to succeed on their claims. They rely on the Court's dismissal of claims in the *Robins* action as primary support for their argument that the Zik Class's claims lack merit, or at least bear great risk. However, Urban Active correctly asserts that the *Robins'* claims were dismissed because "none of the Plaintiffs allege that Global [Fitness] charged any fees that were inconsistent with the unambiguous terms of their written contracts." (Response, p. 13).

Plaintiffs and Urban Active either mislead the Court or fail to recognize that the Ziks' membership contracts include very different cancellation language than Plaintiffs' contracts and the contracts *Robins*. In essence, the Ziks' contracts (i.e. those undisputedly sold by Urban Active at every location prior to March 2008) only allow charging **one** additional month's dues post cancellation, while the contracts in Gascho and *Robins* purportedly allow charging **two** month's dues post cancellation.

The cancellation clause in the Ziks' contracts reads:

> … This **month-to-month membership may then be cancelled with a 30 day written notice** to Seller by certified mail, return receipt requested, or on the cancellation form provided at the Club location <u>with said cancellation to become effective on the 1st of the next month following the expiration of this 30-day written notice</u> with no proration, provided your account is not delinquent. Said written notice must be received by the Club at least 30 days prior to the first day of the month which Member desires to cancel said membership…

(Objection, pp. 22-24 and citations therein; A more legible copy of the Ziks' contract, including a blow up of the cancellation clause, is attached hereto as **Exhibit A**)(emphasis added).

Under such language, if a member cancelled in December 2009 (like the Ziks), they could be properly charged dues for January, but any charge for dues in February would clearly breach the contract. The Ziks (and all members who signed up prior to March 2008) should not have been charged this extra month's dues. Urban Active admits it charged the extra month's dues to such members from at least June 2009 through June 2010, regardless of which cancellation language was in the member's contract, and cancellations exceed 100,000 members in that time period alone, although evidence exists that Urban Active continued to charge members the extra month's dues outside of that one year time period. (Objection, pp. 23, 24)(Plaintiffs' Response, p. 12, 13)(Rose Declaration, Ex. 3 to Objection, ¶ 15).

To the contrary, the cancellation clauses in the contracts of Plaintiffs, Robins, and Hearon (i.e. those sold after March 2008) read:

> You may cancel your membership and the continued billing of monthly dues by certified mail, return receipt requested, personal delivery, manually, or on the cancellation form provided at the club location. A cancellation notice delivered or postmarked a minimum of 30 days prior to your next Billing Date will result in no further billing of dues if you paid your last month's dues in advance. If your last month's dues was not paid in advance, you will be billed one more cycle. A cancellation notice delivered or postmarked less than 30 days prior to your next Billing Date will result in one more monthly billing, if you paid your last month's dues in advance. If your last month's dues was not paid in advance, **you will be billed two more cycles**.

(Ex. 2 to Objection at p. 4 and Ex. C thereto; A copy of the post March 2008 cancellation language is blown up and attached hereto as **Exhibit B**)(emphasis added); See *also Robins*, 838 F.Supp. at 640 (*quoting* the cancellation language).

The revised cancellation language was used to implement Urban Active's policy of billing members for two months post cancellation. (Id.; Plaintiffs' Response, 12). The *Robins* Court dismissed Ohio plaintiffs Zadiraka and Odelli's claims (applying Ohio law), expressing that they were properly charged dues for the two months (i.e. billing cycles) after sending a

notice of cancellation. Zadiraka and Odelli sent notice of cancellation in November 2010, their billing date was December 1, and they were charged dues for December 2010 and January 2011. *Robins*, 838 F.Supp. at 638, 643, 644.

The *Robins* Court also held that Plaintiffs Zadiraka and Odelli were also not damaged because the January charges were reversed by their banks, and that fact (along with the dismissal of all other claims in the case) may have swayed the Court to dismiss Zadiraka and Odelli's claims under the contract language. In contrast, in the *Zik* lawsuit, the Court denied Urban Active's motion to dismiss in its entirety after extensive briefing, including the breach of contract claim of Hearon and Objectors' claims under Kentucky's Consumer Protection Act, KRS § 367.170 ("KCPA").[1]

Further, Robert Zik's contract undisputedly does not contain any $10.00 cancellation fee. (Objection, p. 23, citations therein, including Ex. 3-E thereto). Plaintiffs allege that Urban Active added the $10.00 cancellation fee to its contracts in late 2007/early 2008. (Plaintiffs' Response, p. 13). Likewise, Plaintiffs' and Robins' contracts all include the $10.00 cancellation fee. (Id.; Plaintiffs' Second Amended Complaint). Just like Urban Active's implementation of the two billing cycle policy, Urban Active charged members the $10 cancellation fee after June 2009 regardless of whether or not the fee was expressly provided in the membership contract. (Plaintiff's Response, p. 13).

The Zik's breach of contract claims are not only materially different than Plaintiffs' claims and the claims in *Robins* – they are irrefutable. Urban Active absolutely did not have the right to charge the Ziks (and all members who signed a membership agreement prior to March

---

[1] The Zik Class' KCPA claims are based on Urban Active misleading consumers by selling them "month-to-month" memberships, which are really not "month-to-month" memberships if Urban Active's interpretation of the contracts are applied. Zadiraka and Odelli did not possess these claims and Plaintiffs clearly never pursued them.

2008) an extra month's dues, but it arguably had the right to charge Plaintiffs the extra month's dues (as the Court in *Robins* determined). Further, Urban Active irrefutably did not have the right to charge Robert Zik (and members who signed a membership agreement after 2007) the $10.00 cancellation fee, yet the fee was charged to all members who cancelled after June 2009. Robert Zik (and those like him) are clearly owed a refund of one month's dues, $10, and interest, on their breach of contract claims alone, without even considering their Kentucky Consumer Protection Act claims, which amounts to approximately $75.00 for Robert Zik (one month's dues of $59.99, $10.00 cancellation fee, plus interest at 8% for 3 years).

