```
 1                    IN THE UNITED STATES DISTRICT COURT
 2                   FOR THE SOUTHERN DISTRICT OF OHIO
                               EASTERN DIVISION
 3

 4     AMBER GASCHO,                    )        CASE NUMBER
                                        )        2:11-CV-436
 5                   PLAINTIFF,         )
                    VS.                 )        COLUMBUS, OHIO
 6                                      )        FEBRUARY 13, 2014
       GLOBAL FITNESS HOLDINGS, LLC,    )
 7                                      )        10:00 A.M.
                                        )
 8                   DEFENDANT.         )
       _____)
 9

10                            FAIRNESS HEARING
                 BEFORE MAGISTRATE JUDGE NORAH MCCANN KING
11                     UNITED STATES DISTRICT COURT

12

13     APPEARANCES OF COUNSEL:

14     FOR PLAINTIFF:              THOMAS N. McCORMICK, ESQ.
                                   KENNETH J. RUBIN, ESQ.
15                                 GREGORY M. TRAVALIO, ESQ.
                                   MARK H. TROUTMAN, ESQ.
16

17     FOR DEFENDANT:             DAN L. CVETANOVICH, ESQ.
                                  BRANDON McGRATH, ESQ.
18                                RICHARD S. GURBST, ESQ.

19     FOR BLACKMAN OBJECTOR:     ADAM E. SCHULMAN, ESQ.
                                  THEODORE J. FRONECK, JR., ESQ.
20

21     FOR ZIK OBJECTORS:         JOSHUA T. ROSE, ESQ.
                                  GREGORY A. BELZLEY, ESQ.
22

23

24           GEORGINA L. WELLS, OFFICIAL FEDERAL COURT REPORTER
                              (614)719-3225
25
```

1                        **I N D E X**

2    WITNESS                                    PAGE NO.

3

4    JEFFREY DAHL

5

6    DIRECT EXAMINATION                            22
     CROSS-EXAMINATION                            35
7    CROSS-EXAMINATION                            54
     REDIRECT EXAMINATION                         57

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1         Thursday Morning Session,

2         February 13, 2014.

3           - - -

4    THE COURT:  Ms. Rector, call the case, please.

5    COURTROOM DEPUTY CLERK:  Case Number 2:11-CV-436,

6 Gascho v. Global Fitness Holdings, LLC.

7    THE COURT:  We are here today for the Fairness

8 Hearing, which Judge Smith referred to me for a hearing, and

9 evidentiary hearing if appropriate, to be followed by a Report

10 and Recommendation.  I think I would like to go through the

11 formality of having all counsel enter their appearance on the

12 record, please.

13    MR. McCORMICK:  Thank you, Your Honor.  Good morning.

14 Tom McCormick on behalf of the plaintiffs.

15    MR. RUBIN:  Your Honor, Ken Rubin, also on behalf of

16 plaintiffs.

17    MR. TROUTMAN:  Mark Troutman on behalf of the

18 plaintiffs.

19    MR. TRAVALIO:  Greg Travalio, Your Honor, on behalf

20 of the plaintiffs.

21    THE COURT:  Thank you.  Then, for the defense?

22    MR. McGRATH:  Brandon McGrath on behalf of the

23 defendant.

24    MR. CVETANOVICH:  Dan Cvetanovich on behalf of the

25 defendant.

1          MR. GURBST:  Richard Gurbst on behalf of the

2    defendant.

3          THE COURT:  We also have in the courtroom counsel for

4    the objectors.  Could I ask the representative for Josh

5    Blackman to please enter your appearance?

6          MR. FRONCEK:  Local counsel is Theodore Froncek on

7    behalf of Mr. Blackman.

8          MR. SCHULMAN:  Adam Schulman.

9          THE COURT:  Thank you.  And for the Zik objectors?

10         MR. ROSE:  Yes, Joshua Rose and Greg Belzley.

11         THE COURT:  All right.  Thank you.

12         I'd like to start out giving counsel for the

13   plaintiffs an opportunity to address the Court in support of

14   the proposed settlement.

15         MR. McCORMICK:  Thank you, Your Honor.

16         If I may approach, Your Honor?  I do have some copies

17   of the Power Point slides for the Court's reference, if it so

18   desires.

19         THE COURT:  All right.  Okay.  Thank you.

20         MR. McCORMICK:  Here we are.

21         THE COURT:  I assume you have provided this to

22   defense counsel and counsel for the objectors?

23         MR. McCORMICK:  Yes, Your Honor.

24         THE COURT:  Thank you.

25         MR. McCORMICK:  May it please the Court, at the

1    Fairness Hearing, Your Honor, the Court's job is to insure that

2    settlements taken as a whole are fair, reasonable and adequate

3    to the class.  We begin this morning by emphasizing that point

4    because this settlement, when taken as a whole, is not just

5    fair, reasonable and adequate to the class, it is a good

6    settlement for the class, and it provides tremendous value to

7    the class.

8         This is a good settlement because each and every

9    class member has the opportunity to recover the majority of

10   their damages -- and in some cases more than their actual

11   damages -- from defendant Urban Active, a company that's no

12   longer in business.  The settlement provides real money to

13   these class members, not coupons or other in-kind benefits.

14        In exchange for these cash payments, the release

15   provided pursuant to the settlement is limited to the facts

16   contained within this lawsuit.  The settlement eliminated any

17   and all risks of an adverse judgment, which we know from other

18   class actions that were filed against Urban Active was a

19   substantial and significant risk.

20        The claims process used here to allow class members

21   to recover cash payments could not have been easier and could

22   not have been more user friendly.  Urban Active also separately

23   agreed to pay all of the settlement administration costs that

24   were occurred by Dahl Administration.

25        And last, Urban Active separately agreed to pay class

1  counsel's attorney fees and costs, and class counsel agreed to

2  accept a value less than their lodestar pursuant to the

3  settlement agreement.  Combined, all of these factors make for

4  a great settlement, and they provide tremendous value to the

5  class.

6         During our arguments today, I want to quickly provide

7  to you a little road map of how we are going to present.  I am

8  going to start by presenting substance as to structure of the

9  settlement, to the merits of the claims and to the value

10  provided to the class.  Then, I am going to turn things over to

11  our Settlement Administrator, Mr. Jeffrey Dahl, and he is going

12  to inform the Court of the work that his company did to

13  administer this settlement.  And then, finally, we are going to

14  close with a presentation by my co-counsel, Mr. Troutman, and

15  he is going to address our Motion for Enhancement Payments and

16  our Motion for Attorney Fees.

17         We begin, then, by talking about the structure of the

18  settlement, and the structure of the settlement begins with the

19  class.  The class includes everyone who signed a gym membership

20  contract or a personal training contract with Urban Active.

21  Class certification is appropriate here because by signing that

22  contract, each member was subjected to practices and policies

23  of Urban Active that failed to comply with State Consumer Sales

24  Practices Acts.

25         Within the class, we have three subclasses.  The Gym

1    Cancel subclass includes everyone who canceled their contract.

2    Certification is proper here because by canceling, each class

3    member was subjected to practices and policies of Urban Active

4    that frustrated that member's ability to cancel, denied that

5    member the ability to cancel and/or led to continued charges

6    after cancellation.

7          Also, within the class we have the Facility

8    Improvement Fee subclass.  The Facility Improvement Fee

9    subclass includes anyone who paid one of Urban Active's $15

10   Facility Improvement Fees.  Class certification is appropriate

11   here because as alleged in the complaint, Urban Active had a

12   practice and policy of failing to properly disclose these fees

13   to its members.

14         And then, finally, we have the Personal Training

15   Cancel subclass.  This includes anyone who canceled their

16   personal training contract.  And just like the Gym Membership

17   Cancel subclass, certification is proper here because by

18   canceling, each subclass member was subjected to practices and

19   policies of Urban Active that denied or frustrated members'

20   abilities to cancel and resulted in continued charges after

21   cancellation.

22         Now, for the class and each one of the subclasses,

23   ultimate success of this lawsuit hinged upon both proving a

24   violation of the law and proving that damages actually stemmed

25   from that violation.  By way of example, through the course of

1    discovery, we collected strong evidence that Urban Active had

2    policies and practices which violated State Consumer Sales

3    Practices Acts.  However, for these violations, damages were

4    not readily apparent.  In addition, the fact that there were

5    very few judicial decisions discussing the appropriate damages

6    when a contract can be rescinded or discussing appropriate

7    damages when a contract would be void, raised the risk that

8    substantial damages may not be recovered.

9            This risk was only heightened by Urban Active's

10   equitable argument which they made may continually and

11   throughout the litigation that these members were happy members

12   for six months, 12 months, 18 months, and they used the gym.

13   So, voiding or rescinding a contract may not necessarily lead

14   to disgorgement of the funds paid pursuant to that contract.

15   These factors combined, again, to raise a substantial risk that

16   even if we had taken this case all of the way through trial and

17   succeeded on the merits, the damages may not have exceeded what

18   we negotiated pursuant to this settlement.

19           From a merits standpoint, there were also substantial

20   risks.  Specifically, the Robins' decision out of the Northern

21   District of Ohio was a stark reminder that courts may strictly

22   interpret these contracts against the consumers.  This posed a

23   significant risk to both our Gym Cancellation subclass and our

24   Facility Improvement Fee subclass because Urban Active's

25   conduct in charging additional fees after cancellation and

1   charging $15 Facility Improvement Fees was arguably authorized

2   within the terms of its own contracts.

3           Despite these and the other hurdles that we discussed

4   in our papers that we have previously filed, we balanced these

5   risks.  We balanced the risks of continuing to litigate, and we

6   negotiated a favorable settlement.  As the Court, I am sure is

7   well aware, the dollar values that we negotiated are:  $5 to

8   every class member; $20 to every Gym Cancel subclass member;

9   $20 to every Facility Improvement Fee subclass member; $30 to

10  every Personal Training Cancel subclass member for a potential

11  total of $75 per claimant.

12          These numbers are especially favorable to the class

13  for a number of reasons.  First, in order to receive this

14  money, all class members had to do was file a claim.  They

15  didn't need to provide any proof, and they didn't need to

16  provide any evidence that they were members of these

17  subclasses.  If they fit the definition and they were within

18  Urban Active's data base, they filed a claim and they got the

19  money.

20          Second, there was no limit on the number of claims

21  that would be paid.  There was no cap that existed.  Every

22  class and every subclass member that filed a claim was entitled

23  to receive and will receive the negotiated settlement payment.

24          Thus, the total value available to the class here is

25  the product of simple math.  It is not a mirage; it is not

1  fiction like some of the objectors have alleged.  It is simple

2  math.  There is over 605,000 class members.  Payment of $5

3  amounts to a potential recovery of exceeding $3 million.  The

4  same with the Gym Cancel subclass, the potential recovery

5  exceeding $6 million.  The Facility Improvement Fee subclass,

6  potential recovery exceeding $6 million, and the Personal

7  Training subclass, again, a potential recovery exceeding $1.5

8  million.

9       Potentially, the total liability pursuant to the

10  settlement and the total funds being made available by Urban

11  Active in this case exceeded $17 million.  As the Supreme Court

12  has instructed and as the Northern District has noted, "The

13  right to share in the harvest of a lawsuit, whether or not that

14  right is exercised, is still a benefit to the class."  Pursuant

15  to the settlement, the class is benefiting by the availability

16  of over 17 million to it.

17       Now, additional benefits to the class, as I mentioned

18  earlier, include Urban Active's agreement to pay all of the

19  settlement administration fees, which are estimated to be about

20  $500,000.  And it also includes Urban Active's agreement to pay

21  the legal fees and costs of class counsel, which amounts to

22  $2,339,000.  Urban Active's agreement to pay these monies is an

23  additional benefit to the class as instructed by the Sixth

24  Circuit, and, again, by the Northern District of Ohio.

25       Another way to look at this settlement and determine

1    whether or not it is providing value to the class is by looking

2    at the average recovery per claimant.  Pursuant to the

3    settlement, we had approximately 50,000 class members file

4    claims.  The average recovery per class member is $36.50.

5         Now, we are going to be discussing our Gym Cancel

6    subclass in some detail later today, so it is worth noting that

7    for our average class member, who is also a member of the Gym

8    Cancel subclass, the average payment that they are going to

9    receive pursuant to this settlement is $44.07.

10        To put those numbers into context and to give the

11   Court a frame of reference, the average fee paid per month by

12   an Urban Active member is $26.  So our average class member is

13   going to take home $10.50 more than what they paid on average

14   per month.  Our average Gym Cancel subclass member is going to

15   take home almost $20 more than what they paid on average per

16   month to be a member at Urban Active.

17        This comparison can be further -- the value of the

18   settlement, I should say, can be further shown by comparing

19   this value to other recent health club settlements that have

20   taken place -- Vaughn v. L.A. Fitness was a recent decision or

21   recent settlement out of the Eastern District of Pennsylvania;

22   Martina v. L.A. Fitness, a recent settlement out of the

23   District of New Jersey; and Friedman v. 24-Hour Fitness, a

24   recent settlement out of the Central District of California.

25        Vaughn, Martina and Friedman all alleged claims that

1    were very similar to the claims that are alleged by our Gym

2    Cancel subclass members.  So, the appropriate dollar comparison

3    is the $44.07.  Vaughn, Martina and Friedman -- the recovery is

4    shown on the screen -- and it dwarfs in comparison to what our

5    average class member is going to be taking home.

6           Another important point about Vaughn, Martina and

7    Friedman, each one of these settlements had a coupon element.

8    And as this Court knows, coupon settlements in class action

9    context are universally disfavored.  Coupon elements are

10   disfavored for a number of reasons, but among them, the costs

11   are less to the defendant.  The true value of the coupon is

12   hard to determine.  And for the most part, coupons amount to

13   nothing more than advertising or marketing for the defendant

14   because in order to use the coupon, you have to continue doing

15   services with that defendant.

16          The Vaughn court specifically really struggled with

17   the coupon aspect of this settlement, and it noted in its

18   opinion that because of the coupon aspect, the actual cash

19   payments being made by L.A. Fitness were not that significant.

20   Our settlement is noticeably different.  There are no coupons.

21   There are no vouchers.  It is a straight cash payment to each

22   and every class member.  The value is unsaleable.

23          Another way we can look at the tremendous value being

24   provided pursuant to this settlement is to look at the

25   objectors.  As noted in Urban Active's Motion to Strike,

1    Mr. Blackman has absolutely zero damages.  He paid Urban Active

2    nothing.  But yet pursuant to this settlement, he is entitled

3    to recover $25 as a member of the class and as a member of the

4    Gym Cancel subclass.  Obviously, a tremendous value.

5            We can also look at the Zik-Hearon class.  Now, as I

6    noted earlier, the Zik-Hearon class partially overlaps with the

7    claims of our Gym Cancel subclass.  So, the appropriate dollar

8    comparison is our $44.07, which is the average recovery that

9    will be taken home by a member of our Gym Cancel subclass.  If

10   Zik-Hearon were to continue with their claims and succeed on

11   the merits, their average recovery would total $36.  And that

12   average recovery is made up of the average payment for one

13   month's dues, which is $26, plus $10 for the Cancellation

14   Administration fee that was charged by Urban Active.

15           So, comparing the potential recoveries, we have

16   $44.07, which is a guaranteed recovery if this settlement is

17   finally approved versus the opportunity to recover $36.  And I

18   want to emphasize, that's only an opportunity to recover $36.

19   In order for that opportunity to come to fruition, it is going

20   to take about three to four years of continued litigation.

21   Zik-Hearon group is going to have to get class-certified.  They

22   are going to have to succeed on the appeal of that class

23   certification decision, which is an appeal as of right under

24   Kentucky law.  They are then going to have to survive on a

25   Motion for Summary Judgment, which we know is coming because of

1  the Robins decision out of the Northern District.  They are

2  then going to have to succeed at trial on the merits.  And they

3  are then going to have to succeed on the appeal on any

4  potential recovery that is made.

5       Viewed in this context, $44.07 today versus potential

6  recovery of $36 three to four years now, there is simply no

7  comparison.  This settlement provides a tremendous value to the

8  class.

9       To conclude this discussion of value to the class,

10 all of these comparisons, all of these figures, all of this

11 analysis firmly establishes one thing, the class is recovering

12 a tremendous amount of money based upon the potential claims

13 that they have brought in this litigation, and that recovery is

14 guaranteed if this settlement is finally approved.

15      I now want to switch gears for a moment and discuss

16 the claims process that was used in this litigation -- or I'm

17 sorry -- that was used in this settlement.  To recover the

18 monies that I have just been talking about, class members

19 simply had to file a claim form that was available on Dahl's

20 website or available by mail.  The objectors have argued that

21 this claims process was unnecessary and that it renders this

22 settlement unfair.  This argument is both factually inaccurate

23 and legally unsupported.

