IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION


AMBER GASCHO, *et al.*,

        Plaintiffs,

   vs.                      Civil Action 2:11-cv-436
                                    Judge Smith
                                    Magistrate Judge King


GLOBAL FITNESS HOLDINGS, LLC,

        Defendant.


REPORT AND RECOMMENDATION

## I.   Background

### A.   Procedural History and *Third Amended Complaint*

Plaintiffs initiated this class action in the Court of Common Pleas for Franklin County, Ohio, on April 13, 2011, against defendant Global Fitness Holdings, LLC, formerly doing business as Urban Active ("Global Fitness" or "defendant"). Defendant removed the action to this Court on May 19, 2011, pursuant to the Class Action Fairness Act, 28 U.S.C. §§ 1332(d), 1453. Plaintiffs are residents of Ohio and Kentucky who signed a gym membership contract and/or a personal training, child care, and/or tanning contract with Global Fitness. *Third Amended Complaint*, Doc. No. 100, ¶ 2. Defendant is a Kentucky limited liability corporation that operated fitness facilities in Ohio, Kentucky, Georgia, Nebraska, North Carolina, Pennsylvania, and Tennessee until October 2012, when it sold all of its assets to Fitness and Sports Clubs, LLC, doing business as LA Fitness. *Id.* at ¶ 3.

This action is one of five similar actions pending against Global Fitness.  Class Counsel also represented the plaintiffs in an action in Boone County Circuit Court, Commonwealth of Kentucky, titled *Tartalia v. Global Fitness Holdings, LLC*, No. 11-CI-1121 (the "*Tartalia* action").  The claims asserted in the *Tartalia* action were asserted in this action in the *Third Amended Complaint,* which was filed on September 19, 2013.

The *Third Amended Complaint* alleges that Global Fitness engaged in common practices of, *inter alia*, knowingly misrepresenting the terms and conditions of contracts at the time of sale, making unauthorized deductions from plaintiffs' bank accounts, failing to provide consumers with copies of contracts at the time of signing, failing to provide consumers with a list of available plans, selling membership plans that did not appear on required registration statements, failing to orally inform consumers at the time of signing of their right to cancel, failing to provide copies of "notice of cancellation" forms, failing to honor contract cancellations, and failing to perform in good faith its duties under the contracts. *See e.g., Third Amended Complaint*, ¶ 9.  Plaintiffs assert the following claims: breach of contract (Count I), unjust enrichment (Count II), and false, deceptive, and unconscionable consumer practices violative of

> the Ohio Consumer Sales Practice Act [CSPA] and Prepaid Entertainment Contract Act [PECA], O.R.C. §§ 1345.02, 1345.03, and 1345.41-1345.45; the Kentucky Consumer Protection Act and Kentucky Health Spa Act, KRS 367.170, 367.910-367.920; the Pennsylvania Health Club Act and Unfair Trade Practices and Consumer Protection Law 73 Pa. Cons. Stat. § 2161 *et seq.,* the North Carolina Prepaid Entertainment Contract Act N.C. Gen. Stat. § 66-118 *et*

*seq.*, the Tennessee Health Clubs Act and Consumer Protection Act Tenn. Code Ann. § 47-18-301 *et seq.*, and the Nebraska Consumer Protection Act, Neb. Rev. Stat. § 59-1601

*Third Amended Complaint*, ¶¶ 143-173 (footnote omitted) (Counts III and IV). The *Third Amended Complaint* seeks compensatory and equitable relief, including rescission, as well as an award of costs and attorneys' fees.

On February 2, 2011, *i.e.,* before this action was initiated, Robert J. Zik, April N. Zik, and James Michael Hearon, acting on behalf of themselves and a class of similarly situated persons, filed a complaint against Global Fitness in the Jefferson County Circuit Court, Commonwealth of Kentucky. *Zik v. Global Fitness Holdings, LLC*, No. 11-CI-7909 (the "*Zik* action"). *See* Doc. Nos. 118-1 (docket sheet), 118-2 (amended complaint). The *Zik* action presented claims of breach of contract, fraud, and violations of the Kentucky Consumer Protection Act ("KCPA"), K.R.S. § 367.170, *et seq.*, premised on the alleged breach by Global Fitness of "its members' membership agreements by charging its members one extra month of membership dues and a $10.00 cancellation fee when members terminate their membership agreement." Doc. No. 118-2, pp. 1, 6. The *Zik* action sought "compensatory damages for unpaid dues and cancellation fees, interest, and court costs, . . . punitive damages and their attorney's fees." *Id*. at ¶ 37.

On April 15, 2011, *i.e.*, two (2) days after this action was filed, Phillip S. Robins, proceeding on behalf of himself and others similarly situated, initiated an action against Global Fitness in the Cuyahoga County Court of Common Pleas, which action was thereafter

3

removed to the United States District Court for the Northern District of Ohio. *Robins v. Global Fitness Holdings, LLC*, No. 1:11-cv-1373 (N.D. Ohio) ("the *Robins* action"), *Notice of Removal*, Doc. No. 1. The complaint in the *Robins* action alleged

> that, contrary to the express terms of Global's Membership Contracts and Personal Training Contracts . . . Global has (1) retained fees paid by members of its health clubs for the period in which they were disabled, deceased, or relocated, (2) collected from Plaintiffs' credit, debit or bank accounts additional fees not part of the agreed-upon monthly fees, and (3) drafted form contracts containing egregious, confusing and misleading cancellation provisions that guarantee members will be charged for one or more months beyond the date they cancel their memberships. Based on these allegations, Plaintiffs assert the following common-law claims against Global: breach of contract (Count One), unjust enrichment (Count Two), and fraud (Count Three). Plaintiffs have also asserted claims against Global for violation of the following state and federal statutes: Ohio's Consumer Sales Practices Act (Count Four), Ohio's Prepaid Entertainment Contracts Act, O.R.C. §§ 1345.41 *et seq.* (Count Five), Ohio's Deceptive Trade Practices Act, O.R.C. §§ 4165.01 *et seq.* (Count Six), Kentucky's Consumer Protection Act–Health Spas (Count Seven), the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961 *et seq.* ("RICO") (Count Eight), Ohio's version of RICO, O.R.C. §§ 2923.31 *et seq.* (Count Nine), and the Electronic Fund Transfer Act, 15 U.S.C. §§ 1693 *et seq.* (Count Ten).

*Robins v. Global Fitness Holdings, LLC*, 838 F.Supp. 2d 631, 637 (N.D. Ohio 2012). On January 18, 2012, all claims in the *Robins* action were dismissed, some with prejudice and some without prejudice. *Id.* at 654. Plaintiffs' appeal from that judgment remains pending. *Robins v. Global Fitness Holdings, LLC*, Case No. 12-3231 (6th Cir.).

The earliest of the five class actions against Global Fitness was filed by David Seeger and fifteen other named plaintiffs, on behalf of themselves and a class of similarly situated persons, in the Boone County Circuit Court, Commonwealth of Kentucky. *Seeger v. Global*

4

*Fitness Holdings, LLC*, No. 11-CI-7909 (the "*Seeger* action"). The *Seeger* plaintiffs asserted claims of forgery, fraud, breach of contract, concealment and non-disclosure, breach of good faith and fair dealing, and violations of K.R.S. §§ 516.030 and 367.170. *See Seeger Amended Complaint*, Doc. No. 118-12.

The *Seeger* plaintiffs negotiated a class settlement with Global Fitness and, on December 21, 2012, the Boone County Circuit Court held a fairness hearing to determine whether the settlement was fair, reasonable, and adequate. Counsel for plaintiffs in this action (and in the *Tartaglia* action) and counsel for plaintiffs in the *Zik* action appeared at the hearing and objected to the proposed settlement. *Order*, Doc. No. 118-10. The court in *Seeger* declined to approve the proposed settlement. *Id*. In "summarize[ing] the greatest reasons" for rejecting the proposed settlement, the court in *Seeger* concluded that the release sought by Global Fitness in that action was "overly broad" because it was "unlimited to time or nature of the claims," "includes claims that do not share the identical factual predicate as Plaintiff's claims," and class counsel "had not conducted meaningful and adequate discovery on many of the claims sought to be released." *Id*. at p. 2. The *Seeger* court also concluded that the notice of settlement provided to the putative class members was deficient and that the claims process was too cumbersome, resulting in an approval rate of just 0.6 percent of the potential class. *Id*. Moreover, the proposed settlement had a "lack of value:" it was a "coupon settlement for the most part" and 90 percent of the cash refund claims had been rejected. *Id*. at pp. 2-3. The *Seeger* court therefore concluded that

the settlement was unfair in that too large a group of people were bound to an agreement for which little benefit was given.[1] *Id*.

On September 12, 2013, the parties to this action executed a settlement agreement, *Settlement Agreement and Release* ("*Settlement Agreement*"), Doc. No. 97-1, and shortly thereafter applied to the Court for preliminary approval of the settlement. *Joint Motion for an Order Preliminarily Approving the Class Action Settlement, etc.,* Doc. No. 97. On September 30, 2013, the Court preliminarily approved the proposed settlement, preliminarily certified a class and subclasses for settlement purposes, appointed the named plaintiffs as Class Representatives, appointed lead counsel for the class, approved and directed the issuance of notice to the class, and referred the matter to the undersigned for a fairness hearing

> to determine (a) whether the proposed settlement of the action on the terms and conditions set forth in the Settlement Agreement is fair, reasonable, and in the best interest of the Classes and Subclasses and should be finally approved by the Court; (b) whether the Class and Subclasses should be finally certified for settlement purposes; (c) whether the Action should be dismissed with prejudice pursuant to the terms of the Settlement; (d) whether Settling Plaintiffs should be bound by the release set forth in the Settlement Agreement; (e) whether and in what amount Class Counsel should be awarded fees and reimbursement of expenses, (f) whether and in what amount the Class Representatives shall be awarded the Class Representative Enhancement Payments, (g) and to rule on any other matters the Court may deem appropriate.

*Preliminary Approval Order*, Doc. No. 111, pp. 1, 5. The Court also established a procedure for the filing of written objections to the proposed settlement. *Id*. at p. 6.

---

[1] Defendant represents that the plaintiffs in the *Seeger* action have taken no substantive action since the proposed settlement was rejected in January 2013. *Memorandum in Response to Objections* ("*Defendant's Response*"), Doc. No. 126, p. 17.

The named plaintiffs in the *Zik* action, Robert J. Zik, April N. Zik, and James Michael Hearon (the "Zik Objectors"), have filed objections to the proposed settlement on behalf of themselves and a class of similarly situated persons.  *Objection to Proposed Class Action Settlement* ("*Zik Objections*"), Doc. No. 118.  The Zik Objectors compare the proposed settlement in this action to the proposed settlement in the *Seeger* action and argue that the proposed settlement in this action should be rejected because the Class Representatives and Class Counsel have failed to adequately protect the interests of the class and because the proposed settlement is procedurally and substantively unfair.

Joshua Blackman has also filed objections.  *Objection of Joshua Blackman* ("*Blackman Objections*"), Doc. No. 122.  "[T]he gist of Blackman's objection" is the "[p]referential treatment to class counsel;" "[h]is cardinal objection is that the settlement is unfair because class counsel is appropriating an excessive 65% of the settlement value for itself."  *Id.* at *PAGEID* 2083-84 (footnote omitted).  Blackman also challenges the claims process, the adequacy of class representation given the requested incentive awards (or enhancement payments), and the adequacy of the notice of Class Counsel's request for attorneys' fees.  *Id.* at *PAGEID* 2089, 2094-99, 2107.

Plaintiffs have responded to the objections, *Plaintiffs' Response to the Objection of Joshua Blackman and the Objection of Zik/Hearon* ("*Plaintiffs' Response*"), Doc. No. 128, as has Global Fitness, *Defendants' Response*, Doc. No. 126.  The Zik Objectors have filed a

reply, *Zik Objectors' Reply*, Doc. No. 135, as has Blackman, *Blackman's Reply*, Doc. No. 133.

The undersigned held a fairness hearing, conducted pursuant to Fed. R. Civ. P. 23(e), on February 13, 2014. Counsel for plaintiffs, for Global Fitness, for the Zik Objectors, and for Blackman all appeared. Jeffrey D. Dahl, President of the Court appointed Claims Administrator Dahl Administration, LLC, also appeared and testified.

This matter is now ripe for consideration.

**B.    Preliminarily Certified Class and Subclasses**

The preliminarily certified Class and Subclasses of plaintiffs consist of the following:

a. The "Class" includes all individuals who signed a gym membership or personal training contract with Defendant during the Class Period which is January 1, 2006, to October 26, 2012. At the time of preliminary certification, the total number of Class Members is estimated to be 606,246 persons.

b. The "FIF Subclass" includes all Class Members who paid a $15 Facility Improvement Fee ("FIF"), Club Administrative Fee ("CAF"), or any other biannual $15 fee charged by Defendant during the FIF Subclass Period, which is April 1, 2009, to October 26, 2012. At the time of preliminary certification, the total number of FIF Subclass members is estimated to be 316,721 persons.

c. The "Gym Cancel Subclass" includes all Class Members who cancelled their gym membership contract. At the time of preliminary certification, the total number of Gym Cancel Subclass members is estimated to be 387,177 persons.

d. The "Personal Training Cancel Subclass" includes all Class Members who cancelled a Personal Training contract. At the time of preliminary certification, the total number of Personal Training Cancel Subclass members is estimated to be 64,805 persons.

*Preliminary Approval Order*, p. 3. Plaintiffs Amber Gascho, Ashley Buckemeyer, Michael Hogan, Edward Lundberg, Terry Troutman, Anthony

Meyer, Rita Rose, Julia Cay (fka Julia Snyder), Albert Tartaglia, Michael Bell, Matt Volkerding, and Patrick Cary have been appointed as Class Representatives of the Class, FIF Subclass, and Gym Cancel Subclass; Amber Gascho, Julia Cay, and Albert Tartaglia have been appointed as Class Representatives of the Personal Training Cancel Subclass. *Id*.

> ### C. *Settlement Agreement*

The *Settlement Agreement* authorizes the payment of monetary compensation to any Class or Subclass member who becomes an Allowed Claimant[2] by filing a timely and valid claim form with the Claims Administrator and upon confirmation by the Claims Administrator. *Settlement Agreement*, § 6.1. Each Allowed Claimant is entitled to $5 for his or her membership in the Class, $20 if he or she is a member of the FIF Subclass, $20 if he or she is a member of the Gym Cancel Subclass, and $30 if he or she is a member of the Personal Training Cancel Subclass. *Id*. at §§ 6.1.1-6.1.4. Claim awards are cumulative, which means that an Allowed Claimant may recover for every Subclass membership for which he or she qualifies. *Settlement Agreement*, § 6.2.

