## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## EASTERN DIVISION

| | | |
|---|---|---|
| AMBER GASCHO, et al., | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | CASE NO. 2:11-CV-436 |
| | ) | JUDGE SMITH |
| GLOBAL FITNESS HOLDINGS, LLC, | ) | Magistrate Judge King |
| | ) | |
| Defendant. | ) | |

### OBJECTION TO MAGISTRATE'S REPORT AND
### RECOMMENDATION TO APPROVE CLASS ACTION SETTLEMENT

Robert J. Zik and April N. Zik (collectively the "Ziks") and James Michael Hearon ("Hearon"), on behalf of themselves and a class of similarly situated persons (collectively "Objectors"), by counsel, object to the Magistrate's Report and Recommendation to approve the proposed class action settlement in this case.

Respectfully submitted,

*Counsel for Objectors, Robert Zik, April Zik, and James Hearon*

/s/ Ronna Lucas
Ronna Lucas
Ohio Registration No. 0063304
John E. Stillpass, Attorneys at Law
4901 Hunt Road, Suite 103
Cincinnati, Ohio 45242
Ph. 513.936.0800
Fax 513.794.8800
rlucas@stillpass.com

/s/ Joshua T. Rose
Joshua T. Rose
Hummel Coan Miller Sage & Rose LLC
239 South Fifth Street, Suite 1700
Louisville, KY  40202-3268
502/585-3084
jrose@hcmsrlaw.com

/s/ Gregory Belzley
Gregory A. Belzley
P.O. Box 278
Prospect, KY  40059
502/292-2452
gbelzley@aol.com

1

## TABLE OF CONTENTS

I.  Summary of Argument ........................................................................... 1

    *Robins v. Global Fitness Holdings, LLC,*
    838 F.Supp.2d 631 (2012) ............................................ 2

II.  The unnecessary claims process diluted the payout by over 90% of the settled
     liability, and Class counsel is to receive 60% of the drastically diluted payout ... 4

     Federal Judicial Center, *Judges' Class Action Notice and Claims Process
     Checklist and Plain Language Guide,* p. 6 ....................................... 4

     *Manners v. American Gen. Life Ins. Co.,*
     1999 WL 33581944 at *6, 20 (M.D. Tenn.) ..................................... 4

     *See De Leon v. Bank of America, N.A.,*
     2012 WL 2568142 at *19-20 (M.D. Fla.) ........................................ 4

III.  Plaintiffs failed to adequately represent the Class, including the Ziks.  Plaintiffs
      claims are likewise not common or typical of the Class claims, and common
      issues do not predominate over individual inquiries ............................................ 8

      *Amchem Prods., Inc. v. Windsor,*
      521 U.S. 591, 625 (1997).......................................................... 8,14,16

      *Wal-Mart Stores, Inc. v. Dukes,*
      131 S.Ct. 2541, 2552 n.5 (U.S. 2011) ................................... 8,9

      *Comcast Corp. v. Behrend,*
      133 S.Ct. 1426, 1432 (U.S. 2013) ....................................... 9

      *Robins, supra.* ........................................................................ 9,10,11
                                                                                   12,13

      *DeLeon, supra* ..................................................................... 13

      *Sacred Heart Health Sys., Inc. v. Humana Military Heath Care Servs., Inc.,*
      601 F.3d 1159, 1171 (11th Cir. 2010) ................................... 13

      *Pilgrim v. Universal Health Card, LLC,*
      660 F.3d 943 (6th Cir. 2011)............................................... 15

      Tenn.C.A. § 47-18-305 ....................................................... 15

IV.    Judicial Estoppel ...........................................................................    16

     *New Hampshire v. Maine,*
     532 U.S. 742, 749 (2001).............................................................    16

V.    The Release is Overbroad ...........................................................    18

     *Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,*
     396 F.3d 96, 107 (2nd Cir. 2005) .......................................    18

     *Robins, supra*..................................................................    18

VI.    Additional factors weighing against approval of the settlement.........................    19

     A.    Collusion ..................................................................    19

         2 Newberg & Conte § 11.28, at 11∙59...........................    20

         *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod.'s Liab. Lit.,*
         55 F.3d 768 (3d Cir. 1995) .......................................    20

     B.    The opinions of Class counsel and class representatives ........................    20

         *In re Gen. Motors Corp.,*
         55 F.3d at 804 ...................................................    21

     C.    Likelihood of success on the merits...............................    21

         *Robins, supra*....................................................    21

     D.    The reaction of the Class........................................    21

         *In re Gen. Motors Corp.,*
         55 F.3d at 812 ...................................................    21

         *Bell Atlantic Corp. v. Bolger,*
         2 F.3d 1304, 1313 (3d Cir. 1993) ...............................    21

         *De Leon, supra*...................................................    21

         *In re Gen. Motors Corp.,*
         55 F.3d at 812 ...................................................    21

VII.    Class Counsel fees and preferential treatment....................................    22

*Dennis v. Kellog Co.*,
697 F.3d 858, 868 (9th Cir. 2012).......................................................................... 22,23

VIII.   Objectors should be awarded attorneys fees and incentive awards..................... 23

*Olden*,
294 F. App'x 210, 221 ....................................................................................... 23

*Manners*,
1999 WL 33581944 at *32 .............................................................................. 24

V.    Conclusion......................................................................................................... 27

## I.       Summary of Argument

Magistrate Judge King's Report and Recommendation ("Report") should not be approved, because it ignores many issues and facts that are important to determining the fairness of the proposed settlement.  The Magistrate also erred when construing Objectors' claims and seemed to presume that the settlement is fair by overbroadly comparing it to other settlements and claims processes – instead of acutely analyzing the settlement and issues on their own merits.  The Magistrate also ignores (much less squarely addresses) many undeniable facts that highlight the unfairness and fiction of the settlement, including admissions of Plaintiffs in prior proceedings.  The law requires that Plaintiffs prove that the settlement is fair to the entire Class and that the Court, as fiduciary of the Class, conduct a rigorous analysis of the details and value of the Class' claims and settlement.  This simply was not done.

