# UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed:  May 13, 2016

Mr. Gregory A. Belzley
P.O. Box 278
Prospect, KY 40059

Mr. Theodore H. Frank
Mr. Adam Ezra Schulman
Competitive Enterprise Institute
Center for Class Action Fairness
1899 L Street, N.W., 12th Floor
Washington, DC 20036

Mr. Theodore Joseph Froncek Jr.
Croswell & Adams
1208 Sycamore Street
Olde Sycamore Square
Cincinnati, OH 45210-0000

Mr. Richard Gurbst
Squire Patton Boggs
127 Public Square, Suite 4900
Cleveland, OH 44114

Ms. Lauren Suzanne Kuley
Ms. Larisa Vaysman
Squire Patton Boggs
221 E. Fourth Street, Suite 2900
Cincinnati, OH 45202

Mr. Thomas N. McCormick
Mr. Kenneth J. Rubin
Vorys, Sater, Seymour & Pease
52 E. Gay Street
Columbus, OH 43215

Mr. Virgil Brandon McGrath
Bingham Greenebaum Doll
255 E. Fifth Street
Suite 2350
Cincinnati, OH 45202

Mr. Joshua T. Rose
Hummel, Coan, Miller, Sage & Rose
239 S. Fifth Street
Suite 1700
Louisville, KY 40202

Mr. Gregory M. Travalio
Mr. Mark Hayden Troutman
Isaac Wiles Burkholder & Teetor
Two Miranova Place, Suite 700
Columbus, OH 43215

      Re: Case Nos. 14-3761/3798, *Gascho, et al v. Global Fitness Holdings*
        Originating Case No. : 2:11-cv-00436

Dear Counsel,

    The court today announced its decision in the above-styled case.

    Enclosed is a copy of the court's opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

           Yours very truly,

           Deborah S. Hunt, Clerk

           Cathryn Lovely
           Deputy Clerk

cc:  Mr. Richard W. Nagel

Enclosures

Mandate to issue.

RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0114p.06

# UNITED STATES COURT OF APPEALS

### FOR THE SIXTH CIRCUIT

_____

AMBER GASCHO, on behalf of herself and all others
similarly situated, et al.,

*Plaintiffs-Appellees,*

*v.*

GLOBAL FITNESS HOLDINGS, LLC,

*Defendant-Appellee,*

Nos. 14-3761/3798

ROBERT J. ZIK, APRIL ZIK, and JAMES MICHAEL
HEARON (14-3761); JOSHUA BLACKMAN (14-3798).

*Objectors-Appellants*

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:11-cv-00436—George C. Smith, District Judge.

Argued:  June 9, 2015

Decided and Filed:  May 13, 2016

Before:  KEITH, CLAY, and STRANCH, Circuit Judges.

_____

#### COUNSEL

**ARGUED:**  Joshua T. Rose, HUMMEL COAN MILLER, SAGE & ROSE LLC, Louisville,
Kentucky, for Appellants in 14-3761.  Theodore H. Frank, CENTER FOR CLASS ACTION
FAIRNESS, Washington, D.C., for Appellant in 14-3798.  Kenneth J. Rubin, VORYS, SATER,
SEYMOUR AND PEASE LLP, Columbus, Ohio, for the Gascho Appellees.  **ON BRIEF:**
Joshua T. Rose, HUMMEL COAN MILLER, SAGE & ROSE LLC, Louisville, Kentucky,
Gregory A. Belzley, BELZLEY BATHURST ATTORNEYS, Prospect, Kentucky, for
Appellants in 14-3761.  Theodore H. Frank, CENTER FOR CLASS ACTION FAIRNESS,
Washington, D.C., for Appellant in 14-3798.  Kenneth J. Rubin, Thomas N. McCormick,
VORYS, SATER, SEYMOUR AND PEASE LLP, Columbus, Ohio, Gregory M. Travalio, Mark
H. Troutman, ISAAC WILES BURKHOLDER & TEETOR, LLP, Columbus, Ohio, for the
Gascho Appellees.  V. Brandon McGrath, BINGHAM GRENEBAUM DOLL LLP, Cincinnati,

Ohio, Richard S. Gurbst, Larisa M. Vaysman, SQUIRE PATTON BOGGS (US) LLP, Cleveland, Ohio, for Appellee Global Fitness.

STRANCH, J., delivered the opinion of the court in which KEITH, J., joined. CLAY, J. (pp. 34–46), delivered a separate dissenting opinion.

––––––––––––––––––

**OPINION**

––––––––––––––––––

STRANCH, Circuit Judge. This case involves challenges to the settlement of a consumer class action. Amber Gascho and other Plaintiffs (collectively, "Plaintiffs") sued Global Fitness Holdings, LLC alleging that between 2006 and 2012 Global sold gym memberships and incorrectly charged fees pertaining to cancellation, facility maintenance, and personal training contracts. When class counsel and Global announced the settlement, two objectors—Joshua Blackman and the Zik objectors—challenged its terms, both claiming that the settlement was unfair under Federal Rule of Civil Procedure 23(e). They argued that class counsel's fees were disproportionate to the claims paid, that the settlement unnecessarily required a claims process, and that the settlement contained "clear-sailing" and "kicker" provisions that suggest self-dealing by class counsel. The Zik objectors further argued that the settlement must be rejected because it failed to provide adequate compensation for the Kentucky plaintiffs' state-law claims and for plaintiffs who had signed an early, more favorable version of the contract.

The district court approved the settlement based on a magistrate judge's 80-page Report and Recommendation (R&R), which addressed each objection. Both objectors appealed. We find that the district court did not abuse its discretion when approving the settlement, and therefore AFFIRM the district court's decision.

## I. BACKGROUND AND PROCEDURAL HISTORY

This case is one of a number of suits against fitness facilities. Each is a consumer class action consolidating numerous claims of small monetary value on behalf of individuals who purchased memberships in such facilities and allege that they were charged improper fees. Global is a Kentucky LLC that operated fitness facilities under the brand name "Urban Active"

in Ohio, Kentucky, Georgia, Nebraska, North Carolina, Pennsylvania, and Tennessee until October 2012, when it sold its assets to the entity doing business as LA Fitness.  Plaintiffs filed suit against Global on behalf of a class of Ohio consumers in Ohio state court in 2011.  Global removed the suit to federal court under the Class Action Fairness Act (CAFA).  The Gascho case and several similar actions filed in other courts alleged that Global engaged in a variety of unfair sales practices relating to lack of disclosure to consumers, improper deductions from bank accounts, and improper handling of contract cancellations; the cases brought claims under theories of breach of contract, unjust enrichment, fraud, and various state consumer protection laws.

One such consumer class action, *Robins v. Global Fitness Holdings, LLC*, 838 F. Supp. 2d 631 (N.D. Ohio 2012), was dismissed. The parties later stipulated to the dismissal of the resulting appeal, apparently after settling the case.  In another suit brought in Kentucky state court in 2012, Global and plaintiffs' counsel (not related to class counsel or the objectors in this case) also attempted to settle claims, but class counsel in this litigation and counsel for the Zik objectors together objected to that settlement.  The Kentucky court rejected that settlement for several reasons, including the "lack of value" of the settlement owing to the "dismal" participation rate of the class plaintiffs.  The court stated that the low participation rate might have been because the settlement was a coupon settlement for the most part, and that those seeking a cash refund had to undergo a "cumbersome" process in which 90% of the cash refund claims were rejected.  In denying approval of the settlement, the court noted that 1,444 out of the 242,243 potential class members—i.e, only 0.6% of the potential class—had claims of any kind that were approved.

## A.  The approved Global settlement

Global and class counsel reached a settlement in this case in September 2013, after more than two years of litigation that included extensive discovery.  The settlement class consists of the approximately 606,246 people who signed a gym membership or personal training contract with Global from January 1, 2006 through October 26, 2012.  ***Id. at* 1496–97, 1491.**  Any class member who filed an approved claim received $5 in addition to any other claim award provided for in the settlement.  The settlement also created three subclasses, defined as follows:

1. The "FIF Subclass," which includes all class members who paid a $15 Facility Improvement Fee (FIF) or any other biannual $15 fee charged by the defendant between April 1, 2009 and October 26, 2012.  The FIF Subclass has approximately 316,721 members, and all who filed approved claims were entitled to receive $20 in addition to any other claim award.

2. The "Gym Cancel Subclass," which includes all class members who cancelled their gym membership contracts between January 1, 2006 and October 26, 2012.  The Gym Cancel Subclass has approximately 387,177 people, and all who filed approved claims were entitled to receive $20 in addition to any other claim award.

3. The "Personal Training Cancel Subclass," which includes all class members who cancelled a personal training contract between January 1, 2006 and October 26, 2012.  The Personal Training Cancel Subclass has approximately 64,805 members, and all who filed approved claims were entitled to receive $30 in addition to any other claim award.

(R. 97-1, Settlement, PageID 1490, 1492, 1497.)[1]  Each class member had the opportunity to recover once from each subclass to which she/he belonged.  The maximum per-person recovery was therefore $75 (5+20+20+30).  Class members were required to file a simple claim form and if total claims amounted to less than $1.3 million, approved claimants would have their awards increased in equal shares.

The settlement permitted class counsel to apply for $2.39 million in attorney's fees and costs, and contained a "clear sailing" clause: an agreement from Global not to oppose any application for that sum or less.  The agreement also included a "kicker" clause: an agreement that in the event the court awarded less than $2.39 million for costs and fees, that amount would constitute full satisfaction of Global's obligation for costs and fees.

**B. The notice-and-claims process**

Jeffrey Dahl, president of Dahl Administration, LLC, a claims administration firm hired by class counsel to implement the settlement, testified that he sent individualized notice by postcard to 601,494 class members, and email notice to just under half the class.  After

---

[1]These numbers were modified slightly in a February 22, 2014 Joint Motion in which the parties stated that there were approximately 606,000 class members, 323,518 Gym Cancel subclass members, 300,017 FIF subclass members, and 50,038 Personal Training Cancel subclass members.

correcting the addresses of the 146,617 postcard notices returned as undeliverable and re-mailing them, 90.8% percent of the notices were successfully delivered to an address associated with a class member, though Dahl could not confirm how many notices reached the specific class member to whom they were addressed.  Class members could either fill out a claim on paper or on a website provided in both the postcard and the email notice.  The claim form itself required class members to provide basic contact information, identify which of the three subclasses they qualified for, and sign under penalty of perjury.  Dahl testified that about 55,600 claims were made in total, and 49,808 claims were approved, resulting in a total class payment of $1,593,240.  Dahl calculated that the average payout to a claimant was $31.99, and that the average payout to a claimant in the Gym Cancel Subclass was $41.28.

## C.  The Blackman objection

Joshua Blackman, a class member, objected through his counsel affiliated with the Center for Class Action Fairness.  Though Blackman suffered no actual damages because he cancelled his gym membership for a full refund within three days of enrolling, he fell within the definition of the Membership Cancellation subclass, and made a claim for $25 under the settlement.  Blackman states that he did not make a $20 claim for the FIF subclass because the class notice did not specify whether he was a member of that subclass.  He almost certainly was not, as he was a gym member for only three days.  Blackman alleged that the settlement was one-sided in favor of class counsel because it awarded $2.39 million for the legal services they rendered in representing the class but likely paid much less in class claims due to the class members' predictable low response to the claims-made process.  Blackman argued that the terms of the settlement were counter to this court's decision in *In re Dry Max Pampers Litigation*, 724 F.3d 713 (6th Cir. 2013), which forbids "preferential treatment" to class attorneys over unnamed class members.  Invoking the Ninth Circuit's decision in *In re Bluetooth Headset Products Liability Litigation*, 654 F.3d 935 (9th Cir. 2011), Blackman further objected to the settlement's clear sailing clause and kicker clause, and argued that any fee award in a claims-made settlement must be based on the claims paid only, rather than on the total amount made available by the settlement should all class members make a claim.

