**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**AMBER GASCHO, et al.,**
**On behalf of themselves and all**
**others similarly situated,**

              **Plaintiffs,**            **Case No. 2:11-cv-436**

      **v.**                     **CHIEF JUDGE EDMUND A. SARGUS, JR.**
                                      **Magistrate Judge Norah McCann King**

**GLOBAL FITNESS HOLDINGS, LLC,**

              **Defendant.**

## OPINION AND ORDER

This matter is before the Court on Plaintiffs' Motion for a Preliminary Injunction, which seeks to enforce a settlement agreement entered as an Order of this Court. (ECF No. 163.) The Court granted Plaintiffs' Application for Temporary Restraining Order on April 19, 2017, which was reissued on April 24, 2017 and extended on May 8, 2017 for another 14 days. Plaintiffs are asking the Court to order Defendant and interested parties Laurence Paul and Royce Pulliam to show cause why they should not be held in contempt for violating the Settlement Agreement and Court Order requiring it to make payments to Class Counsel and Dahl Administration, LLC. (ECF No. 197.) The Court held a hearing on this matter on May 15, 2017 and issued an initial Preliminary Injunction extending the terms of the Temporary Restraining Order until a final ruling could be issued. For the reasons that follow, Plaintiffs' Motion for a Preliminary Injunction (ECF No. 163) is **GRANTED**.

Defendant, Global Fitness Holdings, LLC ("Global Fitness"), and individuals, Paul and Pulliam, have also filed motions to vacate the Temporary Restraining Order, (ECF Nos. 169, 171 and 174), which are now **DENIED as moot**.

## I.    BACKGROUND

Plaintiffs initiated this class action lawsuit on April 13, 2011, alleging claims of false and deceptive consumer practices, unconscionable consumer sales practices, and breach of contract, with some claims being dismissed in the Court's ruling on Defendant's Motion for Judgment on the Pleadings. (ECF No. 69.) Plaintiffs' claims are based on Defendant's billing practices arising out of Plaintiffs' gym memberships and personal training agreements at Urban Active gyms, which were owned by Global Fitness.

On September 5, 2012, Defendant Global Fitness and Sport & Fitness Clubs, Inc. ("LA Fitness") executed an Asset Purchase Agreement for the sale of substantially all of Global Fitness's assets for approximately $70 million. (Transcript of Preliminary Injunction Hearing ("Hearing Tr.") at 102:15–16, ECF No. 208; Asset Purchase Agreement, Plaintiffs' Deposition Exhibit 9; *see* Minute Entry for list of admitted exhibits, ECF No. 205.) As part of the sale, LA Fitness was required to make a holdback payment to Global Fitness, which Global Fitness received on April 25, 2014 in the amount of $10,044,374.31. (Plaintiffs' Deposition Exhibit 7 ("Pls. Dep. Ex. 7."), ECF No. 201-7.)

On October 10, 2012, Global Fitness initiated an action in the United States District Court for the Eastern District of Kentucky, *Global Fitness Holdings, LLC v. Federal Recovery Acceptance, Inc.*, Case No. 2:13-cv-204 (hereinafter the "*Paramount*" case). In *Paramount*, Global Fitness sought an injunction against Paramount, its billing services provider, to transfer necessary member information for the sale to LA Fitness scheduled for October 15, 2012. Because the information was not transferred in time, the closing was delayed until October 26, 2012, and as a result of the delay, LA Fitness exercised its rights to reduce the purchase price by roughly $9,000.000, for which Global Fitness is seeking in damages from Paramount. The

2

*Paramount* case was ultimately transferred to the District Court of Utah, and on August 29,

2013, Paramount filed counterclaims against Global Fitness alleging $4,599,125.04 in damages,

plus interest and attorneys' fees. (Defendant's Memorandum of Law ("Def. Mem.") at 2, ECF

No. 195.) The case remains pending. Despite the sale of its assets to LA Fitness, Global Fitness'

continued coordination of the sale and its involvement in both this case and in the *Paramount*

case. Global Fitness maintained a small staff of employees to oversee their information, interests,

and participation in the sale and litigation.

On September 12, 2013, the parties in this case reached a settlement and executed a

Settlement Agreement and Release. (Settlement Agreement and Release ("Settlement

Agreement"), ECF No. 97-1; Plaintiff's Deposition Exhibit 22.) Under the terms of the

Settlement Agreement, Defendant agreed to pay Plaintiffs' Counsel $2,390,000.00 in attorneys'

fees and Claims Administrator, Dahl Administration, LLC ("Dahl"), for the cost to administer

the settlement to claimants, estimated at approximately $500,000 to $600,000. (Plaintiffs'

Memorandum in Response to Def. Mem. ("Pls. Mem. in Opp.") at 2, ECF No. 203 (citing

Settlement Agreement).) Owner/Manager and former CEO of Global Fitness, Royce Pulliam,

executed the Settlement Agreement on behalf of Global Fitness. (Settlement Agreement at 27.)

The parties then filed a Joint Motion for Settlement Approval on September 18, 2013 (ECF No.