Plaintiffs did not possess the irrefutable breach of contract claims of the Ziks, and they fail to even recognize or acknowledge the important distinctions between their claims and the Ziks' claims. So how could Plaintiffs possibly adequately protect such claims? It is clear they did not – they pursued and settled their own divergent claims, which are based on conduct of Urban Active arising prior to cancellations being processed. *See De Leon v. Bank of America*, N.A., 2012 WL 2568142 at *10-12 (M.D. Fla.)(rejecting settlement because contract terms varied among members). "[C]laims of breach of contract are peculiarly driven by the terms of the parties' agreement, and common questions rarely will predominate if the relevant terms vary in substance among the contract." *Id.* (quoting *Sacred Heart Health Sys., Inc. v. Humana Military Heath Care Servs., Inc.,* 601 F.3d 1159, 1171 (11th Cir. 2010).

Plaintiffs then seem to argue that it does not matter whether or not they pursued and protected the Zik Class's claims, because the Zik Class's damages are similar in amount to the settlement benefits negotiated by Plaintiffs. (Response, p. 13, 14). Plaintiffs completely miss the boat, and this argument only further demonstrates why this global settlement of widely disparate claims is improper.

Plaintiffs negotiated a value of $20 for cancelling members based on the claims asserted by Plaintiffs – not the claims for which Plaintiffs did not possess, including the irrefutable claims of the Ziks for the extra month's dues and $10 cancellation fee. This negotiated value of $20 is far less than the $75 owed to Robert Zik and those like him. The only claims that Plaintiffs possibly possessed regarding Urban Active charging the extra month's dues and the $10.00 cancellation fee post-cancellation purportedly ran contrary to the express language of their own membership agreements (as determined by *Robins*). And as discussed in the Objection, the core of Plaintiffs' claims arose from conduct occurring prior to Urban Active processing cancellations, including Urban Active failing to allow members to cancel, charging Facility Improvement Fees ("FIF"), and selling members unregistered plans in violation of Kentucky's Health Spa Act ("KHSA"). Those are the claims that Plaintiffs' settled – not Objectors' claims.

After all, one cannot settle or release claims that one does not possess, much less adequately protect the interests of such claimants.

### B.   KHSA Claims and Other Hollow Arguments of Plaintiffs regarding the Disparity among the Class's Claims

Plaintiffs disingenuously argue that the *Robins* decision significantly hampered their claims. First, Plaintiffs were aware of the *Robins* decision prior to continually representing the great value of their claims (particularly their KHSA claims) to the Seeger Court and Objectors. In fact, Plaintiffs argued to this Court that the *Robins* decision "is not relevant, and that even if it is relevant, the reasoning expressed therein supports their position in this case, and not the position of Defendant." *Gascho v. Global Fitness Holdings, LLC*, 863 F.Supp.2d 677, 689 (S.D. Ohio 2012).

Likewise, the Court considered *Robins* and distinguished it. *Id.* at 696. The *Robins* court dismissed plaintiffs' breach of contract and claims under the Ohio Consumer Sales Practices Act ("OCSPA") and Ohio Prepaid Entertainment Contract Act ("OPECA"), because the Court held: (1) the alleged wrongful charges were expressly allowed under plaintiffs' membership contracts; and (2) the claims were not based on conduct prescribed by Ohio courts or the attorney general. *Robins*, 838 F.Supp.2d at 649.

Finally, the Robins Court dismissed plaintiffs' KHSA claims, because plaintiffs' contracts contained the exact contractual language required by the KHSA. *Id.* at 651. These are not the KHSA claims and violations that Plaintiffs boasted to be so valuable. Unlike the claims in *Robins*, Plaintiffs' KHSA claims are based on Urban Active selling memberships without disclosing the list of all available plans registered with the Kentucky Attorney General and selling plans that were more expensive than registered plans.

Plaintiffs also argue that Urban Active has "strong equitable arguments" to their KHSA claims that would have reduced damages available for KHSA violations to the amount negotiated in the settlement (Response, p. 15). First, Plaintiffs would have been aware of such purported strong arguments when they represented to the *Seeger* Court:

> [T]he cash value [being reimbursement of one month's dues per member under the Seeger settlement] **pales in comparison** to the statutory right of all members to void the contract *ab initio* and receive disgorgement as discussed in Objections 5, 6, and 7 below.

(Objections of Tartaglia to *Seeger* Settlement, p. 8)(emphasis added).

In the Settlement, Plaintiffs achieved far less than one month's dues for KHSA violations. Because the violations sound in Urban Active failing to disclose all registered contracts to members and selling memberships that exceed registered prices, the minimal recovery would be voiding all contracts with L.A. Fitness going forward and disgorgement of all

money paid by members that exceed prices and charges included in comparable contracts registered with the Kentucky Attorney General. For example, if Urban Active sold a member a contract for $49.99 per month, but the highest comparable registered contract was $29.99 per month, the member would clearly be entitled to $20.00 per month for the entire time he/she was a member (perhaps many years), plus any other charges not disclosed in registered contracts, plus interest. Thus, as Plaintiffs represented to the Court in Seeger, certain class members' KHSA claims could be worth hundreds (if not thousands) of dollars. However, such members may only receive $5.00 under the Settlement for such claims, and the average payout per member solely for those claims alone would equate to a paltry 41 cents (i.e. 8.16% of $5.00). That again does not sound like the type of recovery Plaintiffs presented to the *Seeger* Court and Objectors.

Urban Active even admits that Plaintiffs' KHSA claims are not amenable to class resolution. (Response, p. 14). As such, the claims cannot be settled as a class, because every class action settlement must independently meet the criteria for class certification. (See Objection, p. 9).

Differences in state law further compound the disparities, including Tennessee statute not permitting any type of cancellation fee. (Objection, pp. 19-22)(citing *Amchem Products, Inc.*, 521 U.S. at 624). Plaintiffs own statements speak volumes: "Ohio and Kentucky claims must remain separate for both class certification and settlement purposes"; and "Given the requirements of the Kentucky Health Spa Act and the penalties that result from a violation, we stand a much better chance of recovering significant dollars and reaching LA Fitness in Kentucky." (Ex. 3-A to Objection, Mr. McCormick's Feb. 27 Email).