24      Factually, the claims process here served three

25 primary purposes.  First, and most importantly, Urban Active's

1    data base of customers was unreliable.  A claims process was

2    needed to insure that the money actually ended up in the hands

3    of class members.

4        Second, the open claims process that was negotiated

5    pursuant to this settlement allowed any class member to file a

6    claim, even if they didn't receive the email notice that was

7    sent or the postcard notice that was sent.  As explained in

8    Dahl's supplemental affidavit -- which we will be shortly

9    providing you updated copies of -- pursuant to that

10   supplemental affidavit, this open claims process, allowing

11   anyone to go to the website and file a claim has resulted in

12   approximately 350 class members who were previously unknown or

13   unidentified to file claims and be deemed allowed claimants

14   pursuant to the process set forth in the settlement agreement.

15       Now, this stands in stark contrast to the objectors'

16   additional arguments that no additional class members would be

17   found pursuant to the open claims process.

18       Third, and related to that second point, the open

19   claims process allowed class members to select subclass

20   membership above and beyond what was shown in Urban Active's

21   records.  So, the open claims process has given class members

22   the ability to recover additional monies on top of what was

23   known pursuant to Urban Active's records.  And as explained in

24   Dahl's supplemental affidavit, they are currently reviewing

25   approximately 2500 such claims by class members that they are

1    entitled to more money than they otherwise would have gotten if

2    checks had just been sent in the mail.

3           Now, within those three points, I do want to come

4    back and spend a little bit more time on the unreliability of

5    Urban Active's data because that's really the central point

6    here.

7           Urban Active's customer data base, which was used to

8    create the class list, was a customer data base created on

9    information that was created by the class member at the time

10   they signed their contract.  Given that fact, the information

11   that is within the customer data base is best case scenario one

12   year old and worst case scenario eight years old.  By that I

13   mean Urban Active stopped doing business in October of 2012.

14   Claims notices didn't go out until October of 2013.  So, the

15   most recent piece of data in that claims -- in that customer

16   data base was one year old.  Again, worst case scenario, that

17   information had been provided eight years ago.  And the vast

18   majority of the class members joined somewhere between three

19   and five years ago.  So, this data was outdated and unreliable.

20          The simple fact is that within the 600,000 names in

21   the data base, no person can go through and state affirmatively

22   that any of those name and address combinations are actually

23   current addresses.  No one knows.  It is outdated data.

24          So, for this reason alone, the argument that the

25   parties just should have simply mailed checks to all of the

1    class members is ridiculous.  Those checks would have gone out,

2    and they would have been received --

3              THE COURT:  May I interject for just a moment here?

4              MR. McCORMICK:  Absolutely.

5              THE COURT:  Of course, the objectors will have an

6    opportunity to elaborate on this.

7              Is that a fair representation of the objectors'

8    objection in this regard?  Or are the objectors -- this is an

9    unfair question -- but is the objection more that once

10   addresses were verified and/or at least verified by the

11   evidence of the non-return of the notice, at that point the

12   check or payment should have been made directly?

13             MR. McCORMICK:  Sure.  The way we read their

14   objections is that the payments just should have been sent out.

15   However, even if the addresses -- even if you waited until the

16   second step and you verified some addresses, there is still no

17   assurance that just because a postcard was delivered, it was

18   actually received by the class member.  The postcard very well

19   could be delivered or a check very well be delivered to an

20   address, but that person no longer lives at that address.  So,

21   just because we went through processes to verify addresses,

22   that doesn't provide any assurances that a check that is being

23   sent is actually being received by the class member that's

24   entitled to receive that check.

25             THE COURT:  Thank you.

1    MR. McCORMICK:  Yes.  Given all of these factors that

2  I have just discussed, the easy user-friendly claims process

3  that was used here was entirely appropriate and was reasonable.

4  However, even setting aside the factual situation that we

5  encountered with this settlement, the objectors' argument that

6  a fair settlement requires the direct mailing of checks is

7  simply unsupported.

8    Cases cited by the objectors in their briefs were

9  thoroughly discussed in our responses, and I am not going to

10  belabor the point, but it can be summarized as saying:  In each

11  and every one of those cases, the settlement was rejected

12  because of gross fundamental problems with the settlement.  And

13  the rejection had very little, if anything, to do with the fact

14  that a claims process was being used.

15    I do want to focus, however, on one of the cases

16  cited by the objectors in their brief.  And that's Burden v.

17  Selectquote Insurance Services.  In Burden, the objectors cited

18  the case for the proposition that a court refused to grant

19  preliminary approval because a claims-made process existed for

20  administration of the settlement.

21    That part is true.  The court refused to grant

22  preliminary approval.  And what the court did was it instructed

23  the parties to file supplemental papers explaining why a

24  claims-made process was reasonable in that situation.  And it

25  is important to note that Burden was an employee in a wage and

1    hour class action.  The facts of that case were that the class

2    members were current or former employees of the company.

3    Clearly, if it is a current employee of the company, the

4    defendant had accurate information, and it could easily provide

5    payment to that person.  So, immediately the facts are

6    distinguishable.

7         But what's really notable about this case is that

8    plaintiffs' counsel filed the supplemental brief, just like the

9    Court asked.  And in justifying the claims-made process,

10   plaintiffs' counsel cited three reasons:  (1) claims-made

11   processes are not inherently unreasonable, (2) it was the

12   result of arms-length negotiation, and (3) the opportunity to

13   submit a claim provides a benefit to the class.  There was no

14   other justification provided for the claims-made process in

15   this case, and the Court approved the claims-made process

16   despite the fact that the class -- a significant portion of the

17   class members were current employees of the company.

18        Now, Burden, out of the Northern District of

19   California, isn't the only court to make similar decisions.

20   Here in the Southern District of Ohio, Kritzer v. Safelite

21   Solutions, again, an employee wage and hour class action where

22   a significant portion of the class members were current

23   employees.  Clearly, accurate contact information existed.

24   Nevertheless, the court approved a claims-made process for

25   administering funds from the settlement.

1          Now, a few final thoughts on the claims-made process.

2   Both plaintiffs and Urban Active in our responses to the

3   objections cited a number of cases in which -- similar to

4   Kritzer -- in which claims-made processes were approved by

5   courts.  The objectors have attempted to distinguish these

6   cases in a number of ways, but two ways primarily.  One, they

7   argue that there were no objections in those cases, therefore,

8   the decisions are somehow irrelevant.  And second, they say

9   that in all of the cases that we cited -- or in some of the

10  cases that we cited -- the claims-made process served a

11  legitimate purpose because the class member had to make a

12  choice between a cash payment and a coupon.

13          Now, let's talk first about the lack of objectors.

14  As this Court knows, judges have an independent duty to insure

15  that settlements are fair, reasonable and adequate.  The

16  absence of an objector says absolutely nothing about the

17  prevalence or the reasonableness of claims-made settlements.

18          As to the second argument, that the class member had

19  to make a choice between a coupon and cash payment, as we have

20  already discussed, coupons are universally disfavored in class

21  action settlements.  But now we have an objector justifying a

22  claims-made process because there was a coupon element as part

23  of the settlement.  Here, we have no coupon element because

24  they are universally disfavored.  The objector's argument is

25  entirely backwards, and it exposes counsels' entire position on

1    this as being without merit.

2            The simple fact is that claims-made settlements are

3    routinely approved by courts, and objectors have not cited a

4    single case where a court has disapproved or disallowed a fair

5    and adequate settlement, like we have here, simply because of a

6    claims-made process.  Given the condition of Urban Active's

7    data and the value being provided to the class here, there is

8    nothing unfair, and there is nothing unreasonable.  And it is,

9    in fact, appropriate that a simple, easy user-friendly

10   claims-made process be used to insure that the money is

11   actually received by the class member who is entitled to

12   receive it.

13           Now with that, I am going to ask Mr. Jeffrey Dahl

14   from Dahl Administration to come up and make a short

15   presentation regarding the settlement website and the work that

16   they did pursuant to the settlement agreement.  And because of

17   our discussion earlier, I don't know if you want to have him

18   sworn in?

19           THE COURT:  I mean no disrespect to Mr. Dahl --

20           MR. McCORMICK:  Sure.

21           THE COURT:  -- but certainly presentation by counsel

22   admitted to the Bar of this court is different than an unsworn

23   presentation.

24           MR. McCORMICK:  Sure.  If the Court would prefer, we

25   can have him sit on the witness stand, and I can do this as a

1    question-and-answer format?

2         THE COURT:  I think that would be the better course.

3         MR. McCORMICK:  Okay.

4         THE COURT:  Mr. Dahl, could you step forward and be

5    sworn, please?

6                        - - -

7                   JEFFREY DAHL

8    AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

9                        - - -

10                 DIRECT EXAMINATION

11   BY MR. McCORMICK:

12        MR. McCORMICK:  First, I will approach the witness

13   and allow him to use the clicker, if it is okay, for him to

14   scroll through some slides during my questioning?

15   Q.   Good morning.  Could you please state your name for the

16   Court?

17   A.   Jeffrey D. Dahl, D-A-H-L.

18   Q.   Thank you.  And what's your educational background?

19   A.   I have a BA from Concordia College in Moorhead, Minnesota.

20        I have a certificate, a Certified Public Accountant from

21   the State of Minnesota, currently in inactive status.

22   Q.   Do you have any other educational qualifications?

23   A.   I took graduate accounting level courses at the University

24   of Minnesota, both in business and to obtain my CPA

25   certificate.

1  Q.    And what is your current employment?

2  A.    Currently, I am president of Dahl Administration.

3  Q.    What is Dahl Administration?

4  A.    Dahl Administration is a class action claims

5  administration firm that provides administrative services for a

6  variety of consumer and other types of class actions.

7  Q.    How long have you been working at Dahl Administration?

8  A.    Approximately five-and-a-half years.

9  Q.    What did you do before Dahl Administration?

10 A.    Before Dahl Administration, I was a founding partner of

11 Rust, R-U-S-T, Consulting, Minneapolis, Minnesota.  I was there

12 for approximately 15 years.  When I left Rust, they had

13 approximately five offices, about 600 employees and was the

14 second largest class action claims administrator in the

15 country.

16 Q.  Can you describe for us some of the cases you have worked

17 on either at Rust or in your current position at Dahl?

18 A.    Sure.  When I was at Rust, I did approximately -- the firm

19 did approximately 2500 class actions.  I personally was

20 responsible for about 300 of those.

21       Since leaving Rust and starting Dahl, at Dahl, we at any

22 point in time we have about 100 current settlements in process.

23 In our five-year period, we have completed about 300 class

24 action settlements.  Primarily in consumer employment.

25       Some of the cases that I have done of note, I was a

1  court-appointed distribution agent for the SEC, Fannie Mae

2  settlement.  It was a $350 million security case.

3      I was the court-appointed claims agent for the W.R. Grace

4  Asbestos bankruptcy.  I was responsible for receiving

5  approximately 200,000 personal injury claims and processing

6  those with a budget of $1.7 billion bankruptcy.

7      I was appointed by the Special Master in the Google

8  Research Analyst Settlement.  It was a Security Exchange

9  Commission settlement involving a number of different

10  defendants.  It was a $450 million settlement.  I was

11  responsible for the receipt and processing of notice and the

12  payment of those claims.

13      I did work on the CD Music settlement for the nationwide

14  Attorney Generals.  It was one of the largest class actions

15  ever settled.  They had about 100 million class members.

16  Q.  Thank you.  Can you describe for the Court your

17  involvement with this class action settlement?

18  A.  I was the partner in charge of overseeing the claims

19  administration services for this case.  So, I was actively

20  involved in, you know, oversight and the implementation of our

21  services.  Our services generally involved notice to the class,

22  handling class member communications, processing claims,

23  reviewing claims, curing claims, and we ultimately will be

24  responsible for the distribution of the money involved in this

25  case.

1  Q.   Okay.  Based upon your experience, how did this class

2  action settlement and specifically the notice process and

3  claims process compare to other class action settlements you

4  have worked on?

5  A.   From an administrative standpoint -- let me start with the

6  notice.  I mean, you know, typically, we measure notice in

7  terms of reaching frequency.  That's what percentage of the

8  class do we reach and how many times do we reach them.  In most

9  settlements, we have a defined class list.  We would provide

10  direct mail notice to the class.  You know, we get some return

11  mail.  So, we would retrace or re-mail, and we would expect to

12  hit, you know, 90 percent or 90 percent plus based on that.

13  So, in terms of reaching frequency, we would reach 90 percent

14  of the class one time.  In the vast majority of settlements,

15  you know, that's all the notice that's really required where we

16  have, you know, a known class list.

17      In this settlement, we reached out beyond that.

18  Concurrent with the mail notice, we did an email notice with

19  anyone who had a current email address.  Subsequently, we did a

20  reminder email, and then we published twice in one Sunday and

21  one consecutive day in 13 different newspapers where the

22  defendant operated, you know, facilities.

23      So, I mean it was a very robust notice program, and, you

24  know, depending where you fit in the class, I mean you could

25  have both seen the notice twice in the published notice, you

1    could have received, you know, two e-mails and a postcard

2    notice.  So, we would have reached some class members with a

3    frequency of up to five times.

4    Q.    Okay.  The notice that was sent, as you have just

5    described the notices that were sent in this case were postcard

6    notices and email notices, what is your experience with the

7    effectiveness of mailing postcards versus mailing long form

8    notices?

9    A.    Well, we have a lot of experience with notice because in

10   almost every case we mail some sort of notice.  I like --

11   personally like postcard notices.  You know, there has been an

12   evolving trend over the last, you know, three or four years

13   towards postcard notices both in state courts and federal

14   courts.  You know, they are designed to meet Rule 23 standards.

15   You know, even under the best scenario that we know of with

16   long-term notices using the Federal Judicial Center Guidelines

17   for notice, it is an eight or 12-page notice, it is what gets

18   under plain language requirements, but it gets really difficult

19   for class members to understand it.

20        Our experience with postcard notice, particularly linked

21   with online filing, is that it is a modern -- you know, I like

22   it because it is a modern approach to providing notice.  You

23   can grab people's attention for a short period of time.  If you

24   link it to an online filing website, my experience is that we

25   get very robust filing rates.  We have done a lot of review for

1    this, and our experience is that we get twice the filing rate

2    with our postcard and online versus a paper filing claims

3    process.

4        You know, it follows how people tend to consume media.

5    You know, if you do an email notice, which we had in this case,

6    you are one click away from the website.  And it follows for

7    the trends, you know, today.  Given the choice between paper

8    and online, we see 90 percent plus, and in some instances up to

9    98 percent of people choosing the online option versus the

10   paper option.

11   Q.   Okay.  Now, you mentioned in that response a number of

12   times the website and online filing capabilities.  I know we

13   have a few slides prepared, and I guess I'd like you to go

14   through and describe for the Court the website that was created

15   and how a class member would file a claim.

16   A.   Sure.  You know, we post websites today for almost every

17   settlement.  And we are finding more and more people go to the

18   website as their first point of finding additional information

19   about the settlement.  In this particular case, we had, I

20   think, about 110,000 website hits and, you know, we had 6,000

21   phone calls, and that's kind of consistent with our experience

22   in other cases.

23       Our website follow a format that has been -- is pretty

24   consistent between claims administrators, and it is consistent

25   in being involved with the courts over the last, you know, five

1    or ten years.  You will notice in the upper left-hand corner we

2    have a series of buttons.  There is a home page, which we are

3    on now, which gives a summary of the case, and it links to sort

4    of other pages within the website.  There is a section of

5    Frequently Asked Questions and Answers.  So, people can, you

6    know, view a list of questions and can click on an answer

7    within that section.

8         And for instance, if they are clicking on:  How do I file

9    a claim?  There will be hot links where they can click a link,

10   and they will be transferred directly to the claim filing page.

11        We have key dates.  It is all the key dates that the class

12   member needs to knows about.  They are concisely displayed in

13   one section.

14        We have a "File a Claim Page", which we will show you

15   later.  There is a link to settlement documents where people or

16   class members can view or download and print case documents,

17   and there is a contact page where people can contact the claims

18   administrator.  They can do that in email.  There is an

19   800-number that is shown on the website, also, and displayed on

20   all of the published or printed materials.

21        On the first page, I would just like to point out at the

22   bottom, there is a call-out portion of the page where people

23   can file a claim form.  If they click a button here, it will

24   take them directly to the claim filing page.

25   Q.   Can you show us that, please?  Thank you.

1   A.    This is our claim filing page.  You know, it gives fairly

2   concise instructions.  You will notice there is "hot links"

3   here, one that goes to the "Long Form Notice", and you can view

4   that.  Another one goes to "Frequently Asked Questions".

5        It has the filing deadlines clearly displayed.  And there

6   is a button to click to file online.

7        In Item 2, you can also request a "Long Form Notice", and

8   there is an 800-number, you know, prominently displayed, and we

9   have a "File a Claim" button, you know, that they can click if

10  they would like to file a claim.