The *Settlement Agreement* provides for a Minimum Class Payment of $1,300,000, which includes payments to Allowed Claimants and incentive awards totaling $40,000 to the Class Representatives. *Id*. at §§ 7.1, 8.1. Class Representatives Tartaglia and Bell are authorized to receive incentive awards of $5,000; Class Representatives Gascho, Buckemeyer, Hogan, Lundberg, Troutman, Meyer, Rose, and Cay are

---

[2] Capitalized terms not otherwise defined have the meaning indicated in the *Settlement Agreement*.

authorized to receive $3,500; and Class Representatives Volkerding and Cary will each receive $1,000. *Id.* at §§ 8.2.1, 8.2.2, 8.2.3. The incentive awards have been characterized as payment for services rendered to the class members and Class Representatives will receive a Form 1099 for the payments. *Id.* at § 8.3.

The *Settlement Agreement* also provides that Global Fitness will pay the reasonable attorneys' fees and actual costs awarded by the Court, not to exceed $2,390,000, and will not oppose Class Counsel's application for fees. *Id.* at §§ 9.1, 9.2. The agreement to pay Class Counsel's reasonable attorneys' fees and costs has "no effect on, and will not reduce, the Class Payment by Defendant." *Id.* at § 9.1. According to the *Settlement Agreement*, the allocation of fees among Class Counsel is "the sole responsibility of Class Counsel." *Id.* at § 9.3.

The *Settlement Agreement* requires Global Fitness to pay the administration costs of the Claim Administrator. *Id.* at § 10.1. The Claims Administrator is charged with the sole responsibility for determining eligibility for, and the amount of, claims awards to be paid, in accordance with the terms of the *Settlement Agreement*. *Id.* at §§ 10.4, 10.5.

**D. Notice, Response, and Claims**

Pursuant to the Court's order granting preliminary approval, Global Fitness provided Claims Administrator Dahl Administration, LLC, data files related to potential class members. *Declaration of Jeffrey D. Dahl with Respect to Notice and Claims Administration Tasks Complete as of January 21, 2014* ("*Dahl Declaration*"), Doc. No. 126-1,

¶ 5.  The Claims Administrator reviewed the data for completeness and duplication and processed the data through the United States Postal Service National Change of Address database.  *Id*. at ¶¶ 6-8.  After compiling a list of potential class members with the updated mailing addresses, the Claims Administrator "sent a notice postcard in a form and content substantially similar to the Summary Notice attached as Exhibit 7 to the *Settlement Agreement*, on October 30, 2013" to 601,494 class members via First Class mail.  *Id*. at ¶¶ 10, 12.  *See also Transcript*, *PAGEID* 2715-17 (Mr. Dahl's testimony detailing the address scrubbing and confirmation process).  Of the 601,494 Postcard Notices mailed, 146,617 were initially returned as undeliverable.  *Dahl Declaration*, ¶ 14.  Of these, 2,077 were re-mailed to a forwarding address provided by the United States Postal Service and 89,198 were re-mailed to new addresses obtained by an address search firm.  *Id*.  "After re-mailing the Notices, 90.8% of the Postcard Notices were delivered."  *Id*. at ¶ 14.

In addition to the Postcard Notice, 259,195 class members were sent notice by email on October 30, 2013.  *Id*. at ¶ 15.  Of these, 154,216 were "bounced back" from invalid email addresses and 150,581 were delivered.  *Id*.  On November 29, 2013, "all potential Class Members with valid email addresses who had not filed Claim Forms in order to become Allowed Claimants or who had not Opted Out within thirty (30) days after the original mailing of the Postcard Notice were sent Supplemental Email Notice . . . of the settlement."  *Id*. at ¶ 18.

Notice was also published on two consecutive days, with one of the two days being the first Sunday after the Notice Postcards had been mailed, in 13 different newspapers. *Id*. at ¶¶ 16-17, Exhibit F. The publication notice contained "content substantially similar to the Summary Notice attached as Exhibit 7 to the Settlement Agreement," *id*. at ¶ 16, which had been approved by the Court.

The Claims Administrator established a settlement website, www.UrbanActiveLawsuit.com, in accordance with the terms of § 12.2 of the *Settlement Agreement*. *Id*. at ¶ 27. The website provides general settlement information, contact information for the Claims Administrator, a list of frequently asked questions and answers, a list of important dates and deadlines, and certain settlement documents in .pdf format, including the long-form legal notice, the claim form, the *Settlement Agreement*, the *Preliminary Approval Order*, the *Scheduling Order* (Doc. No. 113), and the *Third Amended Complaint*. *Dahl Declaration*, ¶ 28; *Plaintiffs' Exhibit 1*. The website also provides a link that permits a claimant to file a claim online. *Plaintiffs' Exhibit 1*. The website address was included in the Postcard Notice, in the long-form notice, in the email and the reminder email, and in the publication notice. *See Dahl Declaration*, Exhibits C-H.

The Claims Administrator also established a toll-free helpline to assist individuals seeking information about the proposed settlement. Like the website address, the toll-free number was included in the Postcard Notice, in the long-form notice, in the email and reminder email, and in the publication notice. The toll-free helpline is also

posted on the settlement website. *Dahl Declaration*, ¶¶ 21-22, Exhibits C-H.

The long-form notice,[3] the Postcard Notice, the email and reminder email, and the publication notice all informed potential class members that, in order to qualify for a cash settlement, the claimant was required to submit a Claim Form by mail or online by December 30, 2013. All forms of notice also provided instructions for opting out of the settlement and for objecting to the settlement at the fairness hearing. *See Dahl Declaration*, Exhibits C-H.

"As of November 29, 2013, the Notice reached at least 90.8% of potential Class Members." *Id.* at ¶ 45. The Claims Administrator received 55,597 Claim Forms, 54,129 of which were filed online and 1,468 were filed by mail. *Id.* at ¶ 31. As of January 21, 2014, the Claims Administrator had confirmed 49,457 claims from Allowed Claimants, 3,965 claims were pending further review, 2,161 were duplicates, and 14 were not timely filed. *Id.* at ¶¶ 32-33. As of February 11, 2014, the Claims Administrator had validated and calculated final award amounts for 29,341 Allowed Claimants, resulting in a total Class Payment of $1,070,895.00. *Supplemental Declaration of Jeffrey D. Dahl with Respect to Deficiency Notice and Claims Administration Tasks Completed as of February 10, 2014* ("*Supplemental Dahl Declaration*"), Doc. No. 138-1, ¶ 13. For the remaining 20,469 Allowed Claimants, there was a disparity between the subclass awards claimed by the Allowed Claimants and Global Fitness' records, and the

---

[3] The long-form notice is also posted on the settlement website. *See Transcript*, *PAGEID* 2708.

Claims Administrator secured additional information in order to verify
the claims. *Id*. at ¶ 15; *Dahl Declaration*, ¶ 38; *Transcript*, *PAGEID*
2724-27. The Claims Administrator "was able to validate additional
Class Payments to 2,284 Class Members." *Second Supplemental
Declaration of Jeffrey D. Dahl with Respect to Claims Administration
Tasks and Final Class Payment Calculations Completed as of March 21,
2014 ("Second Supplemental Dahl Declaration")*, Doc. No. 140-1, ¶ 5.

The Claims Administrator has now "validated claims and calculated
final award amounts for 49,808 Allowed Claimants, resulting in a total
final Class Payment of $1,593,240.00. The average Class Payment is
$31.99 and the average Gym Cancel Subclass Payment is $41.28." *Id.* at
¶ 9.

## II.  **Motion to Strike Blackman's Objection**

Global Fitness has moved to strike Blackman's objections on the
basis that Blackman lacks standing to file objections. *Motion to
Strike Objection of Joshua Blackman*, Doc. No. 125. Specifically,
Global Fitness argues that Blackman "signed a membership agreement on
August 16, 2011 at a Global Fitness club in Louisville, Kentucky," but
rescinded the contract pursuant to a three-day cancellation provision.
*Id*. at pp. 2-3. Because Blackman's contract was rescinded *ab initio*,
Global Fitness argues, Blackman cannot be considered a former "member"
of Global Fitness and cannot qualify as a member of any Class or
Subclass. *Id*.

The *Settlement Agreement* defines a "Class Member" as "each person
who is a member of the Class as defined in Section 6." *Settlement
Agreement*, § 2.8. Section 6 defines the "Class" as "all individuals

14

who signed a gym membership or personal training contract with Defendant during the Class Period," *id*. at § 6.1.1, *i.e.*, "January 1, 2006, to October 26, 2012." *Id*. at § 2.10.  Blackman meets the literal definition of a "Class Member," and therefore has standing to object to the settlement, *see* Fed. R. Civ. P. 23(e)(5); *Tenn. Ass'n of Health Maint. Orgs., Inc. v. Grier*, 262 F.3d 559, 566 (6th Cir. 2001), because he "signed a membership agreement on August 16, 2011 at a Global Fitness club in Louisville, Kentucky." *See Motion to Strike Objection of Joshua Blackman*, pp. 2-3.  Indeed, Global Fitness effectively conceded this point at the fairness hearing. *See Transcript*, *PAGEID* 2747-48.

Accordingly, it is **RECOMMENDED** that defendant's motion to strike, Doc. No. 125, be **DENIED**.

## III. Class Certification

### A. Standard

A class action "may only be certified if the trial court is satisfied, after a rigorous analysis, that the prerequisites of Rule 23(a) have been satisfied." *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982).  *See also Stout v. J.D. Byrider*, 228 F.3d 709 (6th Cir. 2000).  Rule 23(a) of the Federal Rules of Civil Procedure establishes four prerequisites to class certification:

> **(1)** the class is so numerous that joinder of all members is impracticable;
>
> **(2)** there are questions of law or fact common to the class;
>
> **(3)** the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
>
> **(4)** the representative parties will fairly and adequately protect the interests of the class.

15

Fed. R. Civ. P. 23(a).  "In addition to fulfilling the four
prerequisites of Rule 23(a), the proposed class must also meet at
least one of the three requirements listed in Rule 23(b)." *In re
Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*, 722 F.3d
838, 850 (6th Cir. 2013) (citing *Wal-Mart Stores, Inc. v. Dukes*, --
U.S. --, 131 S. Ct. 2541, 2550 (2011)).  Plaintiffs in this action
seek class certification under Rule 23(b)(3), which requires a finding
"that the questions of law or fact common to class members predominate
over any questions affecting only individual members" and that the
class action is "superior to other available methods" to adjudicate
the controversy fairly and efficiently.  Fed. R. Civ. P. 23(b)(3).
"The trial court has broad discretion in deciding whether to certify a
class, but that discretion must be exercised within the framework of
Rule 23." *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1079 (6th Cir.
1996).  This Court will consider each of the Rule 23 requirements for
certification.

   **B.   Numerosity**

   Rule 23(a)(1) requires the class to be "so numerous that joinder
of all members is impracticable."  Fed. R. Civ. P. 23(a)(1).  Although
"there is no strict numerical test, 'substantial' numbers usually
satisfy the numerosity requirement." *Daffin v. Ford Motor Co.*, 458
F.3d 549, 552 (6th Cir. 2006) (quoting *In re Am. Med. Sys.*, 75 F.3d at
1079).  The parties have established that the Class consists of
605,735 members, the FIF Subclass consists of 300,017 members, the Gym
Cancel Subclass consists of 323,518 members, and the Personal Training
Cancel Subclass consists of 50,038 members. *Supplemental Dahl*

16

*Declaration*, ¶ 17.  Joinder of tens – or hundreds - of thousands of class members across multiple states would be impracticable.  The numerosity requirement of Rule 23(a)(1) is therefore satisfied.  *See e.g., In re Whirlpool Corp.*, 722 F.3d at 852; *Adams v. Anheuser-Busch Cos., Inc.*, No. 2:10-cv-826, 2012 WL 1058961, at *3-4 (S.D. Ohio Mar. 28, 2012) (finding a class of approximately 60 individuals geographically dispersed over the country sufficient to satisfy the requirements of Rule 23(a)(1)).

### C.    Commonality

"Rule 23(a)(2) requires plaintiffs to prove that there are questions of fact or law common to the class . . . ." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 542 (6th Cir. 2012).  "To demonstrate commonality, plaintiffs must show that class members have suffered the same injury."  *In re Whirlpool Corp.*, 722 F.3d at 852 (citing *Dukes*, 131 S. Ct. at 2551).  "Their claims must depend upon a common contention . . . [which is] of such a nature that it is capable of classwide resolution — which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Dukes*, 131 S. Ct. at 2551.  "This inquiry focuses on whether a class action will generate common answers that are likely to drive resolution of the lawsuit."  *In re Whirlpool Corp.*, 722 F.3d at 852 (citing *Dukes*, 131 S.Ct at 2551).  *See also Davis v. Cintas Corp.*, 717 F.3d 476, 487 (6th Cir. 2013).

"The commonality test is qualitative rather than quantitative, that is, there need be only a single issue common to all members of

the class." *In re Am. Med. Sys.*, 75 F.3d at 1083 (internal quotations omitted).  *See also Dukes*, 131 S. Ct. at 2541 ("We quite agree that for purposes of Rule 23(a)(2) '[e]ven a single [common] question' will do[.]") (internal quotations and citations omitted; alterations in original); *In re Whirlpool Corp.*, 722 F.3d at 853.  "'[T]he mere fact that questions peculiar to each individual member of the class action remain after the common questions of the defendant's liability have been resolved does not dictate the conclusion that a class action is impermissible.'"  *Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 619 (6th Cir. 2007) (quoting *Sterling v. Velsicol Chem. Corp.,* 855 F.2d 1188, 1197 (6th Cir. 1988)).

This case presents common issues of fact sufficient to satisfy the requirements of Rule 23(a)(2).  The *Third Amended Complaint* alleges that the policies and practices of Global Fitness resulted in common injuries to all members of the class.  Specifically, plaintiffs allege that Global Fitness engaged in a common policy and practice of, *inter alia*, "knowingly misrepresenting and failing to disclose the terms and conditions of its membership contracts and personal training contracts;" "refusing to provide copies of membership contracts, personal training contracts and other contracts for services at the time they are signed;" "misrepresenting the terms, conditions, and availability of its contracts; intentionally avoiding, making it unduly burdensome and/or refusing to honor valid notices of cancellation; and knowingly taking payment from Plaintiffs and other Class members' accounts without authorization." *Third Amended Complaint*, ¶¶ 160-63.  As for the FIF Subclass, the alleged policy or

18

practice of failing to disclose the FIF or CAF at the time of sale is a common question of fact. The Class, the Gym Cancel Subclass, and the Personal Training Cancel Subclass share common questions of fact, *i.e.*, whether Global Fitness failed to inform members of a right to cancel, failed to provide notice of cancellation, failed to honor notice of cancellations, failed to properly disclose cancellation fees, and continued to bill members monthly dues after cancellation. Accordingly, there are issues of fact common to all members of the Class and Subclasses sufficient to satisfy the requirements of Rule 23(a)(2).

### D. **Typicality and Fairness and Adequacy**

"Rule 23(a)(3) requires proof that plaintiffs' claims are typical of the class members' claims." *Young*, 693 F.3d at 542. "Typicality is met if the class members' claims are 'fairly encompassed by the named plaintiffs' claims.'" *In re Whirlpool Corp.*, 722 F.3d at 852 (quoting *Sprague v. Gen. Motors Corp.,* 133 F.3d 388, 399 (6th Cir. 1998)). "This requirement insures that the representatives' interests are aligned with the interests of the represented class members so that, by pursuing their own interests, the class representatives also advocate the interests of the class members." *Id*. at 852-53 (citing *Sprague*, 133 F.3d at 399).