The Court should reject the settlement in order to prevent Urban Active from keeping virtually all of its ill-gotten gains and Class counsel from keeping the majority of the payout. The parties attempt to globally settle all claims of every Urban Active member since January 1, 2006 at the rate of an average of **$2.63 per member** ($1,593,240 class payout divided by 605,735 class members), despite:

- Urban Active admittedly possessing the information necessary to directly pay most (if not all) class members without requiring members to submit unnecessary claims.  The claims process drastically diluted the agreed upon settled "benefit" to the class from over $17 million to $1.6 million, and the <u>only credible reason</u> for the unnecessary claims process was to save Urban Active $15.4 million.  Plaintiffs' counsel collusively agreed to the settlement without Objectors' participation to satisfy their bulging billed hours and expenses in this litigation – which ultimately amounts to Plaintiffs' counsel taking 60% of the class payout.

- Plaintiffs did not adequately protect the interests of Objectors. No Plaintiff possessed the claims of the Ziks, and Plaintiffs' counsel previously admitted and cannot deny the significant value of Objectors' claims and their counsel's work. Objectors' claims were brought prior to Plaintiffs' lawsuits, and Objectors were closer to class certification than Plaintiffs when Plaintiffs collusively settled this case. Robert Zik (and the tens, if not hundreds, of thousands of members like him) are irrefutably owed a refund of one month's dues and a $10 cancellation fee, plus interest. Unlike Plaintiffs, whose post-cancellation claims to these amounts were arguably barred by their membership contracts (as the *Robins* Court ruled), Robert Zik is owed approximately $75 under the express terms of his membership contract, without even considering his Kentucky Consumer Protection Act claims. Plaintiffs cannot possibly settle and release claims they do not possess, much less adequately represent the Ziks (and those like them) on such claims. Plaintiffs merely settled pre-cancellation claims and post-cancellation claims that were dismissed by the *Robins* court for $25 per gym member – not the Ziks' post-cancellation claims.

- Plaintiffs did not adequately represent other large segments of the Class. Groups of class members with widely divergent claims were not segregated into appropriate subclasses or represented by distinct class representatives, contrary to U.S. Supreme Court precedent. Plaintiffs' disparate claims run the gamut as to both liability and damages, including some groups of class members' claims being worth hundreds, if not thousands, of dollars each and other claims being worth zero (as Plaintiffs' admitted). Instead, each subclass member (i.e. the 8.2% who are approved and even those with no loss) will be paid the identical amounts.

Neither Plaintiffs nor the Magistrate even attempts to explain the disparities of Plaintiffs' claims with any detail or evidence, much less demonstrate that such disparities should

2

not preclude settling such claims for the same prices. Plaintiffs likewise offered absolutely no evidence on how they determined or calculated the value of their claims and those of the Class or that they even pursued (much less analyzed) a direct payment mechanism without a claims process.

Plaintiffs also utterly failed to explain or reconcile (and the Magistrate did not address) why Plaintiffs' positions with this Court are drastically different than the positions previously taken with the *Seeger* Court and Objectors, including Plaintiffs' previous positions that: (1) Kentucky claims and Ohio claims must remain separate for class certification and settlement; (2) their Kentucky claims were immensely valuable and should be litigated in Kentucky to maximize that value; and (3) Objectors' claims (and their attorney's work) were valuable, and that Plaintiffs and Objectors must work together to achieve maximum results (not collusively settle like Plaintiffs did).

It is clear that Plaintiffs will take whatever position is necessary to save their Settlement (including their $2.39 million attorney fee), regardless of the merits of the position or the effect on certain class members. The Court should not presume that the settlement is fair or that class certification is proper. As required by law, the Court must satisfy its independent duty to rigorously analyze all of the various claims brought here and in other lawsuits. After doing so, the Court should reject the settlement under its fiduciary duty to protect all class members.[1]

---

[1] Objectors incorporate their prior court filings as if fully set forth herein, including their Objection to Proposed Class Action Settlement ("Objection", Doc. No. 118) and their Reply in Support thereof ("Reply", Doc. No. 135).

**II.     The unnecessary claims process diluted the payout by over 90% of the settled liability, and Class counsel is to receive 60% of the drastically diluted payout.**

The Federal Judicial Center warns that õ[i]n too many cases, the parties may negotiate a claims process which serves as a choke on the total amount paid to class members.  *When the defendant already holds information that would allow at least some claims to be paid automatically, those claims should be paid directly without requiring claim forms."* Federal Judicial Center, *Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide,* p. 6 (emphasis added); *see also Manners v. American Gen. Life Ins. Co.,* 1999 WL 33581944 at *6, 20 (M.D. Tenn.) (100% of class members received $130M in settlement benefits without the necessity of having to submit a claim) (relied on by Plaintiffs in their Response to Objections, Doc. No. 128, p. 23); *see also See De Leon v. Bank of America*, N.A., 2012 WL 2568142 at *19-20 (M.D. Fla.) (determining claims process was unnecessary).

The parties do not dispute that Urban Active possesses the data necessary to determine who is a member of the Class and Subclasses and thus entitled to payment.  It is also undisputed that only 8.2% of claims were approved (49,808 Class members), leaving 555,927 Class members without any recovery.  (Dahlôs Second Supplemental Affidavit, Doc. No. 140, ¶¶ 9, 10; Dahlôs Supplemental Declaration, Doc. No. 138-1, ¶ 17).  Likewise, of the purported settled liability of Urban Active of $19,390,515,[2] the Class will receive only $1,593,240 (8.2%).  Class counsel seeks to receive $2,390,000 ó over 60% of the payout.  Urban Active keeps the rest.

Despite these obvious inequities, the Magistrate opined that the claims process was appropriate because: (1) Mr. Dahl generally testified that claims made class settlements are more common than direct payment settlements (i.e. without requiring claims to be submitted); (2) Mr.

---

[2] Claims liability of $17,000,515 and attorneys fees of $2,390,000, but not including settlement administration costs.

Dahl generally testified that claims approval rates in consumer class actions (where claims are required to be submitted) are between one and twelve percent; and (3) Urban Active's membership records date from 2006 through October 26, 2012 (inferring that the postcard notices and direct payments may not reach certain Class members). (Report, pp. 58-62).

However, Mr. Dahl never testified that the membership addresses were unreliable or that more than 10% of the postcard notices did not reach the Class members. In contrast, he testified that he took significant measures to assure that the mailed postcard notice reached over 90% of the Class:

> I mean, you know, typically, we measure notice in terms of reaching frequency. That's what percentage of the class we reach  We would provide direct mail notice to the class. You know, we get some return mail. So, we would retrace or re-mail, and we would expect to hit, you know, 90 percent or 90 percent plus based on that. So, in terms of reaching frequency, we would reach 90 percent of the class one time.