**D.  The Zik objection**

The Zik objectors echo Blackman's objections and add that the settlement is unfair because it fails to provide sufficient relief for (1) class members who had an early version of the contract with allegedly more favorable cancellation terms, and (2) class members from Kentucky who can assert claims under the Kentucky Health Spa Act (KHSA).  The Zik objectors argue in the alternative that, if the settlement is approved, they should be awarded attorney's fees because they benefited this class by successfully objecting to the *Seeger* settlement and because their Kentucky state court case likely drove Global and class counsel to settle in this case at the time they did.

**E.  The fairness hearing and settlement approval**

Magistrate Judge King held a fairness hearing in February 2014, during which the parties argued their positions and testimony was taken from Dahl.  In April 2014, the magistrate judge issued an 80-page R&R approving the settlement and the requested fees.  The magistrate judge found the settlement in *Pampers* distinguishable because this case had been "vigorously litigated" for two-and-a-half years prior to settlement and involved "extensive" discovery and motion practice, and because class counsel obtained "significant monetary relief to class members" rather than the "illusory injunctive relief" obtained in the *Pampers* settlement. (R. 141, PageID 2841.)

The R&R found the proposed attorney's fees and costs to be reasonable based on the work performed and because the request was well below counsel's lodestar (hours worked on the case multiplied by counsel's hourly rate), and also noted the significance of the settlement's creation of an available benefit of $15.5 million (the total payout if all of the class members filed claims).  The magistrate judge included a common fund cross check of the lodestar calculation. For this percentage fee calculation, the $15.5 million available award was proposed; Blackman argued that the relevant benefit is the $1.5 million actual payout.  Instead of adopting either position, the R&R split the difference and found that "the potential monetary compensation to class members should be valued at $8,546,835, *i.e.*, the midpoint between the Available Benefit

of $15,500,430 and the actual payment of $1,593,240," resulting in a "reasonable" ratio of 21%.[2] (*Id.* at 2874–75.)  The R&R explained that the "clear sailing" clause was not an issue in light of the reasonable value of the class settlement, and that the "kicker" clause was "not improper in this case" because the parties negotiated a reasonable attorney fee that the court upheld, so the class was not deprived of "any benefit, real or perceived."  (*Id.* at 2849–52.)  The R&R further determined that the claims-made process was reasonable, given the age of class address information, the lack of certainty that the postcards actually reached the named class members, and because the 8.2% response rate was "well within the acceptable range of responses in a consumer class action."  (*Id.* at 2857–59.)  Dahl had testified that response rates in consumer class actions generally range from 1 to 12 percent and, given the age of the address information, a claims-made process rather than a direct payout to class members was the norm.

Upon reviewing all the circumstances surrounding the fee request, the R&R also concluded that though class counsel had not submitted detailed billing records for review by the court, the lodestar award was justified because: class counsel provided the number of hours worked and averred under penalty of perjury that those hours were reasonably necessary to prosecute the action; class counsel's hourly rates were consistent with the market rate; class counsel indicated they would not submit a fee request for the hours they worked after the settlement date, which were substantial; the fee request resulted in a lodestar of less than one (meaning that the fee requested represented payment for fewer hours than were actually worked); and there was no objection to the reasonableness of the hourly rates or the number of hours worked despite "vigorous objections" to other aspects of the settlement.

Blackman and the Zik objectors filed objections to the magistrate judge's R&R.  The district court overruled all objections to the R&R, and adopted and affirmed it.  It issued a final order approving the class action settlement and final judgment in July 2014.  The separate appeals of Blackman, Case No. 14-3798, and the Ziks, Case No. 14-3761, followed and were consolidated.

---

[2] The magistrate judge's calculations: $8,546,835 + attorneys' fees and costs of $2,390,000 + administration costs of $496,259 = $11,433,094 Total Class Benefit.  $2,390,000 ÷ $11,433,094 = Fees constituting 20.904% of the Total Class Benefit.

## II.  ANALYSIS

We review both the district court's approval of the settlement and class counsel's attorney fee request under an abuse-of-discretion standard.  *In re Dry Max Pampers Litig.*, 724 F.3d at 717 (settlement); *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 779 (6th Cir. 1996) (fees).

### A.  Fairness of the settlement

Rule 23(e) governs class action settlements and mandates that the court may approve a settlement upon holding a fairness hearing and concluding that it is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  In 2007, we set out the factors that guide the court's inquiry and that we apply here:

> (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest.

*Int'l Union, United Auto., Aerospace, & Agric. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007).

The R&R determined that the following case specific factors weigh in favor of approving the settlement:  (1) The parties' two-and-a-half years of litigation, extensive discovery, ongoing settlement negotiations, and formal mediation session all weighed against the possibility of fraud or collusion; (2) Discovery was "extensive," including the service of multiple sets of interrogatories, the production of over 400,000 documents, and over ten depositions, and required "significant Court involvement," (R. 141, PageID 2832); (3) The likelihood of plaintiffs' success on the merits was called into question by the dismissal of *Robins*, 838 F. Supp. 2d at 631, which the *Gascho* court had noted presented similar facts and legal issues to those alleged here; (4) The litigation had been pending for nearly three years, resulting in millions of dollars in legal fees, and continued litigation would undoubtedly require years of extensive and costly litigation, including fact discovery, expert discovery, and motion practice; (5) Class counsel and representatives approved the settlement agreement; (6) Out of a pool of 605,000 class members, only 90 class members opted out and only 2 objections were filed; (7) The public

interest favored settlement because it provided an immediate cash payout to class members for their compensable injuries in an amount the court found to be fair, reasonable, and adequate, and because settlement would conserve judicial resources.

In addition to the seven *UAW* factors, Blackman and the dissent cite our recent *Pampers* case, which addressed whether the settlement gave "preferential treatment" to class counsel or named plaintiffs, while only "perfunctory relief to the unnamed class members." *Pampers*, 724 F.3d at 718. They also rely on the Ninth Circuit's decision in *Bluetooth*, which found that signs of collusion include a kicker clause, a clear sailing clause, or a situation in which class counsel "receive a disproportionate distribution of the settlement" or the "class receives no monetary distribution but class counsel are amply rewarded," 654 F.3d at 947 (internal quotation marks omitted).

The primary focus of the objections by Blackman and the dissent are these additional considerations introduced in *Pampers* and *Bluetooth*. They take issue with the district court's conclusion that relief to the class was "substantial" (as opposed to nominal) because, though a claims process was created to allow all class members to participate, only 8.2% of the class filed a claim. They argue that, because Global need only pay approximately $1.6 million—as opposed to more than $15.5 million in relief that plaintiffs argue counsel secured for the entire class—allowing class counsel to collect a fee of $2.39 million would constitute the "preferential treatment" for class counsel that *Pampers* forbids.

The central issue is how to value the benefit to the class: as (1) only the value of the claims actually approved, (2) the total relief available to the class if every member filed a claim, or (3) by splitting the difference between the two, as the district court did here. Blackman and the dissent argue that for the benefit calculation to be valid under *Pampers,* only the value of the claims actually approved may be used.

We do not find either *Pampers* or *Bluebooth* to be dispositive here. First, the *Pampers* case involved a Rule 23(b)(2) class for injunctive relief and does not discuss how to value cash benefits for a class that are secured by the work of class counsel but go unclaimed. 724 F.3d at 716. The relief at issue in *Pampers*, moreover, has little relation to the cash settlement obtained

here.   The *Pampers* settlement agreement allotted class counsel $2.73 million, even though "counsel did not take a single deposition, serve a single request for written discovery, or even file a response to [the defendant's] motion to dismiss." *Id.* at 718.   The class members's purported benefits included (1) a refund for one box of diapers, if they retained a receipt and a UPC code from a box of diapers purchased up to eight years before (relief that had been available before the filing of a lawsuit), (2) changes to the Pampers box labeling to warn about diaper rash, and (3) minimal and obvious medical advice about diaper rash posted on the Pampers.com website. *Id.* at 718–19.   The settlement contained no other cash relief whatsoever.   The facts of *Bluetooth* itself also shed little light on the instant case, as that was a cashless settlement for the class at large that involved, among other things, $100,000 in *cy pres* awards[3], package labeling about acoustic safety, payments to the class representatives only, and up to $800,000 in attorney's fees for class counsel.  *Bluetooth*, 654 F.3d at 939–40.

Relying on *Pampers* and *Bluetooth*, Blackman asks us to approve a proposed per se rule of unfairness, arguing that "disproportionate allocation violates Rule 23(e) even without a showing of actual collusion."   (Blackman Br. at 16.)   Blackman's proposal depends on acceptance of two premises:  first, it assumes that use of the percentage of the fund calculation method is mandated whenever class counsel settles a claim; and second, it requires that such calculation be based only on the value of the class claims paid as opposed to the total relief that class counsel's work obtained for the entire class.

As discussed below, the reasoned basis of ample precedent in our circuit and decisions from multiple other circuits counsel against these presumptions.   These authorities demonstrate that it is within the discretion of a district court both to select a lodestar computation as the appropriate method of fee calculation and, if choosing to use or include a percentage of the fund calculation, to value the benefit to the class based on the total relief class counsel makes available to all the class members. Supreme Court authority, moreover, does not support the benefit calculation that Blackman proposes.   The Court has held that class plaintiffs' "right to share the harvest of the lawsuit upon proof of their identity, *whether or not they exercise it*, is a

---

[3] A *cy pres* award is "used to distribute unclaimed portions of a class-action judgment or settlement funds to a charity that will advance the interests of the class."  Black's Law Dictionary (10th ed. 2014)

benefit in the fund created by the efforts of class representatives and their counsel." *Boeing Co.
v. Van Gemert*, 444 U.S. 472, 480 (1980) (emphasis added).

The subsections below focus on each of Blackman's and the dissent's bases for
challenging the settlement in turn: that the attorney's fee was too high as a proportion of the
claims paid, that the claims process was an improper barrier to the class obtaining relief, and that
the clear sailing and kicker provisions were improper. The Zik objectors raise the same concerns
and some additional objections that will be addressed.

### 1. Attorney's fee

Blackman does not ask this court to find that the dollar payout to class claimants was
unreasonable: he does not challenge the fundamental fairness of the amount the class itself
received; instead, his objection is to the amount the attorneys received in comparison to the
amount the class members claimed and received. The analysis the district court employed when
approving class counsel's fee—grounded in our precedent—reaches the heart of the issue.

In applying the abuse-of-discretion standard to an award of attoreny's fees, the trial court
is entitled to "substantial deference because the rationale for the award is predominantly fact-
driven." *Imwalle v. Reliance Med. Prods., Inc.* 515 F.3d 531, 551 (6th Cir. 2008). Such
deference "is appropriate in view of the district court's superior understanding of the litigation
and the desirability of avoiding frequent appellate review of what essentially are factual matters."
*Id.* (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 437 (1983)).

"When awarding attorney's fees in a class action, a court must make sure that counsel is
fairly compensated for the amount of work done as well as for the results achieved." *Rawlings v.
Prudential-Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir. 1993). These two measures of the
fairness of an attorney's award—work done and results achieved—can be in tension with each
other. The lodestar method of calculating fees "better accounts for the amount of work done,"
whereas "the percentage of the fund method more accurately reflects the results achieved." *Id.*

To determine the lodestar figure, the court multiplies the number of hours "reasonably
expended" on the litigation by a "reasonable hourly rate." *Bldg. Serv. Local 47 Cleaning*

*Contractors Pension Plan v. Grandview Raceway*, 46 F.3d 1392, 1401 (6th Cir. 1995).   The court "may then, within limits, adjust the 'lodestar' to reflect relevant considerations peculiar to the subject litigation."  *Adcock-Ladd v. Sec'y of Treasury*, 227 F.3d 343, 349 (6th Cir. 2000).   In contrast, to employ the percentage of the fund method, the court determines a percentage of the settlement to award to class counsel.  *In re Sulzer Hip Prosthesis & Knee Prosthesis Liab. Litig.*, 268 F. Supp. 2d 907, 922 (N.D. Ohio 2003).