97.), which was preliminarily approved on September 30, 2013. In December, several

individuals ("Objectors") objected to the Settlement Agreement, opposing, *inter alia*, the amount

of fees to be paid to Plaintiffs' Counsel. (ECF Nos. 118, 122.) The matter was set for a fairness

hearing before Magistrate Judge King on February 13, 2014. On April 4, 2014, Judge King

issued a detailed Report and Recommendation on the fairness hearing and pending objections, in

which she found the Settlement Agreement to be fair and reasonable, including the amount of

3

attorneys' fees and costs. (ECF No. 141.)

Twenty-eight days later, on May 2, 2014, Defendant Global Fitness issued a "tax distribution" to its four Managers (Royce Pulliam, Tomi Anne Pulliam, Pulliam Fitness Corporation, and Laurel Crown Global Fitness Holdings, LLC) in the amount of $10,044.374.31, the exact amount that Global Fitness received from LA Fitness as a holdback payment the previous week on April 25, 2014. On July 16, 2014, Judge Smith adopted the Report and Recommendation. (ECF No. 146.) The Final Order approving the Class Action Settlement was filed the same day. (Final Order Approving Class Action Settlement ("Final Order"), ECF No. 147.) On August 14, 2014, Global Fitness issued another "tax distribution" to its Managers in the amount of $318,055.11.

The same Objectors who challenged the terms of the settlement agreement at the fairness hearing appealed this case. On May 13, 2016, the Sixth Circuit affirmed the ruling on the class, and the Objectors' petition for writ of certiorari was denied by the Supreme Court on February 21, 2017. Upon the final judgment, the parties were expected to perform in accordance with the terms of the Settlement Agreement. The Settlement Agreement defines the "Effective Date" to be after "the Final Order and Final Judgment and the order of dismissal with prejudice have been fully and finally affirmed by the highest court to which such appeal is taken." (Settlement Agreement at 4–5.)

Pursuant to the terms of the Settlement Agreement, Defendant Global Fitness was required to escrow amounts payable to the Class. The class has been paid in accordance with the Settlement Agreement ($1,633,240) from the funds held in escrow by Dahl. However, Defendant Global Fitness filed a notice with this Court on April 18, 2017 (2 days before the final payments were due) that it is unable to pay the class counsel's attorneys' fees, as well as the amount still

due to Dahl, approximately $300,000.[1]

Plaintiffs immediately filed the application for a temporary restraining order and motion for preliminary injunction seeking to freeze all assets and accounts of Global Fitness (including its primary principals Royce G. Pulliam and Laurence E. Paul). Plaintiffs are asking the Court to order Defendant to show cause why it should not be held in contempt for failure to comply with the Settlement Agreement and the Court's Order (ECF No. 197), and to enforce the Settlement Agreement and the Court's Final Approval Order and Final Judgment (ECF Nos. 147 and 148).

On May 15, 2017, the Court held a hearing at which testimony and evidence was presented on Plaintiffs' Motion for Preliminary Injunction. At the close of the hearing, the Court granted an initial preliminary injunction extending the terms of the earlier Temporary Restraining Order until this ruling is issued.

## II.    STANDARD OF REVIEW

The Court must consider four factors in determining whether to issue a preliminary injunction:

> (1) whether the movant has a strong or substantial likelihood of success on the merits; (2) whether the movant would suffer irreparable injury without the relief requested; (3) whether issuance of the injunction will cause substantial harm to others; and (4) whether the public interest will be served by issuance of the injunction.

*Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 432 (6th Cir. 2004). These four factors are "to be balanced, not prerequisites that must be met." *Hamad v. Woodcrest Condo. Assoc.*, 328 F.3d 224, 230 (6th Cir. 2003); *see also Capobianco, D.C. v. Summers*, 377 F.3d 559, 561 (6th Cir. 2004). Notwithstanding this balancing approach, the

---

[1] The parties have since agreed that Defendant will pay $100,000 of its remaining assets directly to Dahl. (ECF No. 190.)

5

likelihood of success and irreparable harm factors predominate the preliminary injunction inquiry.

The decision to issue a preliminary injunction lies within the sound discretion of the district court. *See Golden v. Kelsey-Hayes*, 73 F.3d 648, 653 (6th Cir. 1996). As noted by the Supreme Court and Sixth Circuit, "[t]he purpose of a preliminary injunction is merely to preserve the status quo until a trial on the merits can be held." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981); *Certified Restoration Dry Cleaning Network, L.L.C., v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007). The issuance of a preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban Co. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002).

### III.    DISCUSSION

Plaintiffs filed this Motion for Preliminary Injunction to prohibit Global Fitness and its principals Royce G. Pulliam and Laurence E. Paul from continuing to distribute, dissipate, and otherwise transfer assets, and ultimately to hold Defendant, Pulliam, and Paul in contempt of this Court's Final Order Approving Class Action Settlement. (Final Order, ECF No. 147.)