Plaintiffs then mislead the Court by arguing that the disparities among their claims (both factually and legally) do not preclude the settlement, because õmanageabilityö concerns that are relevant to a class action trial are not applicable to settlement (where no trial exists).  However, Objectors do not take issue with trial manageability problems.  Objectors take issue with settling widely disparate claims (both factually and legally) under the same terms, particularly when the disparate groups of claimants are not even represented by distinct class representatives (such as the Ziks and those like them).

Our Supreme Court said it best:

> The settling parties, in sum, achieved a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected. Although the named parties alleged a range of complaints, each served generally as representative for the whole, not for a separate constituency.
> []
> ÷[W]here differences among members of a class are such that subclasses must be established, we know of no authority that permits a court to approve a settlement without creating subclasses on the basis of consents by members of a unitary class, some of whom happen to be members of the distinct subgroups.

*Amchem Products, Inc.,* 521 U.S. at 609, 627.

Plaintiffs failure to even educate the Court on their claims is quite telling, and Plaintiffs do not even attempt to explain with any specificity (including math) why members with widely disparate claims and damages should receive the same payouts in lieu of being properly segregated into subclasses so that each representative can negotiate a recovery based on their claims ó not based on some drastically diluted average payout.  (See Objection, pp. 14-22). Instead, Plaintiffs broadly argue that the Settlement is appropriate because it is a consumer protection case where some common facts and some common laws exist.  This is not the law required by our Supreme Court and is certainly not fair to members of the class.

Plaintiffs rely on *Manners v. American Gen. Life Ins. Co.,* 1999 WL 33581944 (M.D. Tenn.). However, the *Manners* settlement included a "Claim Evaluation Process, which is specifically tailored to meet the needs of the Class in this case," and an alternative dispute resolution process for any claims that do not fit the criteria for the Claim Evaluation Process. *Id. at* *6-8. Contrary to Plaintiffs' Settlement, in *Manners*, the benefit paid to a class member was based on evaluating the individual nature and strength of each claim and actual damages (as part of the claims process). Id. at *7. The *Manners* settlement also provided a class benefit of $169M - $193.6M, with attorney's fees of only $19.1M. Id. at *28.[2]

Just by way of one example (although they are countless), how is it fair that a member improperly charged bi-annual $15 FIFs for years (and even perhaps charged dues for years in excess of registered plans in violation of KHSA) receive zero dollars (like 90% of the class) or even $20 ($15 for FIF and $5 general), when a member who was never improperly charged in any respect receives $25 ($20 cancellation and $5 general)? As further detailed in the Objection (pp. 11-24), Plaintiffs own claims and damages are widely disparate (both factually and legally) and cannot be globally settled for the same prices.


C.     **The Overbroad and Vague Release**

Plaintiffs first admit that they can only release claims based on factual predicates that are "identical" to those alleged in their complaint (as they argued in *Seeger*), but then seem to hedge

---

[2] *Swartz v. TXY Corp.* likewise has no bearing. 2005 WL 3148350 (N.D. Tex.). In *Swartz*, plaintiffs allege the identical type of fraud related to the sale of public securities, and varying payouts per share were tailored to the dates when the purchaser bought the stock. Id. at *4, 8, 13. There appear to be no objections in *Swartz*, and no issues were contested or litigated. Also, the case of *In re Inter-Op Hip Prosthesis Liab. Litig.,* 204 F.R.D. 359 (N.D. Ohio 2001)(cited by Plaintiffs) was withdrawn by the publisher.

that they can also release claims based on factual predicates that are "related" to factual allegations in their complaint. (Response, pp. 16-18).

In support of its argument, Plaintiffs cite this Court's decision in *Levell v. Monsanto Research Corp.* and inaccurately argue that the Court approved the settlement. 191 F.R.D. 543 (S.D. Ohio 2000)(Response p. 17). However, this Court in *Levell* actually rejected the settlement, and *Levell* supports Objectors' position. In *Levell*, the proposed settlement agreement provided that class members release defendants from liability for all claims stemming from exposure to radiation, beryllium, and asbestos. *Id.* at 550. After preliminarily approving the settlement and then conducting a fairness hearing, this Court rejected final approval of the proposed settlement, in part, because it provided different settlement benefits to former employees and current employees without plaintiffs justifying the differences. *Id.* at 551, 554, 555, 565.[3]

Likewise, Plaintiffs here have utterly failed to justify why members with vastly disparate claims and damages should receive the same amount of money. Regarding the release language in *Levell*, the Court expressed in dicta that the release could include claims "related" to conduct of various defendants, however all released claims had to arise from exposure to radiation, beryllium, and asbestos caused by such conduct. The issue in Levell was the disparity between the benefits provided to class members – not disparity between conduct of the defendants, which was apparently not material. We have both problems here, and they are material.

---

[3] The Court in *Levell* was also concerned with Defendant not admitting that class certification was appropriate. *Id.* at 549. Similarly, here, Urban Active admits that class certification is not appropriate on Plaintiffs' claims.

As Plaintiffs argued in Seeger and seemingly assert here, the law is clear that only claims based on identical factual predicates can be released, and Plaintiffs' proposed release patently goes beyond those bounds. It releases claims that:

> were raised or which could have been raised in the Action, <u>and</u> which arose during the Class Period <u>and</u> arise out of **or are related to the factual allegations or** are based on the same factual predicates as alleged in the Action's Third Amended Complaint**.**

(Settlement Agreement, p. 6)(emphasis added).

The Settlement Agreement purportedly releases all claims "related to the factual allegations" alleged in the Action's Third Amended Complaint." (Id.). The addition of the phrase "or are related to the factual allegations" is not only overly broad under the law requiring that only claims with "identical factual" predicates be released, the term "related" is vague. And the ambiguity of the term "related" is then potentially explained by the next sentence in the release providing that:

> This specifically includes any and all claims for breach of contract, unjust enrichment, misrepresentation, and/or violations of consumer protection acts, health spa acts, or prepaid entertainment contract statutes resulting from Defendant's sales, communications, contracting, billing, and/or cancellations of any gym or personal training contracts.