11       When class members file a claim, they have two methods of

12  filing a claim.  And I will discuss the second method that's on

13  the bottom of the screen first.  When we send an email or a

14  postcard to a class member, we include a check-digited number,

15  which gives them a claim and ID number.  And if they can put

16  their claim and ID number and the first three characters of

17  their mailing name that shows on their postcard, then we can

18  pre-populate some information and make the claim filing process

19  a little quicker.

20       If they don't have a card, for instance if they saw the

21  published notice or if they heard about it from somebody else,

22  they can click the button -- I'm sorry -- they can click the

23  button above right here, and it will take them to a different

24  claim filing screen, and they don't necessarily have to have

25  the number to file a claim.

1    This is the "File a Claim" screen for people without an ID

2    number.  We ask for minimal information -- name, address, city,

3    state and zip -- in order to file a claim.

4    This is the screen for people that have their ID number.

5    If they have an ID number, it pre-populates the upper portion

6    here with their name and their original mailing address and

7    given the opportunity to update their mailing address in this

8    section below.

9    Once the class members have put in the initial

10   information, we bring them to this screen.  We do capture an

11   email address of class members if they have one because that

12   allows us to do subsequent follow-up with an email.  And then

13   we have a relatively simple check of your box screen that class

14   members click for, you know, the different categories of class

15   membership to which they belong.  You will note that the claim

16   awards are promptly displayed and a description of the classes

17   included in that screen.

18   After they have completed that information, there is a,

19   you know, a click in terms of certification and then a

20   verification step that they hit to continue, and that, in fact,

21   files their claim.

22   The last step is if we provide a verification that their

23   claim has been filed.  It is provided in two forms.  One, we

24   electronically provide it -- or excuse me -- we are at a screen

25   here that allows -- if a claim isn't perfected, then they will

1    have to click the certification statement and they will have to

2    click --

3    Q.   If I could interject with a question here?  Now, this

4    screen is if the claim form is improperly completed; is that

5    correct?

6    A.   Yes, sir.  For instance, if you didn't select a

7    subcategory or subclass or if you didn't electronically certify

8    your claim, then you would see one of these messages, and you

9    would have to go back and click something.

10   Q.   So, does that allow for the class members -- it is kind of

11   a foolproof method to make sure that the class member properly

12   electronically completes the claim form?

13   A.   That's correct.  It is a verification method to make sure

14   we get the claim form as technically complete as possible.

15   Q.   Thank you.

16   A.   And then the last step is we give them a note that your

17   claim is submitted.  We display on the screen a confirmation

18   number.  And then concurrent with that, we will electronically

19   send them their confirmation via email that their claim has

20   been submitted electronically.  And if they have any subsequent

21   questions, they can refer to that number in any such subsequent

22   communications with us.

23   Q.   Does that complete, then, the claims filing process?

24   A.   Yes.

25   Q.   Thank you.  Now, in your experience as a settlement

32

1  administrator, have you also administered settlements where

2  cash payments or checks were sent directly to class members

3  without the claims-made process?

4  A.    We have.

5  Q.    Okay.  How common or how frequent is that?

6  A.    Well, in the 300 cases we have done in the last year, we

7  have done a handful where we have sent checks out directly.  On

8  the consumer side, we have three cases.  All three of those

9  were insurance cases where we sent a notice, and then we sent a

10 check directly to the class members.

11       You know, I think we should note that in those cases, we

12 had a high reliance on the defendant data because it were

13 either current or former clients that had, you know, account

14 relationships, and we had data that we knew was reliable.

15       We also on a few unemployment cases, we had a process

16 where we would send a check.  But out of maybe 100 employment

17 cases, we probably had maybe ten or 12 where we may have sent a

18 check instead of a claims process.  Most of them are still

19 claims-made processes.

20 Q.    I want to go back and clarify something you said.  You

21 said both with the insurance cases and the employment cases, it

22 was a high reliability on the data.  What exactly did you mean

23 by that?

24 A.    Well, in insurance, they are customers.  We have policy

25 information.  You know, many of them are current customers.

1    You know, some might be former customers, but because they have

2    a policy relationship, we have -- you know, we feel like we

3    have very good underlying data.

4        On the employment side, we have, you know, employment

5    records.  So, we have social security numbers.  We have

6    employment payroll records, and we have information we have

7    reliance on.

8        But overall, in my experience across 3,000 settlements,

9    you know, most of those settlements have been made claims-made

10   and relatively few -- when I say relatively few, you know,

11   maybe less than ten or 20 -- that we would mail direct payments

12   to them.

13   Q.   In any of those, you know, handful, ten or 20 cases where

14   direct payments were mailed, did you ever mail payments

15   directly when the data that was provided by the defendant was

16   in best case one year old and worst case eight years old?

17   A.   No to my knowledge.  All the ones had some sort of current

18   component to the data.

19        MR. McCORMICK:  Thank you, Mr. Dahl.  That's all of

20   the questions that I have.  If the Court would prefer

21   cross-examination now, or we can continue on with

22   Mr. Troutman's portion of the presentation concerning

23   enhancement payments and attorney fees.

24        THE COURT:  I will leave it up to the objectors, but

25   I would think that waiting and asking Mr. Dahl to remain

34

1   available until the objectors make their presentations would be

2   more acceptable.  What's your preference?

3           MR. BELZLEY:  With Mr. Dahl on the stand, I am happy

4   to do it now before a break.

5           MR. SCHULMAN:  I think that makes sense.

6           THE COURT:  Okay.  How long do you think your

7   examination, your inquiry will take?

8           MR. BELZLEY:  I think now, based on what we heard, I

9   think mine will be at least a half-hour, maybe a little more

10  than that.

11          MR. SCHULMAN:  And then I plan on making a

12  presentation of about 15 minutes to a half-hour.

13          THE COURT:  When you say presentation?

14          MR. SCHULMAN:  Oral argument.

15          THE COURT:  I am just talking about inquiry and

16  cross-examination of Mr. Dahl.

17          MR. SCHULMAN:  I only have about seven or eight

18  questions.

19          THE COURT:  Okay.  And you think that your

20  cross-examination of Mr. Dahl would take upwards of half an

21  hour?

22          MR. BELZLEY:  It might, Your Honor.

23          THE COURT:  Okay.  Let's take a 15-minute recess.

24                          - - -

25                  THEREUPON, a recess was taken.

1                        − − −

2           THE COURT:  Before we get to the objectors, is there

3    any inquiry on behalf of the defendant?

4           MR. McGRATH:  No, Your Honor.

5           THE COURT:  All right.

6           MR. BELZLEY:  Thank you, Your Honor.

7           THE COURT:  Please step forward, and you can proceed.

8           And if you prefer, you can pivot that podium around

9    so that you can see.

10                       − − −

11                   CROSS−EXAMINATION

12   BY MR. BELZLEY:

13   Q.   Your Honor, counsel.  Good morning, Mr. Dahl.

14   A.   Good morning.

15   Q.   I want to try to be short.  I don't want to cover what

16   ground you have already covered, but I want to ask some

17   questions based upon that.

18           MR. BELZLEY:  Before I do that, however, if it

19   pleases the Court, Your Honor, I have prepared just a piece of

20   demonstrative evidence.  And for the lack of a better term, I

21   call it "numbers", and what I have done is I have kind of gone

22   through Mr. Dahl's declaration and his supplement and just

23   pulled all of the numbers out.  We may be referring to some of

24   this during my cross of Mr. Dahl.

25   Q.   (By Mr. Belzley) Mr. Dahl, you were present, were you not,

1  during Mr. McCormick's presentation?

2  A.    I was.

3  Q.    And you heard him say that the purpose of the claims

4  process in this case was three-fold:  Number one, Global

5  Fitness's data was unreliable;  Number two, the open claims

6  process found 350 new class members; and Number three, class

7  members got an opportunity to get more money than Global

8  Fitness's record said that they were owed; is that right?

9  A.    That's correct.

10 Q.    All right.  Let's take those one at a time.  Let's talk

11 about first the reliability of Global Fitness's records.  As I

12 understand your Declaration, prior to mailing notice in this

13 case, Global Fitness provided you their data base and before

14 you mailed anything you did a double-check, you ran that

15 through some kind of a national address data base, did you not?

16 A.    Well, when we receive data from a defendant -- and I am

17 going to talk specifically in relationship to mailing

18 addresses -- you know, we do a number of things.  You know,

19 first, we make sure that the data is in a consistent format.

20 In other words, it is last name, comma, first name.  You know,

21 we may do some address hygiene to separate out -- for instance,

22 it would not be unusual to have, you know, zip codes keyed into

23 a state field, for instance.  So, we do some address hygiene to

24 standardize addresses as best we can.

25      And then we go through the data, and we look for data

1    anomalies.  We look for missing or unmailable addresses, you

2    know, that may occur in the data base.  We may look for any

3    exact duplicates that are in the data base.  We do some address

4    hygiene things to make sure that we have identified as many

5    mailing addresses as possible.

6         You know, there may be some interaction with defendants in

7    terms of providing additional information, you know, to fix

8    some of those things, and there may not be.  Once that's done

9    prior to mailing -- and, you know, we run the information

10   through the National Change of Address Data Base.  You know,

11   that data base really does two things.  One, it standardizes

12   addresses to postal regulation formats.  So, for instance, I

13   used to live at 102 Second Street Northwest.  You can spell

14   that many different ways.  But it cast certifies that, and it

15   changes that address to "102 2ND", capital "ND", and street is

16   abbreviated to capital "ST" and northwest is made "NW".  So,

17   there is that component of the national address process that

18   standardizes addresses.

19        Then, the National Address Data Base updates addresses for

20   anyone who went into the Post Office and filled out a change of

21   address card.  And it updates that address for either three or

22   four years, depending on what data base you used.  We can use

23   one that goes back four years.  And if you filled out a card,

24   then it would update that to a more current address.

25   Q.   Okay.  Well, and here I was standing here thinking all you

1   did was run it through just the USPS National Change of Address

2   Data Base.  You did more than that.

3       The point is that what you are telling the Judge, before

4   you ever mailed out a postcard, before anything was ever sent

5   to a potential class member in this case, you didn't just take

6   Global Fitness's data base and start mailing stuff, you assumed

7   and through your practice as a claims administrator develop a

8   process by which you go through and improve the, if you will,

9   the integrity of that data base, correct?

10   A.   Well, if I wasn't clear, I am always speaking to the

11   mailing name and address portion, but yes.  We go through a

12   process to get the most updated information that's available

13   from the Post Office.

14   Q.   Okay.  And once you had that information, then you mailed

15   out the postcards.  You sent out, according to your affidavit,

16   601,494 postcards, representing 99.3 percent of the class.  You

17   had 146,617 come back, and 91,275 of those were sent to either

18   forwarding addresses that you were provided or new addresses

19   that your company found through address search, correct?

20   A.   Yeah.  And I am going to preface this by saying that I am

21   relying on your numbers here, I am not taking numbers directly

22   from the affidavit.  Assuming your numbers are the same as

23   mine, then that would be correct.

24   Q.   Okay.  Okay.  And when all is said and done, in your

25   Declaration you represented to the Court that you were

1  confident that 90.8 -- that mailed notice had reached 90.8

2  percent of the 605,000 class members, correct?

3  A.   Well, my presumption is that 90.8 percent of the notices

4  sent, you know, were, in fact, delivered.  When we deliver them

5  to the Post Office, we are presuming they are delivered to the

6  recipient, you know, but we don't have a way of definitively

7  saying they actually reached the class members.  We presume

8  that it was delivered in the mail, much like when you mail your

9  utility check, you are assuming it goes to the utility company.

10  Q.   Well, I am looking at Paragraph 45 of your initial

11  Declaration and you state:  As of November 29, 2013, the notice

12  reached at least 90.8 percent of potential class members?  You

13  said that, did you not?

14  A.   I did.

15  Q.   Now, the other 9.2 percent came back to your offices and

16  couldn't be forwarded because there was no additional address

17  or no other address to send them to, correct?

18  A.   Well, we go through a little bit -- a little different

19  process than what you are describing.  When notices comes back

20  as undeliverable -- everything in our data base has a unique

21  I.D. number.  We have a bar code on the notice.  And when it

22  comes back in, we scan the bar code.  We have to indicate in

23  the data base that it comes back as undeliverable.  Some of the

24  ones that come back have a yellow sticker on it that are

25  attached to the outside of the notice that has a new address.

1    And presumably, those are people who have moved and aren't in

2    the NCOA, National Change of Address system but have a new

3    address.  So, those are entered into our system and mailed to a

4    new address, and we call those forwards.

5        We also have ones that come back that are returned, and we

6    don't know why they are returned.  You know, those are run

7    through Experian, which is one of the three large data base

8    providers which will give us a better address.  They will look

9    at address history and other information in their data base and

10   tell us that they believe that person now lives at a different

11   address.  And in those instances, then we mail that card to

12   that better address.

13   Q.   Yeah.  Well, I know all of that, but what I am asking is

14   that you believe or represented to the Court that 90.8 percent

15   of the notices reached class members.  And I understood that

16   figure to be --

17        THE COURT:  Can I interject here?  I think the term

18   was "potential class members".

19   Q.   (By Mr. Belzley) Okay.  Potential class members.  And I

20   understood that 90.8 percent figure to be the number of

21   mailings, the number of envelopes that went out and didn't come

22   back?

23   A.   In the end, that's the number of postcards that went out.

24   Q.   Okay.  The other 9.2 percent?

25   A.   Yes.

1   Q.   For whatever reason, they didn't get anything sent to

2   them?

3   A.   Their cards were sent to them, but they came back

4   "undeliverable" and no better address was found.

5   Q.   Okay.  Now, the actual total claims in this case, you

6   represented was 55,597 claims but that included 2,161

7   duplicates, correct?

8   A.   That included -- yes.  I am relying on your numbers here

9   again.

10  Q.   All right.  So, if you subtract the duplicates, you have

11  got 53,436 actual claims?

12  A.   Okay.

13  Q.   Okay.  And that's -- my calculation shows that 8.8 percent

14  of the class.

15       Now that aside, you have represented and you have

16  testified this morning that a 9.2 response rate in this case is

17  a strong filing percentage due in part to the robust notice

18  program and the easy filing process.

19       Now, you are a founding partner of Rust Consulting; are

20  you not, sir?

21  A.   Yes.

22  Q.   Are you aware in the DeLeon case that Rust Consulting

23  represented to the court that consumer class settlement

24  response rates ranged from 2 percent to 20 percent?

25  A.   Well, I am not aware of that particular representation.

42

1   Q.   Is that consistent with your experience?

2   A.   Well, I mean I have my own experience related to claims

3   filings and my own opinion related to that.

4   Q.   Well, the representation, at least according to the master

5   judge in that case, was 2 percent to 20 percent depending upon

6   a variety of factors, including the amount the claimant will

7   receive and the requirement to submit a claim form.

8        To the extent that the response rate in this case was

9   actually 8.8 percent instead of 20 percent, what do you

10  attribute that to?  The amount?  The requirement of a

11  claims-form process?

12       MR. McCORMICK:  Objection.  Mr. Belzley is putting

13  evidence into the case that he has no foundation for.

14       THE COURT:  I will sustain the objection.  I think

15  that you are implying that this witness agrees with whatever

16  the reasoning of the magistrate judge in the DeLeon case was.

17  You can ask this witness questions about what he means when he

18  says that the "response rate in this case was robust" and what

19  his opinion of that was and why he thought it was and why the

20  response rate might not have been higher but not in the form

21  that you have presented that question.

22  Q.   (By Mr. Belzley) Okay.  Well, in your experience, how --

23  what is the top range of response rates in consumer class

24  actions?

25  A.   Well, let me address my experience with ranges in consumer

1    class actions in general.  A number of years ago I participated

2    in a study with Professor McGovern at Duke University, and we

3    looked at 10 million class notices that were mailed across a

4    variety of cases, and we looked at response rates to those

5    cases.  In the consumer area, they ranged from one point

6    something, I think up to 11 or 12 percent in the range that --

7    in consumer cases.  They were somewhat higher in employment

8    cases.  Lower in some other cases.  We looked at securities.

9    We looked at employment.  We looked at finance cases, a variety

10   of case types.

11       Overall, I know in the consumer area, the median response

12   for us, the middle response was about 5 to 8 percent, in that

13   range.  I am going from memory here, but on a fairly broad

14   base, you know, those results are consistent with what I would

15   see on normal consumer cases across a variety of cases.

16   Q.   Okay.  All right.  Now, what percentage of the U.S.

17   population has access to the internet?

18          MR. McCORMICK:  Again, Your Honor, I think that

19   question lacks foundation and calls for speculation.

20          THE COURT:  Well, if this witness has personal

21   knowledge, he can answer.  And if he doesn't, he can indicate

22   he doesn't.