Rule 23(a)(4) requires that "the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "The adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named parties and the class they seek to represent." *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625

(1997). "A class representative must be part of the class and possess the same interest and suffer the same injury as the class members." *Id.* (quotations omitted). The determination of adequacy of representation is grounded in two considerations: "'1) the representative must have common interests with unnamed members of the class, and 2) it must appear that the representatives will vigorously prosecute the interests of the class through qualified counsel.'" *In re Am. Med. Sys.*, 75 F.3d at 1083 (quoting *Senter v. Gen. Motors Corp.*, 532 F.2d 511, 525 (6th Cir. 1976)).

The requirements of commonality and typicality "'tend to merge'" because "'[b]oth serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Dukes*, 131 S. Ct. at 2551 n.5 (quoting *Falcon*, 457 U.S. at 157-158 n.13). Commonality and typicality "'also tend to merge with the adequacy-of-representation requirement, although the latter requirement also raises concerns about the competency of class counsel and conflicts of interest.'" *Id.* (quoting *Falcon*, 457 U.S. at 157-158 n.13). The adequate representation requirement also "overlaps with the typicality requirement because in the absence of typical claims, the class representative has no incentive to pursue the claims of the other class members." *In re Am. Med. Sys.,* 75 F.3d at 1083. Because of the "intertwined nature" of these factors, the Court will consider typicality and the adequacy of representation together. *See In re*

*Whirlpool Corp.*, 722 F.3d at 853 (considering commonality, typicality, and adequate representation together).

The *Zik* Objectors challenge certification on the basis of typicality and adequacy of class representation. The *Zik* Objectors argue, first, that plaintiffs' claims are not typical of those of the class and that the named plaintiffs cannot adequately represent the class because no plaintiff "possess[es] the claims of the Ziks." *Zik Objectors' Reply*, *PAGEID* 2619. The *Zik* Objectors argue that April and Robert Zik's "membership contracts include very different cancellation language than Plaintiffs' contracts." *Id*. According to the *Zik* Objectors, April and Robert Zik's contracts and any membership agreement entered into with Global Fitness before March 2008 "only allow charging one additional month's dues post cancellation," whereas plaintiffs' contracts "purportedly allow charging two month's dues post cancellation." *Id*. (emphasis omitted). The *Zik* Objectors represent that Global Fitness changed the cancellation provision in its form contract in March 2008 and that none of the named plaintiffs signed a gym membership contract with the pre-March 2008 cancellation provision. *Id*. at *PAGEID* 2619-22. Adequate representation of April and Robert Zik's claims is precluded, the *Zik* Objectors argue, because "[n]ot one plaintiff had contractual language with the one-month billing cycle." *Transcript*, *PAGEID* 2762-63. This argument is not well taken.

The plaintiffs in the *Zik* Action sought to certify a class of members who cancelled their month-to-month memberships with Global Fitness "from February 2, 1996 through the present, and after such

cancellation, were charged: (a) membership dues for the month that started subsequent to 30 days after they provided notice of cancellation of their membership to [Global Fitness]; and/or (b) a $10.00 (or greater) administrative cancellation fee." *Zik Objections*, p. 5. The members of this purported class who signed membership agreements with Global Fitness between January 1, 2006 and October 26, 2012 are members of the Gym Cancel Subclass because they are Class Members who cancelled their gym membership contract. *See Settlement Agreement*, §§ 2.10 (defining "Class Period"), 6.1.1 (defining the "Class"), 6.1.3 (defining the "Gym Cancel Subclass").

Like objectors April and Robert Zik, plaintiff Lundberg entered into a contract with Global Fitness prior to March 2008 and was charged membership dues after he cancelled his contract. *See Third Amended Complaint*, ¶¶ 50-57. To the extent that the March 2008 change in the cancellation provision of Global Fitness's form contact impacts the claims of the class members,[4] the claims of those members who entered into a contract prior to March 2008 would nevertheless be similar to plaintiff Lundberg's claim; Lundberg possesses the same interest and suffered the same injury as those class members. Similarly, plaintiff Meyer, who allegedly signed a gym membership contract after March 2008 and was charged a $10 cancellation fee and monthly dues after cancellation, *see Third Amended Complaint*, ¶¶ 66-73, suffered the same type of injury as did the class members who entered into a contract with Global Fitness after March 2008.

---

[4] Global Fitness contended at the fairness hearing that its form contracts always permitted it to charge two months' dues after cancellation. *Transcript, PAGEID* 2785-86.

Furthermore, there is no indication that the interests of these (or any other) Class Representatives conflict because, regardless of which form contract the member signed, the Class Representatives allegedly suffered the same type of injury, *i.e.*, they were, pursuant to a common policy or practice of defendant, allegedly improperly charged monthly dues and a cancellation fee after cancellation of the contract.

The *Zik* Objectors also argue that the named plaintiffs cannot adequately represent the class because Robert Zik's contract – like all contracts executed before 2008 - did not contain a $10.00 cancellation fee, whereas all of the named plaintiffs' contracts did contain such a fee. *Zik Objectors' Reply*, *PAGEID* 2620-21.  Citing to *De Leon v. Bank of America, N.A.*, No. 6:09-cv-1251, 2012 WL 2568142 (M.D. Fla. Apr. 20, 2012), the *Zik* Objectors argue that the named plaintiffs cannot adequately represent the class because they are not possessed of the precise breach of contract claim as are those class members who executed their contracts before 2008.  *Zik Objectors' Reply*, *PAGEID* 2621-23.  This argument is not well taken.

Rule 23(a)(3) requires that the named plaintiffs' claims be <u>typical</u> of the class members' claims, not identical to those claims. *Prater v. Ohio Educ. Ass'n*, No. C2-04-1077, 2008 WL 2566364, at *3 (S.D. Ohio June 26, 2008) ("The claims of the named plaintiffs and the absent members must be typical, not identical or homogeneous."); *Jenkins v. Hyundai Motor Fin. Co.*, C2-04-720, 2008 WL 781862, at *5 (S.D. Ohio Mar. 24, 2008) (same); *Tomlinson v. Kroger Co.*, No. C2-03-706, 2007 WL 1026349, at *4 (S.D. Ohio Mar. 30, 2007) (same); *Tucker*

*v. Union Underwear Co., Inc.,* 144 F.R.D. 325, 329 (W.D. Ky. 1992)
("Rule 23 does not require absolute homogeneity.").  Although Robert
Zik's contract claim may differ because his contract did not authorize
a $10.00 cancellation fee, the claims of the named and absent
plaintiffs are nevertheless based on strongly similar legal theories.
Whereas the plaintiffs in *De Leon*, 2012 WL 2568142, asserted a single
breach of contract claim on behalf of a nationwide class, *see id*. at
*5, the *Third Amended Complaint* asserts claims of breach of contract,
unjust enrichment, and false, deceptive, and unconscionable consumer
practices violative of state consumer protection laws based on a
business practice that is common to all class members.  The Class
Representatives suffered the same type of injury as, and have an
interest in common with, unnamed members because both were allegedly
improperly charged a $10.00 cancellation fee pursuant to Global
Fitness's common policies and procedures.  Accordingly, in pursuing
their own interests and claims related to the allegedly improper
charge, the Class Representatives will also be advocating for the
interests of the absent class members.

The *Zik* Objectors also argue that certification is improper
because the damages due each class member could vary depending on the
amount of his or her monthly dues, the number of unauthorized charges,
and the amount of improper fees actually paid by each member.  *Zik
Objections*, *PAGEID* 1929-32.  However, and the *Zik* Objectors' arguments
to the contrary notwithstanding, individual damages calculations do
not inevitably serve to preclude class certification.  *See, e.g.*, *In
re Whirlpool Corp.*, 722 F.3d at 861 (quoting *Comcast Corp. v. Behrend*,

133 S. Ct. 1426, 1437 (2013) (Ginsburg and Breyer, J.J., dissenting) ("Recognition that individual damages calculations do not preclude class certification under Rule 23(b)(3) is well nigh universal.")).

As noted *supra*, plaintiffs Gascho, Buckemeyer, Hogan, Lundberg, Troutman, Meyer, Rose, Cay, Tartaglia, Bell, Volkerding, and Cary have been appointed as Class Representatives of the Class, the FIF Subclass, and the Gym Cancel Subclass, and Gascho, Cay, and Tartaglia have been appointed as Class Representatives of the Personal Training Cancel Subclass. *Preliminary Approval Order*, p. 3. The Class Representatives all signed a gym membership or personal training contract with Global Fitness, *see Third Amended Complaint*, ¶¶ 25 (Gascho), 34 (Buckemeyer), 45 (Hogan), 51 (Lundberg), 58 (Troutman), 67 (Meyer), 77 (Rose), 91 (Cay), 113 (Tartaglia), 118 (Bell), 126 (Volkerding), 134 (Cary), and paid a biannual $15 FIF or CAF charged by defendant, *id*. at ¶¶ 73 (Meyer), 84 (Rose), 122 (Bell), 130 (Volkerding), 138 (Cary), cancelled their gym membership contract, *id*. at ¶¶ 47 (Hogan), 55-57 (Lundberg), 72 (Meyer), 87 (Rose), 123 (Bell), 129 (Volkerding), and/or cancelled their personal training contract with defendant, *id* at ¶¶ 30 (Gascho), 114-15 (Tartaglia). The claims of the Class Representatives arise from the same policies and practices of defendant that give rise to the claims of other class members and are based on the same legal theories. In short, the interests of the Class Representatives are sufficiently aligned so as to ensure adequate representation of the class. *See, e.g., Beattie v. CenturyTel, Inc.*, 511 F.3d 554, 563 (6th Cir. 2007) (Because the plaintiffs suffered the same type of injury as members of the class,

"there is every reason to believe that [the plaintiffs] will vigorously prosecute the interests of the class.").

The Class Representatives and Class Counsel have also aggressively pursued the claims on behalf of the class. Class Counsel are experienced practitioners in both class action litigation and consumer law and are qualified to handle this matter. *See* Doc. Nos. 97-10, 114-1, 114-2 (declarations and résumés of plaintiffs' attorneys). Because the Class Representatives and Class Counsel have demonstrated an ability to vigorously pursue the claims of the class, and because there is no conflict of interest or antagonism among the named plaintiffs, the classes and their counsel, the Court concludes that the Class Representatives will fairly and adequately protect the interests of the class.

### E.    Rule 23(b)(3)

Having concluded that the four prerequisites of Rule 23(a) have been met, the Court must now determine whether plaintiffs have established that this litigation may properly be maintained as a class action under one of the subdivisions of Rule 23(b). Under Rule 23(b)(3), a class action is appropriate where "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Rule 23(b)(3) thus has both a predominance and superiority requirement. *See, e.g., Vassalle v. Midland Funding LLC*, 708 F.3d 747, 756 (6th Cir. 2013) ("Because the district court certified the class under Rule 23(b)(3), the class

must satisfy the additional requirements of superiority and predominance.").

"The Rule 23(b)(3) predominance inquiry tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." *Amchem,* 521 U.S. at 632. "'To meet the predominance requirement, a plaintiff must establish that issues subject to generalized proof and applicable to the class as a whole predominate over those issues that are subject to only individualized proof.'" *Young*, 693 F.3d at 544 (quoting *Randleman v. Fidelity Nat. Title Ins. Co.,* 646 F.3d 347, 352–53 (6th Cir. 2011)). "Further, 'the fact that a defense may arise and may affect different class members differently does not compel a finding that individual issues predominate over common ones.'" *Id.* (quoting *Beattie,* 511 F.3d at 564). "While the commonality element of Rule 23(a)(2) requires showing one question of law or fact common to the class, a Rule 23(b)(3) class must show that common questions will *predominate* over individual ones." *Id.* (emphasis in original). However, "Rule 23(b)(3) does not mandate that a plaintiff seeking class certification prove that each element of the claim is susceptible to classwide proof." *In re Whirlpool Corp.*, 722 F.3d at 859 (citing *Amgen Inc. v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1196 (2012)). "[C]ommon issues may predominate when liability can be determined on a class-wide basis, even when there are some individualized damage issues." *Beattie*, 511 F.3d at 564 (quotations and alterations omitted).

Plaintiffs' claims are premised on the theory that defendant's common policies and practices caused common injuries to all class

members: every Gym Cancel Subclass member was allegedly "subject to [Global Fitness's] practices and policies which included charging additional fees and refusing to honor, accept, and process gym membership cancellations in accordance with its contracts and applicable law[;]" every FIF Subclass member was allegedly "subject to [Global Fitness's] practice and policy of failing to properly disclose [a $15 FIF or CAF;]" and every Personal Training Cancel Subclass member was allegedly "subject to [Global Fitness's] practices and policies which included charging additional fees and refusing to honor, accept, and process personal training cancellations in accordance with its contracts and applicable law." *Plaintiffs' Response*, p. 21. *See also Third Amended Complaint*, ¶¶ 9, 14-17, 20-23. Evidence of Global Fitness's common policies and practices and Global Fitness's uniform application of its policies to class members unites the Class and Subclasses by a common interest in determining whether Global Fitness's course of conduct is actionable. Evidence would either prove or disprove, as to all members of the Subclasses, whether Global Fitness's alleged policies and practices resulted in, *inter alia*, the improper nondisclosure of fees and the improper charge of additional fees. Likewise, evidence of Global Fitness's practices and the application of those common practices to class members will minimize the need to examine each class member's individual claims.

Although the class members' claims are not governed by the same state law, *see Pilgrim v. Universal Health Card, LLC*, 660 F.3d 943, 946-50 (6th Cir. 2011), this action is not, notably, presented as a nationwide class action premised on conduct that differed in every

28

state. *See id*. at 946-48 (affirming the district court's finding of no predominance where the plaintiffs' claims were governed by the laws of the various states and the defendants' "program did not operate the same way in every State and the plaintiffs suffered distinct injuries as a result"). Rather, as discussed *supra*, plaintiffs' claims are premised on defendant's alleged misconduct and the effect of that alleged misconduct on class members. For example, plaintiffs' breach of contract claims arise from the interpretation of Global Fitness' form contracts and the common policies and practices that allegedly conflict with those contracts. *See Third Amended Complaint*, ¶¶ 143-49. "[C]laims arising from the interpretation of a form contract are particularly suited for class treatment, and breach of contract cases are routinely certified as such." *Cowit v. CitiMortgage, Inc*., No. 1:12-cv-869, 2013 WL 940466, at *6 (S.D. Ohio Mar. 8, 2013). The issues of manageability, which often arise in the application of different state laws to a class, *see id*., are in fact minimized by the proposed settlement of this matter. *See Amchem*, 521 U.S. at 619-20, 622 ("Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial."); *In re Inter-Op Hip Prosthesis Liab. Litig.,* 204 F.R.D. 330, 347 (N.D. Ohio 2001) ("[W]hen taking the proposed settlement [] into consideration for purposes of determining class certification, individual issues which are normally present in . . . litigation become irrelevant, allowing the common issues to predominate.") (internal quotations omitted). Under the

circumstances, the Court concludes that common issues predominate over questions that affect only individual members.