(Fairness Hearing Transcript, Doc. No. 139, p. 25).

Mr. Dahl took a number of steps to make sure the postcard notices reached the Class members, including: (1) standardizing the addresses; (2) scrubbing the addresses for abnormalities; and (3) updating addresses through the National Address Database, which would provide a new address for any member who moved locations and notified the post office of his/her new address within the last four (4) years. (*Id*., pp. 36-38).

After the above measures were taken, notice was mailed to the Class. Of the 601,494 notices mailed to Class members, 144,540 were returned without a forwarding address. (Dahl Declaration, ¶ 14). Of the 144,540 returned notices, Mr. Dahl was purportedly able to locate a reliable address for 89,198 by using a third party provider who researches address history and other information to determine the current address of the class members. (Fairness Hearing

Transcript, p. 39, 40). At the end of the day, Mr. Dahl testified that the postcard notice reached 90.8% of the Class, assuming the post office actually delivered the notice. (*Id*. at 39).

Plaintiffs presented no evidence that more than 10% of the postcard notices did not reach the Class, what percentage above 10% did not reach the Class, or which addresses or types of addresses (based on age or otherwise) were not reliable. Mr. Dahl did not testify at what age (if ever) addresses become too unreliable to assume that they are accurate or why. Mr. Dahl did not testify specifically how any aspect of the addresses may have caused addresses to be unreliable or to what extent. Mr. Dahl vaguely mentioned that consumer addresses may be less reliable that employee addresses, but he did not give any specifics in that regard. In contrast, Class members were typically members of Urban Active for years – as opposed to consumers in many other class actions being one-time purchasers. Urban Active's counsel has characterized its membership as "transient," but there is no evidence to that effect.

The fact that Mr. Dahl's company used a third-party service to find reliable addresses for 62% of class members who no longer lived at their prior address and left no forwarding address clearly shows that direct payments could have been sent to the vast majority of the Class without requiring that claims be submitted.

Further, the fact that the claims approval rate was near the upper end of the 1-12% expected approval rate further shows that Urban Active's addresses are not unreliable (due to age or otherwise). Plaintiffs offered no evidence that a direct payment mechanism, without requiring a claims process, was even considered, much less negotiated or analyzed. Plaintiffs likewise offered no evidence that a direct payment mechanism would have resulted in any fraud, the expected amount of fraud, or balancing the added benefit to the class with the risk of fraud.

Plaintiffs also failed to offer any evidence that removing the claims requirement would not have significantly increased claims approval rates.

Thus, given Plaintiffs' burden of proof, the Court must assume that approximately 90% of direct payments would have reached the Class and that the Class would have cashed their checks. In contrast, in order for a class member to receive money via the unnecessary claims process, the member would have to: (1) receive the notice; (2) recognize he/she had a claim; (3) take the time to complete the claim form and include personal identifying information; (4) verify the claim under penalty of perjury, despite many class members likely not remembering the details of their membership and likely not recognizing or understanding any details of their particular claims; and (5) submit the claim via mail or email. People are typically reluctant to provide personal identifying information to strangers who send them postcards, particularly given the abundance of mail scams, identity theft, and the emerging marketplace of companies selling identifying information of people for profit.

The reality is that Urban Active and Plaintiffs knew (having gone through the *Seeger* settlement administration and being counseled by their experienced class action attorneys) that the approval rates for a claims made process would likely be less than 10%, which is why Urban Active only guaranteed a $1.3M payout to the Class (which equates to a 7.6% approval rate). (Objection, p. 32). Based on that reality, it is obvious that Urban Active conditioned any settlement on requiring a claims approval process, and Plaintiffs did not even attempt to negotiate otherwise. The only reasonable explanation for the claims requirement was to dilute the payout to less than 10% of Urban Active's settled liability. And the only reason for Plaintiffs' agreement to such a process was for the named Plaintiffs to secure a payment that

dwarfed those received by approved class members, and for their counsel to rescue its investment in a class action that was unlikely even to be certified.

The law requires that any claims submittal process must be necessary and in furtherance of fairness to the Class – not to allow Defendant to keep over 90% of its ill-gotten gains and Plaintiffs' counsel to take the lion's share of the recovery. It was Plaintiffs' burden to prove why the claims made process was necessary and fair, and they have failed in their burden.

**III.    Plaintiffs failed to adequately represent the Class, including the Ziks. Plaintiffs' claims are likewise not common or typical of the Class' claims, and common issues do not predominate over individual inquiries.**

The Magistrate recognized that typicality, predominance, and adequacy of representation tend to merge, and to be met, "[a] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." (Report, p. 20) (*quoting Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 625 (1997). Likewise, "the named plaintiff's claim and the class claims [must be] so interrelated that the interests of the class members will be fairly and adequately protected." (Report, p. 20) (*quoting Wal-Mart Stores, Inc. v. Dukes,* 131 S.Ct. 2541, 2552 n.5 (U.S. 2011).

The Supreme Court in *Dukes* explained that the key is not the quantity of common or typical legal issues or facts but that resolution of central issue(s) on a class-wide basis must predominate:

> Quite obviously, the mere claim by employees of the same company that they have suffered a Title VII injury, or even a disparate-impact Title VII injury, gives no cause to believe that all their claims can productively be litigated at once. Their claims must depend upon a common contention– for example, the assertion of discriminatory bias on the part of the same supervisor. That common contention, moreover, must be of such a nature that it is capable of classwide resolution– which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.

[]

    "What matters to class certification ... is not the raising of common "questions'— even in droves— but, rather the capacity of a classwide proceeding to generate common *answers* apt to drive the resolution of the litigation. Dissimilarities within the proposed class are what have the potential to impede the generation of common answers."

*Id.* at 2551 (cited by Report, p. 20).

    Our Supreme Court has also "repeatedly" "emphasized" that the trial Court has a duty to rigorously analyze the claims, including probing behind the allegations in the complaint and into the merits of the claims if necessary:

    [I]t may be necessary for the court to probe behind the pleadings before coming to rest on the certification question," and that certification is proper only if "the trial court is satisfied, after a rigorous analysis, that the prerequisites of <u>Rule 23(a)</u> have been satisfied." "í Such an analysis will frequently entail "overlap with the merits of the plaintiff's underlying claim."[] That is so because the "class determination generally involves considerations that are enmeshed in the factual and legal issues comprising the plaintiff's cause of action."