As the two methods measure the fairness of the fee with respect to different desired outcomes, "it is necessary that district courts be permitted to select the more appropriate method for calculating attorney's fees in light of the unique characteristics of class actions in general, and of the unique circumstances of the actual cases before them."  *Rawlings*, 9 F.3d at 516.   District court decisions must include "a clear statement of the reasoning used in adopting a particular methodology and the factors considered in arriving at the fee" in order to allow effective appellate review for abuse of discretion.  *Id.*   This court has noted that there are advantages and drawbacks to each method.  *Id.* at 516–17.

The advantages of the percentage of the fund method are that: "it is easy to calculate; it establishes reasonable expectations on the part of plaintiffs' attorneys as to their expected recovery; and it encourages early settlement, which avoids protracted litigation."  *Id.*  But, "a percentage award may also provide incentives to attorneys to settle for too low a recovery because an early settlement provides them with a larger fee in terms of the time invested."  *Id.* With the lodestar method, the

> listing of hours spent and rates charged provides greater accountability.   In addition, enhancing the lodestar with a separate multiplier can serve as a means to account for the risk an attorney assumes in undertaking a case, the quality of the attorney's work product, and the public benefit achieved.   The lodestar method also encourages lawyers to assess the marginal value of continuing work on the case, since the method is tied to hours and rates, and not simply a percentage of the resulting recovery.

*Id.*  But "the lodestar method has been criticized for being too time-consuming of scarce judicial resources."  *Id.*

District courts have the discretion to select the particular method of calculation, but must articulate the "reasons for 'adopting a particular methodology and the factors considered in arriving at the fee.'" *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 352 (6th Cir. 2009) (quoting *Rawlings*, 9 F.3d at 516). *Moulton* set out the germane factors:

> Often, but by no means invariably, the explanation will address these factors: "(1) the value of the benefit rendered to the plaintiff class; (2) the value of the services on an hourly basis; (3) whether the services were undertaken on a contingent fee basis; (4) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides."

*Id.* (quoting *Bowling*, 102 F.3d at 780). Here, the district court employed the lodestar method to determine the fairness of the fee, then chose to cross-check it with the percentage-of-the-fund calculation. *See, e.g., Bowling*, 102 F.3d at 780; *Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, 436 F. App'x 496, 500–01 (6th Cir. 2011).

### a. Lodestar method

Applying the factors enumerated in *Moulton*, the district court determined that the lodestar method was appropriate because the "results achieved" by the settlement are "substantial" and therefore the "interest in fairly compensating counsel for the amount of work done is great." (R. 141, PageID 2869.) It further noted that class counsel had devoted substantial time and energy (8,684 hours at the time of settlement) to the action despite the risk of not being compensated, the litigation was complex, opposing counsel was skilled, and limiting an award to a percentage of the actual recovery could dissuade counsel from undertaking similar consumer class actions in the future. The district court also correctly noted that several of the plaintiffs' claims involved fee shifting statutes, KRS 367.930(2); O.R.C. 1345.09(F)(2), and that the purpose of such statutes is to induce a capable attorney to take on litigation that may not otherwise be economically viable. *See, e.g., Perdue v. Kenny A. ex rel Winn*, 559 U.S. 542, 552 (2010) (explaining that a "reasonable" fee is one that is "sufficient to induce a capable attorney to undertake the representation of a meritorious civil rights case"). The court concluded that "[u]nder the circumstances of the case, the lodestar method will best ensure that Class Counsel is fairly compensated for their time and it will fairly account for the risk to Class Counsel and the

policy underlying the fee shifting statutes."   (R. 141, PageID 2869 (internal citation and quotation omitted).)  It was undoubtedly within the court's discretion to select this method.

The district court approved class counsel's lodestar figure based on declarations from counsel about each person who billed hours on the case, their rates and experience, and what percentage of the billing was attributed to each lawyer or paralegal.  Lawyers' rates varied from $180 to $450 per hour based on the lawyer's experience, with the average at $275.20 per hour after subtracting for costs.

Several of this court's opinions suggest that before approving class counsel's lodestar amount, the court should review the attorney's lodestar fee request in more detail than what was presented in class counsel's affidavits in this case.  We have found that

> [t]he key requirement for an award of attorney fees is that the documentation offered in support of the hours charged must be of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation . . . . Although counsel need not record in great detail each minute he or she spent on an item, the general subject matter should be identified.

*Imwalle*, 515 F.3d at 553 (internal quotation marks and citations omitted); *see also Rawlings*, 9 F.3d at 516–17.

Here, the district court acknowledged this body of case law and noted that the "best practice may have been to submit more detailed records of the costs and time expended in the litigation."  (R. 141, PageID 2870.)  Nonetheless, the court was "satisfied" that the number of hours billed and hourly rates of class counsel were reasonable because counsel "averred under penalty of perjury that the hours expended and costs incurred in the litigation were reasonably necessary to prosecute the action," the hourly rates were "consistent with those in the market" and the court's experience, class counsel had not billed for the significant number of attorney hours expended after the date of settlement, and despite vigorous objections to other aspects of the settlement, the objectors had not argued that class counsel's number of hours worked or hourly rates were unreasonable.  (R. 141, PageID 2871-72.)  Class counsel represented that, by the time the magistrate judge ruled on the fairness hearing, the actual lodestar had grown to

almost $2.8 million, though it would only seek to recoup the $2.39 million it had already agreed on.

Blackman argues that the plaintiffs failed to sustain their "burden of providing for the court's perusal a particularized billing record," (Blackman Br. at 36 (quoting *Imwalle*, 515 F.3d at 553)), and that the R&R "drastically understated the problem" when opting to rely on the lodestar method as the basis for awarding counsel fees in the absence of detailed billing records, (Blackman Br. at 35).  The dissent also challenges the adequacy of class counsel's billing records.

The district court appropriately addressed the *Moulton* factors and explained its rationale for choosing to use the lodestar method, and it would clearly have been within its discretion to rely on the lodestar method supported by adequate billing records.  It is, however, a close question whether the minimal billing information provided suffices to justify the lodestar award in light of our caselaw.  We need not reach the issue, however, because the district court also employed the percentage of the fund cross-check and, as discussed below, that method independently validated the decision to award the attorney's fees in the case.  *See Van Horn*, 436 F. App'x at 501 (finding that a mistake in the district court's percentage of the fund analysis was not an abuse of discretion because the district court was justified in awarding the fee based on the lodestar alone); *Bowling*, 102 F.3d at 779–81 (6th. Cir. 1996) (affirming the district court's fee award, which was based on the percentage-of-the-fund and cross-checked with the lodestar, without reviewing the lodestar analysis).

### b. Percentage-of-fund cross check

A percentage of the fund cross-check is optional, and we have repeatedly upheld a district court's determination that a fee award is reasonable based solely on a lodestar analysis.  Van Horn, 436 F. App'x at 500–01 (citing *Rawlings*, 9 F.3d at 516).  Here we review the percentage-of-fund cross check for two reasons: (1) the issue of sufficiency of the records submitted for the lodestar analysis, and (2) Blackman's argument for a standard creating a per se violation of Rule 23(e).  With respect to the second issue, we specifically address below the calculation method;

the benefit to the class and its ratio to attorney's fees; and—central to the dispute here—what the district court may, within its discretion, choose to do.

When conducting a percentage of the fund analysis, courts must calculate the ratio between attorney's fees and benefit to the class. Attorney's fees are the numerator and the denominator is the dollar amount of the Total Benefit to the class (which includes the "benefit to class members," the attorney's fees and may include costs of administration). The dispute here is over the first component—what the court may choose as the benefit to class members. Blackman argues that the benefit may be only the actual payments to class members and plaintiffs argue that it should be the entire benefit made available to the class through the efforts of counsel.

Because a settlement addresses the particular facts of and parties in a case, calculation of the denominator is necessarily case specific. To reach a resolution satisfactory to all parties, litigants may agree to cash and noncash settlement components. Calculating the ratio between attorney's fees and benefit to the class must include a method for setting the denominator that gives appropriate consideration to all components that the parties found necessary for settlement. Circuits have resolved the issue in several different ways, with a few establishing categorical rules but many maintaining a more case-specific approach and reviewing for abuse of discretion without mandating a particular method. Our circuit precedent fits within the latter approach.

Here, class counsel asserts that the "benefit to the class" portion of the denominator is the value of the settlement if all class members exercised their right to file valid claims. The magistrate judge calculated that available benefit to be $15,500,430.[4] Blackman counters that the $15.5 million figure is illusory because class counsel and Global could easily anticipate that only a fraction of the class would actually file a claim, given the testimony that only 5 to 8% of plaintiffs file claims in a typical consumer class action. Blackman's argument is that the benefit component of the denominator must be calculated based only on the amount of money actually paid to the class.

---

[4]Though class counsel reiterates in its appellate brief that the available benefit is $17 million, we adopt the lower court's figure without further discussion because the difference is not dispositive, as either figure would lead to an acceptable ratio if used to calculate the denominator.

Here, the district court properly relied on Supreme Court authority recognizing that class plaintiffs' "right to share the harvest of the suit upon proof of their identity, *whether or not they exercise it*, is a benefit in the fund created by the efforts of class representatives and their counsel." *Boeing Co.*, 444 U.S. at 480 (emphasis added). *Boeing* concerned a case in which a common fund was created for the class, and the court recognized that "[t]o claim their logically ascertainable shares of the judgment fund, absentee class members need prove only their membership in the injured class." *Id. Boeing*'s "latent claim" to the money left in the fund after class member claims had been paid did not affect the Court's determination that the "present rights" of class members to access that money through a claims process was a benefit to class members. *See id.* at 482. The Supreme Court held that the district court had not abused its discretion by awarding fees to class counsel based on the size of the entire fund as opposed to the portion of it for which claims had been approved. *Id.* at 477–78.

Despite *Boeing*'s guidance, the circuits have split on the most appropriate way to value settlement funds, though such differences are sometimes explainable based on factual distinctions in settlement structures. In a case where unclaimed funds would be distributed to a *cy pres* beneficiary as opposed to reverting back to the defendant, we noted that it is correct to weigh the amount allocated to the class rather than the amount actually disbursed in claims when determining whether an attorney's fee award is unreasonable:

> The thirty percent attorney's fee award, [the objectors] add, is too high, claiming that it "will exceed the recovery of the Class by over $100,000.00." Moulton Br. 32. But this estimate is wrong: The objectors focus on the amount *claimed* rather than the amount *allocated*. Claimants, it is true, will in the aggregate receive less than Class Counsel. But that is because just 4,026 class members submitted claims. Except for fees and costs, class members had the first shot at the settlement proceeds—nearly $2.5 million by our estimate—which exceed the amount paid to Class Counsel by some measure. That the public schools [the beneficiaries of the unclaimed residue of the fund] will receive $1.28 million in *unclaimed* funds does not reflect on the settlement's fairness.

*Moulton*, 581 F.3d at 352.

In another case involving funds that would not revert back to defendants if unclaimed, the Second Circuit held that a district court abused its discretion by calculating fees strictly based on the dollar amount paid to approved claimants, and expressly rejected the idea that basing an

award on the benefit available to the class would create a windfall for class counsel. *Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437 (2d Cir. 2007). The court reasoned that "[t]he entire Fund, and not some portion thereof, is created through the efforts of counsel at the instigation of the entire class. An allocation of fees by percentage should therefore be awarded on the basis of the total funds made available, whether claimed or not." *Id.*

Similarly, in a class action settlement involving a fund where all unclaimed money would revert to the defendant, the Eleventh Circuit affirmed a district court's award of 30 percent of the total recovery fund, and rejected the argument that the fee should only have consisted of 30 percent of the funds actually claimed. *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1296–97 (11th Cir. 1999). *Waters* expressly noted that the district court had relied on the Supreme Court's reasoning in *Boeing* in reaching its conclusion and found that though the unclaimed funds would revert to the defendant, the relief was real and available to the class. *Id.* at 1297. The appellate court also noted that it was reviewing for abuse of discretion, and that a different result might be warranted on the facts of a different case. *Id.* at 1298.

The Ninth Circuit has also applied *Boeing* to determine that—with respect to a class action settlement involving a common fund holding money that would revert to the defendant if unclaimed—the district court erred by awarding class counsel a fee of only one third of the $10,000 actually claimed rather than a fee of one third of the entire $4.5 million settlement fund or a fee based on a lodestar calculation. *Williams v. MGM-Pathe Commc'ns. Co.*, 129 F.3d 1026, 1026–27 (9th Cir. 1997) (per curiam).