### A.    Likelihood of Success of the Merits

The Court must first determine whether Plaintiffs have shown a likelihood of success on the merits of its Motion for Order to Show Cause Why Defendants Should Not Be Held in Civil Contempt. (ECF No. 197.) Plaintiffs maintain that Defendant Global Fitness, as well as its principal Managers, Royce Pulliam and Laurence Paul, should be held in contempt for violation of the Court's order requiring it to pay Class Counsel and Dahl Administration pursuant to the terms of a Settlement Agreement entered into by the parties and approved by this Court. (*See*

Final Order.) Defendant argues that at the time Judge Smith issued the Final Order approving the Settlement Agreement, Global Fitness "had sufficient cash to pay all amounts of the Settlement Agreement" and "had sufficient resources to pay the class, the class representatives, and the proposed legal fees to Plaintiffs' counsel." (Def. Mem. at 3, 5.) However, continuing to operate the business to maintain the ongoing litigation, Defendant claims that it could no longer satisfy its obligations under the Settlement Agreement once the payments finally came due.

A decision on a motion for contempt lies within the sound discretion of the Court. *See Elec. Workers Pension Tr. Fund of Local Union # 58 v. Gary's Elec. Serv.*, 340 F.3d 373, 378 (6th Cir. 2003). While the contempt power should not be used lightly, the power "'is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed'" by law. *Id.* (quoting *Gompers v. Buck's Stove & Range Co.*, 221 U.S. 418, 450 (1911)). Failure to comply with a court order is sufficient grounds for demonstrating contempt. *See United States v. Conces*, 507 F.3d 1028, 1041 (6th Cir. 2007). Contempt proceedings are used to "enforce the message that court orders and judgments are to be complied with in a prompt manner." *Id.* "Judicial sanctions in civil contempt proceedings may, in a proper case, be employed for either or both of two purposes; to coerce the defendant into compliance with the court's order, and to compensate the complainant for losses sustained." *United States v. United Mine Workers of Am.*, 330 U.S. 258, 303–04 (1947).

In order to hold a litigant in contempt, the movant must produce clear and convincing evidence that shows that "he violated a definite and specific order of the court requiring him to perform or refrain from performing a particular act or acts with knowledge of the court's order." *NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 588 (6th Cir. 1987). Clear and convincing evidence is a not a light burden and should not be confused with the less stringent, proof by a

7

preponderance of the evidence. S*ee Consol. Coal Co. v. Local Union No. 1784, United Mine Workers of Am.*, 514 F.2d 763, 766 (6th Cir. 1975). Once the movant establishes his prima facie case, the burden shifts to the contemnor who may defend by coming forward with evidence showing that [it] is presently unable to comply with the court's order. *United States v. Rylander*, 460 U.S. 752, 757 (1983) ("Where compliance is impossible, neither the moving party nor the court has any reason to proceed with the civil contempt action. It is settled, however, that in raising this defense, the defendant has a burden of production."). To meet this production burden in this circuit "a defendant must show categorically and in detail why [it] is unable to comply with the court's order." *Rolex Watch U.S.A., Inc. v. Crowley*, 74 F.3d 716, 720 (6th Cir.1996). When evaluating a defendant's failure to comply with a court order, we consider whether the defendant "took all reasonable steps within [its] power to comply with the court's order." *Peppers v. Barry*, 873 F.2d 967, 969 (6th Cir. 1989).

    1.   Prima Facie Case of Contempt

       The Court finds that it is likely that Plaintiffs will prevail on establishing a prima facie case for contempt against Defendant Global Fitness. Plaintiffs have provided clear evidence that Global Fitness is currently in violation of "a definite and specific order of the Court" requiring it to pay Class Counsel $2.39 million and Dahl Administration its incurred costs in administering the Settlement to the Class. *See Cincinnati Bronze*, 829 F.2d at 588. The Settlement Agreement entered into by Defendant Global Fitness with Plaintiffs provided that "Defendant agrees to pay Plaintiffs attorneys' fees and litigation costs as Ordered by the Court, provided that such payment does not exceed two million three hundred ninety thousand dollar ($2,390,000.00)." (Settlement Agreement ¶ 9.1.)

       On July 16, 2014, Judge Smith issued a Final Order Approving Class Action Settlement,

which incorporated the terms of the Settlement Agreement and ordered the parties to comply with those terms. (Final Order ¶ 1.) If the terms of a settlement agreement are incorporated into a court order, "a breach of the agreement would be a violation of the order, and ancillary jurisdiction to enforce the agreement would therefore exist." *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 381 (1994). Accordingly, Defendant had a clear obligation under the Court's order to comply with the Settlement Agreement and pay Plaintiffs attorneys' fees when due.