This explanatory sentence further expands the release past the legal limits of releasing claims based on identical factual predicates. Plaintiffs also imply that the clause limiting the release to claims that "were raised or which could have been raised in the Action" limits the release to claims based on identical factual predicates. First, that clause could likely be construed as simply pertaining to the legal rule of res judicata and the prohibition against claim splitting – not as pertaining to the factual predicate of the claims. In other words, once a plaintiff brings any claim against a party, any and all claims he/she brought or could have brought against

that party (regardless of the factual predicate) are extinguished by resolution of the action.[4] Likewise, the factual predicate issue is expressly addressed in a different clause of the release — the clause that improperly expands claims based on "related" factual predicates.

**More importantly, if Plaintiffs are taken at their word that only claims with identical factual predicates are released, then the Ziks claims are clearly not released, because the Ziks possess breach of contract claims that Plaintiffs do not possess. If that is the case, the Court must carve out the claims of the Ziks (and persons with similar claims) from the Settlement.**

Urban Active misleadingly relies on *Moulton v. U.S. Steel Corp.,* but that case is completely distinguishable. 581 F.3d 344 (6th Cir. 2009)(Response, p. 14, 15). The contested issue in *Moulton* was to what extent the parties could release "continuing" nuisance claims, which would be based in part on future events. *Id.* at 349. The parties initially tried to release all continuing and future nuisance claims, but after the Court hearing objections, the parties narrowed the release for continuing nuisance claims. *Id.* at 348. The revised release expressly did not preclude "claims based solely on future operations by [U.S. Steel] that (i) involve substantially different manufacturing processes and (ii) result in substantially different or greater air emissions, releases, or odors than current or historical operations." *Id.* at 348. Thus, the Court concluded that the settlement agreement "accommodates U.S. Steel's interest in protecting itself from suits based on **identical claims** that existed at the time of the complaint (and

---

[4] Likewise, *Taft v. Ackermans* (cited by Plaintiffs at p. 18) is not instructive. In *Taft,* a Dutch investor in a securities class action settlement objected that the release was overly broad, because it released his claims which were arguably based on Dutch law, despite his claims being based on identical factual predicates as the settling plaintiffs' claims. The opinion does not express any disparity between Dutch and U.S. securities law or any factual disparity between the Dutch objector's claims and plaintiffs' claims.

settlement) without extinguishing the class's right to file distinct claims in the future." *Id.* at 350 (emphasis added).

Urban Active also cites the unpublished opinion of *Olden v. Gardner,* 294 Fed. Appx. 210 (6th Cir. Mich. 2008). In *Olden*, the trial Court initially rejected the settlement, but after a long and tortured history, later approved a revised settlement covering claims arising from emissions from a cement plant. The settlement apparently focused on property damage and minor personal injury claims, as it exempted "those claims of alleged personal injuries that were brought to the attention of a health care provider by way of a personal visit prior to the date of this Agreement where either the class member or the health care provider asserted, at the time of the visit, a causal connection between the injury and an emission from the Defendant's plant." *Id.* at 213. Also, the settlement agreement provided a formula for the amount of each class member's recovery based on many factors, including the distance between the member's home and the cement plant and the duration of home ownership. *Id.* The basis of the objection to the release in Olden is not explained, but the objectors seem to have taken issue with the legal theory of claims, despite the claims being based on the identical factual predicates. *Id.* at 219, 220.

The Settlement Agreement (by its express terms) purports to release claims based on factual predicates that are not identical to and extend beyond those alleged by Plaintiffs, including claims that Plaintiffs did not possess (like the Ziks claims). This flaw precludes approval of the Settlement.

### III. $19 million purported value vs. $2 million actual value.

The parties acknowledged in their motion for preliminary approval of the Settlement that Defendant's potential liability to the class *exceeded* $19 million. (p. 9). This was not a "limited

fund" settlement – there has been no evidence (or legal argument) presented by Plaintiffs or Urban Active that Defendant lacked the resources to meet its obligations under the settlement had all class members filed a claim or that Plaintiffs negotiated a reduced value based on a limited fund. Thus, the Court should ignore Plaintiffs insinuations that Global Fitness's solvency had any bearing on the Settlement. In reality, we know that it did not, because Global Fitness knew well that the claims approval rate would not exceed 10%.

Among the factors the Court must consider in ruling upon the fairness of the settlement in this case is "the reaction of the class to the settlement." *UAW v. Gen. Motors Corp.,* 497 F.3d 615, 631 (6th Cir. 2007). The parties incorrectly argue that the Class approves the settlement due to the limited number of objectors. The Court should not infer support from silence, particularly when the payouts are small. *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod.'s Liab. Lit.,* 55 F.3d 768, 812 (3d Cir. 1995). As recognized by the Courts, class members with small damages "have insufficient incentive to contest an unpalatable settlement agreement because the cost of contesting exceeds the objector's pro rata benefit." *Id.* (*citing Bell Atlantic Corp. v. Bolger,* 2 F.3d 1304, 1313 (3d Cir. 1993). Likewise, the court in *De Leon, supra,* considered a $28 cash payment unlikely "to induce class members to submit a claim." 2012 WL 2568142 at * 19. The "vociferousness" and substance of objections is also relevant. *See In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod.'s Liab. Lit.,* 55 F.3d at 812.

The verdict is now in, and the class has resoundingly rejected the proposed settlement by failing to significantly participate. Just 53,526 of 605,735 class members – 8.8% -- either responded with a claim or a request for exclusion. (*Jeffrey D. Dahl Declaration,* hereafter "Dahl

Declaration" ¶¶ 6, 33).[5]  More than 90% of the class, for one reason or another, didn't bother to respond at all.

Two other factors the Court must consider in adjudicating the fairness of the proposed settlement is "the ability of the [Defendant] to withstand a larger judgment," and "the range of reasonableness of the settlement fund in light of the best possible recovery." *McReynolds, supra.* Defendant's total payout to the class will not exceed $2,003,415.00, and could be as little as $1,542,505.00, if that – a figure between just 8% and 10.5% of its total estimated liability of *at least* $19 million.  (Dahl Declaration, ¶ 38).

A. **There was no need for mailed notice or the claims process, particularly as to the Zik Class.**

Objectors have argued that class members, particularly those in the cancellation class they represent, should simply have been mailed checks.  The Federal Judicial Center warns that "[i]n too many cases, the parties may negotiate a claims process which serves as a choke on the total amount paid to class members.  *When the defendant already holds information that would allow at least some claims to be paid automatically, those claims should be paid directly without requiring claim forms."* Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide,* p. 6 (emphasis added).