23   A.   I have personal knowledge of that.  I think the current

24   studies estimate 80 percent plus.  It varies by state.  Some of

25   the southern states have a fairly low internet rate, being in

1    the 60 percent range.  You know, some of the more urban states

2    are in the 90 percent range.  It increases, obviously, every

3    year.  As of the last census, I believe the overall knowledge

4    here was of the high 90 percent, I believe.

5    Q.   Okay.  Now, it appears that 97.4 of the claims in this

6    case were filed by email.  Only 2.6 percent of the claims were

7    filed by mail.  Does that sound about right?

8    A.   Not email but online.

9    Q.   Online, I'm sorry.  Does that indicate to you that claims

10   typically were not filed unless the claimant had access to the

11   internet?

12   A.   Not particularly.  And I want to clarify my previous

13   answer.  When we say people have "online access", you know,

14   people have access to the internet a whole variety of other

15   places without, you know, being in that 80 percent I talked

16   about.  They have access at work.  They have access through

17   libraries, from friends, through phones or other devices.

18   Q.   When it comes to mailing notice, the decision was made to

19   send a postcard.  Was that your decision, or was that what you

20   were told to do by the parties in this case?

21   A.   No, that is what was approved by the court, and presumably

22   negotiated by the parties.

23   Q.   Okay.  You have administered class actions where, instead

24   of just a postcard, an envelope with a notice and the claim

25   form was sent to the class member, was it not?

1   A.    Yes.

2   Q.    But that's considerably more expensive than mailing just a

3   postcard?

4   A.    It is more expensive.

5   Q.    Now, I want to talk about the number of people that have

6   gotten more -- or may get more money because of this claims

7   process.  According to your numbers, 29,000 or 54.3 percent of

8   the claims filed have already been awarded money, and it is my

9   understanding from your declaration that that's because the

10  claimant asked for an amount equal to or less than what was

11  reflected in the data you were provided by Global Fitness?

12  A.    That's correct.

13  Q.    Okay.  So, it was easy at that point, Global Fitness is

14  offering them more or the same amount they are claiming,

15  simple.  I assume in that situation they got what Global

16  Fitness's records reflected?

17  A.    Yes.

18  Q.    Okay.  Now, that left 20,473 people who claimed more than

19  what was reflected in Global Fitness's records.  So, let's

20  drill down into this.  You sent them deficiency notices, asking

21  for more information to this 20,473 people.  Only 2,464

22  responded, 12 percent?

23  A.    Yes.

24  Q.    If you didn't respond, the 88 percent that didn't respond

25  were told in the deficiency letter, if you don't respond, you

1 will get what the Global Fitness records say that you are

2 entitled to, correct?

3 A.   Yes.

4 Q.   So, at this point we have got 2,464 people who might get

5 more money than the Global Fitness records reflect; is that

6 right?

7 A.   That's correct.

8 Q.   Can you tell the Court how it is going to be determined,

9 how y'all decided to determine whether these people get more

10 money or not?

11 A.   Well, we are currently going through those responses.  You

12 know, the responses are falling in a couple of different

13 categories.  Some have responded and opted to, you know,

14 enclose additional information.  In other words, they have just

15 shown us or given us their member ID.  Some have responded with

16 information that shows they are a member of one of the other

17 subclasses.  Some have responded with narrative information

18 that they didn't have the information but have described a fact

19 pattern where they may -- or have indicated that they are

20 eligible for other classes.

21     For the people that have proof, you know, we are giving

22 them the higher award amount.  For anyone who has made a

23 representation that, you know, they belong in a different

24 class, we are giving them the benefit of that representation.

25 We also had a few in that class that said, oh know, I made a

1    mistake when I filled out my form.  And we had some that had

2    not documented the claim and probably ended up getting what we

3    have in the records as our best indicator.

4    Q.    Okay.  Of these 2,464 people, do you have a sense at this

5    time of what percentage of that group will actually get more

6    money?

7    A.    As of this morning, I think we were -- had gone through

8    about 900 of those, and it appears about 30 percent of those

9    will get more money based on the initial review.

10   Q.    So, if that holds, roughly one-third of this group of

11   2,464 people or around 800, 900 people are going to get more

12   money?

13   A.    That's correct.

14   Q.    So, if we are looking at this settlement and the claims

15   process as being noted as important and essential so that more

16   people or where people have a chance to get more money, the

17   numbers show that 800, 900 people of the roughly 50,000 claims

18   are going to get more money or have a chance of getting more

19   money, correct?

20   A.    Well, I think your numbers are somewhat skewed.  People

21   that provided -- you know, for instance checked more subclasses

22   than the data showed, all had the opportunity to provide

23   additional information to get more money.  Of that, we can

24   believe about 30 percent have responded and provided that

25   proof, but in the end -- in the end the ones that will

1   ultimately get more money will be about 800.

2   Q.   Okay.  About one-third of these 2,464, and according to my

3   figures, about one-tenth of 1 percent of the class?

4   A.   I will rely on your estimates.

5   Q.   And if this claims process was necessary for that, for the

6   sake of one-tenth of 1 percent of the class getting a chance to

7   recover or getting more money, over a half-million class

8   members didn't get a penny; is that right?

9   A.   Well, of the people that made claims, those who used the

10  claims-made process, so your numbers are, in fact, right,

11  people had the opportunity to file a claim and people had the

12  opportunity, you know, to indicate if they thought they were

13  due additional money.

14  Q.   All right.  Now, let's turn to the open claims process

15  that was able to find more class members.  3,964 or 7.4 percent

16  of the actual claims filed, there was no Global Fitness record

17  of membership, correct?

18  A.   That's correct.

19  Q.   These people, because there was no Global Fitness record

20  of membership, I would assume that these 3,964 did not get

21  mailed notice?

22  A.   Well, I don't know that for a fact.  We weren't able to

23  match them back to a record in the data base.

24  Q.   All right.  Now, of this number, 3,964, there were 545

25  that you said in your supplemental declaration that you believe

49

1   were fraudulent?

2   A.   We have -- I think potentially fraudulent was the word

3   that I used.

4   Q.   Potentially fraudulent.  Why did you send them deficiency

5   notices?

6   A.   Because I said potentially fraudulent.  It means that we

7   had -- we know, for instance, in this settlement, there is a

8   class action website called rebateclassactions.com, and I think

9   this settlement was posted on that website.  So, then we also,

10  you know -- our claim filing -- our online claim filing system

11  process is fairly sophisticated.  So, when someone files a

12  claim, we know the IP address or the computer that they file

13  the claim from.  When we have multiple claims filed from the

14  same computer address, it raises a red flag within our system.

15  We go back and look at those claims.  And in many instances, we

16  had multiple claims from the same address but different

17  spelling of the name or different things, and then we flag

18  those as a suspicious claim.

19       Our normal process, though, is we do give everyone a

20  chance to perfect their claim with a cure.  So, they may send a

21  cure letter just like everyone else and have the opportunity to

22  perfect their claim.  Because as I mentioned earlier, we say

23  "potentially fraudulent", we really don't know.

24  Q.   Okay.  But the fact of the matter is, even with a notice

25  and a claims-made process, there is the potential that there

1   will be fraudulent claims and some of those fraudulent claims

2   will be paid?

3   A.    There is always that potential.  We do whatever we can to

4   monitor for that process.

5   Q.    Now, how did you -- you said in your supplemental

6   declaration that you validated 343 of the 358 responses that

7   you received to this membership deficiency notice.  How did you

8   do that?  How did you validate it?

9   A.    Well, we used a very similar process that we described

10  earlier.  If proof is provided with their claim, some sort of

11  proof, you know, we validate their claim.  If they made a

12  statement or a representation, you know, then we took that into

13  account.  And if we believe that was adequate, we validated

14  that.

15        We were able to validate most of the responses.  In

16  situations -- we had a relatively small number, I believe --

17  that we weren't able to validate, and we are in the process of

18  reaching out to those class members to see if they can provide

19  more information.

20  Q.    All right.  So, of these 3,964 claims that raised issues

21  of whether they were members at all, it appears that 343 are

22  actually going to get approved and actually get some money?

23  A.    That's correct.

24  Q.    Now, I want to spend a little more time on the issue of

25  fraud.  Because this claims process was described to the Court

1   as being necessary to make sure people who get the money are

2   entitled to receive it.

3       Now, I think you have just admitted that even in a notice

4   and claims process, that there is some potential for a

5   fraudulent claim being paid.  So, it is not a guarantee against

6   payment of fraudulent claims, is it?

7   A.   It is not a guarantee.

8   Q.   Okay.  There were 545 claims that were filed that you

9   believed were potentially fraudulent and that came, according

10  to my math, to 1 percent of the claims filed, 9/100ths of 1

11  percent of the class.

12      Now, do you believe that based on your experience that

13  there is more or less incentive to file a fraudulent claim than

14  there is to forge an endorsement on a check?

15  A.   I really don't have an opinion on that.

16  Q.   Okay.  Let me ask you this.  Are you aware of any instance

17  in any of the claims -- the class actions that you have

18  administered in which a claim believed to be fraudulent was

19  prosecuted?  Referred to the criminal authorities?

20  A.   I mean, in my experience over the years we have referred a

21  few claims to the prosecuting authorities.  For sure, in the

22  marketplace there has been some claims referred to prosecutors.

23  You know, so the answer is yes, I am aware of some.

24      You know, but I am not aware of a tremendous amount of

25  identified fraudulent claims.  Where they are is I think it

52

1    depends upon the size and magnitude of the claim and how the

2    claim administrators and the parties want to pursue that.

3    Q.   Can you tell us whether any of those claims that were

4    referred to a prosecutor were $20, $40, $60?

5    A.   I really don't have knowledge.

6    Q.   Okay.  Now, I think we have seen today, and you saw today

7    in the Power Point presentation, that according to the parties

8    in this case, Mr. Blackman, he is getting $25 when Global

9    Fitness records show that he is not entitled to anything.

10        Was there any discussion about that that you were involved

11   in with the parties, about the propriety of paying somebody

12   who -- as to whom the records reflected had no damages at all?

13   A.   We had no discussions with the parties related to the

14   treatment of individual claims that you are describing.

15   Q.   Do you know -- you have been involved in claims

16   administration of direct payment classes, correct?

17   A.   Yes.

18   Q.   There is the potential for somebody forging the

19   endorsement in those checks, forging an endorsement on a check

20   that's directly mailed to somebody but who comes into the hands

21   of somebody other than the class member?

22   A.   Yes.

23   Q.   Do you have a sense of what the percentage of that is, or

24   what the rate is?

25   A.   You know, I don't have any, you know, knowledge of

53

1    instances where, you know, class members didn't receive checks.

2    Q.   Well, I am talking about where somebody other than the

3    class member got the check and forged it and got the money?

4    A.   I don't have direct knowledge of instances related to

5    that.  I am sure it happens.

6    Q.   All right.  To sum up, based on Global Fitness records,

7    you represent to the Court in your Declaration that notice

8    reached 90.8 of potential class members, correct?

9    A.   That's correct.

10   Q.   Over 99 percent of the claimants -- awarded claimants in

11   this case are going to receive what the Global Fitness records

12   show they were entitled to be paid, correct?

13   A.   Based on your numbers, yes.

14   Q.   And this open claims process resulted in increasing the

15   size of the class from -- I think it was 6/100ths or 6/1000ths

16   of a percentage?

17   A.   According to your numbers.  I am going to rely on you for

18   the math.

19   Q.   Those results -- we are talking about the results here,

20   that it is those results that justify over a half a million

21   class members in this case not getting a penny?

22           MR. McCORMICK:  Objection, Your Honor.

23           THE COURT:  Sustained.

24           MR. BELZLEY:  No further questions, Your Honor.

25           THE COURT:  Mr. Schulman?

1          MR. SCHULMAN:  Thank you, Your Honor.  I will try to

2    be brief since Mr. Belzley covered some of the ground I wanted

3    to discuss for address verification.

4                              - - -

5                        CROSS-EXAMINATION

6    BY MR. SCHULMAN:

7    Q.    Thank you for joining us, Mr. Dahl.  I am glad to see you

8    here this morning.

9          I was wondering if you had the updated numbers as far as

10   the current claims that have been verified, the number of

11   claimants, a dollar figure?

12   A.    I don't have any numbers beyond those in my supplemental

13   Declaration.

14   Q.    Okay.  I want to ask you a little bit about -- Mr. Belzley

15   discussed how there were class members that checked too many

16   boxes, and then you had to send a deficiency notice to those

17   class members to get a response from them.  Do you have any

18   data whether there were any class members who checked too few

19   boxes and thus would have been underpaid?

20   A.    Yes.

21   Q.    There were such class members?

22   A.    Yes.

23   Q.    Do you have an approximate number?

24   A.    There were a significant number that underchecked.

25   Q.    It was in the thousands?

1   A.   Yes.

2   Q.   I wanted to ask a little bit about whether it would have

3   been feasible -- in your Declaration, I believe you said that

4   97.4 percent of claims were submitted online.  Would it have

5   been feasible for you to have established online objection and

6   opt-out process?  Have you done that in other cases?

7   A.   We have done an online opt-out form, but I am not aware of

8   having an online objections form.

9   Q.   Would it be feasible for you?

10  A.   I guess everything is feasible.  It is not my experience,

11  but it is feasible.

12  Q.   So, the only reason that there wasn't such an online

13  opt-out form in this case was because the parties settled and

14  that they brought to you -- they didn't allow for that?

15  A.   Well, you know, our role is really to implement the

16  settlement agreement approved by the courts.  So, we are

17  working off of that document and attachment.  So, we are really

18  following that guidance.

19  Q.   In your experience as a settlement administrator, do you

20  have any sense of what percentage roughly of settlements have

21  no objectors at all?

22  A.   Well, I don't have any particular, you know, definitive

23  data on that, but we do a lot of settlements that don't have

24  objectors.

25  Q.   Are you aware of the FJC study which surveyed settlements

1    in several district courts and found that 42 to 64 percent of

2    settlements showed no objectors?

3    A.   I haven't heard of that study.

4    Q.   I want to ask you a little bit about my client

5    specifically, if you could testify as to that.  Do you have

6    knowledge that he was sent a notice, an email notice?

7    A.   I don't have -- actually, I don't have any direct

8    knowledge of your client in particular.

9    Q.   Could I ask you specifically about clients that are --

10   class members that are similarly situated to my client, in that

11   class members who signed up for a gym membership and then

12   canceled it within three days after that, are you aware?

13   A.   I don't have specific knowledge.

14   Q.   Okay.  Do you know whether Mr. Blackman was sent a

15   deficiency notice?

16   A.   I don't have any particular knowledge of Mr. Blackman's

17   notice claim.  I did not look at his.

18   Q.   Do you know whether class members in the same situation as

19   Mr. Blackman were sent a deficiency notice meaning --

20   A.   I am not sure what his situation is as relates to the

21   other class members or what you are trying to say.

22   Q.   Oh, I'm sorry.  Oh, okay.  Right.  By his situation, I

23   mean those class members who signed up and canceled their

24   membership within three days?

25   A.   Well, I have previously testified, you know, the data that

1   we were provided in terms of providing notice was provided by

2   defendants from their data base.  I don't have specific

3   knowledge as to how that was accumulated from defendant's

4   standpoint, who was involved and included or how they were

5   included.

6   Q.   So, if a class member had been sent email notice, then it

7   is safe to say that you consider them to be a class member; is

8   that correct?

9   A.   I consider the lists that we received from defendants to

10   be the definitive class list.  If they were sent notice, then I

11   would presume that they would be a part of the class.

12         MR. SCHULMAN:  Okay.  Thank you.  No further

13   questions.

14         THE COURT:  Any questions on redirect?

15         MR. McCORMICK:  Fairly short redirect, Your Honor.

16                       - - -

17                 REDIRECT EXAMINATION

18   BY MR. McCORMICK:

19   Q.   During cross-examination, opposing counsel asked you about

20   the number of class members who filed claims and claimed less

21   money than what was shown in Urban Active's records, and you

22   indicated that there were a number of people that did that,

23   correct?

24   A.   That's correct.

25   Q.   What determination did Dahl make with respect to those

1    claims?

2    A.    Well, the determination of the final validation of the

3    claims was my determination.  Of course, all the claims

4    categories were based upon the terms of the settlement

5    agreement.  If we had people that had underclaimed, then I

6    determined I would pay them the higher amount based on the

7    defendant's records.

8    Q.    So, all benefit was given to the class member?

9    A.    Yes.

10              MR. McCORMICK:  Thank you, Your Honor.

11              THE COURT:  Thank you, Mr. Dahl.  You may step down.

12              I believe we were in the midst of the presentation?

13              MR. McCORMICK:  Yes, Your Honor.  And the

14    presentation now is going to turn to Motion for Enhancement

15    Payments and Attorney Fees, and my co-counsel, Mr. Troutman,

16    will handle that for us.