Rule 23(b)(3) also requires that the class action vehicle be superior to other methods of adjudication. In determining the superiority of a class action to other litigation options, a court must consider

> **(A)** the class members' interests in individually controlling the prosecution or defense of separate actions;
>
> **(B)** the extent and nature of any litigation concerning the controversy already begun by or against class members;
>
> **(C)** the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
>
> **(D)** the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3).

In the case presently before the Court, all of the factors weigh in favor of a class action. First, the potential recovery by any one individual is relatively small; plaintiffs' claims are premised on having been improperly charged membership dues,[5] a $10 cancellation fee, and/or a biannual $15 FIF or CAF. True, the *Third Amended Complaint* seeks rescission; however, as discussed in greater detail *infra*, the likelihood of actually obtaining that remedy on a class-wide basis is questionable in light of the dearth – indeed, the absence - of authority either interpreting or applying the rescission statutes at issue. Under these circumstances, individual class members would be expected to have little interest in individually

---

[5] "A review of the database produced by Urban Active's third party vendor Motionsoft for members in Ohio, Kentucky, Georgia, Tennessee, North Carolina, and Pennsylvania indicates that the average monthly fee from 2009 until 2012 was approximately $26.76." *Declaration of Thomas McCormick* ("*January 2014 McCormick Declaration*"), Doc. No. 128-4, ¶ 6.

controlling separate actions. Second, although this is one of five similar class-action lawsuits pending against Global Fitness, there are no known actions pending by individual class members, nor is such litigation likely given the costs of litigation relative to the potential recovery on individual claims. Third, concentration of these claims in this Court will have the desirable benefit of streamlining the resolution of the claims and conserving resources. Finally, the Court is aware of no particular difficulties associated with the management of this class action, especially given the current stage of the litigation. It is often the case, as here, that class action litigation grows out of alleged systemic failures that result in small monetary losses to large numbers of people. *See Young*, 693 F.3d at 540. The potential for only a small individual recovery lessens the likelihood of individual lawsuits and supports the conclusion that the class action is a superior mechanism for adjudicating the dispute. *See Beattie*, 511 F.3d at 567. In this regard, the Court also notes that any class member who wishes to control his or her own litigation may opt out of the class under Rule 23(c)(2)(B)(v). *See In re Whirlpool Corp.*, 722 F.3d at 861. In short, the Court concludes that the class action vehicle is superior to other methods of adjudication.

Based on the foregoing, the Court concludes that this action should be certified pursuant to Rule 23(a) and 23(b)(3).

**IV. Approval of the Proposed Class Settlement**

Rule 23(e) governs settlements of class actions and imposes the following procedural safeguards:

**(1)** The court must direct notice in a reasonable manner to all class members who would be bound by the proposal.

**(2)** If the proposal would bind class members, the court may approve it only after a hearing and on finding that it is fair, reasonable, and adequate.

**(3)** The parties seeking approval must file a statement identifying any agreement made in connection with the proposal.

. . .

**(5)** Any class member may object to the proposal if it requires court approval under this subdivision (e); the objection may be withdrawn only with the court's approval.

Fed. R. Civ. P. 23(e).[6]

The parties submitted the terms of the settlement, which the Court preliminarily approved. *Preliminary Approval Order*, Doc. No. 111. Notice provided to the class, as described *supra*, was effected in conformity with the directions of the Court. A fairness hearing was conducted pursuant to Fed. R. Civ. P. 23(e) on February 13, 2014. The Court must now consider whether the *Settlement Agreement* is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2). In making this determination, the Court considers several factors:

> "(1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest."

*Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235, 244 (6th Cir. 2011) (quoting *UAW v. Gen. Motors Corp.*, 497 F.3d 615,

---

[6] Rule 23€(4), which is not applicable to this case, provides: "If the class action was previously certified under Rule 23(b)(3), the court may refuse to approve a settlement unless it affords a new opportunity to request exclusion to individual class members who had an earlier opportunity to request exclusion but did not do so."

631 (6th Cir. 2007)).  In considering these factors, the task of the court "is not to decide whether one side is right or even whether one side has the better of these arguments. . . .  The question rather is whether the parties are using settlement to resolve a legitimate legal and factual disagreement." *UAW*, 497 F.3d at 632.

### A.    Risk of fraud or collusion

Having carefully examined the terms of the *Settlement Agreement*, the Court now turns to the first factor of its inquiry, *i.e.*, the risk of fraud or collusion.  *See Poplar Creek Dev. Co.*, 636 F.3d at 244. The duration, complexity, and history of this litigation undermine any suggestion of fraud or collusion in the *Settlement Agreement*.  This action was initiated in April 2011 and has been highly contested since its inception.  The parties litigated for two and one-half years; they engaged in extensive, contested discovery before reaching a settlement.  The Court fielded numerous contested pretrial motions, including plaintiffs' motion to remand, Doc. No. 11, defendant's motions for judgment on the pleadings, Doc. Nos. 16, 36, 61, plaintiffs' motion to strike defendant's motion for judgment on the pleadings, Doc. No. 62, and plaintiffs' motion to certify a question to the Supreme Court of Ohio, Doc. No. 73.  *See Opinion and Order*, Doc. No. 69; *Opinion and Order*, Doc. No. 83. The parties also exchanged in general settlement discussions over the course of several months before proceeding to formal mediation on July 8, 2013; settlement negotiations continued for a period of time after the mediation before the parties were able to reach agreement. *Declaration of Thomas N. McCormick in Support of Plaintiffs' Motion*

*for Preliminary Approval of Settlement Agreement*, Doc. No. 132-6, ¶¶ 6-8.  Class Counsel characterizes these settlement negotiations as "vigorous" and "hard fought," and that characterization is entirely consistent with nearly every aspect of this litigation.  It would be difficult to take seriously a charge that this history was fabricated in an effort to mask collusion between the parties.  *See Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 351 (6th Cir. 2009) (finding no collusion where the settlement agreement was entered into after four years of complex and contested litigation and the agreement was the product of supervised negotiations).

**B.    The Amount of Discovery Engaged in by the Parties**

Moreover, the parties have engaged in extensive discovery in this case, including multiple sets of interrogatories, the production of more than 400,000 documents, and more than 10 depositions.  The parties have also engaged in extensive discovery of electronically stored information related to, *inter alia*, defendant's policies and practices.  "[T]he enormity of that undertaking," *see Order*, Doc. No. 75, p. 1, necessitated significant Court involvement in discovery related matters, as well as several extensions of the pretrial schedule.  *See e.g.*, Doc. Nos. 56 (January 2012), 63 (February 2012), 68 (March 2012), 71 (April 2012), 72 (May 2012), 75 (June 2012), 77 (June 2012), 78 (August 2012), 79 (September 2012), 80 (October 2012), 87 (May 2013).  However, this substantial discovery gave the parties the opportunity to assess the strengths and weaknesses of each other's litigation positions.  Consideration of this factor therefore weighs

in favor of finding the *Settlement Agreement* fair, adequate, and reasonable.

### C. The likelihood of success on the merits

> "The most important of the factors to be considered in reviewing a settlement is the probability of success on the merits. The likelihood of success, in turn, provides a gauge from which the benefits of the settlement must be measured."

*Poplar Creek Dev. Co.*, 636 F.3d at 245 (quoting *In re Gen. Tire & Rubber Co. Sec. Litig.*, 726 F.2d 1075, 1086 (6th Cir. 1984)).

The *Third Amended Complaint* asserts claims of breach of contract, unjust enrichment, and false, deceptive, and unconscionable consumer practices violative of state consumer protection statutes. In resolving defendant's earlier motion for partial judgment on the pleadings, and prior to the filing of the *Third Amended Complaint*, the Court dismissed plaintiffs' conversion and Deceptive Trade Practices Act claims and limited plaintiffs' claims under the CSPA and PECA. *See Opinion and Order*, Doc. No. 69, p. 27. Although this Court has not considered the merits of plaintiffs' remaining claims, *see Opinion and Order*, Doc. No. 83, the viability of the bulk of plaintiffs' claims is called into question by Judge Polster's dismissal in the Northern District of Ohio of class action claims in the *Robins* action. *See Robins v. Global Fitness Holdings, LLC*, 838 F.Supp. 2d 631 (N.D. Ohio 2012). As this Court previously noted, the plaintiffs in the *Robins* action alleged facts that "are the same or similar to the ones alleged in the case at bar" and "present[ed] similar legal issues to those in the case at bar." *Opinion and Order*, Doc. No. 69, pp. 14-15. Although this Court previously distinguished *Robins* in addressing

35

plaintiffs' CSPA and PECA claims, *see id.* at p. 27 n.5, this Court has not expressly considered to what extent, if at all, the holding or reasoning in *Robins* might apply to plaintiffs' contract and KHSA claims. These claims are further clouded by the pendency of the appeal in *Robins*, *Robins v. Global Fitness Holdings, LLC*, Case No. 12-3231 (6th Cir.), which was being briefed at the time of settlement. There is also, as noted *supra*, a dearth of judicial authority related to plaintiffs' claims for rescission and damages under the KHSA and PECA, making the likelihood of success on these claims less certain. Furthermore, the Court notes that Global Fitness no longer operates fitness centers and has no ongoing business, although it is not entirely clear what impact that fact may have had on this litigation.

Beyond the legal obstacles facing plaintiffs in their pursuit of their claims, Global Fitness has contested class certification and asserted various defenses that present financial risks to the class. Global Fitness is also represented by experienced and competent counsel and has already mounted a zealous and thorough defense.

Under all of these circumstances, it cannot be said that the likelihood of success on the merits of plaintiffs' claims is certain. This factor therefore weighs in favor of approval of the *Settlement Agreement*.

### D.    Complexity, Expense, and Likely Duration of the Litigation

"Generally speaking, '[m]ost class actions are inherently complex and settlement avoids the costs, delays, and multitude of other problems associated with them.'" *In re Telectronics Pacing Sys.,*

*Inc.*, 137 F.Supp. 2d 985, 1013 (S.D. Ohio 2001) *decision clarified,*
148 F.Supp. 2d 936 (S.D. Ohio 2001) (quoting *In re Austrian & German
Bank Holocaust Litig.,* 80 F.Supp. 2d 164, 174 (S.D.N.Y. 2000)). This
action is no exception to that general rule, as plaintiffs have
asserted a multitude of claims and defendant has posed a multitude of
defenses. This action has also been pending for nearly three years,
plaintiffs have incurred over $2.7 million in attorneys' fees, *see
Transcript*, *PAGEID* 2733 (Class Counsel's representation that their
lodestar value is now "just shy of $2.8 million"), and the parties
have engaged in extensive motion practice and contested discovery.
Continued litigation would undoubtedly require years more of
litigation and would involve additional fact discovery, expert
discovery, class certification and other motion practice which, if the
history of this litigation serves as a predictor, will be both
extensive and costly. Consideration of this factor therefore weighs
in favor of approving the *Settlement Agreement.*

**E.    The Opinions of Class Counsel and Class Representatives**

Experienced counsel on both sides of this case recommend that the
Court approve the *Settlement Agreement* and this recommendation is
entitled to deference. *See e.g., Williams v. Vukovich*, 720 F.2d 909,
922 (6th Cir. 1983) ("The court should defer to the judgment of
experienced counsel who has competently evaluated the strength of his
proofs[,]" and that deference "should correspond to the amount of
discovery completed and the character of the evidence uncovered.").
Here, Thomas McCormick, Kenneth Rubin, Mark Troutman, and Greg
Travalio, the four attorneys for plaintiffs who have invested the most

time in this matter, have approximately 68 years of combined
professional experience. *See* Doc. Nos. 114-1, 114-2 (declarations and
résumés of plaintiffs' attorneys). Class Counsel ask the Court to
approve the *Settlement Agreement*, which they represent is fair,
adequate, and reasonable. Not insignificantly, the Class
Representatives have also approved the *Settlement Agreement. See
Settlement Agreement*, pp. 27-38.

    **F.    The Reaction of Absent Class Members**

    In determining whether a class action settlement is fair,
adequate and reasonable, a court must also consider the reaction of
absent class members. *Vassalle*, 708 F.3d at 754. Here, from a pool
of more than 605,000 absent class members, 90 opted out of the
settlement, *see Dahl Declaration*, ¶ 30, and two objections were filed.
"Although this is not clear evidence of class-wide approval of the
settlement, it does permit the inference that most of the class
members had no qualms with it." *See Olden v. Gardner*, 294 F. App'x
210, 217 (6th Cir. 2008) (finding that 79 objections in a class of
nearly 11,000 members "tends to support a finding that the settlement
is fair"). *See also In re Delphi Corp. Sec., Derivative & "ERISA"
Litig.*, 248 F.R.D. 483, 500 (E.D. Mich. 2008) ("If only a small number
[of opt outs or objections] are received, that fact can be viewed as
indicative of the adequacy of the settlement.") (internal quotations
omitted; alteration in original); *Hainey v. Parrott,* 617 F.Supp. 2d
668, 675 (S.D. Ohio 2007) ("Generally, however, a small number of
objections, particularly in a class of this size, indicates that the
settlement is fair, reasonable and adequate."). Although the two

objections are vigorously presented and pursued, the Court nevertheless concludes that the number of objectors and opt-outs in relation to the size of the class supports a finding that the *Settlement Agreement* is fair, reasonable, and adequate.

**G. The Public Interest**

The public interest also favors approval of the *Settlement Agreement*. First, "[t]here is a strong public interest in encouraging settlement of complex litigation and class action suits because they are 'notoriously difficult and unpredictable' and settlement conserves judicial resources." *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 530 (E.D. Mich. 2003) (quoting *Granada Invs., Inc. v. DWG Corp.*, 962 F.2d 1203, 1205 (6th Cir. 1992)). *Accord In re Nationwide Fin. Servs. Litig.*, No. 2:08-cv-00249, 2009 WL 8747486, at *8 (S.D. Ohio Aug. 18, 2009) ("[T]here is certainly a public interest in settlement of disputed claims that require substantial federal judicial resources to supervise and resolve."). Second, the *Settlement Agreement* ends potentially long and protracted litigation and frees judicial resources. *See In re Telectronics*, 137 F.Supp. 2d at 1025. More importantly, the *Settlement Agreement* provides an immediate cash settlement to the class for their compensable injuries in an amount that, as discussed *infra*, is fair, reasonable, and adequate. Accordingly, the Court finds that the *Settlement Agreement* serves the public interest.