*Comcast Corp. v. Behrend*, 133 S.Ct. 1426, 1432 (U.S. 2013).

    In *Comcast*, the Supreme Court ruled that common issues did not predominate, because plaintiffs' alleged damages were not "consistent with its liability case" and did not arise from the alleged liability.  *Id.* at 1433.  The Supreme Court expressed that the "permutations involving four theories of liability and 2 million subscribers located in 16 counties are nearly endless." *Id.* at 1434.

    As fully set forth in the Objection and Reply, Plaintiffs did not (and could not have) adequately represented the Ziks, because they possessed very different breach of contract claims than the Ziks.  The express terms of the Ziks' membership contracts only permitted Urban Active to charge **one** additional month's dues post-cancellation.  (Report, p. 21; Reply, Ex. A).  In contrast, the membership contracts of Plaintiffs and the plaintiffs in *Robins* were significantly

different by purporting to express that Urban Active could charge members additional dues for **two** months post cancellation.  (*Id.*)  Urban Active claims that it modified its membership contracts to the "two month" language in March 2008, and Urban Active charged at least 100,000 gym members' dues for two months post-cancellation.  (Objection, p. 23; Reply, p. 4).  The Court in *Robins* even dismissed the plaintiffs' claims for a refund of the extra month's dues based on the express language of the membership contracts.  (Reply, pp. 4, 5).

Also, Robert Zik (and every member whose membership began prior to 2008) possesses a clear breach of contract claim for being charged a cancellation fee of $10 that was not included in the membership agreement.  (Report, p. 23; Reply, p. 5; Objection, p. 23).  Unlike Robert Zik's contract, Plaintiffs' membership contracts (and the *Robins* plaintiffs) all expressly included the $10 cancellation charge.  (Report, p. 24; Reply, p. 5; *Robins*, 838 F.Supp.2d at 641).

Obviously there are three distinct groups of class members regarding Urban Active's ***post cancellation*** charges: (1) members whose contracts expressly only allowed dues to be charged for **one** month post cancellation – like the Ziks and members whose membership started prior to March 2008; (2) members whose contracts expressly did not allow any $10 cancellation fee – like Robert Zik's class; and (3) those whose contracts expressed that dues be charged for **two** month post cancellation, plus a $10 cancellation fee – like Plaintiffs and the plaintiffs in *Robins*.  The Zik class possesses irrefutable breach of contract claims for a refund of one month's dues and a $10 cancellation fee, yet Plaintiffs possess a breach of contract claim that has been dismissed by the *Robins* Court as contradicting the express terms of the membership agreement.  Plaintiffs readily admit that the *Robins* decision significantly hampered their claims.  (Plaintiffs' Motion for Final Judgment, Doc. No. 132, p. 7; Plaintiffs' Response to Objections, Doc. No. 128, pp. 14-16).  But the *Robins* decision has no bearing on the Ziks' claims.

Plaintiffs' lead counsel has always understood that Objectors' claims were different than his clients' claims:

> [W]e believe this [Plaintiffs' offer] properly balances the respective value we each bring to the table vis-à-vis our respective causes of action.

(Feb. 12 Email in Email String from Dec. 31, 2012 – March 4, 2013, attached as Exhibit 3-B to Objection).

> While both your claims and our claims have positives and negatives, we believe ours are more likely to be certified and more likely to succeed on the merits.

(Jan. 23 Email in String).

As the U.S. Supreme Court has repeatedly made clear, these two groups' claims (the Zik class and Plaintiffs' post cancellation class) cannot be settled without division into subclasses, because there is no unified answer to the question of whether or not Urban Active breached the contracts by charging two months dues post cancellation and/or a $10 cancellation fee. Likewise, the Court in *Robins* ruled that class members like Plaintiffs (but unlike the Zik class) have no breach of contract claim for Urban Active's post cancellation charged precisely due to the contractual language. As required by Supreme Court precedent, the Zik class and Plaintiffs class do not possess "common answers" to the central legal question of whether or not Urban Active breached the membership agreements – they likely possess opposite answers. In turn, grouping these members together for settlement purposes wrongfully creates a common result for these disparate claims.

In addressing this obvious and significant disparity, the Magistrate erroneously asserted that Plaintiff Lundberg "possesses the same interest and suffered the same injury" as the Ziks and those similarly situated, because Plaintiff Lundberg allegedly entered into a membership contract with Urban Active prior to March 2008. First and foremost, Plaintiff Lundberg's

membership was **<u>never</u>** cancelled.[3]  (Third Amended Complaint, ¶¶ 50-57).  In March 2011, Mr. Lundberg "attempted" to transfer his membership between two Urban Active gym locations but the transfer was never affected, and he has "continually" been charged membership dues for two locations (which would be over three years now).  (*Id.*)  Unlike the Ziks, Mr. Lundberg did not bring a claim that he was charged membership dues for two months (instead of one month) **after his cancellation was affected** in violation of the express terms of his membership agreement. He could not have brought such a claim, because his membership was never cancelled by Urban Active.  Mr. Lundberg's claim is that he was double billed for over three years due to his transfer not being affected and **no cancellation** being processed by Urban Active.[4]

Next, the Magistrate opines that the contractual disparity regarding the propriety of the $10 cancellation fee is not important by reasoning that claims not need be completely identical and that Class representatives adequately represented the absent class members **<u>merely</u>** by virtue of seeking a refund of the $10 cancellation charge (albeit seeking the refund through claims that were dismissed by the *Robins* court due to contract expressly providing the $10 charge).

The Magistrate also wrote that "there is no indication that the interests of these (or any other) Class Representatives conflict because, regardless of which form contract the member signed, the Class Representatives allegedly suffered the same type of injury, i.e., they were, pursuant to a common policy or practice of defendant, allegedly improperly charged monthly dues and a cancellation fee after cancellation of the contract." (Report, p. 23).

---

[3] Mr. Lundberg is not even a "Gym Cancel Subclass" member.  "The -Gym Cancel Subclass' shall mean all Class Members who cancelled their gym membership contract during the Class Period [Jan. 1, 2006 to October 26, 2012]".  (Settlement Agreement, p. 10 at 6.1.3).
[4] Plaintiffs have likewise not presented any claim, allegation, or evidence that Mr. Lundberg's contract only permitted charging one month's dues post cancellation.