The Third Circuit has not ruled on the issue, but in dicta noted that it would be unwise to impose on a district court a categorical rule in which a portion of a common fund that went unclaimed by class members and was then distributed under the agreement as a *cy pres* award must be discounted for the purpose of calculating attorney's fees:

> There are a variety of reasons that settlement funds may remain even after an exhaustive claims process—including if the class members' individual damages are simply too small to motivate them to submit claims. Class counsel should not be penalized for these or other legitimate reasons unrelated to the quality of representation they provided. Nor do we want to discourage counsel from filing

class actions in cases where few claims are likely to be made but the deterrent effect of the class action is equally valuable.

*In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 178 (3d Cir. 2013). The Third Circuit refused to mandate discounting of *cy pres* awards, though it noted that "awarding attorneys' fees based on the entire settlement amount rather than individual distributions creates a potential conflict of interest between absent class members and their counsel." *Id.* The court therefore concluded that when "a district court has reason to believe that counsel has not met its responsibility to seek an award that adequately prioritizes direct benefit to the class . . . it [is] appropriate for the court to decrease the fee award." *Id.* It explained that "our approach is case by case, providing courts discretion to determine whether to decrease attorneys' fees where a portion of the fund will be distributed *cy pres*." *Id.* at 179.

A case-by-case analysis honors both the principles that undergird the abuse of discretion review standard and the practical realities of examining a settlement reached by particular parties in their specific circumstances. A case-by-case approach allows a reviewing court to address the varying danger of tacit collusion between the parties for unclaimed funds distributed through a *cy pres* award as in *Moulton* and *Baby Products*, as well as cases such as this one, where such funds are left with the defendant. The Third Circuit correctly noted that devaluing the available relief if it goes unclaimed could in many cases unduly penalize class counsel and have the lasting effect of discouraging the filing of class actions in cases where few claims are likely to be made but the deterrent effect of such a suit would be socially desirable. *See In re Baby*, 708 F.3d at 179. The latter policy concern reflects one of the purposes of consumer class actions—the need to insure that mistreatment of consumers will not be insulated because the damage suffered by an individual consumer is too small to justify the expense and time required to challenge the practice—both for the individual harmed and the attorney who represents that consumer.

Determining the appropriate relationship between fees and benefits to the class, however, can be significantly impacted by the facts of a case. For example, where class counsel had already been awarded more than the full lodestar value of their services but were seeking to apply a multiplier, the Fifth Circuit permitted a district court to determine fees relative to benefits distributed. *Strong v. BellSouth Telecomm., Inc.*, 137 F.3d 844, 851–52 (5th Cir. 1998).

It questioned reference to the percentage of the fund analysis in a lodestar case, but addressed the issue, holding that under the facts the district court did not abuse its discretion by focusing on the $1.5 million of benefits distributed to the class rather than the $64 million estimated value of the settlement fund that included coupon-like benefits. *Id.* at 851-53. In this context, the district court found class counsel's valuation of the relief to be "phantom" because class members had the option of continuing phone service *or* receiving a credit, making the relief akin to coupons or certificates, "where the true value of the award was less than its face value." *Id.* at 852.

In upholding the district court's method of determining fees, *Strong* acknowledged that in *Boeing* the Supreme Court had upheld the district court's decision to consider the potential awards available rather than the actual claims made. *Id.* It distinguished *Boeing* because there each member had an "ascertainable claim to part of [the] lump-sum judgment" that could be accessed "simply by proving their individual claims," whereas in *Strong* the agreement did not establish a fund and included the difficult to access "phantom" benefits rather than cash. *Id.* But far from creating a categorical rule requiring courts to consider only the benefits actually distributed, *Strong* noted that fees had already been awarded under the lodestar method and explained that "this course of action is not the usual one" and "under the atypical circumstances of this case, the district court did not abuse its discretion in considering the actual results of the settlement." *Id.* at 853.

In a recent decision on which the dissent relies, the Seventh Circuit varied from these cases by overturning a district judge's use of the value of the available settlement in the denominator of a percentage of fund calculation. *Pearson v. NBTY, Inc.*, 772 F.3d 778, 779–81 (7th Cir. 2014). There, the settlement agreement was reached only eight months after suit was filed, and it called for the defendant to pay $3 per claim. *Id.* at 779, 781. *Pearson* held that the correct ratio to calculate is always that of "(1) the fee to (2) the fee plus what the class members received." *Id.* at 781. The court noted that its mandated ratio "gives class counsel an incentive to design the claims process in such a way as will maximize the settlement benefits actually received by the class . . . ." *Id.* Importantly, *Pearson* held that the value of the attorney's fees being sought there also failed under a lodestar analysis. *Id.*

*Pearson* addressed the import of *Boeing* to its decision, acknowledging that "it is true that an option to file a claim creates a prospective value, even if the option is never exercised." *Id.* at 782. Nonetheless, *Pearson* distinguished *Boeing* by noting that *Boeing* pertained to an existing judgment fund, and that each class member's claim on the fund was "undisputed" and "mathematically ascertainable." *Id.* In contrast, the court reasoned, the settlement in *Pearson* did not concern a litigated judgment, and "there was no expectation in advance of the deadline for filing claims that more members of the class would submit claims than did." *Id.* Well under one percent of the *Pearson* class members had filed claims for the $3 in relief at issue. *Id.*

We find *Pearson*'s efforts to distinguish *Boeing* unconvincing. No matter how the *Boeing* fund was structured, the Supreme Court found value in the work of class counsel that provided a fund from which class members could access their claims. Further, though it went unacknowledged by the Seventh Circuit, there *was* a claims process in *Boeing*, 444 U.S. at 479 ("members of the class can obtain their share of the recovery simply by proving their individual claims against the judgment fund"), and there was a possibility that unclaimed funds would revert back to the defendant, *id.* at 482 (acknowledging *Boeing*'s "latent claim against unclaimed money in the judgment fund"). *Boeing*'s factual features are not significantly different from the settlement terms in this case as they involve a straightforward claims process and a provision that unclaimed funds will remain with the defendant. Considering these comparable facts, we see no reason why *Boeing*'s application should turn on the existence of an actual escrow fund of money for the payment of claims.[5]

---

[5]We disagree with the dissent's assertion that *Boeing*, while good law, has fallen into disfavor. Its sole case citation for this point is Justice O'Connor's statement regarding the denial of certiorari in *International Precious Metals Corp. v. Waters*, 530 U.S. 1223 (2000). We do not find this statement to evidence rejection of *Boeing*. First, no other justices joined it. Justice O'Connor, moreover, did not argue for overruling *Boeing*, but simply for requiring "some rational connection between the fee award and the amount of the actual distribution to the class." *Id.* Our case-by-case approach is consistent with this statement; if a fee award lacks rational connection to the amount distributed to the class, a district court may reject the settlement.

The dissent also points to the Advisory Committee notes to the 2003 amendments to Rule 23, arguing that the Committee distinguished benefits from actual results. But the Committee did not define "result actually achieved" and, as *Boeing* makes clear, the total available benefit *is* a result actually achieved for the class. Further, nothing in the note would support the dissent's categorical rule—the Advisory Committee did encourage courts to scrutinize the claims procedure to ensure "significant actual payments to class members," but it also emphasized that "[a]t the same time, it is important to recognize that in some class actions the monetary relief obtained is not the sole determinant of an appropriate attorney fees award." Fed. R. Civ. P. 23, 2003 Amend., Note to Subdivision 23(h). Only a case-by-case approach can balance these twin concerns.

The other cases noted do not suggest a different conclusion.  While it may be true that a class settlement with a needlessly onerous claims process might warrant discounted relief using the case by case approach the Third Circuit (*In re Baby*) discussed, that is a different matter— one of application as opposed to a general rule.  Further, the Ninth Circuit (*Williams*) imposed and the Eleventh Circuit (*Waters*) upheld attorney's fees based on the whole value of the fund in cases where unclaimed money in the fund would revert back to the defendant.  There is no meaningful distinction between a fund with a reversion provision and a defendant-paid-claims process, as here.  In both cases, unclaimed funds wind up with the defendant.

As this survey of appellate decisions demonstrates, courts have upheld a variety of methods employed by district courts to determine benefit to the class.  The only circuits that have crafted a strict rule have been the Ninth and Second (both holding that the district court erred by using the value of the funds actually distributed rather than the full value of the authorized fund when calculating attorney's fees), and the Seventh (holding the opposite, i.e., that courts *must* only consider the value of the funds actually distributed as opposed to the entire value of the funds made available to the class).

Rather than adopting the Seventh Circuit's categorical rule that Blackman and the dissent urge, we leave the determination of how to value the benefit provided to the class to a district court's discretion, exercised in accordance with our precedent.  This respects the Supreme Court's position, as well as our own, that making claims available to all class members provides them with a benefit.  In a case-by-case analysis, district courts are able to determine fees by considering all the facts of a case, and thereby address the concerns that Blackman and the dissent argue can be resolved only by a per se rule.  Courts may do so, moreover, without the inherent problems recognized by Blackman in his ambiguous assertion he is not "proposing" that the blanket rule would extend to all cases where "Congress established fee-shifting statutes to vindicate specific rights beyond purely pecuniary ones."  (Blackman Br. at 16 n.2.)  But consumer claims also may seek to vindicate rights beyond monetary ones and many of those cases, including this case, raise claims under both common law *and* fee shifting statutes. Blackman's counsel's inability to articulate a functional limiting principle for application of a

per se rule to other categories of cases or settlements is evidence of the problematic nature of this blanket rule proposal.

Consumer class actions, furthermore, have value to society more broadly, both as deterrents to unlawful behavior—particularly when the individual injuries are too small to justify the time and expense of litigation—and as private law enforcement regimes that free public sector resources.[6] If we are to encourage these positive societal effects, class counsel must be adequately compensated—even when significant compensation to class members is out of reach (such as when contact information is unavailable, or when individual claims are very small).[7] An inflexible, categorical rule neglects these additional considerations.

Although we decline to adopt a categorical rule, we recognize the validity of the dissent's concern about settlement structures that are contrived to discourage claims. A needlessly burdensome claims process was one problem with the settlement in *Pampers*, which provided class members a refund for one box of diapers, but only if the claimant had a receipt and a UPC code—including for diapers purchased up to eight years before the settlement. *See* 724 F.3d at 718. Given the low value of individual awards in most consumer class actions, a sworn statement attesting to the purchase may often be sufficient documentation. We also find troubling claim forms and websites that appear designed to confuse class members, either by omitting information on the claims process or by presenting this information in a confusing way. A claims process that includes these features may well be inappropriate for approval. But as we

---

[6] *See* William B. Rubenstein, *On What A "Private Attorney General" Is—and Why It Matters*, 57 Vand. L. Rev. 2129, 2168 (2004) ("[Class counsel's] clients are not just the class members, but the public and the class members; their goal is not just compensation, but deterrence and compensation."); Myriam Gilles & Gary B. Friedman, *Exploding the Class Action Agency Costs Myth: The Social Utility of Entrepreneurial Lawyers*, 155 U. Pa. L. Rev. 103, 106 (2006) ("[T]he deterrence of corporate wrongdoing is what we can and should expect from class actions."); William B. Rubenstein, *Why Enable Litigation?: A Positive Externalities Theory of the Small Claims Class Action*, 74 UMKC L. Rev. 709, 724-25 (2006) ("By enabling litigation, the class action has the structural consequence of dividing law enforcement among public agencies and private attorneys general and of shifting a significant amount of that enforcement to the private sector.").