Under the terms of the Settlement Agreement, Defendant's obligation to pay Plaintiffs' attorneys' fees became due within thirty days of "the Final Order and Final Judgment and the order of dismissal with prejudice have been fully and finally affirmed by the highest court to which such appeal is taken." (Settlement Agreement at 4–5.) The Objectors' motion for writ of certiorari was denied by the Supreme Court on February 21, 2017, and the time period to petition for rehearing expired twenty-five days later. Thus, as clarified by Judge Smith's March 1, 2017 Order, Defendant's obligation became due on April 20, 2017. (ECF No. 160.) On April 18, 2017, Defendant notified the Court that it had insufficient assets to comply with its obligations to pay Class Counsel. The due date has since passed and no payment has been made to Plaintiffs' Counsel to date. It is therefore likely that Plaintiffs will prevail in establishing a prima facie case of contempt on the basis that Defendant Global Fitness violated the Court's Order by failing to pay Plaintiffs' Counsel and Dahl.

2.  Global Fitness' Defense

After Plaintiffs have established the likelihood of success on their prima facie case, the burden then shifts to Defendant to come forward with evidence showing that it was impossible to comply with the Court's Order. Again, Defendant must show "categorically and in detail" why it

is unable to comply, and how it "took all reasonable steps within [its] power to comply with the court's order." *See Rolex Watch U.S.A.*, 74 F.3d at 720; *Peppers*, 873 F.2d at 969.

As an initial matter, Defendant argues that it did not have an obligation to comply with the terms of the Settlement Agreement until the Effective Date, April 20, 2017. While the Court agrees that the payment to Plaintiffs' Counsel was not due until that date, that does not mean that Defendant's obligation to comply with the terms of the agreement and the Court's Order had not arisen. As a matter of basic contract law, Defendant was obligated to comply with the terms it agreed to when it entered into the Settlement Agreement, even if the performance was to occur at a later date upon a subsequent condition. The effective date here was contingent on affirmance of the final appeal. This is a condition subsequent, which in contrast with a condition precedent, "occurs when a contract was formed, but the parties agree that if certain contingencies occur, the contract will no longer be in effect." *Muhammad v. Bedford Nissan, Inc.*, No. 1:11 CV 1947, 2012 WL 33010, at *4 (N.D. Ohio Jan. 6, 2012) (citations omitted). Moreover, the Final Order approving the Settlement Agreement specifically provided: "The Parties and Settling Plaintiffs are hereby directed to implement and consummate the Settlement Agreement according to its terms and provisions." (Final Order ¶ 6.) Additionally, "Nothing in this Final Order or the accompanying Final Judgment shall preclude any action to enforce the terms of the Settlement Agreement." (*Id.* ¶ 10.) Thus, a contract and the parties' respective obligations arose at the time of formation, even if the specific performance of one of its terms was to occur at a later date to be triggered by a condition subsequent.

Defendant Global Fitness next maintains that it was impossible to comply with the Court's Order to pay Class Counsel because the company no longer had sufficient funds to meet the financial obligation. As of April 21, 2017, Global Fitness retained only $176,070.28 in cash.

(Pls. Dep. Ex. 7.) Defendant asserts that at the time the Settlement Agreement was signed and approved by the Court it had sufficient funds to meet its obligations, but that the Objectors' appeals of the case caused the payment due date to be delayed by more than two years. In that intervening time, Defendant alleges that it simply paid its bills as they became due, primarily with respect to the ongoing *Paramount* litigation and the continued winding up of the LA Fitness sale.

Plaintiffs contend that had Defendant not paid more than $10 million to its Managers as a "tax distribution" less than a month after Magistrate Judge King recommended that the Settlement Agreement be approved, Defendant would have enough money to meet its obligations today. They argue that Defendant admitted to not taking any steps to try and comply with the payment obligation, and that the decision to make the tax distribution was unreasonable under the circumstances.

Looking at this from a purely numerical perspective, as Defendant argues, the issue is fairly straight forward. On May 2, 2014, when the Managers decided to authorize a $10 million tax distribution to themselves, there remained $5,220,733.92 in cash—enough left to pay the $2.39 million fee to Plaintiffs' Counsel and approximately $500,000 in costs to Dahl. In isolation, this is correct. In context, however, it is not that simple. Ultimately, given what Defendant knew and could anticipate about its future expenses, its decision to distribute more than $10 million to its Owners/Managers was imprudent and far from a reasonable step towards ensuring compliance with the Court's Final Order. The specific circumstances under which the distribution was made are important to understanding why Global Fitness' defense fails.

First, it is important to note that since Global Fitness had sold substantially all of its assets to LA Fitness and was no longer operating any health clubs, Global Fitness had no further

11

revenue coming into the company. In other words, Defendant knew that whatever funds remained after any distributions to the Managers would not be replenished with new income.