Indeed, "[w]ithin fifteen (15) days" of the Court's preliminary approval of the Settlement, Defendant was to provide the Claims Administrator "an electronic database containing … each Class member's full name, last known address, last known email address, home club, and status of membership (ongoing or terminated) as of the last day of the Class Period," as well as

---

[5] The Claims Administrator represents that total claims filed were 55,597.  (Dahl Declaration, ¶ 33).  But this figure inexplicably includes 2,161 claims that were *duplicates* of others previously filed, and which should therefore have been subtracted from the total, leaving a total of 53,436 claims filed.   To this figure, Objectors have added the 90 requests for exclusion (Dahl Declaration, ¶ 30), for a total of 53,526 responses to notice.

"information identifying which Subclasses each Class Member belongs to." *Id.*, ¶ 12.1.[6] The parties have not argued, much less substantiated an argument, that Defendant lacked "information that would allow at least some claims to be paid automatically." Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide,* p. 6.

The parties have cited authorities for the proposition that there's nothing "inherently" wrong with a notice/claims process. But *notice and the requirement of claims must serve the interests of the class* – not the defendant. Only then would its "choke" on the amount paid to class members be excusable or justified. Class action settlements that do not require claims to be submitted are common and are clearly the better course when the defendant possesses the information necessary to pay the claims.

For example, in *Manners*, *supra*, 100% of class members received significant settlement benefits (actually $130M in benefits) without the necessity of having to submit a claim. 1999 WL 33581944 at *6, 20 (relied on by Plaintiffs in their Response, p. 23); *see also De Leon*, 2012 WL 2568142 at *19-20 (determining claims process was unnecessary). As set forth below, neither postcard notice nor the requirement of claims in this case served any legitimate purpose in identifying class members or distinguishing allowable claims.

**B.    What was the purpose of mailed notice?**

If you believe the parties, the addresses to which notice was mailed were much too unreliable to serve as a foundation for simply mailing checks. Defendant claimed:

---

[6] As Defendant point out in their response, the court in *De Leon, supra,* denied *preliminary approval* of a claims-made settlement where the defendant "maintain[ed] databases that enabled it to identify approximately 500,000" class members. (*Response,* p. 8).

Although Global Fitness has attempted to maintain its database over the years of its existence, it could not account for, *inter alia*, changes in address of former members, errors in data entry, and the names and addresses who signed up through company contracts through their employers. Thus, for purposes of giving notice of the settlement, Global Fitness cannot determine whether any particular name and address combination in its database is correct. The former members must provide some confirmation of their identity and their address, and the notice and claims process is the only fair way available to accomplish that necessary step.

(Response, p. 2). Defendant then blanketly declared that "[t]here is no way to guarantee the checks sent out would actually reach the intended recipients." (Id., p. 7). Defendant continued:

Given the multiyear timeframe addressed in the settlement (January 1, 2006 to October 25, 2012) and the fact that many of the proposed class members moved frequently (e.g. college students away from their family residence), a mass mailing of checks would create an effective post office "lottery" with a significant risk of non-class members receiving checks while class members received nothing. Thus, the fallacy of any direct payment scheme is that the class member identifying information cannot be verified without some affirmative act by the claimant.

(Id.). And further:

It is indisputable that no one, including Global Fitness, can identify any particular class member such that automatic payments could be issued in this case. Unless and until a particular individual provides some additional, confirming information to Global Fitness to verify their identity, it is impossible for Global Fitness to know whether it is paying the appropriate class member.

(Id., p. 9).

This is simply, demonstrably, untrue. Urban Active's electronic database identified 605,735 Class Members. (Dahl Declaration, ¶¶ 5-6). It was also sufficiently specific to allow it to determine the particular subclasses to which hundreds of thousands of class members belonged. In the Settlement, Defendant represented that there were:

1.    Approximately 316,721 persons in the "FIF Subclass" who were entitled to receive an award of $20 in addition to any other claim award;

2.    Approximately 387,177 persons in the "Gym Cancel Subclass" who were entitled to receive $20 in addition to any other claim award; and

3. Approximately 64,805 persons in the "Personal Training Cancel Subclass" who were entitled to receive $30 in addition to any other claim award.

(Settlement Agreement, ¶¶ 6.1.2, 6.1.3, 6.1.4).[7] So, Defendant had databases that identified class members, the subclasses to which they belonged, and the amount under the settlement they were entitled to recover. (Paragraph 12.1 of the Settlement required that Defendant provide this information to the Claims Administrator).

With regard to the issue of the reliability of Defendant's database of current addresses, paragraph 12.2 of the Settlement required that the Claims Administrator "conduct a National Change of Address (NCOV) update *before* mailing the Notice Postcard." (Emphasis added). This resulted in an address database that was sufficiently reliable for the Claims Administrator to feel comfortable mailing notice to 601,494 members of a class of 605,735 persons, or 99.3% of the class. (Dahl Declaration, ¶¶ 6 and 7). What then was left to do other than cut and mail checks?

Over 75% of these notices were delivered. Only 146,617, or 24.4%, were returned undeliverable. (Dahl Declaration, ¶ 14). The Settlement then required that "[a]ny Notice Postcard returned to the Claims Administrator as undeliverable before the Claim Period Deadline shall be resent to any forwarding address affixed thereto. The Claims Administrator shall conduct an address search on each Notice Postcard that is returned in the method and for the cost outlined in its Service Agreement ... ." (Id., ¶ 12.3). Of the returned postcard notices, 2,077 were re-mailed to the forwarding address provided. New addresses were found by an address

---

[7] Had Defendant mailed a $20 check to the approximately 387,177 persons it was able to identify as members of the cancellation class, its initial total payout may have been as much as $7.7 million alone, although checks that could not be delivered by the regime described in the Settlement would ultimately have been cancelled. Thanks to the notice/claim process, little more than 16,000 members of the Gym Cancel Subclass filed claims. (Dahl Declaration, ¶ 37). Could there be any better example of what the Federal Judicial Center warned could be a "choke on the total amount paid to class members"?

search firm for 89,198 of the remaining 144,540 returns.  The process having fully run its course, the Claims Administrator has represented to the Court that "**90.8% of the Postcard Notices were delivered.**"  (Dahl Declaration, ¶ 14)(emphasis added).  There is absolutely no evidence to suggest that checks mailed to class members under the same regime would not have had the same rate of receipt.