17              THE COURT:  All right.

18              MR. TROUTMAN:  If I can have a moment?  I think I can

19    turn this.

20              THE COURT:  There is a plug underneath it that's

21    probably causing some problems there.

22              MR. TROUTMAN:  Is it centered okay, Your Honor?

23              THE COURT:  Okay.  That's fine.

24              MR. TROUTMAN:  Thank you.  Your Honor, we wanted to

25    turn separately to the issue of Enhancement Payments and

1    Attorney Fees just like they were negotiated with Urban Active.

2    What both of these issues come down to is the real benefit that

3    goes to the class doesn't show the preferential treatment

4    warned against by the case law cited by the objectors.

5         Surprisingly, CCAF's attacks on the incentive awards

6    for the class representatives, they challenge that somehow the

7    Enhancement Payments undermine their ability to act as

8    fiduciaries to the class. This argument is firmly and solidly

9    rebutted by looking at the significant recovery achieved for

10   all of the individual class members. This wasn't a coupon

11   case. And as we'll see when we look closer at both the Pampers

12   case and the Bluetooth case, that these weren't zero sum

13   settlements to the class members. Again, it was $36.50 average

14   per person. Even in Blackman's situation, as you have heard

15   twice -- and hopefully, this will be the last time you have to

16   hear it -- is getting $25 when his damages was actually zero

17   dollars. The significant recovery itself proves that they have

18   fulfilled their duties.

19        In fulfilling their duties, they did things like

20   bringing the claims to the attention of the class lawyers.

21   They answered discovery. They met with their lawyers numerous

22   times to make sure that their allegations were properly worded

23   in the amended complaint. Some of them gave depositions. All

24   of them participated in the discovery process. And as it was

25   negotiated, there were three separate amounts based upon their

1    respective burdens and contributions that those class members

2    made.

3            Your Honor, turning to Attorney Fees.  Class

4    counsels' motion for fees is based upon a reduced lodestar

5    amount combined with a common fund cross-check.  Your Honor,

6    the lodestar method is appropriate here for three reasons.

7    First of all, a number of the plaintiffs' claims involve fee

8    shifting statutes.  As the Supreme Court said in Farrar v.

9    Hobby, the settlement agreement that provides comparable relief

10   to that litigation qualifies as a prevailing party.  This was

11   even noted by the Bluetooth case cited by the CCAF.

12           Second, the court in Lonardo, the Northern District

13   Court in Lonardo held that this district routinely follows the

14   lodestar approach.  It is particularly appropriate when that

15   lodestar fund is created separate and distinct from the fund of

16   money available for the class.

17           And third, Your Honor, the lodestar approach is the

18   preferred methodology to award fees set forth -- is the

19   appropriate methodology set forth by the Sixth Circuit.

20           Although the objectors take issue with the use of the

21   lodestar method and the proper application of common fund

22   cross-check, their authority goes against the Van Horn case as

23   decided by the Sixth Circuit and the Lonardo case as decided by

24   the Northern District of Ohio.  In the Van Horn case, the

25   District Court and the Sixth Circuit struck down the very same

1  arguments that you are hearing from the CCAF today.  And

2  ironically enough, in the Lonardo case, the CCAF was actually a

3  participating objector, and the court again struck down the

4  same arguments against a constructive common fund approach

5  that's being advocated by the CCAF.

6         THE COURT:  I should have asked this earlier.  When

7  you say CCAF?

8         MR. TROUTMAN:  It is Mr. Blackman.  It is his entity.

9  It is CCAF, the Center For Class Action Fairness.

10        The nomenclature was used in some of the briefing.

11  Mr. Blackman and CCAF, they are same thing.

12        Your Honor, in terms of authority that is cited going

13  against this common fund approach and the cross-check and the

14  lodestar method being advocated by the plaintiffs, it is

15  CCAF/Blackman begin by arguing very strongly about the Pampers

16  litigation, but as I started, it is very important to see the

17  actual relief that's getting to the class members.  These cases

18  are night and day, Your Honor.

19        If you look at this table, it displays the

20  differences.  Under the box, "Class Members Benefits", it talks

21  about the reimbursement having "negligible" value.  To clarify

22  that, what the Pampers case actually allowed for was years

23  after you bought a box of diapers, if you still had your UPC

24  and you still had your receipt somewhere, you could send that

25  in to P&G and receive a reimbursement for the box of diapers.

1    On top of that, it was the same exact reimbursement program

2    that they had instituted pre-litigation.

3            So, the court concluded that the dollars actually

4    flowing to the individual class members was negligible.  They

5    didn't even have the statistics available at the final Fairness

6    Hearing to say how many dollars actually got in the hands of

7    the class members.

8            We have a stark contrast here.  As you have heard, we

9    have between $5 and $75, and then with an average of $36.  We

10   have created a fund of $17 million that's available for the

11   class.  $19 million of benefit if you count the attorneys fees

12   and settlement administrator costs with a claim rate of

13   9.2 percent.

14           What payments were made in real money in the Pampers

15   case was a $400,000 cy pres award to various organizations to

16   help with diaper rash and infant health and changes were made

17   to the boxes to give warnings like diapers may cause diaper

18   rash, things that people already know.  What we have here is

19   between 1.55 and 2.16 million dollars that will be paid out to

20   class members, which is a stark contrast to a cy pres award of

21   $400,000.

22           The Pampers case was settled before the plaintiffs

23   even responded to the defendant's 12(b)(6) motion.  As this

24   Court well knows, the plaintiffs were able to sustain their

25   claims after two 12(c) motions.  As you know, Your Honor, from

1    handling it personally, I think we counted 15 status

2    conferences where very rarely do the parties ever agree about

3    the scope of discovery and what needed to be obtained.  It just

4    isn't the same case that the Court was dealing with when the

5    Court questioned Pampers.

6         As you probably read it in the reply brief or in

7    briefing from the objectors, they continually talk about the

8    fictive notion of the relief that's getting to the class

9    members.  That word "fictive" comes out of Pampers.  What it

10   held was all these things -- except the attorney fee award --

11   were fictive.  It said all of these things were fictive relief

12   going to the class because there wasn't real dollars.  And it

13   said the only real thing was the attorney fee award at the

14   bottom.

15        We don't have that case.  First of all, our attorney

16   fee award is even less than that.  And none of the rest of the

17   things on the Gascho side of the boxes can be considered

18   fictive.

19        Your Honor, in turning to the Bluetooth settlement,

20   it is no better than the Pampers case.  What happened in

21   Bluetooth was the class member benefit was zero dollars.  It

22   was a warning going out to future Bluetooth purchasers that

23   this could cause hearing loss if you turn it up too loud.

24   Again, in a stark contrast to the real money that's getting

25   back in the hands of class members if the settlement is

1   approved.

2        In terms of payments by the defendant, instead of a

3   $400,000 cy pres award, the Bluetooth case had $100,000 cy pres

4   award. The case proceeded no further in discovery. There was

5   no limited discovery while the parties awaited the 12(b)(6)

6   motion. Again, a stark contrast to the three years of

7   hard-fought litigation that you and the Judge have overseen in

8   this case.

9        And lastly, the attorney fee award in Bluetooth might

10   even be more shocking than the fictive one that was noted in

11   the Pampers case because it constituted eight times the cy pres

12   award. So, the lawyers were asking to be paid $850,000 when

13   the total max out-of-pocket was only $100,000 in the Bluetooth

14   case. As both of these cases show, they aren't the case before

15   the Court that we are seeking final approval for.

16        Your Honor, what is true here on the fee award is

17   that the plaintiffs have agreed to accept significantly less

18   than the current lodestar value. Since the time that the fee

19   petition was submitted, our lodestar has continued to grow

20   while we have worked to get this settlement approved before the

21   Court. We are now just shy of $2.8 million, which corresponds

22   to a .85 multiplier. We are talking about some of the higher

23   multipliers that we see in other cases.

24        Actually, Your Honor, we wanted to go through three

25   comparable fee cases to show that courts do rely upon the

1    common fund that's available for the benefit of the class.  The

2    first case the Court will well know that we briefed

3    extensively, which is the Lonardo v. Travelers Indemnity

4    Company case.  Ultimately, the court approved a lodestar

5    multiplier in that case when there were about 50,000 claims.

6    So, there are about the same number of claims, and an actual

7    cash payment in the neighborhood of what we are looking at.

8    And it based the propriety of that award off a total available

9    fund of approximately of 18 million.

10            Similarly, a state court case in the Berry v.

11   Volkswagen Group of America case actually awarded a lodestar of

12   right around three million when the class only filed claims

13   forms corresponding with $150,000 of an available $23 million,

14   the pot of money for the plaintiffs' claims.

15            What the court did in citing Lonardo is it said where

16   the potential value of the suit was $23 million, that the

17   $150,000 result didn't rebut the presumption that the lodestar

18   was an appropriate fee to be awarded.

19            Lastly, Your Honor, in the Dennings case, the court

20   awarded a lodestar fee of about -- almost 1.9 million for a

21   class recovery of 2.7 million when the court noted that the

22   available fund of money to the class, should everyone avail

23   themselves of it, ranges in the tens of millions of dollars.

24   The important part in this case is that the court looked at the

25   fee shifting provisions under the consumer statutes and found

1    that the lodestar method was the preferable method to follow.

2          Your Honor, as a brief note to shore up an issue

3    raised in the reply, both objectors seem to still question

4    where the money is going should this Court approve the 2.39

5    million dollar fee as in what happened to the Seeger case and

6    what happened to the Robins case filed in the Northern District

7    of Ohio that was dismissed.

8          We hope to set forth clearly enough for the Court

9    that 72 percent of the fee award would go to the Vorys law firm

10    and 28 percent would go to the Isaac, Wiles law firm.  There

11    has been no other agreement and no other allocation to any

12    other lawyers involved, whether in those cases or otherwise.

13          Your Honor, in trying to wrap up the issue of fees,

14    the Zik-Hearon objectors actually request a fee that far

15    exceeds $300,000.  It greatly exceeds the lodestar figure.  It

16    isn't commiserate with the fee petitions that have been filed

17    by plaintiffs' counsel, and frankly, it is unsupported by any

18    evidence in the record; so that the Court shouldn't consider

19    granting such a fee.

20          Moreover, Your Honor, the Zik-Hearon objectors

21    haven't provided a benefit to the class, and they didn't

22    contribute to the settlement in any manner.  When we finalized

23    the settlement with Urban Active, we were very happy with the

24    results achieved for the class.  We attempted to contact the

25    Zik-Hearon plaintiffs.  We figured that they could contribute

1    to helping express the benefits to the class, to the Court in

2    obtaining final approval.  And we had a belief that their

3    lodestar was around $150,000.  So, we reached out to them and

4    offered to share in the fee award to the extent that they could

5    help obtain final approval for the settlement class.

6         Instead of joining with and helping getting money in

7    their class representatives and the class' hands, they, in

8    turn, objected.  They are trying to keep the class from getting

9    any kind of settlement award.  So, to that extent, they aren't

10   trying to benefit the class in any way.  So, we think any fee

11   award coming out of the fund set aside for the class would be

12   inappropriate for the Court.

13        Your Honor, all of the things that I have just

14   presented on the enhancement awards and the fee petition come

15   back to one thing, and that is there is no evidence of

16   preferential treatment between class counsel, class

17   representatives and the class.  This is a good settlement with

18   real dollars that you are getting into people's pockets.  You

19   are going to hear the objectors focus on elements of the

20   settlement and lines in the settlement agreement and then try

21   to apply authority that has either never been applied anywhere

22   or never been applied anywhere within the Sixth Circuit or this

23   Court under these circumstances.

24        The question before the Court that Mr. McCormick

25   started, is whether this settlement is fair, reasonable and

1    adequate.  And given all of the evidence that we have presented

2    this morning, we submit to the Court that it should be finally

3    approved as just that.

4         Thank you, Your Honor.

5         THE COURT:  Thank you.  And who will be making the

6    presentation on behalf of the defendant?

7         MR. McGRATH:  Your Honor, Brandon McGrath.  I just

8    have a very brief statement, a couple of points that I would

9    just like to make.

10        Your Honor, as you are aware, this has been a very

11   difficult litigation.  We have been in front of you -- at least

12   on the telephone -- numerous times.  And as arguments that I

13   have made to you, we believe that we have significant defenses

14   in this case, and we believe that the plaintiffs have

15   significant risks.  But like any case, both sides have

16   significant risks.  And that's why we entered into this

17   settlement.  We believe this settlement is fair to everyone --

18   the class members and the defendants.

19        Obviously, we filed this motion to strike

20   Mr. Blackman's objection.  To a certain extent, it was really

21   our fault for not even considering to try to exclude from the

22   class people who literally -- literally -- had no harm.  As we

23   crafted this settlement agreement, perhaps that's our fault for

24   not clearly excluding those types of people.  You have seen our

25   arguments in the briefs that we believe it was a rescission,

1    and as a matter of law he was put back as he was, as if he had

2    never signed a contract.  But either way, Your Honor, that's

3    clearly our mistake in not making that more clear.  We never

4    intended to provide a remedy to people who had no harm.

5         Your Honor, we, Global Fitness, want this settlement

6    approved.  We want to put those cases behind us.  As has been

7    mentioned several times, the company is no longer operating

8    health clubs.  It has sold off all of its health club assets.

9    It has no current ongoing businesses.

10        We believe that the agreement that we have reached is

11   fair and that it provides a tangible benefit to people who

12   believe that they were harmed.

13        Thank you, Your Honor.

14        MR. GURBST:  Your Honor, may I clarify something that

15   was said?

16        The way I heard it, I didn't want what was said

17   misunderstood.  Richard Gurbst.  And I apologize, Brandon.  It

18   is easier for me to tell the Court than it is for me whisper it

19   to you.

20        When Brandon says:  "It was our fault", it is the

21   lawyers' fault.  We are not saying, though, that we are not

22   willing to deal with the consequences.  We may have not

23   lawyered it well, and therefore, he gets his 25 bucks, but we

24   are not saying we want you to rewrite anything.  We are willing

25   to deal with the consequences.

1          THE COURT:  Thank you.

2          Now, on behalf of Mr. Blackman?

3          MR. SCHULMAN:  Thank you, Your Honor.  May it please

4  the Court, Adam Schulman, and I represent the objector,

5  Mr. Blackman.

6          Preliminarily, I'd like to thank the Court for

7  permitting response and reply papers to be filed with respect

8  to the objections because I think it has enabled a thorough

9  briefing of all the relevant issues.  We don't see that in

10  every settlement that we participate in.

11          I'd like to pick up on just a few of those issues

12  here.  If the Court had any pressing issues, I would be glad to

13  begin there?

14          THE COURT:  No, that's fine.

15          MR. SCHULMAN:  But before I get to the objections

16  themselves, I do want to expand a bit on one argument in their

17  opposition to defend this Motion to Strike.  Mr. Blackman

18  demonstrated how he fits within the parameters of the class

19  definition, as well as the Gym Cancellation subclass definition

20  and how he, therefore, has standing to object to this

21  settlement.

22          But more than that, as averred in his Declaration, he

23  submitted a timely claim form back in December.  All the

24  lawyers for the parties, the settling parties today, have

25  acknowledged that he will be paid his claim.  Thus, they are

1   acknowledging implicitly that he is a class member.  If he

2   wasn't a class member, he wouldn't be paid his $25 on the

3   claim.  And all he needs for standing to object and to deny the

4   defendants' Motion to Strike is the fact that he is a class

5   member, that gives him standing to object under Devlin and

6   other case law.

7           And I want to say that the determination of the

8   claims administrator as an agent for the parties under the

9   settlement, they were given authority to determine who is a

10  class member.  They have determined that he is a class member.

11  So, defendants should be precluded, in fact, from arguing

12  otherwise.

13          In all likelihood, it was a deliberate choice to

14  include Mr. Blackman and those similarly situated within the

15  scope of the class because the defendant wanted the broadest

16  release possible at the time of settlement.  They wanted the

17  broadest waiver from the most possible, potential parties that

18  could sue them in the future.  That's why they expanded the

19  class definition to include all of the people who signed the

20  cancellation agreement.

21          And yet now because Mr. Blackman appears as a

22  dissenting class member, they have concocted a flimsy rationale

23  of why his objection should be stricken, and the Court should

24  reject these games and deny the motion in no uncertain terms.

25          Now, I wanted to attend to the substantive argument

1   of the objection.  And I think it is useful to clarify a few of

2   the arguments that Mr. Blackman is not making but which the

3   settling parties would like to attribute to him.  The first of

4   those is that he is not arguing that the sum of the total

5   constructive common fund is inadequate.  It is fine that the

6   settling parties are settling for roughly $4 million and not

7   $17 million.