**H. Preferential Treatment and Other Factors**

"Although not included in the seven *UAW factors*, in evaluating the fairness of a settlement [the United States Court of Appeals for

the Sixth Circuit] ha[s] also looked to whether the settlement 'gives preferential treatment to the named plaintiffs while only perfunctory relief to unnamed class members.'" *Vassalle*, 708 F.3d at 755 (quoting *Williams*, 720 F.2d at 925 n.11). The Sixth Circuit has "held that such inequities in treatment make a settlement unfair." *Id*. "The same is true of a settlement that gives preferential treatment to class counsel; for class counsel are no more entitled to disregard their 'fiduciary responsibilities' than class representatives are." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 718 (6th Cir. 2013) (quoting *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prods. Liab. Litig.*, 55 F.3d 768, 788 (3rd Cir. 1995)). The Sixth Circuit has warned of the danger of attorneys "'urg[ing] a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees.'" *Id*. (quoting *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir. 1991)). Accordingly, when attorneys' fees in a settlement class "'are unreasonably high, the likelihood is that the defendant obtained an economically beneficial concession with regard to the merits provisions, in the form of lower monetary payments to class members . . . than could otherwise have [been] obtained.'" *Id*. (alteration in original) (citing *Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003)). "Hence the 'courts must be particularly vigilant' for 'subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations.'" *Id*. (quoting *Dennis v. Kellogg Co.*, 697 F.3d 858, 864 (9th Cir. 2012)).

The objectors argue that Class Counsel's request for attorneys' fees in relation to the compensation to the class and the requested incentive awards to the Class Representatives are both suggestive of an unfair settlement that gives preferential treatment to those Class Counsel and Class Representatives.  The objectors also argue that the claims process, notice, release, and settlement negotiations render the *Settlement Agreement* unfair.  These arguments will be discussed in turn.

### 1.    Attorneys' Fees and Compensation to the Class

Blackman's objections focus on the "[p]referential treatment to class counsel;" Blackman's "cardinal objection is that the settlement is unfair because Class Counsel is appropriating an excessive 65% of the settlement value for itself."[7]  *Blackman Objections*, *PAGEID* 2083-84.  Blackman argues that the *Settlement Agreement* should be treated as a "constructive common fund," consisting of the actual monetary payout to the class and the requested attorneys' fees, *see id.* at *PAGEID* 2083-84, 2091.[8]  As so construed, Blackman contends, the *Settlement Agreement* is unfair because Class Counsel's $2.39 million request for attorneys' fees is disproportionately high.  *Blackman Objections*, *PAGEID* 2089.

---

[7]"The [65%] calculation is as follows: $2.39 million fee request/ (2.39 million fee request + 1.3 million class recovery) = 64.7% of the true settlement value." *Blackman Objections*, *PAGEID* 2084 n.3.  At the fairness hearing, Blackman represented that Class Counsel would "get more than 60 percent of the proceeds -- more than double a reasonable fee." *Transcript*, *PAGEID* 2758.
[8]Blackman also contends that attorneys' fees should be limited to 25 percent of that common fund.  *Blackman's Reply*, *PAGEID* 2597. The Court addresses that contention *infra*.

Blackman's contention in this regard relies on *In re Dry Max Pampers Litigation*, 724 F.3d 713 (6th Cir. 2013), and *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935 (9th Cir. 2011).[9] In *Pampers*, the United States Court of Appeals for the Sixth Circuit reversed the trial court's approval of a class settlement because the settlement gave preferential treatment to class counsel but only perfunctory relief to unnamed class members. *See Pampers*, 724 F.3d at 721. Although the settlement awarded class counsel a fee of $2.73 million, "counsel did not take a single deposition, serve a single request for written discovery, or even file a response to [the defendant's] motion to dismiss." *Id.* at 718. On the other hand, the unnamed class members who were allegedly injured as a result of purchasing Pampers brand diapers containing "Dry Max Technology," would have been awarded only injunctive relief in the form of a reinstated diaper refund program, changes to the labels on Pampers' boxes, and changes to the Pampers' website. *Id.* at 716-18. The defendant in that case also agreed to contribute $400,000 to an undetermined pediatric resident training program and the American Academy of Pediatrics. *Id.* at 716. Notably, in determining that the settlement gave preferential treatment to class counsel, the Sixth Circuit characterized as negligible the value of the injunctive relief awarded to the class.

The refund program required consumers to have "retained their original receipt and Pampers-box UPC code, in some instances for

---

[9] Blackman's counsel, the Center for Class Action Fairness, successfully represented objectors in both *Pampers* and *Bluetooth*.

diapers purchased as long ago as August 2008" and it was "merely a rerun of the very same program that [the defendant] had already offered to its customers" in the past. *Id.* at 718-719. The defendant was also unable to demonstrate the effectiveness of the program, despite its earlier implementation. *Id.* The labeling change on Pampers' boxes "amount[ed] to little more than an advertisement for Pampers" and the additional information to be included on the Pampers' website was "common sense, within the ken of ordinary consumers, and thus of limited value to them." *Id.* at 720. The Sixth Circuit found that the $2.73 million benefit to class counsel was "vastly" more than the "illusory" benefit to class members. *Id.* at 721.

This action is distinguishable from *Pampers*. First, as discussed *supra*, this action was vigorously litigated for two and one-half years prior to settlement and involved extensive motion practice and discovery. *Cf. id.* at 718 ("[C]ounsel did not take a single deposition, serve a single request for written discovery, or even file a response to [the defendant's] motion to dismiss."). Second, the *Settlement Agreement* provides significant monetary relief to class members in relation to the value of their claims and the risks of this litigation. In contrast to the class members in *Pampers,* who "received nothing but illusory injunctive relief," *id.* at 722, class members in this case will receive monetary awards ranging from $5 to $75, with the average class member receiving $31.99. *See Second Supplemental Dahl Declaration*, ¶ 9. This recovery is significant in light of the estimated average injuries allegedly suffered by class members, which are premised on the improper charge of an extra month's

dues at an average rate of $26.76 per month (from January 2009 through 2012), *January 2014 McCormick Declaration*, ¶¶ 5-6, a $10 cancellation fee, and/or a $15 FIF or CAF.  Notably, Blackman does not argue that the *Settlement Agreement* provides inadequate compensation to members of the Class or any Subclass in relation to their alleged injuries. In fact, Blackman implicitly acknowledged at the fairness hearing that the awards provided to the Class and Subclasses under the *Settlement Agreement* are appropriate.  *See Transcript*, *PAGEID* 2753 (arguing that the proportion of the fee award to the total actual pay-out by Global Fitness is unfair, but that the monetary terms of settlement would otherwise be fair if every class member were to receive the negotiated settlement amount).

Unlike Blackman, the *Zik* Objectors argue that the *Settlement Agreement* fails to provide adequate compensation to class members because it fails to adequately account for differences in class members' claims and damages.  Specifically, the *Zik* Objectors argue that April and Robert Zik and other class members who signed a membership agreement with Global Fitness before March 2008 have much stronger breach of contract claims than do those plaintiffs and class members who entered into a contract after March 2008.  These claims are so disparate, the Zik Objectors argue, that it is unfair to combine the differing claims in the same subclass and to be settled for the same amount.  *See Zik Objectors' Reply*, *PAGEID* 2618-23; *Transcript*, *PAGEID* 2766 ("What they needed to do was to settle and negotiate additional compensation for people that have a clear breach of contract claim, instead of the Ziks and people like them receiving

the same amount of money as people who have no breach of contract claim, according to the *Robins* court, that was not done.  They received the same amount of money.  Is that fair?  No, it can't be fair.  It cannot be fair.").

The *Zik* Objectors' argument proposes a division of the Gym Cancel Subclass into two classes: (1) class members who entered into a gym membership contract before March 2008 and cancelled their gym membership contract within the Class Period, and (2) class members who entered into a gym membership contract after March 2008 and cancelled their gym membership contract within the Class Period.  The Court concludes that this division is unnecessary because, as discussed *supra*, both of these proposed classes are adequately represented by Class Representatives and members of both proposed classes suffered a common injury, *i.e.,* each was improperly charged, pursuant to a common policy or practice of defendant, monthly dues and a cancellation fee after cancellation.

The *Zik* Objectors also argue that the settlement is unfair because it does not award class members their actual damages; as a consequence, they contend, many class members will be compensated in an amount either greater or less than their actual damages.  The *Zik* Objectors note that Blackman and Robert Zik are both members of the Gym Cancel Subclass and will receive $25 each, yet Robert Zik is "irrefutably" owed $75 and Blackman is owed less than $25 (and possibly nothing).  *See Transcript*, *PAGEID* 2765-70.

Despite the purported variance in actual damages to class members, the Court finds the amount awarded to the Gym Cancel Subclass

to be fair, reasonable, and adequate. The *Zik* Objectors sought to certify a class in the *Zik* action premised on a claim that Global Fitness acted in breach of "its members' membership agreements by charging its members one extra month of membership dues and a $10.00 cancellation fee when members terminate their membership agreement." Doc. No. 118-2, pp. 1, 6. As discussed *supra*, the claims asserted in the *Zik* action are subsumed in the Gym Cancel Subclass, and an Allowed Claimant who cancelled his or her gym membership contract with Global Fitness during the Class Period is entitled to an award of $25. *See Settlement Agreement*, §§ 6.1, 6.1.3. The Claims Administrator has validated claims and calculated final award amounts for the Allowed Claimants: the average Class Payment is $31.99 and the average Gym Cancel Subclass Payment will be $41.28. *Second Supplemental Dahl Declaration*, ¶ 9. This is a significant recovery because it exceeds the $26.76 average monthly fee of a gym membership with Global Fitness between January 1, 2009 and July 2012. *See January 2014 McCormick Declaration*, ¶¶ 5-6. This recovery is also substantial considering the bases of plaintiffs' claims, *i.e.*, improperly charged dues, a $10 cancellation fee, and/or a $15 FIF or CAF.

The Court also finds without merit the *Zik* Objectors' argument that the *Settlement Agreement* is unfair because it does not require an individualized damages determination for each claimant. As detailed *supra*, the average award in the Gym Cancel Subclass will exceed the average monthly gym membership cost from 2009 to 2012 and will approach, if not exceed, the sum of the average monthly gym membership and the alleged improperly charged $10 cancellation fee. Considering

46

the risks of this litigation, the additional costs and delays that would likely result from the need to calculate and verify individual damage awards for each Allowed Claimant, and the difficulty in calculating damages for the 343 Allowed Claimants for whom Global Fitness has no record, *see Second Supplemental Dahl Declaration*, ¶ 4, the Court finds that a flat award for membership in each Class or Subclass is appropriate. *See Williams*, 720 F.2d at 922-23 ("A court may not withhold approval simply because the benefits accrued from the decree are not what a successful plaintiff would have received in a fully litigated case.  A decree is a compromise which has been reached after the risks, expense, and delay of further litigation have been assessed.  Class counsel and the class representatives may compromise their demand for relief in order to obtain substantial assured relief for the plaintiffs' class.") (internal citations omitted).

"'The fairness of the settlement must be evaluated primarily based on how it *compensates class members* . . . .'" *Pampers*, 724 F.3d at 720 (quoting *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006)).  Here, the *Settlement Agreement* provides an immediate and significant monetary benefit to class members.  Moreover, although individual class members had the opportunity to opt out of the settlement if they concluded that the value of their individual claims exceeded the value of the immediate relief provided by the *Settlement Agreement*, only 90 did so.  *See In re Whirlpool Corp.*, 722 F.3d at 861 ("As the district court observed, any class member who wishes to control his or her own litigation may opt out of the class under Rule 23(c)(2)(B)(v).").

The *Zik* Objectors next argue that the settlement is unfair because the *Settlement Agreement* fails to provide any "additional or separate compensation to Kentucky class members for their KHSA claims that are not available to class members in other states . . . [and] would purportedly entitle Kentucky Plaintiffs . . . to rescission of their current, illegal LA Fitness contracts[.]" *Zik Objections*, *PAGEID* 1932-35. *See also Transcript*, *PAGEID* 2767-68. This argument is premised on the proposition that it is only the Kentucky plaintiffs who are possessed of a claim for rescission, combined with the *Zik* Objectors' contention that the Class Representatives do not adequately represent them. The *Zik* Objectors' first proposition is simply not accurate; both the KHSA and PECA contemplate rescission as a potential remedy. *See* KRS 367.912(1); O.R.C. § 1345.44(C). However, as noted *supra*, there is no case law interpreting or applying either of these statutory provisions. The Court also rejects, for the reasons stated *supra*, the *Zik* Objectors' second proposition; the claims of the Class Representatives are typical of the claims of the Class and Subclasses and the Class Representatives will fairly and adequately protect the interests of the class. It is significant, too, that the *Zik* Objectors acknowledge that Class Counsel "devoted" "a large percentage of [their time] to ESI discovery to be used for the purpose of proving the KHSA claims." *Zik Objections*, *PAGEID* 1935. This fact suggests that the development of the KHSA claims was adequate and that Class Representatives and Class Counsel considered, during the court of settlement negotiations, the likelihood of success and the available remedies in connection with this claim.

48

As noted *supra*, Blackman also relies on *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935 (9th Cir. 2011), in arguing that Class Counsel's requested $2.39 million attorneys' fee renders the *Settlement Agreement* unfair.  The plaintiffs in *Bluetooth* alleged that the defendants in that case had failed to disclose the potential risk of noise-induced hearing loss associated with extended use of wireless Bluetooth headsets at high volumes.  *Bluetooth*, 654 F.3d at 938.  The settlement in *Bluetooth*, which was approved by the district court, required the defendants to "post acoustic safety information on their respective websites and in their product manuals and/or packaging for new Bluetooth headsets" and pay a $100,000 *cy pres* award, notice costs up to $1.2 million, attorneys' fees and costs up to $850,000, and incentive awards of $12,000.  *Id.* at 938-40.  The Ninth Circuit remanded the action, without expressing an "opinion on the ultimate fairness of what the parties have negotiated," because the district court had applied the wrong standard in approving the settlement agreement and did not adequately explain its fee award. *See id.* at 938 ("[T]he disparity between the value of the class recovery and class counsel's compensation raises at least an inference of unfairness, and . . .the current record does not adequately dispel the possibility that class counsel bargained away a benefit to the class in exchange for their own interests."), 949-50.

The Ninth Circuit concluded that it "ha[d] no basis for affirming the fee award as reasonable under the lodestar approach" because the district court had not calculated a precise lodestar value nor had it evaluated the degree of success of the settlement.  *Id.* at 944.  As to

the settlement agreement, the court found that, due to "indicia of possible implicit collusion," the district court was "required to examine the negotiation process with even greater scrutiny than is ordinarily demanded, and approval of the settlement had to be supported by a clear explanation of why the disproportionate fee is justified and does not betray the class's interests." *Id*. at 947-49. Specifically, that greater scrutiny was necessary, the Ninth Circuit reasoned, in light of three causes for concern: (1) "the settlement's provision for attorneys' fees is apparently disproportionate to the class reward, which includes no monetary distribution[;]" (2) "[t]he settlement included a 'clear sailing agreement' in which defendants agreed not to object to an award of attorneys' fees up to eight times the monetary *cy pres* relief afforded the class[;]" and (3) "the settlement also contained a 'kicker': all fees not awarded would revert to defendants rather than be added to the *cy pres* fund or otherwise benefit the class." *Id*. at 947.