Again, as the *Robins* court made clear, the driving force of these breach of contract claims are the express terms of the contracts.  To settle the members together (and for the same price), there must be a common, typical, and predominating answer to that core question of whether or not Urban Active had the right under the contracts to collect the charges.[5]  That nexus and common answer is obviously missing here.

Further, the fact that the Class Representatives (and their counsel) achieved **zero** additional dollars for class members with clear breach of contract claims (as compared to those with claims dismissed in *Robins*) patently demonstrates that they did not adequately represent the Zik class.  How could they have? They did not possess the claims.

Moreover, the Magistrate failed to specifically address (much less reconcile) the vast significant disparities between Plaintiffs own claims (both factually and legally) that preclude certification and render the settlement unfair.  Objectors went into great detail to point out the significant disparities in their Objection and Reply.  (Objection, pp. 11-22).  Although Objectors will not rehash all the disparities here, they urge the Court to rigorously analyze Plaintiffs' claims for such disparities and Objectors' prior briefs thereon.

For example, Plaintiffs never explained (much less offered evidence) why class members like Mr. Lundberg (who were double billed monthly dues for over **three years** due to Urban Active failing to transfer a membership between gym locations) should be treated identically and receive the same payout as class members who have no viable claims and suffered zero damage, like Mr. Blackman who rescinded his agreement.  Also,  The Facility Improvement Fee ("FIF"

---

[5] "[C]laims of breach of contract are peculiarly driven by the terms of the parties' agreement, and common questions rarely will predominate if the relevant terms vary in substance among the contract."  *De Leon*, 2012 WL 2568142 at *10-12 (M.D. Fla.) (rejecting settlement because contract terms varied among members) (quoting *Sacred Heart Health Sys., Inc. v. Humana Military Heath Care Servs., Inc.,* 601 F.3d 1159, 1171 (11th Cir. 2010).

Subclass members who overcome the hurdles for claims approval will each receive $20.00 despite some members paying bi-annual $15.00 FIFs for years (and others paying only one $15.00 fee), and despite some members' written contracts including the fee and some members' written contracts not including the fee. Plaintiff Cary alleges that he was charged at least eight $15.00 FIFs (apparently with the FIF included in his contract but not disclosed when he signed up), and Plaintiff Volkerding alleges he was charged numerous $15.00 FIFs despite the FIF not being in his written contract. Reimbursements of FIFs to members, at the very least, must be based on the number of $15.00 charges and distinguish between members with FIFs in their contracts (and those without) – not a blanket value of $20.00 for all members. Neither Plaintiffs nor the Magistrate addressed this obvious and significant disparity.

Plaintiffs and the Magistrate also utterly failed to analyze the differences in state law that further compound the problem, other than broadly stating that "both the KHSA [Kentucky Health Spa Act] and PECA [Ohio's Prepaid Entertainment Contract Act] contemplate rescission as a potential remedy." (Report, p. 48); *See Amchem*, 521 U.S. at 624. Kentucky Plaintiffs have claims under the KHSA that are unavailable to members in other States, which include Urban Active selling memberships without disclosing the list of all available plans registered with the Kentucky Attorney General and selling plans that were more expensive than registered plans. (Third Amended Complaint, pp. 19-26 for Plaintiffs Tartaglia, Bell, Volkerding, and Cary). Plaintiffs touted these claims as extremely valuable and separate from claim of other members:

> [T]he cash value [being reimbursement of one month's dues per member under the Seeger settlement] **pales in comparison** to the statutory right of all members to void the contract *ab initio* and receive disgorgement as discussed in Objections 5, 6, and 7 below.

(Objections of Tartaglia to *Seeger* Settlement, p. 8) (emphasis added).

Plaintiffs' lead counsel, Mr. McCormick, wrote:

[W]e believe that the Ohio and Kentucky claims must remain separate for both class certification and settlement purposes.

[*citing*] *Pilgrim v. Universal Health Card, LLC,* 660 F.3d 943 (6ᵗʰ Cir. 2011)[differences in state consumer protection laws precluded certification]

[]

Given the requirements of the Kentucky Health Spa Act and the penalties that result from a violation, we stand a much better chance of recovering significant dollars and reaching LA Fitness in Kentucky.

(Rose Declaration, ¶ 11, Mr. McCormick's Feb. 27 Email).

Plaintiffs' counsel also represented to the Boone Circuit Court that his Kentucky clients' claims were worth "hundreds" if not "thousands" of "dollars" per person. (Video of August 12, 2012 Hearing at 2:08 p.m. and 2:34 p.m., manually filed *under seal* as Exhibit 8 to Objection). Plaintiffs' counsel likewise continually focused on the enormous value of his clients' KHSA claims when negotiating with Objectors' counsel and even characterized Tartaglia's KHSA claims as "his only claims." (Rose Declaration, ¶ 11, Nov. 28 Email, attached to Objection as Exhibit 3-C).

Plaintiffs failed to even attempt to explain or reconcile these admissions or the significant differences in the causes of action under the KHSA, and the Magistrate did not address them either.[6] Likewise, Urban Active even admits that Plaintiffs' claims are not amenable to class certification. (Response to Objections, pp. 10-14).

---

[6] The disparities in the laws of Kentucky and Ohio regarding Plaintiffs' statutory consumer protection and health spa claims are significant, without even delving into every difference in the consumer protection laws of the numerous other states (namely Tennessee, North Carolina, Pennsylvania, Georgia, and Nebraska) whose consumers are releasing statutory claims under the laws of those states. For example, Tennessee law expressly precludes health clubs from charging any fees other than the monthly membership fee, including any cancellation fee or any FIF fee. T.C.A. § 47-18-305.

Subclasses must be established for groups within the class whose claims materially differ from other groups within the class:

> The settling parties, in sum, achieved a global compromise with no structural assurance of fair and adequate representation for the diverse groups and individuals affected. Although the named parties alleged a range of complaints, each served generally as representative for the whole, not for a separate constituency.
> []
> ÷[W]here differences among members of a class are such that subclasses must be established, we know of no authority that permits a court to approve a settlement without creating subclasses on the basis of consents by members of a unitary class, some of whom happen to be members of the distinct subgroups.