[7] *See* Brian T. Fitzpatrick, *Do Class Action Lawyers Make Too Little?*, 158 U. Pa. L. Rev. 2043, 2047 (2010) (concluding that courts "should not be concerned about compensating class members in small-stakes class actions and, instead, should be concerned only with fully incentivizing class action lawyers to bring as many cost-justified actions as possible" because "the only function they serve is deterrence"); Hailyn Chen, Comment, *Attorneys' Fees and Reversionary Fund Settlements in Small Claims Consumer Class Actions*, 50 UCLA L. Rev. 879, 892 (2003) (arguing that courts should not limit attorney's fees to a percentage of actual claims because doing so will often "result in a fee that is so small as to prevent class action attorneys from pursuing such cases, which serve primarily a regulatory and deterrent function").

discuss in greater detail below, that is not the claims process here, which was transparent and not burdensome.

Having rejected a per se rule, we turn to the decision below.  In performing the percentage of the fund cross-check, the district court took a middle of the road approach, selecting a midway point between the benefit available to the entire class and the actual payments made.  It acknowledged that the claimants benefited from the potential for relief, but found that, under these particular circumstances, it might be appropriate to value that potential relief as different from money in the plaintiff's pocket.  The $8.5 million figure the R&R selected recognizes that class counsel provided the valuable service of obtaining substantial relief for each class member who cared to invest the minimal time required to claim it and that in obtaining this relief, counsel undertook a substantial effort for which they deserve compensation.

Blackman protests that if a court is allowed to "split the baby," the parties can game the system by awarding members an inflated benefit then imposing an onerous process to limit claims, making the midpoint higher than if a more modest settlement award had simply been mailed to each class member.  Blackman also argues that there is no universally-applicable "principled dividing line" between fully valuing a settlement where only .001% of the class participates and fully valuing a settlement where just under 10% of the class participates.  It does not follow, however, that the only way to judge the validity of the claims process is to rely solely on the amount the claims process will *actually* pay to the class.  And concern about gaming the system ignores the district court's discretionary right to reject the settlement under Rule 23(e) because the claims process is unduly burdensome.

Our job is to determine whether the district court's actions were an abuse of its discretion. We do not agree with Blackman's and the dissent's argument that the district court erred by not accepting the proposal of a per se rule of unfairness.  Such a rule would require us to jettison the Supreme Court's guiding principles and our own circuit's past acknowledgement that there is value in providing a class member the ability to make a claim, whether she takes advantage of it or not.  We do not abandon that foundational principle.

The question remains whether the district court's valuation of the benefit amount as the midpoint between the parties' positions was a proper exercise of its discretion.  As a general matter, this procedure presents concerns and we do not endorse a rule adopting a "midpoint" calculation.  In the circumstances of this case, however, the decision is an acceptable way to quantify the court's recognition that having the ability to make a claim has value.  Given the facts of this case and the well-reasoned opinions concluding that the settlement relief made available was fair to the class, we decide only that the method employed was within the court's discretion with respect to the case before it.

2.  The claims process

Blackman, the Zik objectors, and the dissent assert that the district court abused its discretion by approving the settlement given the claims process employed in this case.  The court considered the objectors' position, and Dahl testified about the claims process at length during the Fairness Hearing.  Here, class members were identified using the name and address provided at the time they initially signed a contract, between January 1, 2006 and October 26, 2012.  Because notice was sent to class members in October 2013, each class member's contact information was between one and eight years old.  Class counsel also indicated that Global had used four different electronic record management systems during the class period and had transferred information between them, causing class members' records to become incomplete and inaccurate.

Nearly 25% of the notice postcards were returned after the first mailing, suggesting that many class members had moved since joining a gym.  Dahl cross-checked the rejected cards against available address databases, re-sent the cards and a far smaller number were returned.  Ultimately, slightly more than 90% of the cards were delivered to an address associated with the member.  Nonetheless, as Dahl testified, there is "no way of definitively saying they actually reached the class member."  (R. 139, PageID 2718.)  In addition to the postcard program, Dahl also engaged in an email notice program in which 150,581 emails were delivered, created a website for the class, published notice in papers of record, and established a toll-free information helpline.

Dahl testified that the notice and claims program was "robust" and that both postcard and email notice prominently displayed the website or provided a direct link so that class members could easily file a claim online.  According to Dahl, who has been the settlement administrator for hundreds of settlements, this method is "modern," "grabs people's attention," follows how people tend to consume media," and "get[s] robust filing rates."  (R. 139, Fairness Hearing, PageID 2704–08.)

To file a claim, a class member had to click the link in the email, enter the website url from the postcard, or request that a form be sent via U.S. Mail.  The claim form required basic information (name, address, phone number, and email address), that the claimant check boxes indicating subclass membership if applicable, and that the claimant to sign a statement on the form asserting "under penalty of perjury" that the information entered was true.

Dahl testified that, of the more than 3,000 settlements he has administered in his 20 years in the business, fewer than 20 involved direct payment rather than a claims process.  Further, all of those direct payment cases involved a "current component to the data," meaning that the recipients had relationships with the defendant that heightened the reliability of their address data, such as current employees, insurance policy holders, and clients with ongoing account relationships.[8]  (R. 139, PageID 2711–12.)  None of these direct distributions had data as "out of date" as Global's data.  The claims procedure was open, meaning that class members could make claims even if they had not received direct notice.  As a result, several hundred class members who were not in Global's records became claimants, and over 2,000 class members not appearing in Global's subclass records were granted subclass membership and will receive more money than they would have had Global just mailed checks based on its data.

The objectors assert that a check simply should have been mailed to the address listed for each class plaintiff because common sense dictates that direct payment would have resulted in a payout greater than 8% of the claims made.  This ignores the inadequate member data, the number of the checks that would not have reached the class members and the administrative

---

[8]Dahl's testimony is consistent with academic work on this issue.  *See* Adam S. Zimmerman, *Funding Irrationality*, 59 Duke L.J. 1105, 1167 (2010) (observing that direct payments are practical when the parties have "a great deal of information" about potential claimants, but "more problematic" when parties "have less information about potential claimants").

costs of managing that procedure. Blackman's assumption that class counsel "structured the settlement to withhold benefit from 92% of the class," (Blackman Br. at 19), moreover, is not supported by any evidence of an unduly burdensome component of the claims process. Here, there is every indication that Dahl diligently attempted to reach each class member: multiple forms of notice were provided, including ads in 13 different newspapers, a website, and a dual email and postcard mailing approach targeting individual class members. The actual claim form was also short and straightforward.

Class counsel has provided a substantial number of citations to cases employing claims processes similar to this one, including in similar health club settlements. The objectors have provided no authority indicating that the claims process here was improper. Furthermore, Dahl's testimony that response rates in class actions generally range from 1 to 12 percent, with a median response rate of 5 to 8 percent, indicates that the 8 percent response rate was well within the acceptable range for a consumer class action.[9] Given this response, the obvious uncertainty about any class member's address, and Dahl's testimony about the robustness of the process, we conclude that the district court acted within its discretion when finding the claims process employed here to be appropriate.

### 3. The clear sailing and kicker clauses

The objectors and the dissent point to the settlement's clear-sailing and kicker-clauses as evidence of self-dealing by class counsel that would warrant a finding that the settlement was unfair under Rule 23(e). This court has recently noted different perspectives among the circuits with respect to clear sailing provisions:

> Courts have expressed mixed views about the relationship between clear-sailing provisions and adequacy of representation. In *Malchman v. Davis*, the Second Circuit said that, "where . . . the amount of the fees is important to the party paying them, as well as to the attorney recipient, it seems . . . that an agreement 'not to oppose' an application for fees up to a point is essential to the completion of the settlement, because the defendants want to know their total maximum exposure and the plaintiffs do not want to be sandbagged." 761 F.2d 893, 905 n.5

---

[9]In contrast, only 0.6% percent of claims were approved in *Seeger*, R. 118-10, PageID 2002, and slightly more than 0.5% of class members submitted claims in *Redman v. RadioShack Corp.*, 768 F.3d 622, 628 (7th Cir. 2014).

> (2d Cir. 1985), *cert. denied,* 475 U.S. 1143 (1986), *abrogated on other grounds, Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997). Other judges have been less impressed with clear-sailing provisions. In the view of a concurring judge in *Malchman*, such a "clause creates the likelihood that plaintiffs' counsel, in obtaining the defendant's agreement not to challenge a fee request within a stated ceiling, will bargain away something of value to the plaintiff class." *Id.* at 908 (Newman, J., concurring). Another danger is that "the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees." *Weinberger* [*v. Great Northern Nekoosa Corp.*], 925 F.2d [518,] 520 [(1st Cir. 1991)] (holding that courts should "scrutinize" fees requested pursuant to clear-sailing agreements to see whether they "are fair and reasonable").

*Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 425 (6th Cir. 2012). After examining the specifics of the application, the *Gooch* court approved the settlement with the clear sailing provision. *Id.* at 426.

Neither clear sailing provisions nor kicker clauses have ever been held to be unlawful per se, but courts have recognized that their inclusion gives the district court "a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class." *Bluetooth*, 654 F.3d at 948. Here, the R&R *did* peer into the relief to the class and the attorney's fees at issue, and found both to be appropriate.

Blackman argues that "most critically, the reversion and separate compartmentalization" brought about by a standalone attorney's fee and an agreement with a clear-sailing provision and kicker clause "precludes a district court from reallocating an excessive fee request to the class to fix any disproportion: a reduction in attorneys' fees goes to the defendant, thus deterring both courts and objectors from reducing the fee. The combination unfairly insulates the fee request from scrutiny." (Blackman Br. 18.)

Blackman's concern is unwarranted here because the district court unreservedly found that the relief to the class was "substantial" and that class counsel's fee request was appropriate, findings it made within its legitimate discretion. (R. 141, PageID 2850.) The lengthy R&R extensively discussed both relief and fees, and did not exhibit any inclination to find that the former was inadequate or the latter was excessive. Blackman's argument that the court could not rewrite the settlement agreement to reallocate funds between the plaintiffs and class counsel is

unpersuasive.  If a court concludes that the ratio between attorney's fees and relief to the class creates an inequitable situation, it could reject the settlement on Rule 23(e) grounds and send the parties back to the negotiating table.

Though some courts have "disfavored" clear sailing agreements and kicker clauses, their inclusion absent more—as is the case here—does not show that the court abused its discretion in approving the settlement.

## B.  The Zik objectors' contract claims and KHSA claims

In addition to echoing Blackman's arguments, the Zik objectors assert that the class settlement was not fair, reasonable, and adequate because it did not appropriately distinguish between the differing values of and legal theories underlying class members' claims.  The Zik objectors assert that class counsel did not obtain any additional consideration for their "unique and valuable" contract claims or for legal rights afforded under the Kentucky Health Spa Act. (Zik Br. at 30-33.)

With respect to their contract claims, the Zik objectors allege that (1) their contract terms are clearer than subsequent versions of the contract about allowing only one month of additional fees upon cancellation (as opposed to two), and (2) their contracts do not contain a provision for a $10 cancellation fee, which later contracts did.  They, like other plaintiffs, were charged two months of fees after they cancelled (one more than permitted under their contracts, they allege), and were charged the $10 cancellation fee.  They argue that because their contracts terms are different, their claims are worth more and deserve a higher settlement value.[10]

In explaining the reasons it found the amount awarded in the Gym Cancel Subclass to be "fair, reasonable, and adequate," despite some differences in the actual charges individual class members incurred, the R&R noted that

> The Zik Objectors sought to certify a class in the *Zik* action premised on a claim
> that Global Fitness acted in breach of "its members' membership agreements by

---

[10]The Ziks themselves (husband and wife) also appear to have been paying membership fees at the high end of the range of what plaintiffs were charged: $49/month for Robert and $44.99/month for April, as opposed to the class average of $26.76/month.  The Zik objectors provide no information or evidence regarding the monthly membership fees of other would-be members of their subclass.

> charging its members one extra month of membership dues and a $10.00
> cancellation fee when members terminate their membership agreement."
> As discussed . . . the claims asserted in the *Zik* action are subsumed in the Gym
> Cancel Subclass, and an Allowed Claimant who cancelled his or her gym
> membership contract during the Class Period is entitled to an award of $25. The
> Claims Administrator has validated claims and calculated final award amounts for
> the Allowed Claimants: the average Class Payment is $31.99 and the average
> Gym Cancel Subclass Payment will be $41.28.