Second, the company continued to employ a staff and maintain office space to manage the ongoing execution of the sale to LA Fitness as well as its ongoing litigation. According to the Demonstrative Exhibit provided by Defendant, Global Fitness continued to incur payroll expenses (for four employees) of $556,208.12 in 2014, $506,734.39 in 2015, and $495,067.18 in 2016. (Pls. Dep. Ex. 7; Testimony of Coby DeVary ("DeVary Testimony") at Hearing Tr. 152:19–21.) The company also paid "General and Administrative" costs in approximately $271,576.65 in 2014, $177,149.88 in 2015, and $163,900.16 in 2016. (*Id.*) At the hearing, the Chief Operating Officer for Global Fitness, Coby DeVary, testified that coordinating the sale to LA Fitness required the company to maintain this staff and office space to oversee the transfer of customer data and other information, which also produced expenses such as data storage fees. (DeVary Testimony at Hearing Tr. 165:15–25 to 166:1–23 ("[W]hen we sold to LA Fitness in October 2012, they wanted some transitional services for us to be able to help them to make sure there was a smooth transition from that standpoint. . . . We also had some G&A that was in there, and some of that was requirements as it related to having data stored.").) The company also continued to pay for the Health Savings Accounts of the Managers and the life insurance policy of Royce Pulliam. (*Id.* at 151:11–17.) These were all expenses that Global Fitness anticipated at the time and should have taken into consideration before authorizing the $10 million distribution.

Third, Global Fitness could reasonably anticipate the continued payment of legal expenses in this case and the *Paramount* case. In fact, on August 29, 2013, just two weeks before Global Fitness and Plaintiffs entered into the Settlement Agreement, Paramount filed its counterclaims against Global Fitness seeking approximately $4.5 million in damages. Global

Fitness therefore knew that the case was far from over and that now defending the litigation would generate even greater legal costs in the future. That year, in 2014, Global Fitness incurred $1,639,704.03 in legal expenses, $805,727.10 in 2015, and $115,151.52 in 2016 (Pls. Dep. Ex. 7).

At the hearing, Plaintiffs called Joseph J. Patrick, Jr., C.P.A., who testified about the reasonableness of Global Fitness' handling of its cash balances. The Court determined at the hearing that Mr. Patrick was qualified as an expert to give his opinion on the financial records of Global Fitness. In preparation for his testimony, Mr. Patrick created a Summary of Opinions stating his conclusions based on the documents he reviewed. (Plaintiffs' Exhibit—Summary of Opinions ("Patrick Op. Summary").) In reviewing the Weekly Cash Report for Global Fitness as of May 2, 2014 (the day the $10 million distribution was made), which did recognize the company's obligation to pay Class Counsel under the Settlement Agreement, Mr. Patrick testified that in his opinion:

> [Global Fitness] failed to include estimated future payroll, G&A and legal costs in this projection—all costs which were in fact incurred. If [Global Fitness] would have conservatively estimated future payroll, G&A and legal expenses to be incurred, it would have been difficult to project positive cash flow sufficient to meet the Settlement Agreement Obligations when [Global Fitness] made the "Tax Distributions" to the owners.

(Patrick Op. Summary ¶ 7(a), Ex. IV.) Indeed, by the end of 2014, Global Fitness reported having only $2,486,445.06 in remaining cash, already insufficient funds to cover both the fees owed to Class Counsel and Dahl. (Pls. Dep. Ex. 7.) Nevertheless, Global Fitness continued to litigate the Objectors' appeals in this case, remaining silent as to the ability to comply with its obligations under the Settlement Agreement and Court's Order. Even up until February 28, 2017, Defendant asked Judge Smith to clarify the effective date of the Settlement Agreement so that it could fulfill its payment obligations on time, well aware that it did not have sufficient funds to do so. (ECF No. 159.)

With this context in mind, the Court assesses the decision of Global Fitness to make a "tax distribution" to its Owners/Managers of more than $10 million. On April 25, 2014, LA Fitness paid Global Fitness a net amount of $10,044,374.31, the holdback payment required under the terms of the sale. (Pls. Dep. Ex. 7.) A week later, Global Fitness transferred that exact amount to its Managers on May 2, 2014 designated as a "tax distribution." The company issued another tax distribution of $318,055.11 on August 14, 2014 after receiving a payment of a similar amount. Section 9.1(a) of the Global Fitness Operating Agreement provides:

> The Company shall distribute . . . , not later than ninety (90) days after the close of each Fiscal Year, an amount which the Board determines is necessary for the Interest Holders to pay their Federal and state income taxes on their distributive shares of the Company's income to the extent permitted under the Act and as determined by the Board will not have a material adverse effect on the financial condition of the Company and its subsidiaries.

(Plaintiffs' Exhibit 1—Third Amended and Restated Operating Agreement of Global Fitness Holdings, LLC ("Operating Agr.") ¶ 9.1(a).) Again, Defendant maintains that the Board was within its power to make such a tax distribution and that these distributions still left Global Fitness with sufficient cash to make the Settlement Agreement payments at the time.

Mr. Patrick testified at the hearing that despite having the authority to make such distributions, there is no evidence that Global Fitness' Managers actually needed that amount of money to cover their tax liabilities on their Global Fitness shares. (Patrick Op. Summary ¶ 1(b).) According to Mr. Patrick's analysis of Global Fitness' tax returns[2] and K-1 statements (documents showing the allocable share of tax to each shareholder), Global Fitness actually had no tax liability in 2013 to pass through to the owners. (Testimony of Joseph J. Patrick, Jr. ("Patrick Testimony") at Hearing Tr. 67:2–4.) He estimated that Global Fitness' tax liability for

---

[2] The Court did not require individuals Pulliam and Paul to disclose their personal income tax returns for the proceeding on the basis that the tax returns and K-1 financial statements of Global Fitness would reflect any income that would be passed through to the Managers to be taxed. (See DeVary Testimony at Hearing Tr. 198:8–15, 210:16–20.)