Plaintiffs argue that "a direct payment system …  would have sent more than 140,000 checks to undeliverable addresses, and countless others to addresses in (sic) which class members no longer resided."  (Response, p. 34).  Plaintiffs cite just one case from the Eastern District of Louisiana -- *In re: Educational Testing Service Praxis Principles of Learning and Teaching, Grades 7-12*, MDL No. 1643, 2006 WL 3332829, at *2 (E.D.La. Nov. 15, 2006) -- in support of their argument that this alone should be considered ample justification for a notice/claims process.[8]  But as discussed above, more than 62% of notices returned undeliverable were subsequently delivered to forwarding addresses, and the Administrator could have taken such additional address location steps prior to sending the checks in the first instance.

Plaintiffs' argument also ignores entirely the likelihood that checks received by others would be forwarded to the intended recipient (like Defendant's putative college student who had since left the family residence).  In addition, there are a number of impediments to a check being cashed by someone other than the payee.  A forged endorsement carries significant criminal and civil penalties, and a bank has civil liability for accepting a fraudulently endorsed check.  Plaintiffs have not explained why someone willing to forge an endorsement would hesitate to fill out a claim form, falsely representing themselves to be the person to whom notice was mailed.  In fact, almost 4,000 claims  -- 7.3% of the total filed – were signed by persons for whom there

[8] In that case, the objectors were asking the Court to order direct mailing of checks for *$500*, not the $60 checks members of the Zik class are entitled to receive.

exists no record of membership at any of Defendant's facilities. (Defendant's *Response*, p. 7). Persons would also surely be much more likely to submit a false claim form than forge an endorsement on a check.

Plaintiffs also argue that "a direct-distribution settlement may have foreclosed the identification of potential class members... .who did not appear in [Defendant]'s records." (*Response*, p. 36). But Objectors have never argued that direct payments should not be accompanied by other notice mechanisms intended to reach class members not identified in Defendant's records who could prove their entitlement to an award.

### C.      What was the purpose of the Claim Form?

Defendant represents that "[o]f the over 52,000 claims received, Dahl was unable to identify approximately 3,900 claimants as former members of Global Fitness even after reviewing Global Fitness's source data." (*Response*, p. 7). Nevertheless, the Claims Administrator's declaration says these claims have not been rejected, but are "pending." (*Dahl Declaration*, ¶ 33).

The Claims Administrator reports that he has otherwise received 49,457 "valid" Claim Forms -- the only claims declared "invalid" apparently being those filed past the claims deadline, or duplicates of those already filed. (*Dahl Declaration*, ¶ 33). Thus, it appears at this point that the only claims disqualified for payment are those that were filed after the deadline, or were a duplicate of a claim previously filed. Again, claims filed by persons whose names do not appear in Defendant's records have not been rejected, but are "pending."[9]

---

[9] This being the case, it appears that Objector Joshua Blackman's claim is the only one out almost 50,000 filed to be rejected thus far, and it appears his claim was rejected for purposes outside the parameters of the Settlement Agreement.

As a consequence, the information provided by claimants in the claim form appears to have been completely superfluous to the claims process. Defendant has admitted in fact "that many of Global Fitness' former members are receiving a cash benefit *despite not having to prove any essential element of any claim*." (Response, at 2 (emphasis added)). Plaintiffs appear to argue that the notice/claim process has resulted in "the identification of potential Class Members . . . who do not appear in [Defendant]'s records." (Response, p. 36). But remember, those claims are "pending," and there is no evidence that such members would not have been identified in the absence of a process requiring claims forms.

Plaintiffs cite *Schulte v. Fifth Third Bank,* 805 F.Supp.2d 560, 594 (N.D. Ill. 2011) for the proposition that "a direct distribution of settlement benefits . . . is not a panacea." But the court in *Schulte* concluded that the claims process in that case was not "completely superfluous" (as it is here) because, among other things;

> . . . there would presumably be costs associated with investigating how much is owed to each Class Member under the settlement and distributing payments. Had the onus of that process been placed on Defendant, there may have been less money available to pay claims. Second, there has been some suggestion that certain customers intentionally overdrafted their accounts, using the overdraft as an "easy loan program."

*Id.,* at 593-94. Here, Defendant was already required as part of the Settlement to furnish the Claims Administrator with a database identifying class members and the subclasses to which they belonged. And there has been no suggestion that direct payments would be complicated by class member misconduct as it was in *Schulte.*

Plaintiffs assert that "the opens claim process . . . resulted in an *opportunity* for thousands of Subclass Members to recover more money than what was represented in [Defendant]'s records." *Id.* (emphasis added). But the parties offer no evidence that any claimant has recovered more money than could be confirmed by Defendant's records and, if so, on what basis.

Further, any potential identification of additional claims (or additional amounts owed) will pale in comparison to diluting the payout to approximately 10% of the purported settlement benefit through the unnecessary claims process.

As things stand, class members will receive an average payment of $3.31 provided all pending claims are approved for maximum payout ($2,003,415 divided by 605,735 class members). Over 50% of the final awards to **approved** claims in this case are for $25 or less. (Dahl Declaration, ¶ 36).[10] Had Defendant mailed a check for even $44.54 to the 387,177 members of the "Gym Cancel Subclass" it was able to identify from its own records, its initial payout to that subclass alone would have been $17.2 million. The Settlement is not structured to be fair to the class; it's structured to save Defendant money.

### D. The parties have manipulated the claims process

The fact that 40% of approved claims are still pending as to amount clearly demonstrates that either: (1) Urban Active's records as to subclass membership were drastically inaccurate, or (2) further proves that the claims process was not only unnecessary but actually complicated the settlement.