8         As the Pampers court noted, the Court can usually

9   trust a legitimate adversarial negotiation to get the aggregate

10  dollar figure correct.  Rather, Mr. Blackman is contending that

11  the allocation of that $4 million is unfair because class

12  counsel is winding up with roughly 60 percent of the total.

13  The class representatives are getting thousands of dollars

14  each.  And 8 or 9 percent of the class members wind up with an

15  average award of just over $30 while the remaining 92 percent

16  of class members wind up with nothing.

17        The second argument that they would try to attribute

18  to Mr. Blackman that he is not making is that there has been an

19  explicit collusion between the settling parties to sell out

20  absent class members.  Mr. Blackman need not make that argument

21  because as the Pampers court stated, the adversarial process --

22  or as the parties here refer to as hard-fought negotiations --

23  extends only to the amount that the defendant will pay, not the

24  manner in which that amount is allocated between the class

25  representatives, class counsel and unnamed class members.  The

1    economic reality is that the defendant is indifferent with

2    respect to who actually benefits from the settlement funds

3    provided.  Because of this, the Court must seek out quote,

4    unquote subtle signs in the provisions of the settlement itself

5    that indicate unfairness.  Those provisions are here in spades,

6    a disproportionate fee award resulting from the unnecessary

7    claims process, A disproportionate incentive awards of named

8    plaintiffs, clear sailing agreement --

9         THE COURT:  Can I go back to your first statement?

10        MR. SCHULMAN:  Yes.

11        THE COURT:  A disproportionate fee award resulting

12   from the claims process?

13        MR. SCHULMAN:  The claims process.  Because the

14   claims process was there to depress actual class recovery.  It

15   was never really 17 or 19 million dollars or whatever figures

16   the plaintiffs were proposing originally.  That was just an

17   illusory number that they invented.

18        THE COURT:  When you refer to "fee award", you are

19   talking about attorney fees?

20        MR. SCHULMAN:  Right.  I am talking about the 2.39

21   that the settlement provides.

22        THE COURT:  And how is that impacted by the claims

23   process?  Are you talking about the claim filing process?

24        MR. SCHULMAN:  Right.  The claim filing process is

25   impacted because the claims filing is a mechanism by which they

1    could actually not give -- a mechanism which constrained actual

2    recovery by class members to 1.5 or 1.6 or whatever it ends up

3    being.

4            THE COURT:  Are you suggesting that it is the

5    proportion that was impacted by the --

6            MR. SCHULMAN:  Right, by the claims process.

7            THE COURT:  Okay.  Not the absolute dollar amount of

8    attorney fees in the settlement?

9            MR. SCHULMAN:  Right, the proportion was impacted.

10            THE COURT:  The proportion between the benefit to the

11    class and the potential attorneys award.

12            MR. SCHULMAN:  Right, correct.  Because if they use a

13    direct distribution mechanism, then the proportion would have

14    been in proportion.  It would have been $17 million to the

15    class and 2.39 to the attorneys.  But because of the claims

16    process, it took it out of alignment, out of equilibrium.

17            THE COURT:  I understand what your argument is now.

18            MR. SCHULMAN:  Thank you.  And the third argument

19    that Mr. Blackman is not making is that employing a claims

20    process instead of direct distribution is somehow per se

21    illegitimate or unreasonable.  Rather, Blackman suggests only

22    that the settling parties have the burden of justifying the

23    claims process and that in this case they have not discharged

24    that burden.

25            That the parties resort to the inaccuracy of the

1    defendant's records is not satisfying in general and especially

2    not in this case.  That theory flies in the face of all of the

3    representations of the parties as well as the settlement

4    administrator as to the excellence of the direct notice

5    program.

6           As Your Honor mentioned earlier, the one case where

7    that rationale was upheld, I believe it was the Educational

8    Testing Services case from Louisiana that the plaintiffs cited.

9    In that case, the objector had proposed that the claims be

10   distributed along with the notice before any of the

11   verification.

12          As Your Honor recognized when questioning plaintiffs'

13   counsel, that is not the argument that we are making.  We say

14   only after the verification had verified, you know, 91 percent

15   of the addresses, that then there should have been a direct

16   distribution.

17          And yet in the end, even though Mr. Dahl in his

18   Declaration attested that the postal notice reached over 90

19   percent of class members, of potential class members, of

20   households, benefits won't reach 90 percent of class members,

21   they won't even reach 10 percent of class members because of

22   the claims process.

23          The stated reasons why they won't, the parties are

24   afraid that a few non-class members will commit check fraud for

25   amounts ranging from $5 to $75 by endorsing and cashing checks

1    that are not addressed to them.  The parties have put nothing

2    on the record substantiating this concern, even though the onus

3    is on them to do so.  In the vast majority of claims-made

4    settlements, there is a reason that the parties foreswore

5    direct payment mechanism.  Here, we haven't heard a good reason

6    yet.

7         And one last argument that Blackman is not making, is

8    that the UAW seven-factor test is irrelevant and should be

9    ignored.  Blackman does concede that that test does matter, but

10   as the Sixth Circuit demonstrated in Pampers, Vassalle and in

11   Williams, that test -- those factors are not an exhaustive

12   catalog of reasons to reject the settlement.

13        The most common defect of settlements are ones of

14   allocation between class members, class counsel and the class

15   representatives.  Because of the defendant's indifference to

16   this allocation, the only supervisory function that can be

17   achieved is by the participation of objectors and the District

18   Court itself.

19        I ask the Court to seriously consider the reality of

20   this settlement.  The parties initially asked the Court to view

21   this settlement as providing a 17 to 19-million-dollar benefit

22   to the class members.  Mr. Blackman challenged them on this

23   point, and now we know the benefit will be most likely about

24   $1.5 million and no more than $2 million.  But now they

25   encourage the Court to rely on other pernicious fictions to

1   uphold the settlement, fictions that the Sixth Circuit has

2   disavowed.  They claim that the separate ex post negotiation of

3   the fee award means that the class relief and fees can be

4   treated and considered separately.  Pampers rejects this, and

5   so do cases from other circuits.  The fact of the matter is

6   that as long as the settling parties know that a fee

7   negotiation is coming, they will account for that in the

8   initial negotiation of the class benefits.

9           As the Community Bank case -- which we cite out of

10  the Third Circuit -- states:  The only apparent way to cure

11  this problem is to defer fee negotiations until the class

12  settlement has been signed, submitted and approved by the

13  district court.  Or if the defendant refuses to agree to any

14  settlement that does not also include attorney fees --

15          THE COURT:  Could I interject here?

16          MR. SCHULMAN:  Yes.

17          THE COURT:  Your most recent statement, how does that

18  comply with Rule 23(h) or would that process that you just

19  alluded to, would that require a second round of notice to the

20  class?

21          MR. SCHULMAN:  It would require a second round of

22  notice under 23(h), but email notice, though, I think would be

23  sufficient and would not be too costly in this case.  But you

24  are correct, 23(h) would require that.  You are exactly

25  correct.

1        Or if the defendant refused to agree to a settlement

2    that does not also include attorneys fees, the best way to do

3    this is to structure the settlement as a transparent common

4    fund.  Because at least in that case, any excessive fee

5    requests, whether as a result of intentional self-dealing or

6    unintentional overvaluation of the class benefit, that fee

7    request can be mitigated by the court without reducing the

8    total amount that the defendant is willing to pay.

9        For instance, if Your Honor approved this settlement

10   and reduced fees, the excess -- because of the provision as

11   written in the settlement, the excess would revert to the

12   defendant.  And as the Bluetooth court said, there is no

13   apparent reason why that should be the case, why the amount of

14   money they agree to should not be distributed properly amongst

15   the class and the attorneys.  And those principles are the core

16   of the Bluetooth decision.

17       The parties also claim another fiction, that the

18   Court should credit class members' silence as a full-fledged

19   endorsement.  Though, Mr. McCormick did seem to be backing off

20   that argument today.  They ignore the caution in their papers,

21   at least, of the Sixth Circuit that quote, unquote, it is to be

22   expected that class members with small individual stakes in the

23   outcome will not file objections.

24       And at the end of the day, we are left with an

25   untenable settlement that is overly generous to both class

1    counsel and the named representatives.  To class counsel, they

2    will get more than 60 percent of the proceeds -- more than

3    double a reasonable fee.  To the named representatives, they

4    will get enhancement awards of between $1,000 and $5,000

5    each -- many times the plausible value of their claim.  And to

6    92 percent of the class members, they will get absolutely

7    nothing in exchange for release of their claims.

8            I did want to note, since there was a specific

9    discussion of the Pampers and Bluetooth cases, I would like to

10   to tell the Court honestly that we believe this settlement is

11   better than those two settlements.  But those two settlements

12   are not -- this settlement doesn't have to be as bad as those

13   two settlements to warrant rejection.  And we think it is clear

14   that this Court should reject this settlement.

15           As respect to Lonardo, this settlement, we think, is

16   worst than Lonardo.  In Lonardo what happened was, originally,

17   it was quite similar to this case initially, it was something

18   like $5 or $6 million to the attorneys and only $2.8 million to

19   the class.  But after it came in as objected, what the parties

20   did was they agreed to modify that settlement and transfer $2

21   million of their fees to the class, so at least they weren't

22   taking more than 50 percent.

23           Now, in the 40s, we think that under Dennis v.

24   Kellogg, which said that 38.9 percent was clearly excessive --

25   40 percent is still clearly excessive, but it is not as

1   excessive as this settlement.  This settlement is worse than

2   that case.

3          THE COURT:  Can I ask you?

4          MR. SCHULMAN:  Yes, of course.

5          THE COURT:  Again, going back to the direct payment

6   process of the claims --

7          MR. SCHULMAN:  Right.

8          THE COURT:  In your opinion, is a claims-based

9   process ever justified?

10         MR. SCHULMAN:  Yes.  We do think it is justified. I

11   don't know -- you probably don't have my reply brief in front

12   of you, but on Page 4 of Mr. Blackman's reply in support of

13   objections, we go through pretty much all of the cases cited by

14   plaintiffs and defendants and show that in the vast majority of

15   those cases, a claims process was justified, either because the

16   class members had to make a choice between cash and in-kind

17   relief.

18         And Mr. McCormick said earlier that he thinks that

19   that somehow means that we think those settlements are better.

20   No, we just think -- that only implies that the claims process

21   in that case was justified, not that it complied with all of

22   CCAF's regulations about coupon settlements.  But that's one

23   scenario where a claims process is justified.  And the most

24   common is where the defendant doesn't have the information as

25   far as the identity of the class members or the amount of the

1    claim that they are due.  That's another situation where the

2    claims process is justified.

3           And we are not taking issue -- we think it is good

4    that there was an open claims process in addition to that here,

5    our grievance is with the fact that they didn't utilize a

6    direct distribution for class members that they did know about,

7    they made them go through the burden of the open claims

8    process, even though they didn't have to.  That's the

9    objection.

10          But no, we are definitely not arguing that it is per

11   se unreasonable or inherently unobjectionable or anything like

12   that.

13          Thank you, Your Honor.

14          THE COURT:  Who will it be?

15          MR. ROSE:  Me, Your Honor.

16          THE COURT:  All right.  Thank you.

17          MR. ROSE:  Good afternoon now.  I'm Josh Rose.  I

18   represent Robert Zik, April Zik and James Hearon.  Robert and

19   April are married.

20          And we have been -- I have been litigating this case

21   with Mr. Belzley for over three years.  Actually, the case that

22   I filed was filed before any case that any of the plaintiffs

23   here filed.  We put in a lot of good, hard work to develop the

24   Ziks' and Hearon's claims, and let me tell you about their

25   claims.  I am going to touch on the issue that they have been

 1    talking about the most, which is the fiction of the value of

 2    this settlement.  And I'll touch on that in a minute.

 3            But I want to first go to what hasn't been talked

 4    about yet, and that's the difference between the Ziks' claims

 5    and any plaintiffs' claims here.  There is a very material

 6    difference.  The Ziks have a contract that has a one-billing

 7    cycle post-cancellation in their contract.  I would be happy to

 8    show it to you, and we can go through it right now, if you

 9    like, but it is attached to my pleadings, and it is very clear.

10            It is a one-billing cycle cancellation clause, which

11    means if they give cancellation notice in November, they can be

12    charged for December under the contract, but they cannot be

13    charged for January, okay?  But they were.  They were charged

14    for January.  They were charged two months post-cancellation.

15            They and like the tens of thousands of people just

16    like them with a one-billing cycle cancellation clause were

17    charged two months.  At the very least from June '09 to June of

18    2010.

19            Now, we have developed evidence that Urban Active

20    were charging the two-months cycle, regardless of what kind of

21    contractual language you had in your membership contract before

22    and after that date; but, admittedly, they charged the two

23    months, regardless of what was in your contract for that year.

24    And for that one year alone, there were over 100,000

25    cancellations.

1        Every contract -- and this is undisputed in any of

2   the briefs -- every contract that Urban Active sold prior to

3   March of 2008 was a one billing, a one-month cancellation

4   clause, okay?  Their records showed that members stayed for

5   years very often, very often, just like the Ziks who canceled

6   in December of 2009 but were charged two months.  Their

7   corporate policy was not to look at the cancellation language

8   in the contracts and see, was this a cancellation clause like

9   the one in Robins?  Or like the one that every plaintiff in

10  this case had, a two-month billing cycle cancellation, or was

11  it one like the Ziks had, which was the one-month cycle

12  cancellation clause, like all of our contracts prior to March

13  of 2008.

14        That was not their policy.  In deposition, which I

15  have attached to my briefs, their policy was charge the member

16  two months no matter what.  My clients' claims, the Zik claims,

17  unlike the claims in Robins, which the Robins court dismissed

18  because they said, well, you are not due the extra month

19  because your contract says that you can be billed two months

20  post-cancellation, my clients' claims and the ten of thousands

21  of people just like them, clearly under the contract cannot be

22  billed two months, but they were anyway.

23        Now, not only were they not adequately represented,

24  which is required by every case that you can ever look --

25  Amchem, U.S. Supreme Court, Sixth Circuit -- not only were they

1   not adequately represented, the Ziks, I mean, how could they be

2   represented at all?  Not one plaintiff had contractual language

3   with the one-month billing cycle.  They can't adequately

4   protect the Ziks.

5           The first step in adequately protecting the Ziks

6   would have been to call their attorney and tell their attorney

7   that we are involved in some settlement negotiations.  Would

8   you like to participate and present your side of the case for

9   the Ziks and the tens of thousands of people like the Ziks?

10  That was never done, despite the fact that I and Mr. Belzley

11  worked hand-in-hand with Mr. McCormick and his colleagues for

12  six months, while every other Kentucky case was stayed, to

13  defeat a very egregious settlement in Seeger in the Boone

14  Circuit Court in Kentucky.

15          It had a similar unnecessary claims process.  It also

16  had -- they claimed it was a coupon only settlement, it

17  wasn't -- the claimant could also submit proof for a cash

18  payment in the form of an affidavit or some other type of proof

19  for a cash payment.  So, it wasn't only a coupon settlement.

20          Now, in Seeger, the claims response rate or approval

21  rate was less than 1 percent.  This is a settlement that Urban

22  Active negotiated with the plaintiffs' attorneys down in the

23  Seeger case.  Their settlement administrator on the stand at

24  the Seeger Fairness Hearing testified, just like Mr. Dahl did,

25  that a consumer claims notice, settlements like this, you are

1    probably going to get an approval rate between 2 and

2    11 percent, 12 percent.  I think he may even have said 15

3    percent under optimal circumstances.

4         The defendant and plaintiffs -- Mr. McCormick knew

5    this well, we went through the whole process in Seeger and the

6    literature and the case law will support this as well -- but

7    they knew there was no $19-million value.  Every settlement

8    administrator that they have ever dealt with, the literature,

9    the case law, the administrator who testified in this same case

10   in Kentucky, a very similar case in Kentucky, testified it was

11   between 2 and 12 percent.  It was not -- so, they had no

12   illusion that the settlement value to the class would ever

13   surpass 2 million, two-and-a-half million under even optimal

14   circumstances.  So, that was a major fiction.

15        The other fiction that I mentioned is that the Ziks'

16   claims are just like their claims.  We know that they are not.

17   The case law is very clear, it says if you have a different

18   contract, how can you have the same claims?  How can you

19   release claims that are not based on an identical factual

20   predicate?  The basis of these claims, the Ziks' claims, are in

21   their contract.  The core is in their cancellation language.

22   They weren't represented -- they weren't adequately represented

23   by anyone other than me and Mr. Belzley who were not invited to

24   this party until now.

25        Now, that brings us to the overbroad release.  The

1   case law says that you can only release claims with identical

2   factual predicates.  They added a clause into the release that

3   says "or related to factual predicates that they brought".  And

4   they add an explanatory paragraph or long sentence that tries

5   to explain what related means.  And what they say "related to"

6   means is any claim that has to do with the sale of a

7   membership, billing a member, communications with a member, any

8   type of claim related to that is released forever -- 606,0000

9   people.