Blackman argues before this Court that the *Settlement Agreement* is unfair because, as did the settlement agreement in *Bluetooth*, the *Settlement Agreement* contains a clear sailing provision and a kicker provision, and provides for an award of attorneys' fees that will exceed the actual recovery to the Allowed Claimants. *See Blackman Objections*, *PAGEID* 2091-97. According to Blackman, the *Settlement Agreement* includes a "clear sailing" provision because Global Fitness agreed not to contest plaintiffs' request for attorneys' fees and costs so long as the request did not exceed $2.39 million. *See Settlement Agreement*, § 9.1. *See Gooch v. Life Investors Ins. Co. of*

*Am.*, 672 F.3d 402, 425 (6th Cir. 2012). The *Settlement Agreement* includes a "kicker," Blackman contends, because all fees not awarded revert to Global Fitness, rather than to the class. *See Settlement Agreement*, § 9.2. *See Bluetooth*, 654 F.3d at 947. Finally, it is also now apparent that the *Settlement Agreement* will provide for an award of attorneys' fees and costs greater than the actual monetary recovery to the Allowed Claimants. *Compare Second Supplemental Dahl Declaration*, ¶¶ 9-10 (calculating the final Class Payment as $1,593,240.00), *with Settlement Agreement*, § 9.1 ("Defendant agrees to pay Plaintiffs [sic] attorneys' fees and litigation costs as Ordered by the Court, provided that such payment does not exceed [$2,390,000.00].").

Blackman argues that the very presence of clear sailing and kicker provisions render the *Settlement Agreement* unfair. *See Blackman Objections*, *PAGEID* 2094-97. However, the United States Court of Appeals for the Sixth Circuit has recognized that "not every 'clear sailing' provision demonstrates collusion." *Gooch*, 672 F.3d at 425. It is true that a clear sailing provision could indicate that lawyers urged "'a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees.'" *Id.* (quoting *Weinberger*, 925 F.2d at 520). However, a clear sailing provision could just as easily be included for purposes of finality and risk avoidance, *i.e.*, "'because the defendants want to know their total maximum exposure and the plaintiffs do not want to be sandbagged.'" *Id.* (internal quotations omitted). In either event, the court in *Bluetooth* made clear that the presence of clear sailing and kicker

51

provisions required the district court to more carefully scrutinize the proposed settlement; the ultimate issue, however, is still whether "the end product is a fair, adequate, and reasonable settlement agreement." *See id*. at 947-49.

In the case presently before the Court, there is no suggestion that relief to the class is perfunctory. Unlike in *Pampers*, where the value of class relief was "negligible" and "illusory," *see Pampers*, 724 F.3d at 721, the settlement in this case provides for an immediate and substantial cash payment to class members, considering the value of the claims and the risks of protracted litigation. Where, as here, the value of the settlement to class members is reasonable, the risk of collusion associated with a clear sailing provision — *i.e.*, that "lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees," *Weinberger*, 925 F.2d at 524, — is diminished.

The risk of collusion is also lessened in this action because the parties negotiated the payment of attorneys' fees and costs after having reached agreement on the relief to the Class and Subclasses. *See Declaration of Thomas McCormick in Support of Application for Attorneys' Fees and Reimbursement of Costs* ("December 2013 McCormick Declaration"), Doc. No. 114-1, ¶ 4; *Declaration of Mark H. Troutman in Support of Application for Attorneys' Fees and Reimbursement of Costs and Expenses* ("Troutman Declaration"), Doc. No. 114-2, ¶ 4. Although there is no *per se* rule that separate negotiations will lessen the likelihood of collusion, *see Pampers*, 724 F.3d at 717 ("'[T]he economic reality [is] that a settling defendant is concerned only with

its total liability[,]' and thus a settlement's 'allocation between the class payment and the attorneys' fees is of little or no interest to the defense.'") (internal citations omitted), separate negotiations suggest a lower risk of collusion where, as here, relief to the class is fair, reasonable, and adequate. The Court also notes that, despite Blackman's suggestion that a settlement cannot be fair if attorneys' fees are negotiated prior to final settlement approval, *see Transcript*, *PAGEID* 2756 ("The only apparent way to cure this problem is to defer fee negotiations until the class settlement has been signed, submitted and approved by the district court. Or if the defendant refuses to agree to any settlement that does not also include attorney fees") (citing *In re Cmty. Bank of N. Va.*, 418 F.3d 277 (3rd Cir. 2005)), there is no such requirement in Rule 23. Requiring the parties to postpone negotiations on attorneys' fees until after final approval of the settlement could also prove detrimental to class recovery, as it would also require a second notice to the class and could require a second fairness hearing, *see* Fed. R. Civ. P. 23(h), which would increase both the expenses and risks associated with class settlement.

The Court also concludes that the inclusion of a kicker provision in the *Settlement Agreement* is not improper in this case. Notably, the danger of collusion suggested by such a provision is essentially eliminated when the parties have negotiated a reasonable attorneys' fee. *See Bluetooth*, 654 F.3d at 949 ("If the defendant is willing to pay a certain sum in attorneys' fees as part of the settlement package, but the full fee award would be unreasonable, there is no

apparent reason the class should not benefit from the excess allotted for fees.  The clear sailing provision reveals the defendant's willingness to pay, but the kicker deprives the class of that full potential benefit if class counsel negotiates too much for its fees.").  Because, as discussed *infra*, the Court concludes that the parties have negotiated a reasonable attorneys' fee, the class will not be deprived of any benefit, either real or perceived, by the inclusion of the kicker provision in the *Settlement Agreement.*

Based on the foregoing, the Court concludes that the *Settlement Agreement* does not accord preferential treatment to Class Counsel at the expense of the class nor does it offer only perfunctory relief to unnamed class members.

### 2. Incentive awards

The *Settlement Agreement* provides for a Minimum Class Payment of $1,300,000, which includes payments to Allowed Claimants and incentive awards totaling $40,000 to the Class Representatives.  *Settlement Agreement*, § 7.1, 8.1.  Class Representatives Tartaglia and Bell will each receive an incentive award of $5,000; Class Representatives Gascho, Buckemeyer, Hogan, Lundberg, Troutman, Meyer, Rose, and Cay will each receive $3,500; and Class Representatives Volkerding and Cary will each receive $1,000.  *Id.* at §§ 8.2.1, 8.2.2, 8.2.3.

Blackman objects to the provision for incentive awards and argues that that adequacy of representation is undermined by the awards.  *Blackman Objections*, *PAGEID* 2097-99.  Specifically, Blackman argues that the disparity between the incentive payments and what he characterizes as the "minimal cash recovery" of class members raises

an issue as to whether the Class Representatives could be expected to fairly evaluate the settlement agreement. *Id*. It is unfair, Blackman argues, for Class Representatives to receive an incentive award equal to "many times the plausible value of their claim." *Transcript*, *PAGEID* 2758.

The Sixth Circuit has neither approved nor disapproved the practice of incentive awards to class representatives. *Pampers*, 724 F.3d at 722 (citing *Vassalle*, 708 F.3d at 756); *Hadix v. Johnson*, 322 F.3d 895, 897 (6th Cir. 2003) ("This court has never explicitly passed judgment on the appropriateness of incentive awards.") (citing *In re S. Ohio Corr. Facility*, 24 F. App'x 520, 526 (6th Cir. 2001)). However, the Sixth Circuit has recognized that "'there may be circumstances where incentive awards are appropriate,'" *Vassalle*, 708 F.3d at 756 (quoting *Hadix*, 322 F.3d at 897-98), and district courts in this circuit have authorized incentive awards. *See Johnson v. Midwest Logistics Sys., Ltd.*, No. 2:11-cv-1061, 2013 WL 2295880, at *5 (S.D. Ohio May 24, 2013) (approving an incentive award of $12,500); *Godec v. Bayer Corp.*, No. 1:10-cv-224, 2013 WL 1089549, at *4 (N.D. Ohio Mar. 14, 2013) (approving an incentive award of $2,500); *Wess v. Storey*, No. 2:08-cv-623, 2011 WL 1463609, at *12 (S.D. Ohio Apr. 14, 2011) (approving incentive awards "in a very modest amount of $3,000"); *Lonardo v. Travelers Indem. Co.*, 706 F.Supp. 2d 766, 787 (N.D. Ohio 2010) (approving an incentive award of $5,000); *Hainey v. Parrott*, No. 1:02-cv-733, 2007 WL 3308027 (S.D. Ohio Nov. 6, 2007) (approving an incentive award of $50,000 for each class representative); *In re Dun & Bradstreet Credit Servs. Customer*

*Litig.*, 130 F.R.D. 366, 373-74 (S.D. Ohio 1990) (approving incentive awards ranging from $35,000 to $55,000). Courts approving incentive awards "have stressed that incentive awards are efficacious ways of encouraging members of a class to become class representatives and rewarding individual efforts taken on behalf of the class." *Hadix*, 322 F.3d at 897. "Yet applications for incentive awards are scrutinized carefully by courts who sensibly fear that incentive awards may lead named plaintiffs to expect a bounty for bringing suit or to compromise the interest of the class for personal gain." *Id.*

District courts in the Sixth Circuit have considered the following factors in determining whether to approve incentive awards for class representatives:

> (1) the action taken by the Class Representatives to protect the interests of Class Members and others and whether these actions resulted in a substantial benefit to Class Members; (2) whether the Class Representatives assumed substantial direct and indirect financial risk; and (3) the amount of time and effort spent by the Class Representatives in pursuing the litigation.

*Enterprise Energy Corp. v. Columbia Gas Transmission Corp.*, 137 F.R.D. 240, 250 (S.D. Ohio 1991). Although the Sixth Circuit has not had occasion to "lay down a categorical rule one way or the other as to whether incentive payments are permissible," the court in *Pampers* "made some observations" regarding the propriety of incentive awards:

> The propriety of incentive payments is arguably at its height when the award represents a fraction of a class representative's likely damages; for in that case the class representative is left to recover the remainder of his damages by means of the same mechanisms that unnamed class members must recover theirs. The members' incentives are thus aligned. But we should be most dubious of incentive payments when they make the class representatives whole, or (as here) even more than whole; for in that case the class representatives have no reason to care whether the

56

mechanisms available to unnamed class members can provide adequate relief.

*Pampers*, 724 F.3d at 722.

In the case presently before the Court, the *Settlement Agreement* provides for incentive awards ranging from $1,000 to $5,000. The awards will make the Class Representatives more than whole and are worth many times the value of their claims. However, the awards have been tailored to compensate each Class Representative in proportion to his or her actions, time, and effort in prosecuting this action. Class Representatives Tartaglia and Bell have served as Class Representatives since July 2011 and contributed to the drafting of the *Complaint* and amended complaints, have responded to written discovery, have assisted Class Counsel with requests for information, have reviewed and provided input in settlement, and were subject to depositions. *Plaintiffs' Motion for an Award of Class Representatives' Enhancement Payments and Reasonable Attorneys' Fees and Costs* ("*Plaintiffs' Motion for Fees*"), Doc. No. 114, pp. 7-8. Class Representatives Gascho, Buckemeyer, Hogan, Lundberg, Troutman, Meyer, Rose, and Cay have served as Class Representatives since April 2011 and have made similar contributions, although they were not subject to depositions. *Id.* Class Representatives Volkerding and Cary have served as Class Representatives since June 2013 and have contributed to the drafting of the amended complaints, have assisted Class Counsel with requests for information, and have reviewed and provided input regarding the settlement. *Id.* The Class Representatives' initiative, time, and effort were essential to the prosecution of the case and resulted in a significant recovery for the

57

class.  Although the Sixth Circuit has warned that courts should be "most dubious" of awards that make class representatives more than whole, *see Pampers*, 724 F.3d at 722, this Court finds that the awards in this case are fair, reasonable, and properly based on the benefits to the class members generated by the litigation.  Accordingly, the Court concludes that the *Settlement Agreement* does not give preferential treatment to the Class Representatives.

### 3.  Claims Process

The *Settlement Agreement* provides monetary compensation to any Class or Subclass member who becomes an Allowed Claimant by filing a timely and valid claim form signed under penalty of perjury by the Claim Period Deadline.  *Settlement Agreement*, § 12.5.  Claim forms could be requested by telephone, by mail, or online, and could be submitted online or via U.S. Mail.  *Id.*  Of the 55,597 Claim Forms received by the Claims Administrator, 54,129 were submitted online and 1,468 were submitted by U.S. Mail.  *Dahl Declaration*, ¶ 31.

Both Blackman and the *Zik* Objectors challenge the claims process and argue that use of a claims-made process was unfair in this case. The *Zik* Objectors argue that the claims process is too cumbersome because members are required to submit a claim and sign the form "under penalty of perjury."  *Zik Objections*, *PAGEID* 1945-46.  This is unnecessary, the *Zik* Objectors argue, because Global Fitness has all the information necessary to make payments without using a notice and claims procedure.  *Id.*  Similarly, Blackman argues that "[there] is no legitimate reason why this settlement does not issue direct payments to known, eligible class members."  *Blackman Objections*, *PAGEID* 2084.

According to Blackman, a claims-made settlement procedure is
unnecessary because "defendant's records house the class members'
identifying information and the objective criteria upon which their
award value is based" and defendant has the information to pay at
least some claims automatically. *Id.* at *PAGEID* 2085.  Blackman argues
that, because the Claims Administrator was able to verify and send
notice to 90.8 percent of the potential class members, at least 90.8
percent of the potential class members could have received payment if
the *Settlement Agreement* provided for direct payment after settlement
approval. *Blackman Reply*, *PAGEID* 2589; *Transcript*, *PAGEID* 2754, 2759-
60.  The objectors also argue that a claims-made process served to
depress class recovery and is evidence of collusion. *See Blackman
Objections*, *PAGEID* 2089; *Transcript*, *PAGEID* 2752-53, 2764.

The objectors' arguments in this regard are contrary to the
testimony of Jeffrey Dahl at the fairness hearing and are therefore
not well taken.

Jeffrey Dahl testified at the fairness hearing that, acting on
behalf of Claims Administrator Dahl Administration, LLC., he oversaw,
and was actively involved in the claims administration process in this
case. *Transcript*, *PAGEID* 2703.  Mr. Dahl has worked for Dahl
Administration, LLC, for approximately five-and-one-half years and was
a founding partner of Rust Consulting, the second largest class action
claims administrator in the nation, where he worked for fifteen years.
*Id.* at *PAGEID* 2702.  Mr. Dahl has been personally responsible for the
administration of more than 300 class action settlements and has been

involved with the administration of approximately 3,000 settlements. *Id*. at *PAGEID* 2702-03, 2712.

Mr. Dahl testified that, in his experience with 3,000 class action settlements, most settlements are claims-made and "relatively few [of the settlements that he has been involved in] -- . . . maybe less than ten or 20 - [provide for] direct payments[.]" *Id*. at *PAGEID* 2712. Of the 300 class action settlements handled by Dahl Administration, LLC, in the past year, only "a handful," including three consumer cases, provided for checks to be sent without a claims process. *Id*. at *PAGEID* 2711. The three consumer cases referred to were "insurance cases" where there was "a high reliance on the defendant data because it w[as] either current or former clients that had . . . account relationships, and we had data that we knew was reliable." *Id*. Mr. Dahl also testified that, of approximately 100 employment cases handled by Dahl Administration, LLC, "maybe ten or 12" were direct payment without a claims process. *Id*.