*Amchem Products, Inc.,* 521 U.S. at 609, 627.

Even a cursory read of Plaintiffsø Third Amended Complaint shows that their claims vary drastically on both liability and damages, including critical contractual language, time periods overcharged, monthly rates, types of overcharges, reasons for overcharges, and conduct involved.  Plaintiffs have offered no evidence to address theses disparities.  Plaintiffs did not adequately and separately represent the interests of persons similarly situated as themselves by breaking the class into appropriate subclasses with distinct representatives.  That is not fair to the Class.

## IV.    Judicial Estoppel

The doctrine of judicial estoppel õprevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase.ö *New Hampshire v. Maine*, 532 U.S. 742, 749 (2001).  Its purpose is õto protect the integrity of the judicial process,ö õprevents parties from playing ÷fast and loose with the courts'ö, and õprohibit[s] parties from deliberately changing positions according to the exigencies of the moment.ö *Id*. at 749, 750.

Plaintiffs' proposed settlement and positions here run directly contrary to their positions and representations to the Boone County Circuit Court when objecting to the *Seeger* settlement:

(1) Plaintiffs argued to the Boone Circuit Court that their Kentucky clients' claims were worth hundreds (if not thousands) of dollars each and that they were very likely to obtain certification and summary judgment on the merits. But Plaintiffs attempt to settle such claims here for as low as 41 cents (8.2% of $5.00).

(2) Plaintiffs vigorously argued in *Seeger* that a class representative cannot release claims that do not share the *identical* factual predicates as his/her own claims. Plaintiffs reverse course and now seek to release all claims "related" to their allegations, yet "specifically includ[ing]" all claims resulting from Urban Active's "sales, communications, contracting, billing, and/or cancellations of any gym or personal training contracts." (Settlement Agreement, ¶ 2.23; *See* Objections of Tartaglia to Seeger Settlement, pp. 1-7, Exhibit E *filed under seal* to Motion to Intervene, Doc. No. 102).

(3) Plaintiffs represented to Objectors that their KHSA claims were their most valuable claims and that Kentucky claims and Ohio claims must remain separate for both certification and settlement.

(4) Plaintiffs opposed Objectors' intervention in this case, despite Plaintiffs moving to intervene in *Seeger* and arguing that their motion was not untimely because there was no need to intervene until the parties in *Seeger* settled the case. (Reply, p. 28). Here, Objectors' motion to intervene was denied as untimely.

(5) Plaintiffs opposed Objectors' requests for discovery from Plaintiffs in this case despite seeking the same discovery in *Seeger*. (*Id*., pp. 28, 29).

The Objection and Reply lays out Plaintiffs' contrary positions in detail and with evidence from the Boone Circuit Court's records, but the Magistrate failed to even mention (much less address) **any** of them.  Plaintiffs should be estopped from taking positions here that contradict their positions in *Seeger*.  Such estoppel would further demonstrate the unfairness of the settlement, and even if not estopped, Plaintiffs' contrary positions must be given significant weight – instead of being ignored.

### V.     The Release is Overbroad

As Plaintiffs cannot deny, class representatives can only release claims and conduct "aris[ing] out of the **identical factual predicate** as the settled conduct."  (See Objections of Tartaglia to Seeger Settlement, pp. 1-7, Exhibit E *filed under seal* to Motion to Intervene, Doc. No. 102); *citing Wal-Mart Stores, Inc. v. Visa U.S.A. Inc.,* 396 F.3d 96, 107 (2nd Cir. 2005) (emphasis in original) (additional citations omitted).  Plaintiffs' first line of defense in *Seeger* was that the settlement must be rejected because the release covered claims "not identical" to those brought in *Seeger.  Id.* at 2-7.

The Magistrate found "that the release in question is limited to claims that share the same factual predicate as the settled claims, and therefore is not unfair to that extent."  (Report, p. 64).  However, as discussed above, the Ziks' claims do not arise from the same factual predicate, because the core of their claims (the contract language) is significantly different than Plaintiffs' contract language.  The *Robins* court dismissed claims like those of Plaintiffs, but the Ziks possess clear breach of contract claims for improper cancellation charges.

Because the Court cannot rewrite the release language, the Court should either reject the settlement due to the overbroad release or interpret the release as not including the Ziks and those similarly situated.

### VI. Additional factors weighing against approval of the settlement

#### A. Collusion

The Magistrate opines that the "duration, complexity, and history of this litigation undermine any suggestion of fraud or collusion." (p. 33). The Magistrate reasons that there was no collusion merely because the parties litigated aggressively and negotiated for long periods of time. But the Magistrate completely ignored the fact that Plaintiffs collusively settled Objectors' claims without their knowledge or participation, despite Plaintiffs' counsel and Objectors' counsel working closely to defeat the *Seeger* settlement for over seven (7) months. (Objection, pp. 6-8). Plaintiffs' counsel wrote:

> Last, I want to emphasize that I strongly believe the class will benefit from both of our firms working together and avoiding what happened in the Seeger case. As we discussed in Cincinnati, the amount of money that can be recovered from Global Fitness is enough to fully compensate the class and both firms for the work put in. We look forward to talking with you soon. Thanks

(Jan. 23 Email in Email String from Dec. 31, 2012 – March 4, 2013, attached as Exhibit 3-B to Objection).

Also, the following badges of collusion were ignored by the Magistrate: (1) Plaintiffs failing to analyze or attempt to negotiate direct payments of claims and instead agreeing to a claims process that would expectedly lead to diluting the payout to less than 10% of the settled liability; (2) Class counsel receiving 60% of the payout; (3) Plaintiffs' counsel admitted understanding the value brought by Objectors and their counsel; and (4) the Parties settling on

the eve of Objectors' class certification hearing, despite negotiating in secret for over five months.

The general presumption of procedural fairness "depend[s] on the implicit assumption that the lawyers actually negotiating really were doing so on behalf of the *entire* class, *see* 2 NEWBERG & CONTE § 11.28, at 11‑59, assumptions which are clearly unjustified in a context where the potential for intra-class conflict further imperils the class' representation." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Prod.'s Liab. Lit.,* 55 F.3d 768, 797 (3d Cir. 1995). Likewise, where the court has not yet certified a class or named its representative or counsel when the settlement is negotiated, the assumption of fairness in negotiating should be questioned. *Id.* at 787, 788. "Far too much turns on the adequacy of representation to accept it on blind faith." *Id.* at 797.