(R. 141, PageID 2844 (internal citations removed).)    The court found the $31.99 and
$41.28 figures to be "a significant recovery because it exceeds the $26.76 average monthly fee of
a gym membership with Global Fitness between January 1, 2009 and July 2012." (*Id.*)  Because
the *Zik* class complaint sought the contract damages of payment for the one extra month charged
after cancellation (the first month was legitimate, the second was not) and reimbursement for the
$10 cancellation fee (with no mention of the FIF or other fees), the average Zik objector would
receive about $36.76 in contract damages.  This is only a few dollars more than the average
claimant in the case, and several dollars *less* than the average Gym Cancel Subclass member, a
group in which each member of the Zik objectors' proposed class would necessarily be a part.
The court noted the closeness of the value of the settlement to the average class member and the
expected damages of the average Zik objector and correctly found that this was an indicator of
the settlement's fairness.

Rejecting the Zik objectors' argument that the settlement was unfair owing to its lack of
individual damages calculations, the court found it appropriate to consider the risks of the
litigation going forward and the costs and delays that would likely result from a settlement in
which it was required to calculate and verify individual damage awards for the approved
claimants, including those for which Global had no records.  Given the close approximation of
the payout to a typical Zik plaintiff's actual damages and the costs involved in individual
calculations, the court could reasonably find that this weighed in favor of approving the
settlement.

The Zik objectors also fail to present meaningful factual support for their argument that
class counsel failed to extract sufficient value for their plaintiffs' possible Kentucky Health Spa
Act (KHSA) claims.  Instead they rely on class counsel's testimony in *Seeger* about the potential

value of those claims.  But as the Zik objectors acknowledge, the *Robins* court found no value in the plaintiffs' contract-based KHSA claims.  *Robins*, 838 F. Supp. 2d at 650–51.  And the dearth of caselaw about the Act's other provisions make its utility difficult to predict.  Though the Zik objectors' briefing on appeal is vocal about the value of the relief attainable under the KHSA, they fail to provide detail or offer a theory of how the statute would be applied.

At the fairness hearing, the Zik objectors noted that the KHSA requires spas to register the costs of their membership plans with the Kentucky Attorney General, and that if they fail to register and provide the member a list of costs, the member is entitled to void the contract and obtain disgorgement of any difference.  The Zik objectors hypothesize that a Kentucky member charged $39.99 per month for four years of membership when the plan registered with the Kentucky Attorney General called for a charge of $29.99 per month would be entitled to damages of $480 ($10/month).

Class counsel countered that:

[T]here is no situation of Kentucky Health Spa members signing contracts for $49 when the contract was actually $29.  We have all of that data from Urban Active's third party vendor software because we subpoenaed it, and we through our IT staff have done technical analysis of that data.  And the vast majority of the cases, which we would put forth as violations of the Kentucky Health Spa Act actually show that Urban Active sold memberships for less than what the price was registered with the Kentucky Attorney General. So, again, that brings us straight back to the equitable argument, that while we are confident that we can prove a violation, we have significant hurdles in proving damages in excess of what we already negotiated as part of the settlement . . . .

(R. 139, PageID 2782.)   The court appropriately found significance in the Zik objectors' acknowledgement that class counsel "devoted a large percentage of [its] work . . . to ESI discovery to be used for the purpose of proving the KHSA claims."  (R. 141, PageID 2846 (citing R. 118, PageID 1935).)  This suggests that the KHSA claims were adequately developed, and that class counsel considered the likelihood of success on the merits of those claims.  And though the Zik objectors litigated their case for over three years, there does not appear to be anything in their briefing or in the record demonstrating that their hypothetical Kentucky class member who was overcharged $10/month exists, or that they have the factual basis to assert a viable KHSA claim on another theory.

As the court below noted, in the context of determining whether to approve a class action consent decree, we have held that:

> A court may not withhold approval simply because the benefits accrued from the decree are not what a successful plaintiff would have received in a fully litigated case. A decree is a compromise which has been reached after the risks, expense, and delay of further litigation have been assessed. Class counsel and the class representatives may compromise their demand for relief in order to obtain substantial assured relief for the plaintiffs' class.

*Williams v. Vukovich*, 720 F.2d 909, 922 (6th Cir. 1983) (internal citations omitted). Given that the relief sought achieved a number roughly equivalent to the extra month of dues charged and the cancellation fee the Zik objectors seek, while avoiding the costs and risk of additional litigation, there was merit to the settlement. *Williams* also cautioned that:

> Significantly, however, the deference afforded counsel should correspond to the amount of discovery completed and the character of the evidence uncovered. The court should insure that the interests of counsel and the named plaintiffs are not unjustifiably advanced at the expense of unnamed class members. Objections raised by members of the plaintiff class should be carefully considered.

*Williams*, 720 F.2d at 923 (internal citations omitted). As discussed above, class counsel has engaged in ample discovery and motion practice for a period of years, and specifically focused on the Kentucky Health Spa Act claims. There is therefore reason to believe that some deference is warranted. This case is a far cry from *Seeger* or *Pampers*, which were said to have settled before conducting discovery or having an opportunity to understand the relative strengths and weaknesses of their cases.

The Zik objections were carefully considered during the Fairness Hearing and in the orders of the lower court. Having failed to put forth any evidence suggesting that their proposed class's claims and—very importantly—realistic anticipated recovery are significantly different from what was obtained here, we conclude that the district court acted within its discretion when determining that the settlement was fair despite the Zik objectors' assertions.

## C. The Zik objectors' attorney's fee request

The Zik objectors argue that the district court erred in refusing their request for fees. This court reviews a district court's award or denial of attorney's fees for an abuse of discretion.

*Bowling*, 102 F.3d at 779.  "Fees and costs may be awarded to the counsel for objectors to a class action settlement if the work of the counsel produced a beneficial result for the class."  *Olden v. Gardner*, 294 F. App'x 210, 221 (6th Cir. 2008); *see also Lonrado v. Travelers Indem. Co.*, 706 F. Supp. 2d 766, 803–04 (N.D. Ohio 2010) ("Sixth Circuit case law recognizes that awards of attorneys' fees to objectors may be appropriate where the objector provided a benefit to the class by virtue of their objection.").  Here, the district court found that because none of the Ziks' objections had merit, they had not provided the necessary benefit to the class to receive fees.  Though the Zik objectors also argue that counsel provided some benefit to the class by objecting to the prior settlement in *Seeger* and helped drive the defendant to settle by advancing the *Zik* case, they have provided no authority indicating that the district court must award attorney's fees to counsel whose work in an entirely separate litigation may have provided some benefit to a class in the litigation before the court.  Accordingly, we conclude that the district court acted within its discretion in denying attorney fees to the Zik objectors.

## III.  CONCLUSION

For the reasons stated above, we AFFIRM the district court's order.

———————————

## DISSENT

———————————

CLAY, Circuit Judge, dissenting.  Contrary to the focus of the majority opinion, this is not primarily a case about the theoretical policy considerations that should be taken into account in order to determine or apportion the economic or societal benefits of this form of consumer class action litigation.  What the majority misses in its survey of the case law and academic literature is that the court below abused its discretion in approving a class action settlement which fails to adequately protect the interests of class members and unduly enriches class counsel at the expense of their own clients.

Rule 23 imposes obligations on class representatives, class counsel, and the district court to protect the interests of absent class members: class representatives may be appointed only if they will "fairly and adequately protect the interests of the class"; class counsel has the "duty" to do the same; and a court may approve a settlement "only after a hearing and on finding that it is fair, reasonable, and adequate."  Fed. R. Civ. P. 23(a)(4), (g)(4), (e)(2).  We have previously described class counsel's duty as "fiduciar[ies]" of the class, whose performance as such "courts must carefully scrutinize."  *In re Dry Max Pampers Litig.*, 724 F.3d 713, 718 (6th Cir. 2013); *see also Rawlings v. Prudential-Bache Properties, Inc.*, 9 F.3d 513, 516 (6th Cir. 1993).  Because class counsel fell short of their obligations both under Rule 23 and as fiduciaries, and the district court failed to exercise the necessary careful scrutiny to determine that the settlement was fair, reasonable and adequate, I respectfully dissent.

When deciding whether to approve a class action settlement, courts look to several factors:

> (1) the risk of fraud or collusion; (2) the complexity, expense and likely duration of the litigation; (3) the amount of discovery engaged in by the parties; (4) the likelihood of success on the merits; (5) the opinions of class counsel and class representatives; (6) the reaction of absent class members; and (7) the public interest.

*Int'l Union, United Auto., Aerospace, & Agr. Implement Workers of Am. v. Gen. Motors Corp.*, 497 F.3d 615, 631 (6th Cir. 2007).  The circumstances of this settlement, including its disproportionate fee award, strongly suggest an abuse of discretion by the district court in approving the settlement, including the fee award.

The Ninth Circuit warned that courts "must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interests and that of certain class members to infect the negotiations."  *In re Bluetooth Headset Products Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011).  *Bluetooth* gave three examples of such signs: (1) "when counsel receive a disproportionate distribution of the settlement"; (2) "when the parties negotiate a 'clear sailing' arrangement[1] providing for the payment of attorneys' fees separate and apart from class funds, which carries 'the potential of enabling a defendant to pay class counsel excessive fees and costs in exchange for counsel accepting an unfair settlement on behalf of the class'"; and (3) "when the parties arrange for fees not awarded to revert to defendants rather than be added to the class fund."  *Id.* (internal citations omitted).  All three warning signs are present in this case.

Class counsel, who were also class counsel in the court below, argue that we must consider the compensation to the class and the award of attorney's fees separately.  They obtained what they consider significant relief for the class—which, in congratulating themselves, they label "exceptional" at least five times in their brief—and therefore believe that they have rightly earned a hefty fee award.  Objector Joshua Blackman, however, urges us to view the settlement and the fee award as inseparable.  Because the class recovery was dwarfed by the fee award class counsel ultimately received—a fee award negotiated behind closed doors—the settlement and fee award represent an unconscionable elevation of the interests of class counsel over those of the class that should be rejected under *Dry Max Pampers*.  *See* 724 F.3d at 717 (rejecting $2.73 million attorney fee award where the class itself received no cash whatsoever).  To evaluate these arguments, both separately and together, it is necessary to retrace the relief, the settlement, the fee award, and the role of the district court.

---

[1]A so-called "clear sailing" provision is an agreement on the amount of attorney's fees whereby "the party paying the fee agrees not to contest the amount to be awarded by the fee-setting court so long as the award falls beneath a negotiated ceiling."  *Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402, 425 (6th Cir. 2012).

At the time of the fairness hearing in this case, the deadline to file claims had passed, and although some of the payments were still being finalized, the claims administer, Jeffrey Dahl, had filed a declaration, docketed in the record, that identified 49,810 "Allowed Claimants"[2] out of a total gym membership of 605,735.  (R. 136-1, Dahl Decl. of Feb. 11, 2014 at Page ID 2659.)  Thus, when the fairness hearing took place, the district court was on notice that only some 8.2% of class members had obtained monetary relief.  Dahl testified at the fairness hearing that the median response rate in a study of consumer class actions was 5-8%.  (R. 139, Fairness Hr'g Tr. at Page ID 2722.)   These figures are consistent with the recent observation of the Third Circuit that "consumer claim filing rates rarely exceed seven percent, even with the most extensive notice campaigns."  *Sullivan v. DB Investments, Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (en banc) (quoting finding of special master).  Dahl's testimony, and Plaintiffs' argument, might be recharacterized to ask whether the district court, aware of the low customary response rate in consumer class actions, should have approved a settlement in which 91.8% of the class—whose interests class counsel were under a fiduciary obligation zealously to represent—is left with absolutely nothing.

The majority opinion's argument regarding the propriety of the district court's approval of the settlement is predicated entirely on acceptance of the status quo.  Focusing on the average payment amount to a claimant—and not the average payout spread across all class members—the magistrate judge described the recovery, which by that point had been fixed at $1,593,240, as "substantial."[3]  (R. 141, Report and Recommendation at Page ID 2844.)  And perhaps this case may exceed the average claim rate of consumer class actions.   However, there is another interpretation of class counsel's performance in this scenario: class counsel spent years litigating this case and, as a result of the claims process in whose design they participated, their clients were left with little to show for their counsel's efforts.  From this perspective, class counsel did poorly in absolute terms.