14

the two preceding tax years, 2011 and 2012, would be approximately $3.58 million (without netting the 2013 losses), far short of $10 million. (*Id.* at 94:8–12.) Under the terms of the Operating Agreement, the Global Fitness Board was required to make a determination as to the extent such payment was necessary for tax purposes and to not make such distributions if they were to have a material adverse effect on the company. Mr. Patrick concluded that in his opinion the distributions "were not in accordance with the operating agreement and were not necessary to reimburse the shareholders for their taxable interests in Global Fitness Holdings." (*Id.*) The Court agrees with Plaintiff that but for Global Fitness distributing more than $10 million to its Owners, it would have sufficient funds to comply with the Court's Order today.

Defendant presented no other evidence at the hearing to show that it took any steps to comply with the Court's Order to make the payments at issue. Both Royce Pulliam and Coby DeVary testified at the hearing that neither could recall doing anything specific to ensure that Global Fitness complied with the Court's Order to Plaintiffs' Counsel or Dahl. (Testimony of Royce Pulliam ("Pulliam Testimony") at Hearing Tr. 32:13–14 (":Q. You don't remember doing anything? A. I do not."), DeVary Testimony at Hearing Tr. 147:15–16 ("We had cash available but, no, I mean, I don't know of anything else we did.") Instead, the distribution of more than $10 million to the company's Managers just weeks after the Magistrate Judge recommended approving the Settlement Agreement is evidence that they made no effort. Defendant has thus far failed to categorically and in detail show what reasonable steps, if any, it took to comply with the Court's Order.

   3.  Contempt of Corporate Officers

Plaintiffs further assert that in addition to Defendant Global Fitness, the two primary Managers of the company, Royce Pulliam and Laurence Paul, should also be held in contempt as

the corporate officers of Defendant. Plaintiffs argue that Pulliam and Paul knew about Defendant's obligations under the Settlement Agreement and not only failed to take any reasonable steps to comply with the Court's Order, but acted unreasonably in awarding themselves a distribution of more than $10 million within a month after the Magistrate Judge recommended approving the parties' Settlement Agreement.

Although Pulliam and Paul are not parties to the case, the Court may have jurisdiction over them through the contempt proceeding if they had knowledge of the Court's Final Order and acted in a manner that made the corporate Defendant violate the Order. It is well established that "[a] command to the corporation is in effect a command to those who are officially responsible for the conduct of its affairs. If they, apprised of the writ directed to the corporation, prevent compliance or fail to take appropriate action within their power for the performance of the corporate duty, they, no less than the corporation itself, are guilty of disobedience, and may be punished for contempt." *Wilson v. United States*, 221 U.S. 361, 376 (1911). The Sixth Circuit has likewise affirmed that a non-party officer of a corporation may liable in contempt for disobeying an order directed to the corporation. *See United States v. Hochschild*, 977 F.2d 208 (6th Cir. 1992), cert. denied, 506 U.S. 1067, (1993) ("[A] person who knowingly assists a defendant in violating an injunction subjects himself to civil as well as criminal proceedings for contempt. This is well settled law.") (quoting Judge Learned Hand in *Alemite Mfg. Corp. v. Staff*, 42 F.2d 832 (2d Cir. 1930)).

Defendant, Global Fitness Holdings, LLC, is owned and managed by four individuals: Royce Pulliam, Tomi Anne Pulliam, Laurence Paul, and Stephen Paul.[3] (Pls. Mem. in Opp. at 1; Deposition of Royce Pulliam ("Pulliam Dep.") at 8–9, ECF No. 203-2; Deposition of Laurence

---

[3] Plaintiffs' Motion for Preliminary Injunction (ECF No. 163) and Motion to Show Cause (ECF No. 197) only seek relief as to Mr. Pulliam and Mr. (Laurence) Paul, and therefore the instant analysis and ruling will only apply to the those individuals.

Paul at 26–27, 42 ("Paul Dep."), ECF No. 203-4.) At the hearing, Plaintiffs called Royce Pulliam

to testify and also submitted the deposition of Laurence Paul in lieu of his appearance. The

parties also stipulated that the testimony of Tomi Anne Pulliam would be the same as her

husband's Royce Pulliam, and that of Stephen Paul would be the same as his brother's Laurence

Paul. (Hearing Tr. at 176:9–18.) Both Royce and Pulliam testified that they knew about the

Settlement Agreement and the Court's Order ("It's my understanding that Global Fitness

Holdings was ordered by a court for a settlement agreement to act in the way guided by the

settlement agreement." Paul Dep. at 96; *see also* Pulliam Testimony at Hearing Tr. 31:5–10.)

Royce Pulliam also signed the Settlement Agreement on behalf of Global Fitness and testified

that all Managers would have decided to enter into it together. (Pulliam Testimony at Hearing Tr.