### 1. "Class membership" is a "pending" issue as to almost 4,000 claimants.

Paragraph 2.8 of the Settlement defines the term "class member" as "each person who is a member of the Class as defined in Section 6." Section 6 doesn't define "class member" as such, but says that the "class is composed of "all individuals who *signed* a gym membership or personal training contract with Defendant during the Class Period." *Id.*, ¶ 6.1.1 (emphasis

---

[10] Thus far, only 3,633 claimants – less than 1% of the Gym Cancel Subclass alone -- have been awarded more than $45. *Dahl Declaration,* ¶ 36.

added). "Class Period'… mean[s] January 1, 2006 to October 26, 2012." *Id.*, ¶ 2.10. "Within fifteen (15) days" of the Court's preliminary approval of the Settlement, Defendant was to provide the Claims Administrator "an electronic database containing … each Class member's full name, last known address, last known email address, home club, and status of membership (ongoing or terminated) as of the last day of the Class Period." *Id.*, ¶ 12.1. Operating from this database, the Claims Administrator then proceeded to mail notice to "class members." Any class member who filed an "allowed" claim was entitled to receive at least $5, even if they did not fit in any of the subclasses defined in the Settlement.[11]

But there now appears to be a question even as to who is, and who is not, a "class member." Among the "class members" who received notice was Objector Joshua Blackman, whom the parties now contend was in fact *not* a "class member" for reasons surrounding the cancellation of his membership – such reasons are nowhere defined as a disqualifying factor in the Settlement. In addition, according to the Claims Administrator, there are some 3,965 class members who fall into a category of "Pending Claims – Class Membership." (Dahl Declaration, ¶ 33). The parties offer no explanation of why, a month after the Claims Deadline, these claims still "pending."

### 2. A "final award" has yet to be determined for more than 40% of "valid" claims.

Within 15 days of the Court's preliminary approval of the Settlement, Defendant was to provide the Claims Administrator "information identifying which Subclasses each Class Member belongs to." *Id.*, ¶ 12.1. Paragraph 2.2 of the Settlement says that an "Allowed Claimant" shall mean a Class Member who has timely submitted a completed and valid Claim Form executed

---

[11] According to the Claims Administrator, there are 1,207 such claims. (Dahl Declaration, ¶ 36).

under penalty of perjury and is confirmed by the Claims Administrator in accordance with the Settlement.

Paragraph 12.6 of the Settlement provides:

> If a Claim Form is timely submitted, but is deficient, the Claims Administrator will return the Claim Form (or, if deemed necessary, a new Claim Form) to the Class Member within five (5) business days of receipt of the Claim Form with a deficiency notice explaining the deficiencies and stating that the Class member will have seven (7) days from the date of the deficiency notice to correct the deficiencies and resubmit the Claim Form.

The Claims Administrator has acknowledged, however, that of the 49,457 "valid claims," only 28,998 – 58.6% of "valid" claimants, and *just 4.8% of "class members"*[12] – "final awards" have been determined. According to the Claims Administrator:

> The remaining 20,459 Allowed Claimants indicated subclass membership in an amount greater than the data provided by Defendant. After requesting and receiving additional data from Defendant, Dahl is preparing Notices to be sent to these Claimants asking for additional information related to claimed subclass membership that still does not match Defendant's records. Once this process is complete, final awards will be calculated for these claims.

(Dahl Declaration, ¶ 38).

The fact that 40% of approved claims are still pending as to amount demonstrates that Urban Active's records as to subclass membership were either wholly inaccurate or further proves that the claims process was not only unnecessary but further complicated the settlement. There is no excuse for the loose ends that remain in the settlement process over a month after the Claims Deadline, and the parties may even be manipulating the settlement process to inflate the results for the purposes of appearance.

---

[12] This approaches the utilization rate of discredited coupon settlements, which is typically 3% or less. *See* Leslie, *The Need to Study Coupon Settlements in Class Action Litigation*, 18 GEO. J. LEGAL ETHICS at 1397 (citing *Buchet v. ITT Consumer Fin. Corp.*, 845 F. Supp. 684, 695 (D. Minn. 1994) and Brian Wolfman & Alan B. Morrison, *Representing the Unrepresented in Class Actions Seeking Monetary Relief*, 71 N.Y.U. L. REV. 439, 474 (1996)).

Before the claims results were in, the Objection took great issue with liability in excess of $19 million requiring a mere minimum payment of only $1.3 million and a $2.39 million award of attorney fees to Plaintiffs' counsel. The court in *De Leon v. Bank of Am., supra,* considered a comparable arrangement to be indicative of collusion among the parties. 2012 WL 2568142 at *15. Now, the total of the "final awards" determined thus far amount to only $1,055,910.00, well short of even the $1.3 million minimum payment required by the Settlement. (Dahl Declaration, ¶ 37). True, the Claims Administrator attests that the remaining "allowed" claimants will receive a total of between $486,595.00 and $1,093,965.00 (Id. at ¶ 38), but that is cold comfort when there has been no description of the process by which these claims will be evaluated and paid, much less when.

The parties appear to have completely disregarded the Settlement's mandated procedure and timeline for dealing with deficient claims. The likely reason that there remains any issue as to the validity of claims made or the amount any claimant is entitled to recover one month after the Claims Deadline is that the parties are quite justifiably concerned about the puny response rate and final awards.

This manipulation of the claims approval process should further sour the already unpalatable dish the parties are serving to this Court. Even assuming the total payout to the class is as much as $2,003,415.00, that amounts to only *10.5% of Defendant's settled liability*. Moreover, *Plaintiffs' attorneys would receive 54% of Defendant's total payout*, excluding costs of administration. A great deal for Defendants and Plaintiffs' counsel – not so good for the class.

"Under Rule 23(e) the district court acts as a fiduciary who must serve as a guardian of the rights of absent class members.... [T]he court *cannot* accept a settlement that the proponents have not shown to be fair, reasonable and adequate." *In re Gen. Motors Corp. Pick- Up Truck*

*Fuel Tank Prod. Liab. Lit.*, 55 F.3d at 785 (emphasis added). "The ultimate responsibility to ensure that the interests of class members are not subordinated to the interests of either the class representatives or class counsel rests with the district court." *Maywalt v. Parker & Parsley Petroleum Co.*, 67 F.3d 1072, 1078 (2d Cir. 1995).