10          And of these 606,000 people, you have got people all

11  across the board.  You not only have groups like the Ziks and

12  Hearon, who have -- the Ziks have clear breach of contract

13  claims.  Mr. Zik is owed $75.  His membership was $50.  He has

14  got a contract, by the way, that also has no $10 cancellation

15  fee in it.  Not one plaintiff here, not one plaintiff in Robins

16  had a contract that excluded a $10 cancellation fee on the

17  back.  Those plaintiffs were making that claim because they

18  thought it was misleading -- to bury a $10 cancellation fee in

19  fine print on the back of a contract.

20          Well, we believe that, too, but fundamentally,

21  Mr. Zik does not even have the $10 fee on his contract.  And

22  just like the extra month in dues he was charged and billed, he

23  was charged the $10.  Nobody has the claim he does on the $10

24  charge, but it is not just bad for him and people like him and

25  his wife April.  It is also bad for people in Kentucky that

1    have Kentucky Health Spa claims -- well, let me back up.

2    Before I get there.

3         Their argument seems to be with respect to my

4    clients' claims and the people like him, well, it doesn't

5    matter because most of the people like them would only have

6    received $40 or the opportunity to receive $30 or $40 under

7    this settlement, so it really doesn't matter anyway.  That

8    completely misses the boat.  They have claims, potential claims

9    just like people in other cases for having misleading remarks,

10   consumer protection claims.

11        What they needed to do was to settle and negotiate

12   additional compensation for people that have a clear breach of

13   contract claim, instead of the Ziks and people like them

14   receiving the same amount of money as people who have no breach

15   of contract claim, according to the Robins court, that was not

16   done.  They each received the same amount of money.  Is that

17   fair?  No, it can't be fair.  It cannot be fair.

18        Is it fair for the Kentucky citizens who have unique

19   claims under the Kentucky Health Spa Act?  And the claims under

20   the Kentucky Health Spa Act that plaintiffs have always focused

21   on are not claims that are available under any Ohio Statute or

22   any other state statute where Urban Active did business.  These

23   claims required health spas to register the costs of all of

24   their membership plans, including the monthly rate, if there

25   are any cancellation fees, if there is any Facility Improvement

1    Fees.  And if they didn't register and if they didn't also show

2    the member a comprehensive list of all plans available and

3    registered when the member signed up, that member is entitled

4    to voiding the contract and disgorgement of any difference.

5         So, for example, if you have a member -- if you have

6    a member like some of Mr. McCormick's clients who signed up for

7    $49.99 a month, but the registered plan was only $29.99 a

8    month, and the plan that should have been disclosed in the list

9    to the member was only $29.99 a month, he would be entitled to

10   $20 for however many months he was a member.  Now, that can add

11   up to a lot of money.

12        And for some people, it is going to be zero.  For

13   some people it is going to be hundreds of dollars, just like he

14   represented to the judge down in the Seeger court when he was

15   so vigorously objecting to the settlement.  Your Honor, you

16   cannot approve this overbroad settlement, you know, for a

17   possible payment of $30 because some of my clients are owed

18   hundreds if not thousands of dollars, he said.  Well, that's

19   true for some of his clients.  Those groups of people were not

20   adequately represented.

21        Not one more penny was negotiated for Kentucky

22   members who have Kentucky Health Spa claims -- not one penny.

23   That's not fair to them; that's not fair to them.

24        Even if this illusory value and the claims process is

25   okay -- which I don't think it comes close to being okay -- it

1    is not fair that those Kentucky members get the same amount of

2    money as members who do not have claims like them.  They don't

3    have even an opportunity to present claims like them, much less

4    the hundreds of dollars in damages that some of them have.

5            Another really bad example of the overbreadth of this

6    sprawling settlement is the facility improvement fee subclass.

7    You have got some people like Mr. Cary who in his contract it

8    said he could be charged a Facility Improvement Fee of $15.  It

9    was on the back of his contract.  They made claims that that's

10   misleading if you bury that provision, it is misleading.  He

11   was charged this fee nine times, 15 times 9, $135.

12           You have got some people like Mr. Volkerding where,

13   that the $15 Facility Improvement Fee was not in the contract.

14   He clearly shouldn't have been charged, but he was anyway.  So,

15   you have got people that have clear breach of contract claims

16   on Facility Improvement Fees.  You have got some people,

17   according to the Robins court, no claim or possibly a claim for

18   misleading behavior if you are able to convince another court

19   of that, other than the Robins court.  And you have some people

20   with this Facility Improvement Fees that they are claiming nine

21   times, eight times -- it depends on how long you were a member

22   there, a biannual fee of $15.  Everybody gets $20.  How is that

23   fair?  Some people aren't owed anything, and some people are

24   owed $135.

25           Amchem -- and the case law is very clear, you have to

1    develop subclasses when you have material differences.  These

2    are very material differences.  They need to break out the

3    subclasses much, much better to have any chance of being fair.

4         Now, you didn't hear testimony from any of these

5    class members, like Mr. Volkerding or Mr. Cary, explaining to

6    you why he thought it would be fair for him to get $5,000 and

7    for some people like him, you know, to get zero and some people

8    that had claims a lot better than his and more than his to get

9    $20, if they go through the claims process.  You didn't hear

10   from people like that.  But we don't need to, it is obvious.

11   It can't be fair, these claims are materially different all of

12   the way through.

13        And I really urge the Court -- I don't want to do it

14   right now, I could be here all day literally -- but I urge the

15   Court to read through the Third Amended Complaint of the

16   plaintiffs in great detail and look at how disparate the claims

17   are and start thinking about different groups of people and how

18   they were affected and how good their claims are and how much

19   money they would be owed.  And you are going to come up with

20   many more examples other than what I just told you.

21        Now, fairness is based on reality.  It is not based

22   on fiction like them telling this Court that my clients' claims

23   and people like them are identical to theirs.  That's pure

24   fiction.  It is undisputed in the evidence before you.  They

25   may say it in their briefs, but if you look at my clients'

1   contracts that I have attached and you look at the evidence

2   that I have presented, it is undisputed in the evidence.

3          It can't be fair when people aren't properly

4   represented and subclasses are not divided out to pay people

5   what they need to be paid and what they ought to be paid.  You

6   have got people like Mr. Blackman, and no offense to

7   Mr. Blackman, but he is going to get $25.  Meanwhile, some

8   people and groups of people who have irrefutable claims like

9   Mr. Zik who is owed $75 will get $25; is that fair?  No, it is

10  not fair for people with no claims to get money, and people

11  with irrefutable claims to get the same amount of money.

12         This really boils down to nothing more Urban Active

13  wanting to buy their piece with an overbroad settlement.  And

14  their peace meaning, let's get rid of all of these lawsuits at

15  once.  Mr. Rose's lawsuit that he filed first in Kentucky three

16  years ago, the Seeger lawsuit, the lawsuit in Robins --

17  although that's on appeal -- Mr. McCormick's numerous lawsuits

18  both in Kentucky and Ohio -- let's get rid of this, any claim

19  that any member may ever have related to their membership,

20  606,000 people and let's try to get rid of it as cheaply as

21  possible, and by that I mean $3 per member.  $3 per member.

22  That's not fair.  That is not the class action mechanism

23  working; that's the class action mechanism not working.

24         The plaintiffs want to take shots at me, saying that

25  I am only here interested for fees.  I am not a wealthy man,

1    Your Honor.  If I did not have an ethical obligation -- both

2    morally to the Court and to my profession -- I would have taken

3    $150,000, $200,000 or $250,000 and run.  I have three small

4    children, and I am not wealthy.  I am not here today for money.

5    I have to preserve the record and ask for an award if this

6    Court approves this egregious settlement.  I have to do that.

7    I have to protect my working investment.  But that's not why I

8    am here.  If all I wanted was money, I would not be here.

9         That's all I have to say.  I would be happy to answer

10   any questions, Your Honor.

11        THE COURT:  On that last point, you said you are

12   asking for an award if the Court approves the settlement.  How

13   would that work?  Are you suggesting that from the amount

14   allocated for attorney fees that a portion of it be awarded to

15   you?

16        MR. ROSE:  It would have to work like that because

17   Urban Active has not agreed to pay one penny more than $2.39

18   million plus the claims.  It would have to work like that.

19        Just like Mr. Blackman is objecting and asking the

20   Court to reduce the attorney fees and give some of it to the

21   class or to give some of it to me or the other objectors.

22        THE COURT:  I mean, what would be the Court's

23   authority to do that?  Just in its authority to determine a

24   reasonable --

25        MR. ROSE:  Absolutely.  In the Manners case, which

1   the plaintiffs relied on -- it was actually a good

2   settlement -- I think it was a 193-million-dollar benefit to

3   the class, cash benefit to the class.  Plaintiffs' counsel down

4   there only got about $9 million.  The objectors came in and

5   approved the settlement sum, and they were awarded $600,000.

6         All it is based on is what the Court believes is fair

7   under the circumstances.

8         THE COURT:  Well, wouldn't the Court have to sustain

9   an objection in order to do that?

10         MR. ROSE:  Not necessarily.  We worked for six

11  months, just like plaintiffs worked for six months to defeat

12  the Seeger settlement.  If that settlement is approved, this

13  settlement right here does not include any Kentucky members,

14  over 200,000 people.  They are making claims for attorney fees

15  based on that work.  Obviously, we should be, too.

16         We were working hand-in-hand down there, and that's

17  the undisputed evidence.  We contributed to this case very

18  substantially, not only in Seeger but down in Louisville,

19  Kentucky where we filed the case.  In fact, we were on the eve

20  of our class certification hearing.  And by the eve, I mean it

21  was Friday, and our hearing was on Monday.  Our class

22  certification hearing for Ziks and Hearon was months in advance

23  of any other plaintiffs' class certification hearing.  They

24  have been negotiating with Urban Active -- supposedly without

25  our knowledge -- for six months or more.  They are already two

1   months post-mediation.  I wonder if the fact that we had this

2   teed-up for certification, my case, had anything to do with

3   Urban Active finally bridging the gap.  I bet that it did.

4           And so, those would be the two primary bases for any

5   attorney fee award.  But I really hope the Court does not go

6   there.  Like I said, I am not here for fees, but I am here to

7   object to the settlement because it is not fair to many, many

8   people.  And that's primarily why I am here, okay?

9           THE COURT:  Thank you.

10          MR. ROSE:  Thanks.

11          THE COURT:  Mr. McCormick?  I want to give both the

12  plaintiffs and the defendant an opportunity to respond.

13          MR. McCORMICK:  If we could take a break?

14          THE COURT:  That's fine.  Let's take a recess of 15

15  minutes.

16          Well, how long is this going to be?  I don't want to

17  turn this into a trial by ordeal.  Should we break for a quick

18  lunch?

19          MR. McCORMICK:  I don't imagine more than a few

20  minutes of rebuttal.

21          MR. McGRATH:  Correct.

22          THE COURT:  All right.  Fifteen minutes.

23          MR. McCORMICK:  Thank you, Your Honor.

24          MR. McGRATH:  Thank you.

25          THE COURT:  I will ask the Clerk to recess court.

1                          - - -

2              THEREUPON, a recess was taken.

3                          - - -

4          THE COURT:  Mr. McCormick?

5          MR. McCORMICK:  Yes, Your Honor.  My colleague,

6    Mr. Travalio, is going to say a few words in rebuttal to the

7    Enhancement Payments and the Motions for fees.

8          THE COURT:  All right.

9          MR. McCORMICK:  And then I will have a few comments

10   with respect to the merits of the settlement.

11         THE COURT:  All right.

12         MR. TRAVALIO:  Good afternoon, Your Honor.  May it

13   please the Court, throughout his brief and argument,

14   Mr. Schulman claims that the defendant's concern with the total

15   cost of his liability and for a combination of class relief and

16   attorney fees is somehow relevant to the case.  The fact is, of

17   course, in every case a defendant who case faces the potential

18   for fee shifting is concerned about the ultimate cost of both,

19   the settlement to the plaintiff and the fee shift.  That's true

20   at any time in any settlement.

21             Does this say anything at all about the plaintiffs'

22   ability to separate the discussion, separate the negotiation

23   of class payment from fees?  Which is exactly what happened in

24   this case to which three attorneys have attested.  It doesn't

25   say anything about it.  All it says is that any defendant in

1   any case is concerned about how much he is going to pay all of

2   the way out of his checkbook or out of his pocketbook.

3           Does it suggest that somehow we inappropriately

4   unethically mixed our fees with the class settlement and sold

5   out the plaintiffs?  Absolutely not.

6           We decided on class relief in this case, and we

7   settled on class relief in this case, but what Your Honor has

8   already seen is an exceptional settlement that there was no

9   discussion of fees.  After the discussion and after the

10  conclusion of class relief, it is true we discussed, and we had

11  a hard negotiation about it with respect to our fees.  And, in

12  fact, as Mr. McCormick has said, we agreed to take less than

13  our lodestar fees, and the reason we did it was to get our

14  class the relief that we got.

15          How do we know from this case that we didn't -- that

16  counsel didn't breach its fiduciary duty to the class?  Well,

17  Mr. Schulman asserts -- and I emphasize asserts -- that the

18  negotiation of attorney fees and class relief can't be

19  separated.  He asserts -- he offers no proof for it, and he

20  doesn't give any argument as to why.  It is untrue; he simply

21  asserts it.  And, of course, his assertion isn't true.  There

22  is absolutely no reason why class relief and fees can't be

23  ethically separated.  To the contrary, they can be.  They are

24  routinely separated.

25          Settlements are routinely approved in which the

1    attorneys, as we have, assert that they have been separated and

2    are willing as officers of the court to represent to the Court

3    that that has happened.  And Mr. Schulman's repeated and

4    emphatic assertions in his brief and in his argument today to

5    the contrary doesn't make it so.

6              Again, how do we know that they were separate in this

7    case?  The first and the primary evidence is the great

8    settlement that we have gotten for this class.  That's the best

9    proof of the fact that we haven't misallocated anything to the

10   plaintiffs or to the class representatives.

11             The few cases cited by the objector, Pampers and

12   Bluetooth, are cases in which we demonstrated the relief is

13   virtually valueless.  Comparing these cases to our case -- I

14   have described to my colleagues -- is like comparing apples to

15   armadillos.  There is no comparison.

16             How else do we know it?  We know it by the incredibly

17   small number of objectors.  Mr. Schulman suggests that that's

18   really a matter of indifference or inertia with respect to the

19   class.  His client purports to be objecting out of a concern

20   for the fairness of the settlement to the class,

21   notwithstanding his lack of any damages.

22             And Mr. Schulman, by his argument, must be suggesting

23   that his client is the only person out of 650,000 people -- or

24   605,000 -- excuse me, Your Honor -- 605,000 people sufficiently

25   outraged by this settlement to object.  The real explanation,

1    which I would suggest, for the utter lack of objection is the

2    settlement is eminently fair, as we demonstrated to you, and

3    the class members are more than satisfied with the terms of the

4    settlement.

5           And, finally, how do we know that the fees and class

6    relief, as they are in the multitudes of cases that are

7    approved by the court, were independently determined in this

8    case?  Is that you have three lawyers who have declared as

9    officers of the court that that's what has occurred, and none

10   of the objectors has a whit of evidence to the contrary.

11          And at the very least, Your Honor, when three

12   lawyers, all of impeccable reputation, tell the Court that

13   something is true, the Court should at least presume that it is

14   so, and in my view, anyway, should place a heavy burden on

15   anyone who presumes to suggest to the contrary.

16          One final thing, and that is this idea that keeps

17   cropping up about this being a common fund case constructive or

18   otherwise.  This is a lodestar case, Your Honor.  It is

19   demonstrated why it is a lodestar case, which courts often do

20   cross-check against common fund, and we have no problem with

21   that.

22          Mr. Schulman asserts on Page 10 or 11 of his reply

23   brief, that if the plaintiffs had adopted the approach of the

24   Community Bank case in which the parties got approval of the

25   settlement terms before an agreement on fees, he admits -- he

1   says there would be no constructive common fund.  Well,

2   Your Honor, the Community Bank approach, if you think about it,

3   adds nothing.  If there is no constructive common fund in

4   Community Bank, there is no constructive common fund here.

5          The fact is in both cases, the defendant, of course,

6   remains concerned with his ultimate liability.  That doesn't

7   change in any case.  Moreover, seeking approval of the class

8   settlement in advance of a formal discussion of fees doesn't

9   prevent the very danger that Mr. Schulman suggests here, and

10  that is that the parties somehow surreptitiously mesh and mesh

11  these two components.  That can happen in the Community Bank

12  situation as well as it can happen in the situation in which

13  the parties as part of the negotiations first and independently

14  negotiate class relief and then second and independently

15  negotiate fees.  At the time that the fees were discussed, the

16  class relief had been fully and finally determined, and as you

17  have seen, Your Honor, the class relief could hardly be better.