Blackman acknowledges that claims-made settlements are common and not "inherently objectionable," but he argues that a claims-made process should be implemented only when "justified by a legitimate reason beyond depressing class recovery while simultaneously creating the illusion of class benefit." *Blackman Reply*, *PAGEID* 2589. No legitimate reason exists here, the objectors argue, because the Claims Administrator was able to verify and send notice to 90.8 percent of the potential class members, and thus, could have issued direct payment to 90.8 percent of the potential class members. *See id*.; *Transcript*, *PAGEID* 2754, 2759-60; *Zik Objectors' Reply*, *PAGEID* 2636-37

60

("The process having fully run its course, the Claims Administrator has represented to the Court that '90.8% of the Postcard Notices were delivered.' There is absolutely no evidence to suggest that checks mailed to class members under the same regime would not have had the same rate of receipt.") (citations and emphasis omitted).

The objectors misconstrue the *Dahl Declaration* and Mr. Dahl's testimony. The *Dahl Declaration* provides that, "[a]s of November 29, 2013, the Notice reached at least 90.8% of potential Class Members." *Dahl Declaration*, ¶ 45 (emphasis added). Mr. Dahl clarified at the fairness hearing that 90.8 percent of the Postcard Notices were delivered, but there is no "way of definitively saying they actually reached the class members." *Transcript*, *PAGEID* 2718. Moreover, Mr. Dahl testified that the direct payment cases in which he has been involved have all "had some sort of current component to the data" that was known to be reliable, and none had data as out-of-date as Global Fitness' data. *See id*. at *PAGEID* 2711-12.

Here, the class includes any individual who signed a gym membership or personal training contract with Global Fitness between January 1, 2006, and October 26, 2012, when Global Fitness sold all of its business assets. Global Fitness's data therefore spans a six year time frame and, at best, is current only as of 2012. Given the age of Global Fitness' data and in light of Mr. Dahl's testimony, the Court is satisfied that a claims-made process is appropriate in this case.

To the extent that the objectors challenge the effectiveness of the claims-based process in this case, the Court notes that the *Settlement Agreement* permits claim forms to be submitted online and by

mail. Mr. Dahl testified that the use of such a claim system typically results in a claim rate twice as high as that resulting from a paper filing process. *See Transcript*, *PAGEID* 2705-06. Moreover, the 8.2 percent[10] claim rate in this case is well within the acceptable range of responses in a consumer class action. *See id*. at *PAGEID* 2721-22 (Mr. Dahl's testimony that response rates in class actions generally range from one to 12 percent with a median response rate, and a normal consumer response rate, of approximately five to eight percent).

### 4. Settlement Negotiations

The *Zik* Objectors argue that the *Settlement Agreement* is procedurally unfair because the *Zik* Objectors had no opportunity to participate in settlement negotiations. *Zik Objections*, pp. 25-27. The *Zik* Objectors also argue that the settlement is unfair because plaintiffs opposed the *Zik* Objectors' motion to intervene. *Id*. at p. 28.

The *Zik* Objectors filed a motion to intervene in this action on September 25, 2013, *see* Doc. No. 102, and that motion was denied as untimely on September 30, 2013. *See Opinion and Order*, Doc. No. 110. The *Zik* Objectors' challenge to the *Settlement Agreement* premised on an inability to intervene and participate in settlement negotiations is essentially a challenge to the Court's order denying the *Zik* Objectors' motion to intervene. The *Zik* Objectors have not, however, persuaded the Court that the previous order should be revisited. The Court also notes that the *Zik* Objectors' interest in this action is

---

[10]   49,808 Allowed Claimants ÷ 605,735 Class members = 8.223% response rate

similar to that of every other unnamed class member.  Because the unnamed class members are adequately represented by Class Counsel and Class Representatives, the Court finds no procedural unfairness in excluding the *Zik* Objectors' from participation in settlement negotiations.  *See Bailey v. White*, 320 F. App'x 364, 366-67 (6th Cir. 2009) ("The purpose for intervening - to investigate and evaluate the proposed settlement - was satisfied by the opportunity to participate in the fairness hearing . . . .").

### 5. Release

The *Settlement Agreement* provides that "each Class Representative and each Settling Plaintiff shall be deemed to have fully, finally, and forever jointly and severally released the Released Parties from all Released Claims."  *Id.* at § 15.1.  A Released Claim is defined as

> any and all claims, demands, actions, causes of action, rights, offsets, suits, damages (whether general, special, punitive, or multiple), lawsuits, liens, costs, losses, expenses, penalties, or liabilities of any kind whatsoever, for any relief whatsoever, including monetary, injunctive, or declaratory relief, or for reimbursement of attorneys' fees, costs, or expenses, whether known or unknown, whether direct or indirect (whether by assignment or otherwise), whether under federal, state, or local law, whether alleged or not alleged in the Action, whether suspected or unsuspected, whether contingent or vested, which any of the Class Representatives or Class Members have had, now have, or may have in the future against the Released Parties, and which were raised or which could have been raised in the Action, and which arose during the Class Period and arise out of or are related to the factual allegations or are based on the same factual predicates as alleged in the Action's Third Amended Complaint.  This specifically includes any and all claims for breach of contract, unjust enrichment, misrepresentation, and/or violations of consumer protection acts, health spa acts, or prepaid entertainment contract statues resulting from Defendant's sales, communications, contracting, billing, and/or cancellations of any gym or personal training contracts.

*Settlement Agreement*, § 2.23 (emphasis in original). The *Zik* Objectors argue that the release is overbroad because it releases claims without an identical factual predicate to plaintiffs' claims. *Transcript*, *PAGEID* 2764-65. Specifically, the *Zik* Objectors challenge the provision releasing claims that "arise out of or are related to the factual allegations . . . in the Action's Third Amended Complaint," *Settlement Agreement*, § 2.23. *See Transcript*, *PAGEID* 2764-65. This objection is not well taken.

"Like any other settlement, this one requires the plaintiffs to release their claims against the defendant." *See Olden*, 294 F. App'x at 220. The *Settlement Agreement* releases all claims that "arise out of or are related to the factual allegations or are based on the same factual predicates as alleged in the Action's Third Amended Complaint." *Settlement Agreement*, § 2.23. The *Zik* Objectors challenge the release because it releases claims that "arise out of or are related to the factual allegations," and is not expressly limited to the release of claims with an identical factual predicate as the settled conduct. However, a release need not expressly state that it is limited by "the identical factual predicate doctrine" in order to be so limited. *See In re WorldCom, Inc. Sec. Litig.*, 388 F.Supp. 2d 319, 342 n.36 (S.D.N.Y. 2005). In any event, the Court finds that the release in question is limited to claims that share the same factual predicate as the settled claims, and therefore is not unfair to that extent. *See Olden*, 294 F. App'x at 220 ("Because such claims have an identical factual predicate as the claims pled in the complaint, no problem is posed by their release."); *N. Star Capital Acquisitions,*

*LLC v. Krig*, Nos. 3:07-cv-264, 3:07-cv-265, 3:07-cv-266, 3:08-cv-1016, 2011 WL 65662, at *7-8 (M.D. Fla. Jan. 10, 2011) (approving the release of claims "that are based upon, arise out of, or are related to, or in any way connected with, directly or indirectly, in whole or in part, [the claims in the lawsuit]"); *Taft v. Ackermans*, No. 02Civ.7951, 2007 WL 414493, at *8 (S.D.N.Y. Jan. 31, 2007) (approving the release of "all of the class plaintiffs' claims against the defendants arising out of or related to the purchase of KPNQwest securities during the class period," on the basis that the "release is . . . limited to claims that share the same factual predicate as the settled claims"); *Spann v. AOL Time Warner, Inc.*, No. 02Civ.8238, 2005 WL 1330937 (S.D.N.Y. June 7, 2005) (approving the release of "all Class members' claims against the defendants that arise out of or are related to the claims in this lawsuit"); *Levell v. Monsanto Research Corp.*, 191 F.R.D. 543, 561-62, 561 n.32 (S.D. Ohio 2000) (approving a release of claims under "any other federal or state law, regulation, or rule of any kind and which relate in any way [to the defendant's] acts, omissions, disclosures, non-disclosures, or conduct concerning its operation of the Mound facility, including but not limited to all allegations set forth or which could have been set forth in the action").

Based on the foregoing, the Court finds that the *Settlement Agreement* is fair, reasonable, and adequate and that its approval is in the best interest of the class.

**V.    Attorneys' Fees and Costs**

The *Settlement Agreement* provides that Global Fitness will pay the reasonable attorneys' fees and actual costs awarded by the Court, not to exceed $2,390,000. *Settlement Agreement*, § 9.1. On December 9, 2013, Class Counsel filed *Plaintiffs' Motion for Fees*, requesting an award of attorneys' fees and costs in the amount of $2,390,000. In accordance with the "clear sailing" provision of the settlement, *see Settlement Agreement*, § 9.2, Global Fitness has not opposed the application for fees. The objectors argue that the fee request is excessive and that the class was not given reasonable notice of the fee request. Specifically, the *Zik* Objectors argue that notice of the fee request was not directed to the class in a reasonable manner because the fee request was not disclosed on the Postcard Notice. *See Zik Objections*, *PAGEID* 1946-47. Blackman argues that notice of the fee request was not directed to class members in a reasonable manner because the notice did not specify how an award of attorneys' fees will be divided among Class Counsel. *Blackman Objections*, *PAGEID* 2107-10.

"In a certified class action, the court may award reasonable attorney's fees and nontaxable costs that are authorized by law or by the parties' agreement." Fed. R. Civ. P. 23(h). "A claim for an award must be made by motion under Rule 54(d)(2) . . . ." Fed. R. Civ. P. 23(h)(1). "Notice of the motion must be served on all parties and, for motions by class counsel, directed to class members in a reasonable manner." *Id*. Rule 54(d)(2) requires those claiming attorneys' fees to timely file a motion specifying the grounds entitling the movant to the award and stating the amount sought.

As discussed *supra*, notice was provided by postcard, email and reminder email, publication, and via a settlement website.  Although, as the *Zik* Objectors argue, the Postcard Notice does not advise potential class members of Class Counsel's fee request, notice of the fee request was included on the long-form notice.  Specifically, the long-form notice expressly advised that Global Fitness "has agreed to pay . . . Class Counsel's reasonable attorneys' fees and litigation costs in an amount no greater than $2,390,000."  *Long-Form Notice*, attached to *Dahl Declaration* as Exhibit C, p. 3.  The long-form notice also advised class members of the date, time, and location of the fairness hearing, advised that the Court will "be asked to approve Class Counsel's request for Attorneys' Fees and Costs" at the hearing, and that "[a]ny Class or Subclass Member who does not file an Opt-Out Request may object to the proposed settlement and/or the award of attorneys' fees and expenses" during the fairness hearing.  *Id*. at p. 5.  The long-form notice was posted on the settlement website, the address of which is prominently posted on the Postcard Notice, long-form notice, email and reminder email, and publication notice, and similar information regarding attorneys' fees and objections was included in a "Frequently Asked Questions" section of the website.  The notice informed class members of the potential for an award of attorneys' fees and costs, the amount of fees and costs that Global Fitness agreed to pay, that the award was subject to court approval at the fairness hearing, and that class members would have the opportunity to object to the award at the fairness hearing.  Class Counsel's motion for attorneys' fees and notice of intent to divide a

fee award in proportion to each firm's lodestar value were also filed well in advance of the fairness hearing.  The Court therefore finds that notice of the request for attorneys' fees and costs has been "directed to class members in a reasonable manner."  Fed. R. Civ. P. 23(h)(1).  *See also Newberg on Class Actions* § 8:25 (5th ed.) ("Yet other than requiring that the notice be made 'in a reasonable manner,' Rule 23 does not dictate any specific content that the notice must contain.  The fee notice's content is primarily dictated by Rule 23(h)(2)'s guarantee that class members have the right to object to the fee motion."); *Bessey v. Packerland Plainwell, Inc.*, No. 4:06-cv-95, 2007 WL 3173972, at *1-3 (W.D. Mich. Oct. 26, 2007) (approving notice of class counsel's motion for attorneys' fees where class members were notified of the maximum amount of attorneys' fees counsel intended to seek and of the right to object, but were not notified of the proposed apportionment of fees among class counsel).

"When awarding attorney's fees in a class action, a court must make sure that counsel is fairly compensated for the amount of work done as well as for the results achieved." *Rawlings v. Prudential-Bache Props., Inc.*, 9 F.3d 513, 516 (6th Cir. 1993).  "In general, there are two methods for calculating attorney's fees: the lodestar and the percentage-of-the-fund." *Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, 436 F. App'x 496, 498 (6th Cir. 2011).

> The lodestar method better accounts for the amount of work done, while the percentage of the fund method more accurately reflects the results achieved. For these reasons, it is necessary that district courts be permitted to select the more appropriate method for calculating attorney's fees in light of the unique characteristics of class actions in general, and of the unique circumstances of the actual cases before them.

*Rawlings*, 9 F.3d at 516 (internal citations omitted).

To determine the "lodestar" figure, a court multiplies the number of hours reasonably expended on the litigation by a reasonable hourly rate. *Bldg. Serv. Local 47 Cleaning Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1401 (6th Cir. 1995) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)). The court "may then, within limits, adjust the 'lodestar' to reflect relevant considerations peculiar to the subject litigation." *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000) (citing *Reed v. Rhodes*, 179 F.3d 453, 471-72 (6th Cir. 1999). "'In contrast, under the percentage of the fund method, the court simply determines a percentage of the settlement to award the class counsel.'" *Londardo*, 706 F.Supp. 2d at 789 (quoting *In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, 268 F.Supp. 2d 907, 922 (N.D. Ohio 2003)) (internal quotations and alterations omitted). District courts have discretion to select the particular method of calculation. *Rawlings*, 9 F.3d at 516. Even so, a district court must articulate the "reasons for 'adopting a particular methodology and the factors considered in arriving at the fee.'" *Moulton*, 581 F.3d at 352 (quoting *Rawlings*, 9 F.3d at 516)).

> Often, but by no means invariably, the explanation will address these factors: "(1) the value of the benefit rendered to the plaintiff class; (2) the value of the services on an hourly basis; (3) whether the services were undertaken on a contingent fee basis; (4) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides."

69

*Moulton*, 581 F.3d at 352 (quoting *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996)).  *See also Ramey v. Cincinnati Enquirer, Inc.*, 508 F.2d 1188, 1196 (6th Cir. 1974).

Class Counsel asks the Court to apply the lodestar method in calculating the fee award.  *See Transcript*, *PAGEID* 2739, 2777.  In contrast, Blackman argues that the lodestar method will result in an unreasonable award of attorneys' fees and permit Class Counsel to retain a disproportionate amount of the settlement proceeds.  *See Blackman Objections*, *PAGEID* 2099-2106.  In essence, Blackman argues that it is improper for Class Counsel to receive an award of attorneys' fees that is greater than the total payments to the Class and Subclasses and that any fee award should be limited to 25 percent of the actual recovery by Allowed Claimants.  *See id*. at *PAGEID* 2092-93, 2099-2103; *Blackman's Reply*, *PAGEID* 2597-99.  Blackman's arguments to the contrary notwithstanding, the Court finds that the lodestar method is appropriate in this case.