### B. The opinions of Class counsel and class representatives

Plaintiffs have not presented any opinions or testimony of Class representatives, and class counsel did not testify at the fairness hearing. The named class representatives in this case will recover between $1,000 and $5,000, which is 200-1,000 times the minimal class payment of $5.00. (Settlement Agreement, ¶¶ 8.1-8.2). The Court cannot assume that the class representatives' support of the proposed settlement has anything to do with its merits beyond their own recovery, particularly given the global joint representation and recoveries despite the disparity among Plaintiffs' claims.

Likewise, the self-serving opinions of class counsel should be given little weight when considering their inconsistent positions taken in *Seeger*, their disproportionate share of the settlement proceeds, their collusion with Urban Active to the exclusion of Objectors, and the

drastically diluted class payout resulting from the unnecessary claims process. Courts have explained:

> In considering the adequacy of representation, we are loath to place such dispositive weight on the parties' self-serving remarks. And even if counsel did not discuss fees until after they reached a settlement agreement, the statement would not allay our concern since the *Task Force* recommended that fee negotiations be postponed until the settlement was judicially approved, not merely until the date the parties allege to have reached an agreement.

*In re Gen. Motors Corp.,* 55 F.3d at 804.

The Magistrate failed to address any of these issues.

### C.     Likelihood of success on the merits

When discussing Plaintiffs' likelihood of success on the merits, the Magistrate stressed the *Robins* decision but failed to mention that the decision does not affect the Zik class. The Magistrate also failed to analyze the merits of Plaintiffs' various claims – likely because doing so would only reveal that the claims are not typical or predominant. Finally, the Magistrate failed to address Plaintiffs' portrayal of their claims in the *Seeger* settlement as being highly likely to succeed on the merits and immensely valuable.

### D.     The reaction of the Class

The Court should not infer support from silence, particularly when the payouts are small. *See In re Gen. Motors Corp.,* 55 F.3d at 812. As recognized by the Courts, class members with small damages "have insufficient incentive to contest an unpalatable settlement agreement because the cost of contesting exceeds the objector's pro rata benefit." *Id.* (*citing Bell Atlantic Corp. v. Bolger,* 2 F.3d 1304, 1313 (3d Cir. 1993). Likewise, the court in *De Leon, supra,* considered a $28 cash payment unlikely "to induce class members to submit a claim." 2012 WL 2568142 at * 19. The "vociferousness" and substance of objections is also relevant. *See In re Gen. Motors Corp.,* 55 F.3d at 812.

The fact that more than 90% of the Class did not fill out a claims form in order to receive between $5-$75 shows that the Class has rejected the Settlement.  Please keep in mind that this was the second time many of the Class members received a class action notice involving Urban Active – the first one being the *Seeger* settlement.  Much of the Class is likely confused and/or did not want to spend the time to provide personal identifying information to a stranger and/or verify information of which they were unsure under penalty of perjury for a potential small sum.

## VII.    Class Counsel fees and preferential treatment

The Magistrate's recommendation that Class Counsel should be awarded a fee based in part on the "available benefit" to the Class is improper, because the "available benefit" is pure fiction.

"The issue of the valuation of this aspect of a settlement must be examined with great care to eliminate the possibility that it serves only the ‑self-interests' of the attorneys and the parties, and not the class, by assigning a dollar number to the fund that is fictitious."  *See Dennis v. Kellog Co.*, 697 F.3d 858, 868 (9th Cir. 2012) (after reducing the benefit by potentially fictitious amount, fee award of 38.9% was "clearly" excessive).  "Neither class counsel nor Kellogg offers any credible reason for the mysteries in the current settlement. To approve this settlement despite its opacity would be to abdicate our responsibility to be ‑particularly vigilant' of pre-certification class action settlements."  *Id.*

As discussed above, the parties were (or should have been) well aware that the maximum claims approval rate would be 12% and likely fall below 10%, particularly given their involvement in the *Seeger* settlement.  Thus, Class Counsel should not be rewarded for obtaining a percentage of benefit that was purely illusory and would never be fulfilled.  Instead, Class

Counsel should be required to live with the result of their bargain, which was clearly anticipated, and only be permitted to take a reasonable percentage of the benefit actually paid to the class. A 60% contingency fee is not reasonable. *Id.* (fee award of 38.9% was "clearly" excessive).

Also, Plaintiffs' counsel apparently spent vast amounts of time (and corresponding large fees) in obtaining, managing and reviewing electronic discovery to be used for the purpose of proving KHSA claims that non-Kentucky plaintiffs did not possess – claims for which **no** additional consideration was negotiated for Kentucky class members. (McCormick Nov. 12 Email, Exhibit 3-D to Rose Declaration). The Court should examine Class counsel's detailed time records in order to shed light on the fairness of the settlement and their fees, including how much time was devoted to particular claims, but Class counsel did not present any such records to the Court. Why should Class Counsel be paid large sums of fees for work that produced zero additional benefit to Kentucky members?

The Magistrate recognized that a settlement may not give preferential treatment to the named plaintiffs and/or their counsel over absent class members but failed to recognize the preferential treatment that is obvious here. (Report, p. 40).


**VIII.   Objectors should be awarded attorneys fees and incentive awards**

First and foremost, Objectors seek rejection of the settlement because it is unfair to the Class. However, Objectors must protect their investment and hard work by seeking an award in the alternative.

The Magistrate recognized that "[f]ees and costs may be awarded to counsel for objectors to a class action settlement if the work of counsel produced a beneficial result for the class." (Report, p. 78) (*quoting Olden,* 294 F. App'x, 210, 221(6th Cir. 2008); *see also Manners,* 1999

WL 33581944 at *32 (awarding $600,000 to Objectors to be paid by Defendant) (relied on by Plaintiffs in Response, p. 23). Plaintiffs also admit that "it is critical that attorneys are reasonably compensated for bringing actions on behalf of consumers." (Response, p. 33).

The Magistrate then denied Objectors' request for fees, due solely to the Magistrate not finding the Objections to be meritorious. However, regardless of whether or not the Objections are adopted, the evidence shows that Objectors clearly produced a benefit to the class and should thus be compensated for their work.