---

[2]This was later amended to 49,808 in a later declaration from Dahl, docketed between the fairness hearing and the magistrate judge's report and recommendation. (R. 140-1, Dahl Decl. of Mar. 21, 2014 at Page ID 2797.)

[3]Unclaimed funds were to be redistributed pro rata to claimants only if the total payout were less than $1.3 million, and were capped at that amount.  Class counsel also did not see fit to include a *cy pres* beneficiary, as there often is in cases like this; all unclaimed funds were to revert to Defendant.  *Compare Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 351 (6th Cir. 2009) (awarding unclaimed funds to a nearby school district).

In the district court's view, this purportedly substantial recovery and the protracted proceedings—which had already dragged on for nearly three years by the time of the report and recommendation—were enough to justify class counsel's requested $2,390,000 fee award. (*Id.* at Page ID 2831–32, 2835–36, 2841.)  The district court first justified its findings under the lodestar approach, a method of compensating counsel based on hours of work at the applicable rates (and sometimes a multiplier), and then performed a so-called "percentage of the fund cross-check" whereby it calculated the percentage of the fee award as a proportion of its valuation of an $8.5 million constructive common fund.[4]  *See Rawlings*, 9 F.3d at 516–17 (approving both lodestar and percentage-of-the-fund methods in this Circuit).  Such cross-checks against the other method are not uncommon.  *See Van Horn v. Nationwide Prop. & Cas. Ins. Co.*, 436 F. App'x 496, 500 (6th Cir. 2011); *Bowling v. Pfizer, Inc.*, 102 F.3d 777, 780 (6th Cir. 1996).  Even if Blackman had not raised issues about the allocational fairness of this fee relative to the class payout, the fee award could not be sustained under either of these methodologies.

Although "the lodestar method has been criticized for being too time-consuming of scarce judicial resources," the "listing of hours spent and rates charged provides greater accountability." *Rawlings*, 9 F.3d at 516.  Class counsel failed to submit the voluminous records contemplated by *Rawlings* and instead submitted perfunctory, impenetrable bullet-point lists in two affidavits in which they simply asserted that they had kept contemporaneous records.  (R. 114-1, McCormick Decl. at Page ID 1865–80; R. 114-2, Troutman Decl. at Page ID 1881–1903.) To these bullet lists were appended the lengthy curriculum vitae of class counsel. (*Id.*)  With no such contemporaneous records actually submitted by class counsel, the message to the district court was obvious: we are experienced litigators; just trust us that we did this work.  The district court took class counsel at their word, although it chided counsel that "the best practice may have been to submit more detailed records of the costs and time expended in the litigation." (R. 141, Report and Recommendation at Page ID 2870.)

---

[4]District courts are required to explain their reasons for "adopting a particular methodology and the factors considered in arriving at the fee." *Moulton*, 581 F.3d at 352.  Such explanations often discuss the following factors: "(1) the value of the benefit rendered to the plaintiff class; (2) the value of the services on an hourly basis; (3) whether the services were undertaken on a contingent fee basis; (4) society's stake in rewarding attorneys who produce such benefits in order to maintain an incentive to others; (5) the complexity of the litigation; and (6) the professional skill and standing of counsel involved on both sides." *Id.*

Confronted with counsel's uncorroborated sworn statements, the district court should not have been so trusting.  This Circuit places the "burden of providing for the court's perusal a particularized billing record" on the party seeking fees.  *Imwalle v. Reliance Med. Products, Inc.*, 515 F.3d 531, 553 (6th Cir. 2008) (quoting *Perotti v. Seiter*, 935 F.2d 761, 764 (6th Cir. 1991)) (upholding fee award where counsel "submitted 52 pages of detailed, itemized billing records that specify, for each entry, the date that the time was billed, the individual who billed the time, the fractional hours billed (in tenths of an hour), and the specific task completed").  Reviewing case law, *Imwalle* held that "[a]lthough counsel need not record in great detail each minute he or she spent on an item, the general subject matter should be identified."  515 F.3d at 553 (citations omitted).  District courts, *Imwalle* noted, have reduced fee awards "where billing records 'lumped' together time entries under one total so that it was 'impossible to determine the amount of time spent on each task.'"  *Id.* (quoting *Cleveland Area Bd. of Realtors v. City of Euclid*, 965 F. Supp. 1017, 1021 (N.D. Ohio 1997)).  In the bullet points at issue here, there was no description of the specific task or of the subject matter—apart, of course, from what counsel simply termed the "Litigation."  For example:

- I[, Thomas McCormick, class counsel,] have 11 years of experience in handling complex litigation and billed at my standard hourly rates of $260 per hour in 2011, $350 in 2012; and $375 in 2013.  My time constitutes over 52% of the time billed by Vorys in the Litigation.

(R. 114-1, McCormick Decl. at Page ID 1868.)  Such "documentation" is completely inadequate and should not have been accepted, especially coming from attorneys who touted their experience in the succeeding pages.  *Cf. McCombs v. Meijer, Inc.*, 395 F.3d 346, 360 (6th Cir. 2005) (affirming fee award where the district court found that "*entries* made by [the plaintiff's] counsel were sufficient even if the description *for each entry* was not explicitly detailed") (emphases added).  In approving the $2.39 million fee award, the magistrate judge relied on this deficient recitation and the oral representation of class counsel that the lodestar by the time of the fairness hearing was "just shy of $2.8 million."  (R. 141, Report and Recommendation at Page ID 2871.)  That the fee ultimately awarded was below its orally asserted lodestar should not, alone, save it.  *See, e.g.*, *Hensley v. Eckerhart*, 461 U.S. 424, 433–37 (1983) (allowing district court to reduce lodestar amount for inadequate documentation and limited success).

In performing its percentage-of-the-fund cross-check, the district court also committed legal error because it miscalculated the value of the fund. Following the approach of *Lonardo v. Travelers Indem. Co.*, 706 F. Supp. 2d 766 (N.D. Ohio 2010), it chose as its valuation the midpoint of the $1,593,240 actual payout to class members and the "Available Benefit" of $15,500,430, the maximum payout if all class members were to file claims, for a final valuation of $8,546,835. (R. 141, Report and Recommendation at Page ID 2875.) It then added administration costs ($496,259) and the attorney's fee itself for a "Total Class Benefit" of $11,433,094, of which the requested fee award was 20.9%—an acceptable percentage, in its view. (*Id.*)

Not only has no Circuit in the country approved of such a methodology, it is premised on the faulty and fictional premise that counsel should be given credit for compensation that the class did not receive—in other words, for millions of dollars that would never leave Defendant's coffers. We have long held that "[w]hen awarding attorney's fees in a class action, a court must make sure that counsel is fairly compensated for the amount of work done *as well as for the results achieved*." *Rawlings*, 9 F.3d at 516 (emphasis added). *Rawlings* further stated that "the percentage of the fund method more accurately reflects the results achieved." *Id.* With the claims deadline months past, the district court knew that neither the $15.5 million "Available Benefit" nor the $8.5 million midpoint figure could ever materialize. Yet the district court could have predicted this beforehand simply because it was presiding over a claims-made consumer class action, which would have an extremely low response rate, as courts have begun to recognize. *See Sullivan*, 667 F.3d at 329 n.60.

This is the predictable "economic reality" of claims-made class actions, and one that we must acknowledge. *Dry Max Pampers*, 724 F.3d at 717 (quoting *Strong v. BellSouth Telecomms., Inc.*, 137 F.3d 844, 849 (5th Cir. 1998)). The defense bar, at least, recognizes this; among defense counsel, low participation rates under claims-made class action settlements are both common knowledge and a selling point: class members recover—and a defendant pays— much less when class members opt in than when a defendant disburses funds directly to class

members.[5]  The problem is not, as the majority seems to think, with settlement procedures that are intended to discourage claims.  Even without overt efforts on the part of defense counsel to thwart claims, opt-in claims procedures naturally depress response rates to single-digit percentages for the very predictable reason that class members simply are not sufficiently incentivized to bother to opt in.

The Seventh Circuit rightly rejected a hypothetical total maximum payout of $14.2 million in a consumer class action in which $1 million was paid out as "fiction," holding that the district court should have computed the percentage of the fund by calculating the "'ratio of (1) the fee to (2) the fee plus what the class members received.'"  *Pearson v. NBTY, Inc.*, 772 F.3d 778, 781 (7th Cir. 2014) (quoting *Redman v. RadioShack Corp.*, 768 F.3d 622, 630 (7th Cir. 2014)).[6]  *See also Strong*, 137 F.3d 844.  This is a simple, common-sense rule: in assessing the fairness of the division of the payout between class counsel and the class, courts should look to the amounts actually pocketed by both parties.  Thus, the district court should have used the $1,593,240 actually paid as the benefit to the class for the calculation of its fee.

Yet if valuations based on counterfactual maximum payouts are fiction, they are the sort of fiction in which courts, including the Supreme Court some decades ago, have indulged.  In *Boeing Co. v. Van Gemert*, 444 U.S. 472, 480 (1980), the Supreme Court held that the "right to share the harvest of the lawsuit upon proof of their identity, whether or not they exercise it, is a benefit in the fund created by the efforts of the class representatives and their counsel."  *Accord Masters v. Wilhelmina Model Agency, Inc.*, 473 F.3d 423, 437 (2d Cir. 2007).  Although *Boeing* has never been directly overruled, it has hardly been met with universal acclaim.  In a statement respecting the denial of a petition for certiorari in *Int'l Precious Metals Corp. v. Waters*, 530 U.S. 1223, 120 S.Ct. 2237 (2000), Justice O'Connor expressed serious misgivings about a fee award of $13,333,333 based on a reversionary fund of $40 million, the unclaimed portion of which (all but the $6,485,362.15 actually paid out to the class) would revert to the defendant:

---

[5]Wystan M. Ackerman, *Class Action Settlement Structures*, 63 Federation of Defense and Corporate Counsel Quarterly 35 (2012) (claiming that the "principal advantage" of opt-in, claims-made settlements from the perspective of the defense is that defendants would pay much less than if they simply mailed out checks).

[6]On this basis, the court also held, correctly, that "administrative costs should not have been included in calculating the division of the spoils between class counsel and class members. Those costs are part of the settlement but not part of the value received from the settlement by the members of the class."  *Id.*

> We had no occasion in *Boeing*, however, to address whether there must at least be some rational connection between the fee award and the amount of the actual distribution to the class. The approval of attorney's fees absent any such inquiry could have several troubling consequences. Arrangements such as that at issue here decouple class counsel's financial incentives from those of the class, increasing the risk that the actual distribution will be misallocated between attorney's fees and the plaintiffs' recovery. They potentially undermine the underlying purposes of class actions by providing defendants with a powerful means to enticing [sic] class counsel to settle lawsuits in a manner detrimental to the class.

120 S.Ct. at 2237–38. The Advisory Committee notes to the 2003 amendments to Rule 23 that "[o]ne fundamental focus" of a district court's analysis "is the result actually achieved for class members, a basic consideration in any case in which fees are sought on the basis of a benefit achieved for class members. . . . For a percentage approach to fee measurement, results achieved is the basic starting point." Fed. R. Civ. P. 23, 2003 Amend., Note to Subdivision 23(h). The Advisory Committee had no power to abrogate *Boeing*, but it nonetheless distinguished benefits from actual results.[7]

In *Pearson*, the Seventh Circuit also found *Boeing* distinguishable from constructive common fund cases because *Boeing* was actually litigated to a judgment of $3,289,359 plus interest, and "[n]othing in the court's order made Boeing's liability for this amount contingent upon the presentation of individual claims." 772 F.3d at 782 (quoting *Boeing*, 444 U.S. at 479 n.5). In a case involving an actual, quantifiable common fund with a *cy pres* beneficiary, we valued "settlement proceeds," which, by virtue of the *cy pres* beneficiary, the defendant had to pay out, as the amount received by both the class members and the *cy pres* beneficiary for calculation of attorney's fees. *Moulton v. U.S. Steel Corp.*, 581 F.3d 344, 352 (6th Cir. 2009). Such valuations are intuitive when courts are forced to calculate liabilities or a defendant actually agrees to pay out a certain sum. In so-called "constructive common fund" cases where the vast majority of class members do not claim their awards, but in which unclaimed money remains with the defendant, district courts should not be allowed to engage in unreasonable,

---

[7]The Note's caution that "in some class actions the monetary relief obtained is not the sole determinant of an appropriate attorney fees award," for which it cites *Blanchard v. Bergeron*, 489 U.S. 87, 95 (1989), appears to refer to the irrefutable fact that class counsel should have an incentive to seek and be compensated for obtaining injunctive or declaratory relief, and does not necessarily support basing a fee award on funds never actually claimed or paid out.

counterfactual valuations of the fund—even supposed compromise measures, as the district court did here.