31:22–23.) As to the Managers' knowledge of Global Fitness' ability to satisfy its obligations

under the Settlement Agreement, Plaintiffs presented evidence that Coby DeVary emailed the

Managers "Weekly Cash Reports" detailing the company's cash balances. (*See* Plaintiffs'

Deposition Exhibit 28.) Accordingly, each Manager would have known that Global Fitness was

unable to pay Plaintiffs' Counsel and Dahl under the Settlement Agreement.

      With respect to the tax distribution at issue, Mr. DeVary, the Chief Operating Officer of

Global Fitness, testified at the hearing that he was not involved in its authorization or calculation,

and did not even know who authorized it or when it was authorized. (DeVary Testimony at

Hearing Tr. 154:5–15.) Neither Mr. Pulliam[4] nor Mr. Paul[5] could specifically recall discussing

---

[4]      Q. And you don't remember voting specifically on this distribution.
      A. I do not recall voting.
      Q. Okay. And you don't know how this $10 million tax distribution was calculated, correct?
      A. Sir, I do not.
      Q. And you don't know who calculated it.
      A. I do not.

(Pulliam Testimony at Hearing Tr. 46:5–12.)

17

or voting on the $10 million distribution. However, Section 9.1 of the Operating Agreements provides that the "Board shall determine when the Company's cash available for distribution shall be distributed." (Operating Agr. ¶ 9.1.) Thus, it follows that the Board of Managers, including Mr. Pulliam and Mr. Paul, would have been the sole individuals responsible for deciding to issue the tax disbursement. Defendant presented no any evidence that the Board actually made a determination of whether the distribution was actually necessary for tax purposes or would cause a material adverse effect on the financial condition of the company, as required under Section 9.1(a). Additionally, Mr. Pulliam testified that he couldn't recall taking any steps to fulfill the company's obligations under the Settlement Agreement to pay Plaintiffs' Counsel and Dahl. (Pulliam Testimony at Hearing Tr. 144:22–25 to 145:1.)

The evidence presented establishes a strong likelihood that Pulliam and Paul were both "apprised of the writ directed to the corporation" and "fail[ed] to take appropriate action within their power for the performance of the corporate duty." *See Wilson*, 221 U.S. at 376. The Court finds that Defendant has failed to present any evidence showing that the Managers of Global Fitness took any steps, let alone "all reasonable steps," to comply with the Court's Order. It is therefore likely that Plaintiffs will prevail on their motion to show cause why Defendant and its officers should not be held in contempt.

**B.      Irreparable Harm**

The Court finds that Plaintiffs and Dahl have suffered and will continue to suffer irreparable harm if Defendant continues to spend the remaining assets of Defendant and fails to comply with the terms of the Settlement Agreement.

---

[5]      Q. Okay. And asking specifically with regard to these tax distributions, you don't recall ever having a meeting or a vote to discuss tem with the other managers, do you?
A. I don't recall having a meeting or vote to discuss these tax distributions.

(Paul Dep. at 96.)

A party's harm is irreparable if it cannot be fully compensated by money damages. *Overstreet v. Lexington-Fayette Urban Cty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). Additionally, the Sixth Circuit has specified that to demonstrate irreparable harm under the preliminary injunction test, a plaintiff must show that they will suffer "'actual and imminent' harm rather than harm that is speculative or unsubstantiated." *Abney v. Amgen, Inc.*, 443 F.3d 540, 552 (6th Cir. 2006) (quoting *Monsanto Co. v. Manning*, 841 F.2d 1126 (6th Cir. 1998)).

The loss of an ability to collect a money judgment is not usually regarded as irreparable harm under Rule 65 of the Federal Rules of Civil Procedure. The United States Supreme Court highlighted this point in *Grupo Mexicano de Desarrollo, S.A. v. All. Bond Fund Inc.*, 527 U.S. 308 (1999), reaffirming the principles of its earlier decision in *DeBeers Consol. Mines, Ltd. v. United States*, 325 U.S. 212 (1945). In *Grupo*, the Supreme Court held that "the District Court had no authority to issue a preliminary injunction preventing [defendants] from disposing of their assets pending adjudication" of a contract claim for money damages. 527 U.S. at 332–33. The Supreme Court did however discuss three exceptions to this general rule: (1) where the movant has an established legal or equitable right to the property; (2) where the injunction is necessary to preserve the Court's ability to provide equitable relief as to an equitable action; and (3) where Congress has specifically provided authority to do so. *Id.*

In this case, there is no question that Plaintiffs have a legal right pursuant to the Settlement Agreement and this Court's Final Order. This Court previously noted in the issuance of the Temporary Restraining Order that "[a]llowing Global Fitness and Royce G. Pulliam and Laurence E. Paul to further expend resources only exacerbates the problem now before the Court." (Temporary Restraining Order at 2, ECF No. 165.). During the hearing, Plaintiffs established that, after the Court approved payment to Dahl of $100,000.00 from the remaining

funds, Global Fitness only has $76,000.00 remaining, as well as potential money from insurance

and the Paramount litigation. (Pls. Dep. Ex. 7.) The potential proceeds from the Paramount

Litigation if Global Fitness is ultimately successful would only amount to approximately $1.25

to $1.4 million. (Hearing Tr. at 24:8–14.) This is not sufficient to satisfy the outstanding amount

due and owing under the Settlement Agreement.