The proposition that this is the best the parties can do should not bias the Court towards approval of the results. The fact that Plaintiffs, their counsel, and Defendant are satisfied with this settlement, should be given very little weight in light of the great benefits they will receive when compared to the class. Class members will receive an average of $3.31 on an admitted liability of over $19 million.

## IV.    Procedural Fairness and Attorney's Fees

Plaintiffs argue that their negotiations with Objectors broke down because Objectors refused to recognize that *Robins* precluded their claims. That is patently false, because the Ziks' breach of contract claims are completely different than Plaintiffs. Next, Plaintiffs argue that Objectors refused to accept a division of fees based on a lodestar analysis (Response, pp. 18-20). This is false, because Plaintiffs offered Objectors 40% of any recovery up to $6M based on Kentucky claims, which was based on the value rendered, not derived solely from a lodestar analysis. (Ex. 3-A to Objection). It also would not excuse completely excluding Objectors from negotiations pursuant to Plaintiffs' counsel's ethical obligations and fiduciary duty. *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod.'s Liab. Lit.,* 55 F.3d 768, 801 (3d Cir. 1995). As Plaintiffs admitted:

> [W]e believe this [Plaintiffs' offer] properly balances the respective value we each bring to the table vis-à-vis our respective causes of action.

(Ex. 3-B to Objection, Feb. 12 Email in string)

Last, I want to emphasize that I strongly believe the class will benefit from both of our firms working together and avoiding what happened in the Seeger case. As we discussed in Cincinnati, the amount of money that can be recovered from Global Fitness is enough to fully compensate the class and both firms for the work put in. We look forward to talking with you soon. Thanks

(Id., Jan. 23 Email in string).

Prior to settling the case, Plaintiffs admitted that Objectors added significant value to the claims, and immediately after they settled the case, Plaintiffs made an initial offer of $150,000 to Objectors in exchange for their ӧcooperation,ӧ which Objectors took to mean, not objecting to the Settlement. (Rose Declaration, attached hereto as **Exhibit C**). Objectors refused to make any counter-offer or negotiate the amount of any fees with Plaintiffs until Plaintiffs provided more information to Objectors and convinced them the settlement was in the best interest of the Class. (Id.). Plaintiffs refused to provide information to Objectors, much less convince them of the settlementøs fairness.

Also, counsel in *Seeger* and *Robins* may have been paid off for their ӧcooperation,ӧ given their suspicious lack of objections to the settlement. Shortly after the Settlement, counsel in *Robins* contacted Objectors counsel and expressed he was going to strenuously object to the Settlement. Plaintiffs have noticeably not argued that the lack of objections from counsel in *Seeger* and *Robins* shows supports the settlement, and Plaintiffs have not declared that no agreement exists between them their counsel and counsel for *Robins* and/or *Seeger* plaintiffs.

Plaintiffs admit that ӧit is critical that attorneys are reasonably compensated for bringing actions on behalf of consumers.ӧ (Response, p. 33). Despite this truth and their previous admissions and offers regarding the value of Objectors claims and work, Plaintiffs now audaciously argue that Objectors should be awarded **no** fee if the Settlement is approved. Just like their contrary positions when objecting to the *Seeger* settlement, it is clear that Plaintiffsø

positions change drastically based on what best suits them at that particular moment – not what is fair or best for the Class.

Objectors have clearly brought significant value to this cause. As pointed out by Plaintiffs, Objectors' attorney fees would equate to $382,400 (not $637,000, which was an error) based on Plaintiffs' final offer to Objectors before they collusively negotiated the Settlement. As detailed in the Objection and Exhibit 3 thereto (Rose Declaration), Objectors have presented ample information to justify an appropriate attorney fee and incentive awards, including numbers of hours worked, substance of the work, value brought to the case, and Plaintiffs' previous offers. Objectors filed their lawsuit before Plaintiffs and spent approximately two years litigating these cases, including persuading the Boone Circuit Court (with Plaintiffs) to have the *Seeger* settlement rejected, without which this Settlement would not exist. After the *Seeger* settlement was rejected, Plaintiffs admitted its view of the relative values brought by Plaintiffs and Objectors. Then Plaintiffs and Objectors both took additional discovery and moved for class certification, albeit while Plaintiffs collusively negotiated a settlement with Urban Active. Objectors' motion for certification was on a faster track than Plaintiffs' motion, but Objectors' motion was stayed on the eve of the hearing due to this Settlement.[13]

Plaintiffs have the audacity to accuse Objectors of only being interested in their attorney's fees. If that were true, Objectors would have negotiated with Plaintiffs to receive at least $150,000 in fees instead of enduring the rigors of objecting to the Settlement. First and foremost, Objectors seek rejection of the settlement because it is unfair to the class. However, Objectors must protect their investment and hard work by seeking an award in the alternative.

---

[13] Solely using the lodestar method and an hourly rate of $300 per hour (which is comparable to Plaintiffs' rate), Objectors' attorney's fees would be $186,300, without considering additional time devoted to Objecting to this settlement.

*See Manners,* 1999 WL 33581944 at *32 (awarding $600,000 to Objectors)(relied on by Plaintiffs in Response, p. 23).


**V.    Conclusion**

For the reasons set forth above, this sprawling, overbroad, and unfair settlement – where the class members will only receive an average of $3.31 each – should be rejected.

Respectfully submitted,

*Counsel for Objectors, Robert Zik, April Zik, and James Hearon*

/s/ Ronna Lucas                      /s/ Joshua T. Rose
Ronna Lucas                          Joshua T. Rose
Ohio Registration No. 0063304        Hummel Coan Miller Sage & Rose LLC
John E. Stillpass, Attorneys at Law  239 South Fifth Street, Suite 1700
4901 Hunt Road, Suite 103            Louisville, KY  40202-3268
Cincinnati, Ohio 45242               502/585-3084
Ph. 513.936.0800                     jrose@hcmsrlaw.com
Fax 513.794.8800
rlucas@stillpass.com
                                     /s/ Gregory Belzley
                                     Gregory A. Belzley
                                     P.O. Box 278
                                     Prospect, KY  40059
                                     502/292-2452
                                     gbelzley@aol.com

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed with the Court and served on all participants in the Court's ECF system in this case on this 6th day of February, 2014.


/s/ Joshua Rose