18          And, finally, again, just to say one last thing about

19  this Community Bank approach.  Again, Mr. Schulman admits that

20  there is no constructive common fund here.  In both contexts,

21  Your Honor's obligation is precisely the same, whether you do

22  it seriatim by approving a settlement and then approving a fee

23  agreement or whether, as is your responsibility, your duty in

24  this case to look at both the class relief and the fees as

25  reasonable fees doesn't matter whether it is seriatim or not,

1   you still have an independent responsibility to make an

2   independent evaluation of both of those.

3           So, I would just say, Your Honor, in conclusion that

4   we have got a great settlement here.  Your responsibility both

5   with regard to the attorneys fees and the class relief is to

6   decide as a whole whether it is fair, reasonable and adequate.

7   And I think there is only one conclusion that we can come to,

8   it certainly is.  Thank you, Your Honor.

9           THE COURT:  Thank you.

10          MR. McCORMICK:  Thank you, Your Honor.  I just have a

11  couple of points to make in response to some of the comments

12  that we heard with respect to the merits of the class action

13  settlement before you today.

14          First and foremost, Mr. Zik's counsel argued

15  passionately to the Court that his claims are different than

16  everyone else's claims that is represented here in this

17  settlement.  This position is directly contradicted by Zik's

18  own objection in this case, and it is directly contradicted by

19  Zik's own allegations in his lawsuit in the Louisville state

20  court.  And I will specifically refer you to Page 5 of his

21  objections.

22          He tells the court the objector sought certification

23  of simply defined, contractually based -- I'm sorry, let me

24  start that over -- objector sought certification of a simply

25  defined contractually based class of hundreds of thousands of

1    members who canceled their month-to-month memberships with

2    Urban Active from February 2nd of 1996 through present.  And

3    after such cancellations, they were charged additional fees

4    after they canceled and charged a $10 cancellation fee.

5          So, Mr. Zik's claims are the same contractually based

6    claims as hundreds of thousands members who canceled from 1996

7    to present.  His claims are clearly the same as those of our

8    cancellation subclass.

9          The fact is that the factual predicate underlying all

10   of the claims of our cancellation subclass, including Mr. Zik's

11   claims, is that class members tried to cancel their contracts,

12   and they were either outright denied the ability to cancel, or

13   they continued to be charged after the cancellation.  These are

14   the same factual predicates that underline all of the

15   cancellation claims brought in the Zik litigation, the Seeger

16   litigation and the Robins litigation, the factual predicates

17   are the same.

18         The second point made by Mr. Zik's counsel is that

19   somehow the Kentucky Health Spa Act made those Kentucky class

20   members different than Ohio subclass members and members of

21   other states.  That's simply not true.  The Kentucky Health Spa

22   Act has specific provisions that allow for rescission and

23   voiding of a contract.  Similarly, PECA here in Ohio has

24   provisions which allow for the voiding of a contract.  Similar

25   Consumer Sales Practices Acts in Tennessee have similar

1     provisions which allow for voiding of contracts.  All of these

2     statutes and all of these claims were given consideration, and

3     they were negotiated as a part of the settlement.

4          With respect specifically to the Health Spa Act

5     claims because Mr. Zik spent quite a bit of time on it, and I

6     know we addressed this in our papers, but there is absolutely

7     no case law interpreting the Kentucky Health Spa Act.  So, our

8     claims are based on a statute in which there is no judicial

9     interpretation which says what the appropriate level of damages

10    are when you rescind a contract or void a contract.

11         Now, that leads us back directly to what I said at

12    the very beginning of my presentation, that Urban Active had

13    very strong equitable arguments against damages in excess to

14    what we already negotiated in this settlement.

15         And the last point I want to make because it is

16    misrepresentation of the facts is that there is no situation of

17    Kentucky Health Spa members signing contracts for $49 when the

18    contract was actually $29.  We have all of that data from Urban

19    Active's third party vendor software because we subpoenaed it,

20    and we through our IT staff have done technical analysis of

21    that data.  And the vast majority of the cases, which we would

22    put forth as violations of the Kentucky Health Spa Act actually

23    show that Urban Active sold memberships for less than what the

24    price was registered with the Kentucky Attorney General.

25         So, again, that brings us straight back to the

1    equitable argument, that while we are confident that we can

2    prove a violation, we have significant hurdles in proving

3    damages in excess of what we already negotiated as a part of

4    the settlement, and that's what makes this settlement a great

5    settlement.

6            Last, Zik-Hearon's counsel argues that there were

7    hundreds -- or tens of thousands, maybe hundreds of thousands

8    of class members that were out there that had significant

9    damages far in excess of what we negotiated as part of the

10   settlement -- factually, that's untrue, or factually, there is

11   no evidence to support that, given that there were only 90

12   opt-outs and two objectors.  If there were hundreds of

13   thousands of members who had damages far in excess of what we

14   negotiated, the Court could certainly expect the number of

15   objectors and opt-outs to be much higher.

16           Secondly, for Mr. Zik specifically, if he feels that

17   the settlement as it was negotiated and as provided is

18   inadequate, that's why Rule 23 provides opt-out rights.  The

19   purpose of a class action settlement and class counsel's goal

20   and motivations in negotiating this settlement was to get the

21   greatest amount of good for the greatest number of people that

22   suffered violations at the hands of Urban Active's common

23   policies and common practices.

24           And as we showed you in one of the first slides we

25   presented, in negotiating an available recovery of up to

1   $17 million for 600,000 class members and all that class member

2   had to do was file a simple claims form containing basic name,

3   address and class member eligibility information, that,

4   Your Honor, provides a great amount of good for a lot of

5   people, and that is what makes this a great settlement for the

6   class because it provides tremendous value.  Thank you.

7        THE COURT:  Mr. McCormick, could I ask you to

8   address -- I apologize -- I think it was Mr. Rose's argument --

9   or claim that even if the settlement agreement is approved, the

10  claim for an award of attorney fees.

11       MR. McCORMICK:  We don't think that that claim has

12  any merit.  In order to recover attorney fees, the objectors

13  would have had to have materially affected the settlement

14  agreement, and the settlement agreement, as it was reached here

15  and as it has been presented to the Court, we believe it is

16  incredibly fair, it is incredibly reasonable, and it is a great

17  recovery for the class.  And so because they have not benefited

18  the class, they did not assist prosecuting this negotiation --

19  I'm sorry -- they did not assist prosecuting this litigation,

20  they did not materially change the terms of the settlement

21  agreement, we think their request for fees would have to be

22  denied.

23       THE COURT:  Thank you.

24       MR. McCORMICK:  Yes, Your Honor.

25       MR. McGRATH:  Thank you, Your Honor.  At the very

1    beginning of this, when Mr. McCormick stood up, he talked about

2    the fact that the Court has to look at the overall fairness of

3    settlement to decide whether to approve it.  In all of the

4    discussions and the arguments by the objectors in their briefs

5    and their presentations today, they haven't spent a lot of time

6    talking about who are the people?  The people in the settlement

7    are people who joined a gym.  A lot of those people are young.

8    A lot of those people are transient.  If you look at where

9    Urban Active had their facilities -- Lexington, Louisville,

10   Cincinnati, Columbus -- these are college towns with lots of

11   young people.  That's the population.  And the vast majority of

12   these people got exactly what they wanted they joined Urban

13   Active.  They got a gym to work out in.  And this concept that

14   because people aren't rising up in the streets to protest the

15   settlement is likely the result of the fact that most of these

16   people don't feel like they were harmed.

17          I can tell you, Your Honor, when these lawsuits were

18   filed -- I have been involved in these from the very beginning,

19   every single one of them -- the first lawsuit was filed in

20   December of 2009, that was the Seeger case.  We litigated that

21   case for over a year before any of the other cases were filed.

22   Members who saw this and heard about it came to the company and

23   told people, look, if you need somebody to tell them, tell

24   these people that we like what we got, we will do that.  And we

25   didn't think that was necessary evidence to put in here.

1          But from our perspective in looking at that, the

2     reaction of our membership, the significant legal defenses that

3     we had in this case, and Mr. McCormick touched on it, the

4     Kentucky Health Spa Act, there is no law in the Kentucky Health

5     Spa Act.  Equitable defenses that we had, the arguments that we

6     made to you about discovery, why discovery should be limited

7     because of the types of claims that we had.

8          And the most important piece, the Robins decision,

9     okay?  The objectors don't want to talk about the Robins

10    decision because it destroys what they are trying to do.  The

11    Robins court interpreted the contract language and found that

12    the contracts allowed Global Fitness to charge the fees that

13    specifically these objectors, Zik-Hearon objectors, are

14    complaining about.  The Robins court -- and this is a point

15    that Mr. Rose brings up -- the Robins court addressed a

16    particular version of the contract language.  It has been -- it

17    is Global Fitness's position, has been its position all along,

18    from the very beginning, that the cancellation language allows

19    for Urban Active to charge two billing cycles when they

20    canceled.  It has always been that way.  From the time the

21    language was instituted in 2003, it had the right to do that

22    under those terms.  It clarified that language in March of

23    2008, that's correct.  It changed the language to make sure

24    that was clear.

25          But fundamentally, Global Fitness -- it has always

1    been our position that we could charge the two-billing cycle

2    cancel fee.  That we could charge the cancel fee once the

3    cancel fee was put into the contract.  That we could charge the

4    facility improvement fee once the facility improvement fee was

5    put in the contract.  That we could charge a cancellation fee

6    for early terminations on membership contracts because that

7    language is in the contract.

8          And fundamentally, all of the plaintiffs in all of

9    the cases are claiming that somehow or another

10   misrepresentations were made to them or charges were made to

11   them that weren't explained to them in their contract.  All of

12   these people were members.  They had a contract.  The contracts

13   had particular terms and conditions, and they were charged fees

14   that Global Fitness believes it had a right to charge.  And

15   fundamentally, all of those claims stem from those things.  All

16   of these objectors, all of these plaintiffs fall into the

17   classes and the categories created in the settlement.  And

18   these classes and categories were created based on all of the

19   claims and all of the lawsuits that we faced.

20         One of things Mr. McCormick raised that I think is

21   important to note, this settlement covers all of Global

22   Fitness's members and all of its states for the class period.

23   That's important because about 90 percent of Global Fitness's

24   members in this class period of time were either in Ohio,

25   Kentucky or Tennessee.  And the vast majority were in Kentucky

1    and Ohio.  In Tennessee, there is no right, as a matter of law,

2    to bring a class action lawsuit under Consumer Protection Law.

3    So, these 30,000 or so Tennessee class members would not have a

4    right to relief if they weren't allowed to participate in the

5    settlement.  So, they are getting a benefit that they would not

6    otherwise have as a matter of law in a class action.

7         THE COURT:  Is that really relevant to the

8    consideration of the Zik objection?  And that is that while it

9    may benefit one category of members of the class, but another

10   category is inappropriately joined in the class?  I am not sure

11   that I see the relevance of your last statement.

12        MR. McGRATH:  Well, the relevance is, is when you are

13   looking at the class or the settlement from an overall

14   perspective, we are covering all of the potential different

15   claims that people generally have, and that is that they were

16   members and they were charged fees that they don't believe were

17   appropriate.

18        My point is we are providing a benefit to everybody,

19   regardless of what state law may be at play.  When, ultimately,

20   what they may recover in a particular state -- for example,

21   Kentucky could be significantly less if our equitable defenses

22   are true.  Under Tennessee, it would be non-existent because we

23   have defenses.  But, of course, this is a part of the

24   settlement negotiation process, and we tried to come to

25   something that would compensate everybody who might have a

1     claim is the way it was put together, and that was the purpose.

2          I believe the final point here is that if someone has

3     a claim that they think is valuable, they have a right to

4     opt-out.  And once they opt-out, they could pursue this

5     valuable claim.  And I think we had a total of 90 or 100

6     opt-outs or something like that, and I think that's significant

7     because it shows in general that people who really wanted

8     something, the 50,000 who filed claims, did get a benefit out

9     of this settlement.  Thank you, Your Honor.

10          THE COURT:  We had some documents that were used

11    during the course of the presentation or the testimony.  I am

12    not suggesting that it is necessary, but does anyone intend to

13    proffer those documents into the record?

14          MR. McCORMICK:  Well, first as a clarification, I did

15    deliver a copy of Mr. Dahl's affidavit that we filed.  The

16    Court a couple of days ago noted that Page 4 was missing?

17          THE COURT:  Yes.

18          MR. McCORMICK:  We now have complete copies which we

19    handed to your staff, and we will also electronically file

20    that.

21          THE COURT:  All right.  I assume there is no

22    objection --

23          MR. McGRATH:  No objection, Your Honor.

24          THE COURT:  -- to correcting the Supplemental

25    Declaration?

1      For plaintiffs, the Power Point, the paper version of

2  the Power Point presentation?  Again, I am not suggesting that

3  it needs to be entered into the record.  I just want to make

4  sure we have got a complete record.

5      MR. McCORMICK:  Sure.  We would like to have it

6  entered into the record.

7      MR. McGRATH:  No objection, Your Honor.

8      THE COURT:  All right.  Without objection, the Power

9  Point -- let's call this Plaintiff's Exhibit 1?

10      MR. McCORMICK:  Very good.

11      THE COURT:  And it is admitted.

12      And then for the Zik objectors, we had our numbers

13  document?

14      MR. BELZLEY:  Your Honor, that was just an effort --

15      THE COURT:  Just demonstrative.

16      MR. BELZLEY:  I think it serves a valuable purpose in

17  that regard because it kind of puts it in three pages what is

18  strung throughout 10 or 20 pages of Mr. Dahl's Declaration.

19  So, I would ask that that be admitted as well.

20      MR. GURBST:  Could we reserve our objection to that

21  for a couple of days to figure out what it said and to compare

22  it?

23      THE COURT:  To see if it is an accurate summary?

24      MR. GURBST:  Correct, Your Honor.  If I could have

25  that opportunity?  And if you don't hear from us --

1          MR. McCORMICK:  We would join in the same.

2          MR. SCHULMAN:  Mr. Blackman would like to say that I

3    think one of the figures on the last page, we don't agree with,

4    actually.  It looks like the total claims to be 1.8 million,

5    and I think that's wrong.  It is actually too high because it

6    multiplies the average claim by the amount of the deficiency.

7    So, I would object.

8          THE COURT:  Well, I tell you that I have had a chance

9    to review Mr. Dahl's Declaration and his Supplemental

10   Declaration and most recently again supplemented to include

11   Page 4, and I think the representation is that all of these

12   figures could be gleaned from that Declaration?

13         MR. BELZLEY:  That's where I took them from,

14   Your Honor.

15         THE COURT:  Okay.  Well, I don't think it is

16   necessary.  We are all perfectly capable of making the same

17   gleanings.

18         MR. BELZLEY:  That's fine, Your Honor.

19         THE COURT:  So, that won't be admitted into the

20   record.  With that, is the record complete?

21         MR. McCORMICK:  Nothing else, Your Honor.

22         MR. McGRATH:  Nothing else from the defendants,

23   Your Honor.

24         THE COURT:  And for the objectors, anything further?

25         MR. SCHULMAN:  No, thank you, Your Honor.

1          MR. ROSE:  No, thank you.

2          THE COURT:  All right.  I did leave open this morning

3  the possibility of further briefing.  I don't know that there

4  is any word left unsaid yet, but is there any interest -- or is

5  it safe to regard the record as closed?

6          MR. McCORMICK:  No interest from plaintiffs,

7  Your Honor.

8          MR. McGRATH:  None from the defendant.

9          MR. SCHULMAN:  We will rest on our briefs.

10         MR. ROSE:  The same, Your Honor.

11         THE COURT:  All right.  Thank you.  We will regard

12  the record as closed.  I will undertake the issue of the Report

13  and Recommendation as promptly as we can.  Of course, the

14  parties know that you still have 14 days to object.

15         I want to thank everyone for really an excellent

16  presentation.  It has been a very interesting case so far, and

17  I am sure it will continue to be.

18         I will ask the Clerk to recess court.

19                    - - -

20

21

22

23

24

25

1                      C E R T I F I C A T E

2    United States of America

3    Southern District of Ohio

4            I, Georgina L. Wells, Official Court Reporter of the

5    United States District Court for the Southern District of Ohio,

6    do hereby certify that the foregoing 112 pages constitute a

7    true and correct transcription of my stenographic notes taken

8    of the said requested proceedings, held in the City of

9    Columbus, Ohio, in the matter therein stated on the 13th day of

10   February, 2014.

11           In testimony whereof, I hereunto set my hand on the

12   5th day of March, 2014.

13

14

15

16

17

18                           /s/Georgina L. Wells

19                           _____
                             Georgina L. Wells, RMR
20                           Official Court Reporter
                             Southern District of Ohio
21

22

23

24

25