First, Class Counsel undertook the litigation on a contingent fee basis and devoted substantial time and energy to the action despite the risk of not being compensated.  The risk of Class Counsel's undertaking is significant; Class Counsel devoted approximately 8,684 hours in connection with the litigation, *see December 2013 McCormick Declaration*, ¶¶ 6, 8-10; *Troutman Declaration*, ¶¶ 6, 8-11, without any guarantee of receiving a benefit.  Second, many of plaintiffs' claims involve fee shifting statutes, *see* KRS 367.930(2); O.R.C. § 1345.09(F)(2), the purpose of which is to induce a capable attorney to undertake representation in litigation that may not otherwise be

economically viable.  *See Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010); *Einhorn v. Ford Motor Co.*, 48 Ohio St. 3d 27, 30 (Ohio 1990).  Given the purpose of fee shifting statutes and "the goal of class actions — *i.e.*, to provide a vehicle for collective action to pursue redress for tortious conduct that it is not feasible for an individual litigant to pursue," *Lonardo*, 706 F.Supp. 2d at 795, there is a substantial public interest in compensating Class Counsel for the amount of work done in this action.  Similarly, Class Counsel should be awarded for the risk of undertaking representation on a contingent basis, especially considering the complexity of this action and the professional skill of opposing counsel.  Further, limiting an award to a percentage of the actual recovery by Allowed Claimants, as Blackman suggests, could dissuade counsel from undertaking similar consumer class actions in the future.

In general, the percentage of the fund method is preferred in common fund cases.  *See Rawlings*, 9 F.3d at 515 ("We are aware of the recent trend towards adoption of a percentage of the fund method in such cases.").  This is not, however, a common fund case because the provision for attorneys' fees in the *Settlement Agreement* is independent of the award to the Class and Subclasses.  Where, as here, the results achieved are substantial, the interest in fairly compensating counsel for the amount of work done is great.  Under the circumstances of this case, the lodestar method will best ensure that Class Counsel is fairly compensated for their time, *see id.* at 516 ("The lodestar method better accounts for the amount of work done . . . ."), and it will fairly account for the risk to Class Counsel and

the policy underlying the fee shifting statutes.  *See Perdue*, 559 U.S. at 552 ("First, a 'reasonable' fee is a fee that is sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case. . . .  [T]he lodestar method yields a fee that is presumptively sufficient to achieve this objective.").

As noted *supra*, the lodestar figure is calculated by multiplying the proven number of hours reasonably expended on the litigation by a reasonable hourly rate.  *See Grandview Raceway*, 46 F.3d at 1401. Class Counsel submits that, as of November 30, 2013, the Isaac Wiles firm billed 2,466.18 hours in connection with the litigation and the Vorys firm billed 6,218 hours in connection with the litigation, at rates ranging from $180 per hour to $450 per hour.  *December 2013 McCormick Declaration*, ¶¶ 6, 8-10; *Troutman Declaration*, ¶¶ 6, 8-11. Based on the standard hourly rates charged by each firm, the lodestar value for the time is $2,452,010.  *December 2013 McCormick Declaration*, ¶ 6; *Troutman Declaration*, ¶ 6.  Class Counsel also submits that, as of November 30, 2013, $65,032.86 in necessary costs and expenses have been incurred in connection with depositions, mediation, outside professional services, mileage, lodging, copying, and research and administrative services.  *December 2013 McCormick Declaration*, ¶ 11; *Troutman Declaration*, ¶¶ 5, 12.

Although the best practice may have been to submit more detailed records of the costs and time expended in the litigation, *see e.g.*, *Imwalle v. Reliance Med. Prods., Inc.*, 515 F.3d 531, 553 (6th Cir. 2008) ("The key requirement for an award of attorney fees is that '[t]he documentation offered in support of the hours charged must be

of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation.' . . . Although counsel need not 'record in great detail' each minute he or she spent on an item, 'the general subject matter should be identified.'") (internal citations omitted); *Rawlings*, 9 F.3d at 516-17 ("District courts must pore over time sheets . . . ."); *Lonardo*, 706 F.Supp. 2d at 793 (detailing the time and rate for every hour expended on the litigation), the Court is satisfied that the number of hours billed and hourly rates of Class Counsel are reasonable.  Class Counsel has averred under penalty of perjury that the hours expended and costs incurred in the litigation were reasonably necessary to prosecute the action.  *December 2013 McCormick Declaration*, ¶ 12; *Troutman Declaration*, ¶¶ 11, 14.  Class Counsel's hourly rates are also consistent with those in the market and the Court's experience.  *See e.g.*, *In re Sulzer Orthopedics, Inc.*, 398 F.3d 778 (6th Cir. 2005); *Johnson v. Midwest Logistics Sys., Ltd.*, No. 2:11-cv-1061, 2013 WL 2295880 (S.D. Ohio May 24, 2013); *Lowther v. AK Steel Corp.*, No. 1:11-cv-877, 2012 WL 6676131 (S.D. Ohio Dec. 21, 2012).  Finally, the Court notes that Class Counsel has not billed for a significant number of attorney hours expended after the date of settlement, *see Transcript*, *PAGEID* 2733 (Class Counsel's representation that their lodestar value is now "just shy of $2.8 million."), the fee request results in a lodestar multiplier of less than one and, despite vigorous objections to other aspects of the settlement, there has been no objection to the reasonableness of the

hourly rates or the hours expended on the litigation.  Considering the relief obtained for the class, the risk undertaken by Class Counsel, the skill of counsel for both side, society's stake in rewarding attorneys for benefits secured for the class, and the complexity and duration of the litigation, all discussed *supra*, the Court finds that an award of attorneys' fees and costs in the amount of $2,390,000 is reasonable.

Although "perfectly justified in awarding a fee based on the lodestar analysis alone," *Van Horn*, 436 F. App'x at 501, district courts often employ both the lodestar and percentage of the fund methods, using each as a cross-check against the other.  *See e.g.*, *Lonardo*, 706 F.Supp. 2d at 796-97; *In re Sulzer Hip Prosthesis*, 268 F.Supp. 2d at 923.  "The first step in the percentage of the fund method is to determine the total monetary value of the Settlement Agreement to the Settlement Class — *i.e.*, the "'Total Class Benefit.'" *Londardo*, 706 F.Supp. 2d at 797 (quoting *In re Sulzer Hip Prosthesis*, 268 F.Supp. 2d at 922).

The *Settlement Agreement* requires Global Fitness to pay administration costs of the Claim Administrator estimated at $496,259, attorneys' fees and costs in the amount of $2.39 million, and monetary compensation to any Class or Subclass member who becomes an Allowed Claimant.  *See Settlement Agreement*, §§ 6.1, 9.1, 10.1; *Long-Form Notice*, p. 3.  Global Fitness's independent agreement to pay administration costs and attorneys' fees and costs is a benefit to the class and is included in the Total Class Benefit.  *See Lonardo*, 706 F.Supp. 2d. at 802-03.

The *Settlement Agreement* provides for an available benefit to Class and Subclass members of $15,500,430;[11] however, the overall payment to Allowed Claimants will be only $1,593,240.00. *Second Supplemental Dahl Declaration*, ¶ 9. Blackman argues that the Court should ignore the available benefit and "make the proper comparison between the fee award and the amount actually claimed by the class members." *Blackman Objections*, *PAGEID* 2093. *See also Transcript*, *PAGEID* 2755-56. Plaintiffs argue that the entire available benefit should be considered in determining a fee award or, alternatively, that a fee award should be based on the midpoint between the available benefit and the actual payments to class members. *Plaintiffs' Motion for Fees*, p. 15.

In *Boeing Co. v. Van Gemert*, 444 U.S. 472 (1980), the United States Supreme Court upheld an award of attorneys' fees in a class action where the award was based on the total fund available to the class rather than the amount actually recovered. *Id.* at 480 ("Their right to share the harvest of the lawsuit upon proof of their identity, whether or not they exercise it, is a benefit in the fund created by the efforts of the class representatives and their counsel."). Nevertheless, courts are "split regarding how the value

---

[11]  Plaintiffs represent in various contexts that the available benefit is equal to $19 million, *Motion for Preliminary Approval*, Doc. No. 97, p. 6, $17.5 million, *Plaintiffs' Motion for Fees*, pp. 1, 15 n.8, or $17 million, *Plaintiffs' Response*, *PAGEID* 2255. Plaintiffs do not, however, provide their method for calculating these numbers. The Court calculates the Available Benefit as the total monetary compensation that Global Fitness is required to pay to Class and Subclass members under the *Settlement Agreement* if every potential class member becomes an Allowed Claimant: Available benefit = (605,735 potential Class members x $5) + (300,017 potential FIF Subclass members x $15) + (323,518 potential Gym Cancel Subclass members x $20) + (50,038 potential Personal Training Cancel Subclass members x $30).

of the Benefit Fund should be calculated[;]" some courts "calculate[]
attorneys' fees using the percentage of the fund method based only
upon the amount actually claimed" and others "use the Available
Benefit as the measure of the Benefit Fund." *Londardo*, 706 F.Supp. 2d
at 799 (collecting cases).  In addressing arguments similar to those
made here, the court in *Lonardo* devised a compromise to avoid
decoupling class counsel's interest from those of the class while
adhering to the *Boeing* principle by incorporating the value of the
available benefit into the assessment of the benefit fund.  *Id*. at
799-802.  The compromise in *Lonardo* provided for the calculation of
attorneys' fees based on the "mid-point between the Available Benefit
and the Actual Payment."  *Id*.  In making this compromise, the court
recognized that it would be improper to calculate attorneys' fees
based solely on actual payments to class members.  *See id*. at 801-02.
Specifically, the court noted that both the Second and Ninth Circuits
have found that it is an abuse of discretion for a district court to
award fees based solely on actual recovery and without regard to the
*Boeing* principle.  *Id*. (citing *Masters v. Wilhelmina Model Agency,
Inc*., 473 F.3d 423, 437 (2nd Cir. 2007); *Williams v. MGM-Pathe
Commc'ns Co*., 129 F.3d 1026, 1027 (9th Cir. 1997)).  The Court finds
the reasoning in *Lonardo* persuasive and therefore declines to
calculate attorneys' fees based solely on actual recovery without
regard to available benefit.  The Court also finds that the mid-point
method adopted in *Lonardo* will sufficiently protect the interests of
the class against the risk of the actual distribution being
misallocated between attorneys' fees and the class recovery, while at

the same time adhering to the principle of *Boeing* that the right to share in the harvest of the lawsuit is a benefit to the class. *See Boeing*, 444 U.S. at 480. Accordingly, the Court finds that, for purposes of the percentage of the fund cross-check, the potential monetary compensation to class members should be valued at $8,546,835, *i.e.*, the midpoint between the Available Benefit of $15,500,430 and the actual payment of $1,593,240.

For purposes of the percentage of the fund cross-check, then, the *Settlement Agreement* provides a benefit to the class totaling $11,433,094.[12] Class Counsel's requested fee of $2,390,000 is equal to approximately 21 percent of this class benefit.[13] This percentage is well within the acceptable range for a fee award in a class action. *See Lonardo*, 706 F.Supp. 2d at 803 (26.4%); *Kritzer v. Safelite Solutions, LLC*, No. 2:10-cv-0729, 2012 WL 1945144, at *9 (S.D. Ohio May 30, 2012) (52%); *In re Telectronics*, 137 F.Supp. 2d at 1042 ("Generally, in common fund cases, the fee percentages range from 10 to 30 percent (10%-30%) of the common fund created."). Furthermore, as discussed *supra*, $2.39 million is a reasonable fee award based on the analysis of the six *Ramey* factors. Accordingly, the percentage of the fund cross-check confirms that an award of attorneys' fees and costs in the amount of $2,390,000 is reasonable.

The *Zik* Objectors also request a reasonable incentive payment and attorneys' fee for their efforts in pursuing the *Zik Action*. *Zik Objections*, *PAGEID* 1948-49. "Fees and costs may be awarded to the

---

[12]  $8,546,835 + attorneys' fees and costs of $2,390,000 + administration costs of $496,259 = $11,433,094 Total Class Benefit
[13]  $2,390,000 ÷ $11,433,094 =  20.904 %

counsel for objectors to a class action settlement if the work of the counsel produced a beneficial result for the class." *Olden*, 294 F. App'x at 221. *See also Lonardo*, 706 F.Supp. 2d at 803-04 ("Sixth Circuit case law recognizes that awards of attorneys' fees to objectors may be appropriate where the objector provided a benefit to the class by virtue of their objection."). However, the Court has not found any objections meritorious, and the *Zik* Objectors have not provided any legal justification for an award by this Court to an unsuccessful objector or an attorney prosecuting a separation action. Accordingly, the *Zik* Objectors' request for attorneys' fees is without merit.

**WHEREUPON,** based on the foregoing, the Court concludes that plaintiffs have met their burden of showing that the prerequisites for the certification of a class action pursuant to Rule 23(a) and Rule 23(b)(3) have been satisfied in this case, that the *Settlement Agreement* is fair, reasonable, and adequate, and that Class Counsel's requested award of fees and expenses is fair and reasonable. Accordingly, it is hereby **RECOMMENDED** that

> (a) because the proposed settlement of the action on the terms and conditions set forth in the *Settlement Agreement* is fair, reasonable, adequate, and in the best interest of the Class and Subclasses, the *Settlement Agreement* be finally approved by the Court;

> (b) the Class and Subclasses be finally certified for settlement purposes;

> (c) the Action be dismissed with prejudice pursuant to the terms of the *Settlement Agreement*;

> (d) Settling Plaintiffs be bound by the release set forth in the *Settlement Agreement*;

(e) Class Counsel be awarded reasonable fees and reimbursement of expenses in the amount of $2,390,000,

(f) Class Representatives be awarded the Class Representative Enhancement Payments in the amounts specified in the *Settlement Agreement*, and

(g) Global Fitness's *Motion to Strike Objection of Joshua Blackman*, Doc. No. 125, be denied.

If any party seeks review by the District Judge of this *Report and Recommendation*, that party may, within fourteen (14) days, file and serve on all parties objections to the *Report and Recommendation*, specifically designating this *Report and Recommendation*, and the part thereof in question, as well as the basis for objection thereto. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). Response to objections must be filed within fourteen (14) days after being served with a copy thereof. Fed. R. Civ. P. 72(b).

The parties are specifically advised that failure to object to the *Report and Recommendation* will result in a waiver of the right to *de novo* review by the District Judge and of the right to appeal the decision of the District Court adopting the *Report and Recommendation*. *See Thomas v. Arn*, 474 U.S. 140 (1985); *Smith v. Detroit Fed'n of Teachers, Local 231 etc.*, 829 F.2d 1370 (6th Cir. 1987); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).

April 4, 2014                          *s/Norah McCann King*
                                       Norah M<sup>c</sup>Cann King
                                  United States Magistrate Judge