There is no doubt that Objectors' pursuit of their claims through counsel in their own lawsuit benefitted the Class. Objectors filed their lawsuit before Plaintiffs and have spent over three years litigating their case. Unlike Plaintiffs, Objectors defeated Urban Active's motion to dismiss in full after extensive briefing. (Rose Declaration, ¶ 18, Exhibit 3 to Objection). Objectors engaged in significant discovery, including taking numerous depositions of Urban Active representatives and Objectors being deposed. (*Id.*) Objectors then moved for class certification, and their motion was on a much faster track that any class certification motion of Plaintiffs. (*Id.*) Plaintiffs and Urban Active entered into the settlement two working days prior to Objectors' class certification hearing, and there is no question that Objectors' class certification posture played a role in bridging the settlement gap, particularly given that the parties had been negotiating for many months to no avail. (*Id.*)

Plaintiffs admitted the value that Objectors (and their counsel) brought to the table. Plaintiffs' counsel and Objectors' counsel discussed their respective clients' claims being based on different factual predicates and theories, potentially joining forces, and fair way to divide any recovery if forces were joined based on the disparity between and viability of Plaintiffs' and

Objectors' respective claims.  (Rose Affidavit, ¶ 8, Email String between McCormick and Rose, Dec. 31 – March 4, 2013, Ex. 3-B).

Ultimately Objectors and Plaintiffs were not able to reach an agreement on combining their respective claims, based in large part on Objectors' significant concern with the disparity among Plaintiffs' claims for certification purposes and their counsel's already enormous legal bills that would inevitably reduce the class' recovery.  (*Id*.)  Recognizing the significant value in Zik Class' claims and its counsel's work, Plaintiffs' counsel's last offer was that Objectors' counsel receive 40% of any recovery from the first $6M recovered on behalf of Kentucky class members.  (McCormick Feb. 27 Email).  Also, Plaintiffs' lead counsel expressed:

> [W]e believe this [Plaintiffs' offer] properly balances the respective value we each bring to the table vis-à-vis our respective causes of action.

(*Id*.; Feb. 12 Email in string)

>  While both your claims and our claims have positives and negatives, we believe ours are more likely to be certified and more likely to succeed on the merits.
>
> []
>
> Last, I want to emphasize that I strongly believe the class will benefit from both of our firms working together and avoiding what happened in the Seeger case.  As we discussed in Cincinnati, the amount of money that can be recovered from Global Fitness is enough to fully compensate the class and both firms for the work put in.  We look forward to talking with you soon.  Thanks

(*Id*.; Jan. 23 Email in string)

Unfortunately and despite Plaintiffs' "strong belief" that they must work with Objectors to obtain the best recovery for the class, Plaintiffs' counsel never informed the Zik Class of any settlement discussions with Urban Active until Friday, September 13, 2013, on the eve of the Zik Class' certification hearing set for the following Monday, September 16, 2013.  Apparently, Plaintiffs had been secretly negotiating and colluding with Urban Active to settle all claims

(including Zik Class' claims) for five (5) months, including mediating on July 8, 2013. (Motion for Preliminary Approval, pp. 7, 14).

Further, Objectors' hard work for over seven months in having the *Seeger* settlement rejected was immensely valuable to the Class. (Rose Declaration, ¶ 6, Exhibit 3 to Objection). If the *Seeger* settlement were approved, over 200,000 members of the Class in the *Gascho* action would have received virtually nothing. (Seeger Order, Exhibit 4 to Objection). Plaintiffs' counsel and Objectors' counsel worked closely together and vigorously to defeat the unfair *Seeger* settlement, including jointly drafting briefs, engaging in many strategy conferences, and participating in numerous hearings before the Judge. (Rose Declaration, ¶ 6). Objectors' counsel even took the lead role in argument and examination at the Seeger fairness hearing. Plaintiffs do not contest these facts. Plaintiffs' counsel seeks attorneys fees based on their work in having the *Seeger* settlement rejected, because the work benefitted the Class. Objectors' counsel' work in defeating the *Seeger* settlement cannot be distinguished from Plaintiffs' counsel' work, and it is based on the same benefit to the Class.

Shortly after they collusively settled this case, Plaintiffs' offered Objectors' counsel $150,000 of Class counsel' attorney fees. (Second Declaration of Mr. Rose, Exhibit C to Reply). But Plaintiffs now claim Objectors should not share in the fee, merely because Objectors are objecting to the settlement.

The notion that Objectors work and progress in their case and in *Seeger* had no bearing on the Settlement and benefit to the Class is absurd. The Court has the discretion to award

attorneys fees and incentive awards to any counsel or class member whose efforts benefitted the Class, and the Court should exercise that discretion here.[7]

## V.    Conclusion

For the reasons set forth above, this sprawling, overbroad, and unfair settlement ó where the class members will only receive an average of $2.63 each and Class counsel will receive 60% of the fund ó should be rejected.

Respectfully submitted,

*Counsel for Objectors, Robert Zik, April Zik, and James Hearon*

/s/ Ronna Lucas
Ronna Lucas
Ohio Registration No. 0063304
John E. Stillpass, Attorneys at Law
4901 Hunt Road, Suite 103
Cincinnati, Ohio 45242
Ph. 513.936.0800
Fax 513.794.8800
rlucas@stillpass.com

/s/ Joshua T. Rose
Joshua T. Rose
Hummel Coan Miller Sage & Rose LLC
239 South Fifth Street, Suite 1700
Louisville, KY  40202-3268
502/585-3084
jrose@hcmsrlaw.com

/s/ Gregory Belzley
Gregory A. Belzley
P.O. Box 278
Prospect, KY  40059
502/292-2452
gbelzley@aol.com

---

[7]  Solely using the lodestar method and an hourly rate of $300 per hour (which is comparable to Plaintiffsø rate), Objectorsø attorneyøs fees would be $186,300, without considering additional time devoted to Objecting to this settlement. (Rose Declaration, ¶ 18, Exhibit 3 to Objection). Also, Objectorsø counsel, Mr. Rose, worked 113 hours in defeating the *Seeger* settlement, and Objectorsø counsel, Gregory Belzley worked approximately 60 hours in defeating the *Seeger* settlement (*Id.*)

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that a true and correct copy of the foregoing was electronically filed with the Court and served on all participants in the Court's ECF system in this case on this 21st day of April, 2014.


<u>/s/ Joshua Rose</u>