The correct valuation of the benefit of the class at $1.59 million leads naturally to Blackman's preferred approach of treating the $1.59 million class payout in the context of the $2.39 million attorney fee award. In a case involving a "clear sailing" agreement not to contest fees before the court, the Eighth Circuit described settlement terms and a negotiated fee amount as a "package deal." *Johnston v. Comerica Mortgage Corp.*, 83 F.3d 241, 246 (8th Cir. 1996). By *Johnston*'s sound logic, the fee award and the settlement must be considered together because the fee amount was, for all intents and purposes, negotiated between the parties and memorialized in the settlement agreement, as the other settlement terms were. Courts have frequently expressed "the fear that class actions will prove less beneficial to class members than to their attorneys," as here. *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 524 (1st Cir. 1991). Courts' concerns are twofold—not only might class counsel benefit more than the class, but they might also benefit at the expense of the class. A defendant, concerned only with its total payout, has little incentive to be concerned with "the allocation between the class payment and the attorneys' fees." *In re Gen. Motors Corp. Pick-Up Truck Fuel Tank Products Liab. Litig.*, 55 F.3d 768, 820 (3d Cir. 1995). *See also Dry Max Pampers*, 724 F.3d at 717; *Strong*, 137 F.3d at 849–50. *Weinberger* recognized that class counsel could, in essence, sell out its client: "the lawyers might urge a class settlement at a low figure or on a less-than-optimal basis in exchange for red-carpet treatment on fees." 925 F.2d at 524.

To decide whether that was the case here, it is worth doing a little arithmetic. The amount that the attorneys received exceeded the amount the class received by just over 50%; put differently, calculating the "relevant" ratio that *Pearson* and *Redman* proposed—which compares the amounts received by class counsel and the class as a percentage of the defendant's total payout, exclusive of administration costs—reveals that the attorney's fees represent 60% of Defendant's payout. *See Redman*, 768 F.3d at 630 (rejecting fee award where 55% of the defendant's payout went to attorney's fees). Even though the $1.59 million paid to the class was a more substantial result than the "perfunctory," non-cash relief at issue in *Dry Max Pampers*, which Blackman concedes, that case compels us to consider the allocation of relief between class

counsel and the class. 724 F.3d at 718. Because of its concerns about the misallocation of relief between class counsel and the class, *Dry Max Pampers* rejected a settlement that "g[ave] preferential treatment to class counsel" as demonstrating "disregard" of their "fiduciary responsibilities." *Id.* A fee award that exceeds the recovery of the class by 50%, as the $2.39 million attorney fee award granted by the district court in this case did, seemingly constituted a windfall to the attorneys that the district court should not have allowed in the proper exercise of its discretion.

Two particular clauses in the settlement relating to the fee award are of additional concern: the "clear sailing" clause, whereby Defendant agreed not to contest any attorney's fee request up to $2,390,000, and the "kicker" clause, which stipulated that if the district court were to award less than $2,390,000 in attorney's fees, the unpaid balance would revert to Defendant. (*See* R. 97-1, Settlement, at Page ID 1499–1500.) Blackman sees both these clauses as evidence of yet further "self-dealing" on the part of class counsel at the expense of the class. (Blackman Br. at 17.) The clear sailing clause required Defendant to file a notice with the district court at least 21 days before the fairness hearing stating that it did not oppose the requested fee amount up to the $2,390,000 cap. The kicker clause, in seemingly uncontroversial legalese, stipulated that whatever payment the district court approved "shall constitute full satisfaction of Defendant's obligations" to pay the attorney's fee. (R. 97-1, Settlement, at Page ID 1499.) A clause two paragraphs prior, stating that "such payments shall have no effect on . . . the Class Payment" precluded any potential pro rata distribution of unpaid attorney's fees—and sent such unpaid fees right back to Defendant. (*Id.*)

Plaintiffs defend the use of the clear sailing clause, and argue that we have upheld clear sailing agreements in the past, as in *Gooch v. Life Inv'rs Ins. Co. of Am.*, 672 F.3d 402 (6th Cir. 2012), which held that "not every 'clear sailing' provision demonstrates collusion." *Id.* at 426 (affirming use of clear sailing provision "where the 'clear sailing' provision caps attorney compensation at approximately 2.3% of the total expected value of the settlement to the class members"). However, as *Weinberger* acknowledged, clear sailing agreements necessarily suggest conflict between the class and its counsel, for "the very existence of a clear sailing provision increases the likelihood that class counsel will have bargained away something of

value to the class." 925 F.2d at 525 (citing *Malchman v. Davis*, 761 F.2d 893, 908 (2d Cir. 1985) (Newman, J., concurring), *abrogated on other grounds by Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997).

Plaintiffs also accuse Blackman of predicating his argument "on the erroneous factual assumption that negotiations concerning attorneys' fees affected the relief available to the class," and point to the district court's finding that class counsel negotiated the fee award only after agreeing to the other settlement terms.  (Pls. Br. at 47.)  In support of their fee request, class counsel from the two lead firms submitted affidavits to the district court in which they averred the following:

> The parties did not begin negotiations on attorneys' fees and costs until after the substantive relief was agreed upon between Plaintiffs and Urban Active.  Thus, it is clear that the Settlement resulted from arms'-length negotiation and fair dealing with the named Plaintiffs and classes' [sic] best interests in mind.

(R. 97-10, Decls. of Thomas McCormick and Mark Troutman at Page ID 1605, 1610).  While the blatantly self-serving and conclusory language of the second sentence might have raised serious red flags, the district court held that the risk of collusion was "lessened" because of the order of negotiations.  (R. 141, Report and Recommendation at Page ID 2850.)  In *General Motors*, the Third Circuit declined to "place such dispositive weight on the parties' self-serving remarks" about counsel's assurances about the order in which the settlement and fees had been negotiated. 55 F.3d at 804.

*General Motors* also expressed skepticism about this nearly simultaneous form of negotiation, with no intervening court involvement.  *Id.* (citing *Court Awarded Attorney's Fees, Report of the Third Circuit Task Force,* 108 F.R.D. 238 (1985)) ("even if counsel did not discuss fees until after they reached a settlement agreement, the statement would not allay our concern since the *Task Force* recommended that fee negotiations be postponed until the settlement was judicially approved, not merely until the date the parties allege to have reached an agreement"). *See also Pearson*, 772 F.3d at 786 (dismissing similar arguments as "not realistic").  Quoting the same Third Circuit task force report, the Ninth Circuit explained that "[e]ven if the plaintiff's attorney does not consciously or explicitly bargain for a higher fee at the expense of the beneficiaries, it is very likely that this situation has indirect or subliminal effects on the

negotiations." *Staton v. Boeing Co.*, 327 F.3d 938, 964 (9th Cir. 2003). Class counsel cannot be unaware that fee negotiations are nigh—that is, after all, how plaintiffs' lawyers finance their work—and that knowledge simply might cause them to push less hard for the interests of their clients, even if they fail to realize that they are doing so.

With subconscious or even overt collusion a serious risk, the district court possesses a vital role in monitoring potential collusion. The Ninth Circuit held in *Bluetooth* that "when confronted with a clear sailing provision, the district court has a *heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class*, being careful to avoid awarding unreasonably high fees simply because they are uncontested." 654 F.3d at 948 (emphasis added and citations omitted). *Gooch*, the only Sixth Circuit case to date to have considered the validity of clear sailing provisions, did not explicitly adopt the Ninth Circuit requirement of heightened scrutiny of such provisions, but *Bluetooth* was correct that district courts must be especially wary when the parties agree not to contest fees in class actions. *See Gooch*, 672 F.3d at 426. To its credit, the district court did not simply "ignore[] the clear sailing fee provision," as the court below did in *Bluetooth*, and instead discussed it at some length. 654 F.3d at 948. The court below nonetheless greatly underestimated how the very presence of the clear sailing provision was itself evidence of possible collusion, and thereby cast doubt on the fairness of the settlement as a whole, including the adequacy of class counsel's representation. *See* Rule 23(e)(2), (g)(4).

The inclusion of the so-called "kicker clause," which allowed unpaid attorney's fees to revert to Defendant, only "amplifies the danger of collusion already suggested by a clear sailing provision." *Bluetooth*, 654 F.3d at 949. *Bluetooth* recognized that these two types of suspicious clauses are intimately related: "[t]he clear sailing provision reveals the defendant's willingness to pay, but the kicker deprives the class of that full potential benefit if class counsel negotiates too much for its fees." *Id.* At some point in the settlement negotiations, the parties presumably wished to resolve what would happen if the district court decided to award less than the $2.39 million cap, and agreed that, should the district court do so, any remaining funds would revert to Defendant—rather than being distributed to class members. The district court reasoned that this clause was in no way problematic and had no practical effect because class counsel were

awarded the full $2.39 million in attorney's fees. (R. 141, Report and Recommendation at Page ID 2852.) Yet as with the clear sailing clause, the district court overlooked the extent to which the inclusion of this provision in the agreement may have been the product of compromised representation by class counsel who were willing to deprive their clients of Defendant's full set-aside for fees, so long as they themselves were paid off. The Seventh Circuit rightly held that it is impossible to discern any "justification for a kicker clause," which should be subject to a "strong presumption of [] invalidity." *Pearson*, 772 F.3d at 787.

Consumer class actions may indeed confer societal benefits. Yet allowing such purportedly desirable litigation to remain economically viable should not guide a district court's fairness inquiry under Rule 23. Class counsel are fiduciaries of the class, not of the public at large, and should not be able to justify a poor result for their clients because of the nobility of their mission. The majority cites some scenarios in which "significant compensation to class members is out of reach," such as small claims and unavailable contact information for class members. Indeed, acquiescence to the dysfunctional procedures associated with the status quo of opt-in settlements fails to provide "an incentive to design the claims process in such a way as will maximize the settlement benefits actually received by the class." *Id.* at 781. In fact, the desirable deterrent effect on defendants' behavior might even be expected to increase as the payout to class members grows.

The "package deal" that this settlement, including its disproportionate fee award, offered to the class was a bad one relative to what it offered class counsel. *See Johnston*, 83 F.3d at 246. The disparity is so great that it calls into question whether class counsel may have violated their "fiduciary obligations" to class members. *Dry Max Pampers*, 724 F.3d at 718. As in *Dry Max Pampers*, "[t]he reality is that this settlement benefits class counsel vastly more than it does the consumers who comprise the class." *Id.* at 721. Accordingly, it should have flunked any fairness inquiry the district court made under Rule 23(e).

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

Nos. 14-3761/3798

AMBER GASCHO, on behalf of herself and all others
similarly situated, et al.,
                    Plaintiffs - Appellees,

    v.

GLOBAL FITNESS HOLDINGS, LLC,
                 Defendant - Appellee,

ROBERT J. ZIK, APRIL ZIK, and
JAMES MICHAEL HEARON (14-3761);
JOSHUA BLACKMAN (14-3798),
                Objectors - Appellants.

**FILED**
May 13, 2016
DEBORAH S. HUNT, Clerk

Before: KEITH, CLAY, and STRANCH, Circuit Judges.

**JUDGMENT**

On Appeal from the United States District Court
for the Southern District of Ohio at Columbus.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION WHEREOF, it is ORDERED that the order of the district court is
AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

_____
Deborah S. Hunt, Clerk