The Court therefore concludes that Plaintiffs will continue to suffer irreparable harm if

Defendant fails to comply with the Court's Order ordering it to pay Plaintiffs' Counsel and Dahl.

**C.     Harm to Third Parties**

Plaintiffs represent that they "have no knowledge of harm coming to third parties, nor can

they envision such harm, if the Court issues a temporary restraining order and permanent

injunction." (Plaintiffs' Motion for Preliminary Injunction ("Pls.' Mot.") at 10, ECF No. 163.)

Defendant Global Fitness has filed a Motion to Pay Personnel (ECF No. 189), seeking the

payment of $17,986.62 to Global Fitness's remaining employee and the former chief operating

officer to assist with discovery and this ongoing litigation. The personal assets of individuals

Pulliam and Paul will also continue to be frozen notwithstanding ordinary and customary

expenses and any other appropriate expenses with Court approval as laid out in the Temporary

Restraining Order. Presumably, these parties and other creditors of Global Fitness could be

harmed by the issuance of a preliminary injunction.

Plaintiffs counter, however, that any potential harm to third parties in this case would be

self-inflicted harm. Plaintiffs reference a prior decision of this Court, *MyVitaNet.com v.*

*Kowalski*, No. 2:08-cv-48, 2008 U.S. Dist. LEXIS 8951, at *17 (S.D. Ohio Jan. 22, 2008), in

which the Court held:

> There is no apparent basis to conclude that issuance of a temporary restraining
> order would cause Defendant or others substantial harm, and to the extent that

20

Defendant may incur some harm, that harm would be self-inflicted damage. *Cf. Pappan Enters. v. Hardee's Food Sys.,* 143 F.3d 800, 806 (3d Cir. 1998) (holding in trademark infringement that "a party's self-inflicted harm by choosing to stop its own performance under the contract and thus effectively terminating the agreement is outweighed by the immeasurable damage done to the franchiser of the mark"); *Midwest Guar. Bank v. Guar. Bank,* 270 F. Supp. 2d 900, 924 (E.D. Mich. 2003) (holding that a party "cannot place itself in harms way, and then later claim that an injunction should not issue because of costs which it must incur in order to remedy its own misconduct"). To conclude otherwise would permit Defendant to breach the agreement and then claim that the harm flowing from that breach renders the breach excusable in the injunctive-relief context. That would be an unjust and illogical result.

*Id.* at *16–17.

Here the harm to Plaintiffs is similar and perhaps more compelling because Plaintiffs' Counsel has not received any portion of the $2.39 million in fees owed to it under the Settlement Agreement, and Dahl has only been paid a portion of what it is owed despite its continued administration of the fund to class claimants. While Plaintiffs have litigated the matter thus far without payment, Defendant's employee and counsel have presumably been paid out of Defendant's remaining funds until the recent Temporary Restraining Order freezing Defendant's remaining assets.

**D.    Public Interest**

Plaintiffs assert that the public has an interest in ensuring that parties comply with Court Orders and therefore the public would be served by the issuance of a preliminary injunction in this case. Additionally, Plaintiffs argue "[i]f attorneys and settlement administrators are not compensated for their work through the enforcement of settlement agreements and Court Orders, future actions will be discouraged." (Pls.' Mot. at 12). The Court agrees. *See Miller v. Davis*, No. 15-44-DLB, 2015 U.S. Dist. LEXIS 177606, at *7 (E.D. KY Sept. 23, 2015) ("As for the public interest, the Court simply notes that the public has an interest in the enforcement of valid court orders.").

Therefore, after carefully consideration, all of the aforementioned factors weigh in favor of granting the requested relief sought by Plaintiffs.

## IV.  CONCLUSION

For the foregoing reasons, the Court **GRANTS** Plaintiffs' Motion for Preliminary Injunction. (ECF No. 163.) Specifically, the Court **ORDERS** that Defendant Global Fitness Holdings, LLC and Managers Royce Pulliam and Laurence Paul are **ENJOINED** from further dissipating any assets, absent ordinary and customary expenses or approval from the Court, as previously set forth in the Temporary Restraining Order (ECF No. 179) issued by the Court. The parties shall meet and confer to discuss whether additional discovery or briefing is necessary **and notify the Court within seven (7) days,** including whether the Court should schedule a final hearing on Plaintiffs' Motion to Show Cause (ECF No. 197) or if the matter may be determined from the existing record.

Additionally, the Court **DENIES as moot** the Motions of Defendant, Pulliam, and Paul to Vacate the Temporary Restraining Order. (ECF Nos. 169, 171, and 174.)

**IT IS SO ORDERED.**

_5-19-2017_
**DATE**

**EDMUND A. SARGUS, JR.**
**CHIEF UNITED STATES DISTRICT JUDGE**